# EXHIBIT A

```
09351905232019          Mercer County PA, Prothonotary's Office              Page   1
    PYSPRT                  Civil Case Detail Report                         5/23/2019
```

Case No.......... 2018-01130  BESSEMER SYSTEM FEDERAL CREDIT (vs) FISERV SOLUTIONS LLC

```
Reference No......                              Filed.........  4/20/2018
Case Type......... CONTRACT - OTHER             Time..........      4:27
Judgment..........            $.00              Execution Date.  0/00/0000
Judge Assigned....                              Jury Trial.....
Disposed Desc.....                              Disposed Date..  0/00/0000
----------- Case Comments -----------           Higher Crt 1...
                                                Higher Crt 2...
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ++ GENERAL INDEX ++

| Indexed Party | | Attorney Info |
|---|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION | PLAINTIFF | PARKS RICHARD J<br>  7 WEST STATE STREET<br>  SUITE 100<br>  SHARON, PA  16146<br>NERKO CHARLES J<br>  1633 BROADWAY - 31ST FLOOR<br>  VEDDER PRICE PC<br>  NEW YORK, NY  10019 |
| FISERV SOLUTIONS LLC<br>  FRISCO, TX 75034 | DEFENDANT | EPSTEIN RICHARD W<br>  68 BUHL BLVD<br>  P O BOX 91<br>  SHARON, PA  16146<br>KELLOGG SARAH C<br>  68 BUHL BLVD<br>  P O BOX 91<br>  SHARON, PA  16146<br>WRONSKI ANDREW J<br>  777 EAST WISCONSIN AVENUE<br>  MILWAUKEE, WI 53202<br>PATTERSON TIMOTHY J<br>  777 EAST WISCONSIN AVENUE<br>  MILWAUKEE, WI 53202<br>HAAS ELIZABETH N A<br>  777 EAST WISCONSIN AVENUE<br>  MILWAUKEE, WI 53202 |
| FISERV SOLUTIONS INC<br>  FRISCO, TX 75034 | DEFENDANT | EPSTEIN RICHARD W<br>  68 BUHL BLVD<br>  P O BOX 91<br>  SHARON, PA  16146<br>KELLOGG SARAH C<br>  68 BUHL BLVD<br>  P O BOX 91<br>  SHARON, PA  16146<br>WRONSKI ANDREW J<br>  777 EAST WISCONSIN AVENUE<br>  MILWAUKEE, WI 53202<br>PATTERSON TIMOTHY J<br>  777 EAST WISCONSIN AVENUE<br>  MILWAUKEE, WI 53202<br>HAAS ELIZABETH N A<br>  777 EAST WISCONSIN AVENUE<br>  MILWAUKEE, WI 53202 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ++ DOCKET ENTRIES ++

| Date | Entry Text |
|---|---|
| | - - - - - - - - - FIRST ENTRY - - - - - - - - - - - |
| 4/20/2018 | CAPTION: BESSEMER SYSTEM FEDERAL CREDIT UNION A NOT-FOR-PROFIT FEDERAL CREDIT UNION VS. FISERV SOLUTIONS LLC A WISCONSIN LIMITED LIABILITY CORPORATION F/K/A FISERV SOLUTIONS INC A WISCONSIN CORPORATION |
| 4/20/2018 | PRAECIPE FOR WRIT OF SUMMONS IN CIVIL ACTION F/ATTY RICHARD J PARKS WRIT ISSUED (2) ATTESTED WRITS TO ATTY FOR SERVICE |
| 4/24/2018 | NOTICE OF PRESENTATION OF MOTION FOR THE ADMISSION PRO HAC VICE OF CHARLES J NERKO F/ATTY PARKS |
| 4/24/2018 | MOTION FOR ADMISSION PRO HAC VICE OF CHARLES J NERKO F/ATTY PARKS |

```
09351905232019          Mercer County PA, Prothonotary's Office          Page    2
 PYSPRT                       Civil Case Detail Report                   5/23/2019
```

Case No........... 2018-01130  BESSEMER SYSTEM FEDERAL CREDIT (vs) FISERV SOLUTIONS LLC

```
Reference No......                              Filed........... 4/20/2018
Case Type......... CONTRACT - OTHER             Time...........     4:27
Judgment..........              $.00            Execution Date. 0/00/0000
Judge Assigned....                              Jury Trial.....
Disposed Desc.....                              Disposed Date.. 0/00/0000
----------- Case Comments -----------           Higher Crt 1...
                                                Higher Crt 2...
```

```
               TO CT ADM (W/PROPOSED ORDERS)
               -------------------------------------------------------------
  4/25/2018    ORDER 04/24/2018 UPON CONSIDERATION OF THE MOTION FOR ADMISSION
               PRO HAC VICE PF CHARLES J NERKO AUBMITTED BY BESSEMER SYSTEM
               FEDERAL CREDIT THAT THE MOTION BE PLACED ON THIS COURTS MOTIONS
               CALENDAR FOR ON 04/30/2018 AT 9:00 AM IN COURTROOM NO 3 RGY FILED
               04/25/2018 CC: ATTY PARKS, CA
               -------------------------------------------------------------
  4/30/2018    ORDER OF COURT OF 4/30/18 - UPON CONSIDERATION OF PLF'S MOTION FOR
               ADMISSION PRO HAC VICE OF CHARLES J NERKO - ORDERED THAT PLF'S
               MOTION IS GRANTED. MR NERKO IS SPECIALLY ADMITTED TO THE BAR OF
               THIS COURT FOR THE PURPOSE OF REPRESENTING PLF IN THE ABOVE ACTION
                DPW FILED  5/1/18 CC ATTYS PARKS & NERKO, CT ADM
               -------------------------------------------------------------
  5/11/2018    AFFIDAVIT OF SERVICE OF PRAECIPE FOR WRIT OF SUMMONS IN CIVIL
               ACTION UPON DEFT BY CERT MAIL ON 4/26/18 F/ATTY PARKS
               -------------------------------------------------------------
  6/22/2018    ORDER OF 6/21/18 A STATUS CONFERENCE SHALL BE HELD ON 8/16/18 AT
               10:00 AM IN CT RM #1 ETC CJS FILED 6/25/18 CC; AATY PARKS ATTY
               NERKO CT ADM
               -------------------------------------------------------------
  7/16/2018    MOTION TO RESCHEDULE STATUS CONFERENCE S/ATTY PARKS & ATTY NERKO
               FILED TO CT ADM (W/PROPOSED ORDER OF COURT)
               -------------------------------------------------------------
  7/18/2018    ORDER OF COURT OF 7/18/18 UPON CONSIDERATION OF PLF BESSEMER
               SYSTEM FEDERAL CREDIT UNION'S MOTION TO RESCHEDULE STATUS
               CONFERENCE IT IS HEREBY ORDERED THAT PLF'S MOTION IS GRANTED THE
               STATUS CONFERENCE SET FOR 8/16/18 IS CANCELLED AND RESCHEDULED TO
               8/27/18 @ 1:00PM CT RM #1 ETC CJS FILED 7/20/18 CC: ATTY PARKS
               ATTY NERKO DEFTS CT ADM
               -------------------------------------------------------------
  8/22/2018    PLFS SUMMARY PURSUANT TO L317(C) F/ATTY PARKS
               -------------------------------------------------------------
  8/22/2018    PRAECIPE FOR ENTRY OF APPEARANCE ON BEHALF OF DEFTS F/ATTY RICHARD
               W EPSTEIN AND SARAH C KELLOGG
               -------------------------------------------------------------
  8/22/2018    DEFT'S STATUS REPORT F/ATTY EPSTEIN
               -------------------------------------------------------------
  8/27/2018    MOTION FOR PRO HAC VICE ADMISSION OF ELIZABETH A N HAAS F/ATTY
               EPSTEIN    TO CT ADM BY ATTY
               -------------------------------------------------------------
  8/27/2018    MOTION FOR PRO HAC VICE ADMISSION OF TIMOTHY J PATTERSON F/ATTY
               EPSTEIN    TO CT ADM BY ATTY
               -------------------------------------------------------------
  8/27/2018    MOTION FOR PRO HAC VICE ADMISSION OF ANDREW J WRONSKI F/ATTY
               EPSTEIN    TO CT ADM BY ATTY
               -------------------------------------------------------------
  8/28/2018    ORDER OF 8/27/18 - ORDERED THAT THE MOTION FOR ADMISSION PRO HAC
               VICE IS GRANTED AND ANDREW J WRONSKI SQ IS HEREBY ADMITTED PRO HAC
               VICE FOR PURPOSES OF THIS MATTER  CJS SR JUDGE FILED  8/28/18 CC
               ATTYS PARKS, NERKO, KELLOGG, EPSTEIN & WRONSKI
               -------------------------------------------------------------
  8/28/2018    ORDER OF 8/27/18 - ORDERED THAT THE MOTION FOR ADMISSION PRO HAC
               VICE IS GRANTED AND TIMOTHY J PATTERSON ESQ IS HEREBY ADMITTED PRO
               HAC VICE FOR PURPOSES OF THIS MATTER  CJS SR JUDGE FILED  8/28/18
               CC   ATTYS PARKS, NERKO, KELLOGG, EPSTEIN & PATTERSON
               -------------------------------------------------------------
  8/28/2018    ORDER OF 8/27/18 - ORDERED THAT THE MOTION FOR ADMISSION PRO HAC
               VICE IS GRANTED AND ELIZABETH A N HAAS ESQ IS HEREBY ADMITTED PRO
               HAC VICE FOR PURPOSES OF THIS MATTER  CJS SR JUDGE FILED  8/28/18
               CC   ATTYS PARKS, NERKO, KELLOGG, EPSTEIN & HAAS
               -------------------------------------------------------------
  8/28/2018    CASE MANAGEMENT ORDER OF 8/27/18 ON STATUS CONFERENCE AT WHICH
               TIME BOTH PARTIES APPEARED AND REQUESTED THIS CASE BE DESIGNATED A
               COMPLEX CASE WITH DISCOVERY DEADLINE OF 11/30/19 ETC A REVIEW
```

```
09351905232019          Mercer County PA, Prothonotary's Office          Page     3
PYSPRT                      Civil Case Detail Report                    5/23/2019
```

Case No............ 2018-01130  BESSEMER SYSTEM FEDERAL CREDIT (vs) FISERV SOLUTIONS LLC

```
Reference No......                          Filed.........    4/20/2018
Case Type......... CONTRACT - OTHER         Time..........        4:27
Judgment..........            $.00          Execution Date.  0/00/0000
Judge Assigned....                          Jury Trial.....
Disposed Desc.....                          Disposed Date..  0/00/0000
----------- Case Comments ------------      Higher Crt 1...
                                            Higher Crt 2...
```

|  | CONFERENCE SHALL BE HELD ON 3/8/19 AT 10:30 AM IN CT RM#1 CJS FILED 8/28/18 CC; ATTY PARKS ATTY NERKO ATTY EPSTEIN ATTY KELLOGG ATTY WRONSKI ATTY PATTERSON ATTY HAAS CT ADM |
| --- | --- |
| 3/08/2019 | ORDER OF 3/8/19 - MATTER BEFORE COURT FOR REVIEW CONFERENCE AT WHICH TIME BOTH ATTYS APPEARED IN CHAMBERS AND REQUESTED THAT A REVIEW CONFERENCE BE HELD IN MID-SUMMER. ORDERED THAT A REVIEW CONFERENCE SHALL BE HELD ON 7/29/19 AT 10:00 CT 1  CJS SR JUDGE FILED  3/11/19 CC ATTYS PARKS, NERKO, EPSTEIN, KELLOGG, WRONSKI, PATTERSON & HAAS, CT ADM |
| 4/26/2019 | MOTION TO FILE EXHIBITS UNDER SEAL F/ATTY PARK |
| 4/26/2019 | ORDER 04/26/2019 UPON CONSIDERATION OF THE MOTION TO FILE EXHIBITS UNDER SEAL SUBMITTED BY BESSEMER SYSTEM FEDERAL CREDIT UNION IT IS HEREBY ORDERED THAT THE MOTION BE PLACED ON THIS COURTS MOTIONS CALENDER FOR MONDAY 05/06/2019 @ 9:00 AM IN COURTROOM NO 1 CJS FILED 04/26/2019 CC: ATTY PARKS ATTY NERKO ATTY EPSTEIN ATTY KELLOGG ATTY WRONSKI ATTY PARRERSON ATTY HAAS CA |
| 4/26/2019 | COMPLAINT F/ATTY PARKS |
| 4/26/2019 | CERTIFICATION OF COMPLIANCE F/ATTY PARKS |
| 4/26/2019 | MOTION TO FILE EXHIBITS UNDER SEAL F/ATTY PARKS TO CA W/ORDER |
| 5/02/2019 | ORDER OF 5/2/19 - ORDERED THAT THE HEARING REGARDING PLF'S MOTION TO FILE DOCUMENTS UNDER SEAL SCHEDULED FOR 5/6/19 IS BEING MOVED AND WILL BE HEARD ON 5/20/19 AT 9:00 CT 1  CJS SR JUDGE FILED 5/3/19 CC ATTYS PARKS, NERKO, KELLOGG, EPSTEIN, PATTERSON, WRONSKI, HAAS, CT ADM |
| 5/16/2019 | RESPONSE TO PLFS MOTION TO FILE EXHIBITS UNDER SEAL AND REQUEST TO FILE RELATED MATERIALS UNDER SEAL F/ATTY EPSTEIN     TO CT ADM |
| 5/17/2019 | SCHEDULING ORDER OF 5/17/19 THE DEFT FISERV SOLUTION INCS REQUEST TO FILE RELATED MATERIALS UNDER SEAL IN MOTIONS COURT ON 5/20/19 AT 9:00 AM IN CT RM #1 CJS FILED 5/17/19 CC: ALL ATTYS OF RECORD CT ADM |
| 5/20/2019 | AFFIDAVIT OF SERVICE OF COMPLAINT UPON DEFT FISERV INC C/O CORPORATION SERVICE COMPANY, MADISON WI 53717 BY FED EX ON 5/14/19 F/ATTY KETTERING |
| 5/21/2019 | ORDER OF 5/20/19 FOR ARGUMENT ON PLFS MOTION TO FILE EXHIBITS UNDER SEAL IT IS ORDERED THAT THE PLFS COUNSEL SHALL SUBMIT A MEMORANDUM IN OPPOSITION TO DEFTS RESPONSE TO THE COURT BY 5/24/19 AND DEFENSE COUNSEL SHALL SUBMIT ITS REPLY TO MEMORANDUM TO THE COURT BY 5/31/19 CJS FILED 5/21/19  CC; ATTYS PARKS, NERKO,EPSTEIN, KELLOGG, WRONSKI, PATTERSON & HAAS |

- - - - - - - - - - - - LAST ENTRY - - - - - - - - - - - - -

```
********************************************************************************
                          ++ Escrow Information ++
Cost / Fee               Beg. Balance      Pymts/Adjmts      End. Balance
JCS FEE.                      $40.25            $40.25              $.00
PR WRIT SUMMONS               $75.00            $75.00              $.00
TAX ON SUMMONS                 $.50              $.50               $.00
DISC                          $7.50             $7.50              $.00
PRO AUTO FUND                 $5.00             $5.00              $.00
                         ------------      ------------      ------------
                             $128.25           $128.25              $.00

********************************************************************************
                          End of Case Information
```

Writ of Summons

Commonwealth of Pennsylvania
County of Mercer

No.: 2018-01130

BESSEMER SYSTEM FEDERAL CREDIT UNION
a not-for-profit federal credit union
** VERSUS **

FISERV SOLUTIONS LLC a Wisconsin limited liability corporation f/k/a
FISERV SOLUTIONS INC a Wisconsin corporation

PLF ATTY:
PARKS RICHARD J
7 WEST STATE STREET
SUITE 100
SHARON, PA  16146

TO:      FISERV SOLUTIONS LLC, FISERV SOLUTIONS INC

You are hereby notified that the following Plaintiff(s),

    BESSEMER SYSTEM FEDERAL CREDIT UNION

has(have) commenced an action against you.

Date:  April 20, 2018

_____
Prothonotary(Clerk)

By  _____
                    Deputy

4/20 2018
Attested to be a true and
correct copy of the original.

Prothonotary

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

BESSEMER SYSTEM FEDERAL CREDIT
UNION, a not-for-profit federal credit union,

      Plaintiff,

    v.

FISERV SOLUTIONS, LLC, a Wisconsin
limited liability corporation f/k/a FISERV
SOLUTIONS, INC., a Wisconsin corporation.

      Defendant.

**A JURY TRIAL IS DEMANDED.**

Civil DIVISION

No.: 2018-1130

**PRAECIPE FOR WRIT OF
SUMMONS IN CIVIL ACTION**

Filed on behalf of Plaintiff

Counsel of Record for this Party:

Richard J. Parks
PA. I.D. #40477

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
7 West State Street, Suite 100
Sharon, PA 16146

724-981-1397
724-981-1398 (Fax)

Of Counsel:

Charles J. Nerko
VEDDER PRICE P.C.
1633 Broadway, 31st Floor
New York, NY 10019

212-407-7700
212-407-7799 (Fax)

(*Pro Hac Vice* Application to be Filed)

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION, a not-for-profit federal credit union, | ) ) ) | Civil DIVISION |
| | ) | No.: _____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS, INC., a Wisconsin corporation. | ) ) ) ) ) | |
| Defendant. | ) | |

### PRAECIPE FOR WRIT OF
### SUMMONS IN CIVIL ACTION

To:  The Prothonotary of Mercer County:

Kindly issue a Writ of Summons in Civil Action naming FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS, INC., a Wisconsin corporation, as the Defendant.  Defendant's address is 2601 Network Blvd., Ste. 600, Frisco, TX 75034.

Respectfully submitted,

Of Counsel:

Charles J. Nerko
VEDDER PRICE P.C.
1633 Broadway, 31st Floor
New York, NY 10019
(*Pro Hac Vice* Application to be Filed)

**A JURY TRIAL IS DEMANDED.**

PIETRAGALLO GORDON
ALFANO BOSICK & RASPANTI, LLP

By: _____
      Richard J. Parks, Esquire
      PA ID #40477

7 West State Street, Suite 100
Sharon, PA 16146

*Counsel to Plaintiff*
*Bessemer System Federal Credit Union*

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

| | |
|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION, a not-for-profit federal credit union, ) ) ) ) | CIVIL DIVISION<br>No.: 2018 - 01130 |
| Plaintiff, ) ) | |
| v. ) ) | |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS, INC., a Wisconsin corporation. ) ) ) ) ) | |
| Defendant. ) | |

**SCHEDULING ORDER**

AND NOW, this 24ᵀᴴ day of April, 2018, upon consideration of the

Motion for Admission *Pro Hac Vice* of Charles J. Nerko submitted by Bessemer System Federal

Credit it is hereby **ORDERED** that the motion be placed on this Court's Motions Calendar for

Monday, April 30 at 9:00 A.M. IN COURTROOM NO. 3

BY THE COURT:

Judge Robert G. Yeatts

CC: atty Parks.     atty Vandamme. CA

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION, a not-for-profit federal credit union, | ) ) ) ) | CIVIL DIVISION<br><br>No.: 2018 - 01130 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS, INC., a Wisconsin corporation. | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

**FILED IN MERCER COUNTY**
**2018 APR 30 AM 11: 22**
**RUTH A. BICE**
**PROTHONOTARY**

## ORDER OF COURT

AND NOW, this **30ᵗʰ** day of **April**, 2018, upon consideration of Plaintiff Bessemer System Federal Credit Union's Motion for the Admission *Pro Hac Vice* of Charles J. Nerko, it is hereby **ORDERED** that Plaintiff's Motion is **GRANTED**.

Mr. Nerko is hereby specially admitted to the Bar of this Court for the purpose of representing Plaintiff, in the above-captioned action.

BY THE COURT:

_____
Daniel P. Wallace, Judge

5-1-18 cc attys Parks & Nerko
Clark

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION, a not-for-profit federal credit union, | ) ) ) | CIVIL DIVISION |
| Plaintiff, | ) ) | No.: 2018 - 01130 |
| v. | ) ) | |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS, INC., a Wisconsin corporation. | ) ) ) ) | |
| Defendant. | ) ) ) | |

*FILED IN MERCER COUNTY*
*2018 MAY 11 AM 10: 25*
*RUTH A. BICE*
*PROTHONOTARY*

## **AFFIDAVIT OF SERVICE**

COMMONWEALTH OF PENNSYLVANIA   )
                                                      ) SS
COUNTY OF MERCER                          )

Before me, the undersigned authority, a notary public in and for said County and State, personally appeared Richard J. Parks, who, being duly sworn according to law, deposes and states that a true and correct copy of the Praecipe for Writ of Summons in Civil Action dated April 20, 2018 and filed at the above term and number was served upon the defendant, FISERV SOLUTIONS, LLC f/k/a FISERV SOLUTIONS, INC., 2601 Network Blvd., Ste. 600, Frisco, TX 75034, by Certified Mail on April 26, 2018, as evidenced by the Postal Service form 3811 attached hereto as Exhibit "A".

Richard J. Parks
Pa. I.D. No. 40477
PIETRAGALLO GORDON ALFANO
  BOSICK & GORDON LLP
7 West State Street, Suite 100
Sharon, PA  16146
(724) 981-1397
Attorneys for Plaintiff

Sworn to and subscribed before me
this 9th day of May, 2018

_____
   Notary Public

| Commonwealth of Pennsylvania – Notary Seal |
|---|
| MARJII SER – Notary Public |
| Mercer County |
| My Commission Expires Dec 18, 2021 |
| Commission Number 1263235 |

3591174v1

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
   KuTH Johnson

1. Article Addressed to:

FISERV SOLUTIONS, LLC f/k/a
   FISERV SOLUTIONS, INC.
2601 Network Blvd., Ste. 600
   Frisco, TX 75034

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☑ No

9590 9403 0570 5183 3077 56

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☑ Return Receipt for
   Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

2. Article Number (Transfer from service label)
   7016 1370 0000 8269 0796

PS Form 3811, April 2015 PSN 7530-02-000-9053    Domestic Return Receipt

**EXHIBIT
A**

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

BESSEMER SYSTEM FEDERAL            :
CREDIT UNION, a not-for-profit federal  :
credit union,                                     :
                          Plaintiff           :
                                                      :
          v.                                       :          No. 2018 – 1130
                                                      :
FISERV SOLUTIONS, LLC, a Wisconsin  :
limited liability corporation f/k/a FISERV  :
SOLUTIONS, INC., a Wisconsin          :
corporation,                                    :
                          Defendants        :

## ORDER

AND NOW, on this 21st day of June, 2018, IT IS HEREBY ORDERED that a

status conference shall be held in Courtroom No. 1 of the Mercer County Courthouse on

the 16th day of August, 2018 at 10:00 a.m. regarding the above captioned case.  Each party

shall submit a written summary of the case **directly to Judge's Chambers three days**

before the conference pursuant to Local Rule L317(C)(1).  At the time of the conference,

the case will be assigned one of the following designations:  arbitration, regular, or

complex, and an appropriate Case Management Order will be entered by the Court based

on the designation.

The status conference is expected to take no more than fifteen (15) minutes to

complete.  All counsel and/or unrepresented litigants are required to attend.  Out of county

attorneys may appear by telephone only if granted permission by the Court **at least three**

**days** before the conference.

BY THE COURT:

6·25·18
cc: atty Parks.
atty Nevis
Ctadn

_Christopher J. St. John_  S.J.
Christopher J. St. John, Senior Judge

rmb

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

BESSEMER SYSTEM FEDERAL ) CIVIL DIVISION
CREDIT UNION, a not-for-profit federal )
credit union, ) No.: 2018 - 01130
)
        Plaintiff, )
)
   v. )
)
FISERV SOLUTIONS, LLC, a Wisconsin )
limited liability corporation f/k/a FISERV )
SOLUTIONS, INC., a Wisconsin )
corporation. )
)
        Defendant. )

*FILED IN MERCER COUNTY*
*2018 JUL 18 PM 1: 36*
*RUTH A. BICE*
*PROTHONOTARY*

**ORDER OF COURT**

    AND NOW, this *18th* day of *July*, 2018, upon consideration of Plaintiff

Bessemer System Federal Credit Union's Motion to Reschedule Status Conference, it is hereby

**ORDERED** that Plaintiff's Motion is **GRANTED**.

    The status conference set for August 16, 2018 is CANCELLED and rescheduled to

*August 27, 2018* at *1: 00 pm* in Courtroom *1*. Parties shall comply with

Local Rule L317(C)(1) and submit a written summary of the case directly to Judge's Chambers

three days prior to the scheduled conference.

                      BY THE COURT:

                                        _____, S.J.

3623951v1

# IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA
## CIVIL ACTION - LAW

| | |
|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION a not-for-profit federal credit union, ) ) ) ) ) | |
| Plaintiff, ) ) ) | Case No. 2018-01130 |
| vs. ) ) ) | |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS INC., a Wisconsin corporation, ) ) ) ) ) ) ) | |
| Defendant. ) | |

*FILED IN MERCER COUNTY*
*2018 AUG 28  AM 8: 48*
*RUTH A. BICE*
*PROTHONOTARY*

## <u>ORDER</u>

AND NOW, this _27th_ day of _August_ 2018, it is hereby ORDERED and DECREED that the Motion for Admission *Pro Hac Vice* is GRANTED, and Elizabeth A. N. Haas, Esquire of the law firm of Foley & Lardner LLP, 777 E. Wisconsin Ave., Milwaukee, WI 53202 is hereby admitted *pro hac vice* for purposes of this matter.

BY THE COURT:

_Christopher J. St. John_, J.

## IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA
### CIVIL ACTION - LAW

| | | |
|---|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION a not-for-profit federal credit union, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | Case No. 2018-01130 |
| | ) | |
| vs. | ) ) | |
| | ) | |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS INC., a Wisconsin corporation, | ) ) ) ) | |
| | ) | |
| Defendant. | ) ) | |

*(FILED IN MERCER COUNTY 2018 AUG 28 AM 8:48 RUTH A. BICE PROTHONOTARY)*

## <u>ORDER</u>

AND NOW, this _27th_ day of _August_, 2018, it is hereby ORDERED and DECREED that the Motion for Admission *Pro Hac Vice* is GRANTED, and Timothy J. Patterson, Esquire of the law firm of Foley & Lardner LLP, 777 E. Wisconsin Ave., Milwaukee, WI 53202 is hereby admitted *pro hac vice* for purposes of this matter.

BY THE COURT:

_____, S.J.

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

BESSEMER SYSTEM FEDERAL )
CREDIT UNION a not-for-profit federal )
credit union, )
           )
           )
          Plaintiff, )     Case No. 2018-01130
           )
           )
    vs. )
           )
FISERV SOLUTIONS, LLC, a Wisconsin )
limited liability corporation f/k/a FISERV )
SOLUTIONS INC., a Wisconsin )
corporation, )
           )
          Defendant. )

*(stamp: FILED IN MERCER COUNTY / 2018 AUG 28  AM 8: 48 / RUTH A. BICE PROTHONOTARY)*

## ORDER

AND NOW, this _27th_ day of _August_ 2018, it is hereby ORDERED and

DECREED that the Motion for Admission *Pro Hac Vice* is GRANTED, and Andrew J. Wronski,

Esquire of the law firm of Foley & Lardner LLP, 777 E. Wisconsin Ave., Milwaukee, WI 53202

is hereby admitted *pro hac vice* for purposes of this matter.

BY THE COURT:

_(signature)_ , S.J.

FILED IN MERCER
COUNTY

2018 AUG 28  AM 8:48

RUTH A. BICE
PROTHONOTARY

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

CIVIL ACTION - LAW

BESSEMER SYSTEM FEDERAL        )
CREDIT UNION, a not-for-profit )
federal credit union           )
                               )
vs.                            )        No. 2018 - 1130
                               )
FISERV SOLUTIONS, LLC, a       )
Wisconsin limited liability    )
corporation f/k/a FISERV       )
SOLUTIONS, INC., a Wisconsin   )
corporation,                   )

### CASE MANAGEMENT ORDER

AND NOW, this 27th day of August, 2018, this
matter came before the Court for an initial Status
Conference under Local Rule L317, at which time both
attorneys appeared in chambers as local counsel and
requested that this matter be designated a complex case.
Accordingly, this matter shall be designated as a complex
case governed by L317(C)(4) with a discovery deadline of
November 30, 2019; provided, however, that summary judgment
motions, if any, shall be filed thereafter no later than

RECEIVED

AUG 3 1 2018

SCANNED

December 31, 2019.  A Review Conference shall be held in
this matter on March 8, 2019 at 10:30 a.m. in Courtroom 1.

                    BY THE COURT,

                    _____ S.J.
                    Christopher J. St. John
                    Senior Judge

ag

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

| | |
|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION, a not-for-profit federal credit union, | CIVIL DIVISION<br>No. 2018-01130 |
| Plaintiff, | |
| -against- | **COMPLAINT IN CIVIL ACTION** |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation<br>f/k/a<br>FISERV SOLUTIONS, INC., a Wisconsin corporation, | Filed on Behalf of Plaintiff<br>Bessemer System Federal Credit Union |
| and | |
| FISERV, INC., a Wisconsin corporation, | Counsel of Record for This Party: |
| Defendants. | RICHARD J. PARKS, ESQUIRE<br>PA ID #40477 |

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
7 West State Street, Suite 100
Sharon, PA  16146
Tel:  (724) 981-1397
Fax:  (724) 981-1398
Email:  rjp@pietragallo.com

CHARLES J. NERKO, ESQUIRE
Admitted *pro hac vice*
JOEL S. FORMAN, ESQUIRE
*Pro hac vice* to be filed
VEDDER PRICE P.C.
1633 Broadway
New York, NY  10019
Tel.: (212) 407-7700
Fax: (212) 407-7799
Email:  cnerko@vedderprice.com
          jforman@vedderprice.com

**JURY TRIAL DEMANDED**

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

BESSEMER SYSTEM FEDERAL CREDIT
UNION, a not-for-profit federal credit union,

            Plaintiff,

    -against-

FISERV SOLUTIONS, LLC, a Wisconsin
limited liability corporation
f/k/a
FISERV SOLUTIONS, INC., a Wisconsin
corporation,

and

FISERV, INC., a Wisconsin corporation,

           Defendants.

CIVIL DIVISION
No. 2018-01130

**NOTICE**

YOU HAVE BEEN SUED IN COURT.  IF YOU WISH TO DEFEND AGAINST THE
CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN
TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED, BY
ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND
FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE
CLAIMS SET FORTH AGAINST YOU.  YOU ARE WARNED THAT IF YOU FAIL TO DO
SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED
AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY
CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED
BY THE PLAINTIFF.  YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS
IMPORTANT TO YOU.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT
HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE
OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.
THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A
LAWYER.**

**IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO
PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER
LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

Mercer County Lawyers' Referral Service % Mercer County Bar Association
P.O. Box 1302
Hermitage, PA  16148

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

BESSEMER SYSTEM FEDERAL CREDIT
UNION, a not-for-profit federal credit union,

       Plaintiff,

   -against-

FISERV SOLUTIONS, LLC, a Wisconsin
limited liability corporation
f/k/a
FISERV SOLUTIONS, INC., a Wisconsin
corporation,

and

FISERV, INC., a Wisconsin corporation,

       Defendants.

CIVIL DIVISION
No. 2018-01130

## COMPLAINT

Plaintiff Bessemer System Federal Credit Union ("**Bessemer**" or the "**Credit Union**"),
by and through its undersigned counsel, Pietragallo Gordon Alfano Bosick & Raspanti, LLP and
Vedder Price P.C., for its complaint ("**Complaint**") against Defendant Fiserv Solutions, LLC,
formerly known as Fiserv Solutions, Inc. ("**Fiserv Solutions**") and Fiserv, Inc. (collectively with
Fiserv Solutions, "**Fiserv**"), states as follows upon knowledge as to its own actions and upon
information and belief as to others' actions:

### Nature of the Action

1.     Maintaining accurate account information and safeguarding the confidentiality of
personal information are vital to the success of a financial institution such as Bessemer.  This
action arises from the widespread, systematic misconduct of Fiserv, a vendor that claims
expertise in providing technology solutions to financial institutions.

2.      Fiserv's technology is the lifeblood of Bessemer: Fiserv tracks Bessemer's deposits, generates its statements, and powers its online banking website. Despite Fiserv's claimed expertise, Fiserv has misreported Bessemer's account records and information, while being plagued with security vulnerabilities that affect the privacy of thousands of Bessemer's members. Given the serious pattern of problems, Fiserv itself conceded in an email to Bessemer's Chief Executive Officer: "***Yes, we agree, Bessemer System FCU has experienced an extreme number of issues***."

3.      Even after knowing that its problems were "extreme," Fiserv stuck its head in the sand. For example, after Bessemer reported that Fiserv was not properly allocating loan payments and was falsely reporting that a member was still owing money on a loan that was already paid off, Fiserv admitted that it "told [Bessemer's Chief Executive Officer] that it should work." But Fiserv lied when representing that its system would accurately process loan payments and correctly report loan balances to members. As a result of the Credit Union's persistent questioning, Fiserv later acknowledged that the Credit Union's Chief Executive Officer "was adamant that this wouldn't work ***and she is correct***."

4.      Even more astoundingly, Fiserv has failed to properly safeguard the confidential and highly sensitive financial information Bessemer and its members have entrusted to Fiserv. Bessemer's member information has been subject to ***several instances of critical security vulnerabilities*** while in Fiserv's custody—each based on baffling and amateurish security lapses.

5.      Although Fiserv asserts that it takes privacy and confidentiality very seriously, the facts show otherwise. Indeed, after Bessemer conducted a security review of Fiserv and uncovered that there were security vulnerabilities in the online banking website Fiserv provides for Bessemer, Fiserv's response was to implement a purely cosmetic "fix" that was readily

bypassed and did not address the problem. Meanwhile, Fiserv "thanked" Bessemer by issuing an aggressive "notice of claims," attempting to silence Bessemer by threatening civil and criminal prosecution if Bessemer discussed Fiserv's security problems with third parties, including Fiserv's other clients (who presumably were affected with the same security problems at their own financial institutions). Thus, to Fiserv, it was more important to keep its security problems under wraps than to fix security holes that potentially threatened scores of financial institutions and consumers.

6.      According to *The Wall Street Journal*, Fiserv's misconduct is part of a pattern of victimizing small financial institutions and the consumers they serve. After decades of acquiring other technology providers, Fiserv and its two largest competitors now dominate the market, servicing 90% of U.S. banks with less than $1 billion in assets. Fiserv's strategy is to buy up its smaller competitors to stymie competition. Meanwhile, Fiserv ceases to make the proper financial investments to keep up with emerging technology and security risks—while locking financial institutions into long-term contracts, silencing its clients from disclosing to other affected clients when there are security problems, and holding customers' data hostage when those customers seek to go to competitors. This gambit has fattened Fiserv's profits, while exploiting smaller financial institutions and the consumers they serve. While midsize and local banks hold 13% of primary banking relationships, they capture only 7% of the customers who switch banks. *See* "Frustrated by the Tech Industry, Small Banks Start to Rebel," *The Wall Street Journal*, April 11, 2019, https://www.wsj.com/articles/small-banks-rebel-against-the-most-important-tech-firms-you-have-never-heard-of-11554975000?mod=hp_lead_pos4.

7.      Among vendors claiming expertise in providing account processing services to financial institutions, Fiserv stands alone as the worst offender when it comes to protecting and

accurately reporting consumers' sensitive financial information. The time is up on multibillion-dollar companies such as Fiserv abusing consumers, yet hoping to evade the consequences of their actions by silencing and intimidating critics. Bessemer brings this action to protect itself and thousands of its members from the wide-ranging harm that Fiserv has inflicted.

8.    In addition to harming Bessemer and its members, Fiserv's misconduct significantly harms credit unions, small financial institutions, and all the consumers they serve. If Fiserv is allowed to continue its course of misconduct, it will be encouraged to continue threatening its clients when security issues are reported, rather than making the proper investments to ensure that consumers' information is being properly safeguarded and accurately reported. That result would significantly threaten the thousands of financial institutions that Fiserv services and the innumerable consumers who entrust Fiserv to safeguard their most sensitive financial information.

## Parties

9.    Plaintiff Bessemer System Federal Credit Union is a federally chartered not-for-profit credit union. Bessemer has a principal place of business at 106 Woodfield Drive, Greenville, Pennsylvania 16125.

10.    Defendant Fiserv Solutions, LLC is a limited liability corporation organized under the laws of the State of Wisconsin with a principal place of business at 255 Fiserv Drive, Brookfield, Wisconsin 53008. Defendant Fiserv Solutions, LLC was formerly known as Fiserv Solutions, Inc., a Wisconsin corporation.

11.    Defendant Fiserv, Inc. is a corporation organized under the laws of the State of Wisconsin with a principal place of business at 255 Fiserv Drive, Brookfield, Wisconsin 53008.

## Jurisdiction and Venue

12.     This Court has jurisdiction pursuant to 42 PA. CONS. STAT. § 931 because the matters complained of herein occurred with Mercer County, and this Court has original jurisdiction over all cases not exclusively assigned to another court.

13.     Venue is proper pursuant to PA. R.C.P. No 2179 because: (i) Fiserv regularly conducts business in Mercer County; (ii) the cause of action arose from actions in Mercer County; and (iii) the transactions and occurrences relating to the cause of action arose in Mercer County.

14.     There is no basis for federal jurisdiction.  No federal question is asserted.  No diversity jurisdiction exists because Bessemer is a federally chartered credit union engaged in interstate commerce.  Bessemer does business with members residing in Pennsylvania, Ohio, and more than twenty other states.  Bessemer regularly engages in non-localized interstate business activities, including through an infrastructure provided by Fiserv, which allows Bessemer to transact business on its own account, and with its members,[1] in multiple states. As Bessemer is a federally chartered national citizen, there is no diversity of state citizenship.

## Factual Background

15.     Founded in 1943 by employees of the Bessemer and Lake Erie Railroad, Bessemer is a member-owned, not-for-profit consumer cooperative headquartered in Greenville, Pennsylvania.  Bessemer is committed to serving the financial needs of its several thousand members, many of whom live in Pennsylvania and Ohio.  Bessemer has earned the National

---

[1]   Bessemer may sometimes provide certain services to nonmembers.  References to "members" in this Complaint apply to members of Bessemer and, where applicable, any nonmember customer of Bessemer.

Credit Union Administration's low-income designation, reflecting Bessemer's dedication to helping consumers who are underserved by mainstream financial institutions.

16.     Founded in 1984, Fiserv is one of the world's largest providers of technology solutions to credit unions, banks, and other financial services providers. According to Fiserv's website, it has more than 12,000 clients in more than 50 countries, and Fiserv reported $5.82 billion of revenue in 2018. Fiserv provides core processing services to more than one in three financial institutions in the United States. Fiserv administers 135 million deposit accounts, more than 80 million online banking end users, and approximately 28 million active bill payment end users. More than $75 trillion of transactions each year move through Fiserv's systems.

17.     Fiserv provides account processing services for Bessemer, including through a core processing system known as "Charlotte." An account processing system is the "brains" behind a financial institution, processing and recording all transactions for the financial institution. For example, Fiserv hosts Bessemer's online banking website and processes members' transactions originating from that site as well as from in-branch transactions initiated through tellers' computers.

18.     According to Fiserv, "processing account-based transactions is at the very heart of [a credit union's] business. Each transaction is a reference point that reflects the speed, service, efficiency and overall competitiveness of your organization. When you get account processing right, your customers are satisfied and your workforce is maximally utilized—and your profits go up as a result. When you get it wrong, you can expect it to wreak havoc throughout the enterprise, especially on the bottom line." *See* https://www.fiserv.com/processing-services/account-processing.aspx (last visited April 25, 2019).

19.     Fiserv further explains in its Code of Conduct & Business Ethics, "[t]he nature of our business requires that all Fiserv computer systems and networks that process financial transactions and store financial data operate with the availability, efficiency, reliability and integrity that are expected of systems that process financial transactions and store financial data. The company is firmly committed to operating and maintaining its technology assets in a manner that merits the trust and confidence of the clients and consumers we serve." *See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (last visited April 25, 2019).  As for protecting confidential information, Fiserv acknowledges that "[i]t is our responsibility to safeguard confidential information when it is collected used, transmitted and stored to prevent any unauthorized disclosure.... This includes the personal information that we store for our clients' customers...." *See id.*

20.     Just as Fiserv recognized and acknowledges in its promotional material and Code of Conduct & Business Ethics, the failure by Fiserv to provide the account processing services as represented to Bessemer is wreaking havoc throughout Bessemer's operations and business.

21.     Fiserv advertises and represented to Bessemer that its account processing system offers "all the components required for credit union operations, plus established interfaces to a full range of ancillary products and services." *See* https://www.fiserv.com/resources/charlotte-brochure.aspx (last visited April 25, 2019).

22.     According to Fiserv, "Charlotte offers flexible features designed to help you improve productivity, train employees faster and implement new products and services with ease.  Backed by a world-class customer support team that is dedicated to helping credit unions achieve their growth goals, Charlotte delivers all of your essential account processing functions,

along with a wide range of integrated add-on tools." *See*

https://www.fiserv.com/resources/charlotte-brochure.aspx (last visited April 25, 2019).

    23.    Fiserv represents that its Charlotte platform is "equipped with indispensable

functionality and an array of integrated add-on options for seamless responsiveness that allows

credit unions to stay competitive.  Charlotte has a wide array of advanced solutions such as

lending, Internet banking, document imaging and more capabilities to choose from aimed at

helping credit unions increase productivity and efficiency." *See*

https://www.fiserv.com/industries/credit-unions/account-processing-platforms/charlotte.aspx

(last visited April 25, 2019).

    24.    As part of Fiserv's "Commitment to Accurate Accounting and Recordkeeping,"

Fiserv represents that "Fiserv is committed to maintaining full, fair, accurate and timely

accounting and business records.  This … protects our legal interests; and helps us preserve the

trust of our clients." *See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-

70ccedbdb25c (version in effect on August 22, 2018).

    25.    Fiserv also represents that its Charlotte system will allow financial institutions to

"[s]tay current with technology requirements and regulatory compliance without increasing

staff," and that "[a]s technology tools become more advanced, so does the Charlotte solution.

Fiserv continues to make timely updates and enhancements to the Charlotte system to ensure that

this robust solution remains competitive by using the most up-to-date technologies available."

*See* https://www.fiserv.com/resources/Charlotte-Brochure-November-2014.pdf (last visited April

25, 2019).

    26.    Indeed, Fiserv recognizes its affirmative obligation to provide services that

continuously comply with applicable law and not harm consumers.  As Fiserv explains: "[a]ll

Fiserv associates have an affirmative obligation to design, deliver and support our products and services in a manner that continuously complies with applicable laws and regulations.... Because the principal market for our products and services is the regulated financial services industry, the consequences of non-compliant offerings could seriously damage our reputation and financial interests.  Fiserv should use all reasonable measures to avoid consumer harm, to assist our clients in avoiding consumer harm and in diligently investigating any claims by our clients or others that our products or services are harming consumers...." *See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (last visited April 25, 2019).

27.     Fiserv's privacy policy claims that "Fiserv maintains physical, electronic, and procedural safeguards ... designed to provide a level of security appropriate to the risk of processing Personal Information." *See* https://www.fiserv.com/about/privacypolicy.aspx (last visited April 25, 2019).

28.     Fiserv asserts that it is a "a proven ally in securing your IT infrastructure from increasingly sophisticated and targeted cyber-attacks....  That's why we deliver a layered and comprehensive approach to keep your financial institution's data and reputation safe...  Our Cybersecurity Solutions are designed and managed for financial institutions by experts in the financial industry and cybersecurity." *See* https://www.fiserv.com/risk-compliance/cybersecurity-solutions.aspx (last visited April 25, 2019).

29.     To obtain the benefits represented by Fiserv, Bessemer and Fiserv entered into a "master agreement" ("**Master Agreement**").

30.     **Exhibit 1**, to be filed under seal separately from this Complaint but referenced herein, is a true and correct copy of the Master Agreement.

31.     Fiserv has not performed in accordance with the Master Agreement, is in breach of the express and implied terms of the Master Agreement, and has engaged in other misconduct that has harmed Bessemer.[2]

### Fiserv's History of Failing to Protect Confidential Financial Records

32.     Fiserv has a sordid, unfortunate history of failing to protect confidential information.  Fiserv has been repeatedly put on notice that its security measures were deficient, leaving Bessemer's member information at risk.  Rather than addressing the problems by updating its security, Fiserv continued to use outdated security methods long after vulnerabilities were brought to Fiserv's attention.  This left Bessemer, its members, Fiserv's other customers, and their own customers at risk.

33.     In February 2019, security analyst SecurityScorecard, Inc. rated Fiserv a "C" on its A to F scale.  According to SecurityScorecard, Inc., a company such as Fiserv rated below a B is *5.4 times more likely to suffer a consequential breach*—a dismal state of security for a company such as Fiserv that is entrusted with safeguarding highly sensitive information pertaining to the customers of more than one in three financial institutions in the United States.

34.     In the course of conducting a security review of Fiserv, SecurityScorecard, Inc. uncovered over 40 weaknesses in Fiserv's security, including the following:

(a)     Fiserv has failed to promptly update and patch affected systems to protect against commonly known security vulnerabilities and exposures, including delaying remediation of high-severity vulnerabilities for more than 30 days after publication.

---

[2]     The incidents described in this Complaint are illustrations only.  Fiserv has engaged in other relevant acts, omissions, concealments, and misrepresentations.  Bessemer believes that additional incidents of Fiserv's misconduct will be identified after a reasonable opportunity for further investigation and discovery.

(b)    Fiserv employs products and services past their end-of-life or end-of-service deadlines.  As these products and services are no longer marketed, sold, or upgraded by the manufacturers, they are more likely to be exploited and to have unpatched security vulnerabilities.

(c)    In March 2018, Fiserv was observed engaging in communications indicative of a malware infection.

(d)    In June 2018, Fiserv was observed engaging in communications indicative of yet another malware infection.

(e)    Fiserv runs servers using an obsolete Secure Shell (SSH) network protocol that contains fundamental weaknesses that can be readily exploited by hackers, including a design flaw that allows a man-in-the-middle attack.

(f)    Fiserv employs weak ciphers and encryption certificates that are expired, are self-signed, and have weak signatures.

(g)    Fiserv's web applications do not implement X-XSS-Protection best practices, meaning that hackers can send malicious URLs that inject code into Fiserv-hosted websites.

(h)    Fiserv's web applications do not implement X-Content-Type-Options Best Practices, which could lead to security issues and the execution of malicious code.

(i)    Fiserv's websites do not implement HSTS best practices, which render Fiserv-hosted sites vulnerable to a man-in-the-middle attack that can divert users to malicious websites.

(j)    Fiserv's websites do not enforce HTTPS encryption, leaving users vulnerable to man-in-the-middle attackers who can falsify data and inject malicious code.

(k)     Fiserv's websites redirect users to a new URL in a way that cannot be secured with HTTPS and HSTS headers, leaving users vulnerable to being redirected to spoofed or malicious versions of the sites.

(l)     When a user is redirected to his or her ultimate URL destination, the user passes through one or more URLs served over HTTP (instead of HTTPS), which weakens other security technologies (such as HTTPS and HSTS headers) that are deployed elsewhere.

(m)     Fiserv does not implement X-Frame-Options best practices, which allows other, untrusted websites to embed a Fiserv-hosted website in a frame on their page.  This can be used to make social-engineering attacks appear more legitimate, or it can be used for clickjacking attacks.

35.     Fiserv's lax security controls have harmed Bessemer on multiple occasions.

36.     In 2016, Fiserv had a security breach and improperly and unlawfully provided Bessemer's confidential member information to an unauthorized third party.  The information Fiserv disclosed without authority included members' names, tax identification numbers, and portions of account numbers.  This incident should have served as a "wake-up call" to Fiserv that its security controls were inadequate.  Unfortunately, Fiserv ignored multiple warning signs and failed to fix its shoddy security.

37.     In or around March 2017, Fiserv put an invalid return address on member account statements for Bessemer's biannual verification of accounts, although the correct address was supplied by the Credit Union to Fiserv.  Members who received the statements were alarmed to receive these irregular statements with an unrecognized name or address.  Statements of members who had recently moved or had supplied incorrect addresses were earmarked to be sent to a United States Postal Service "dump pile" because of the invalid return address Fiserv placed

on the statements.  Many of the undeliverable statements, which contain confidential member information, were untraceable and unprotected in the postal system.  Like the 2016 data breach, this incident threatened the confidentiality of the sensitive financial information entrusted to Fiserv.

38.     As another example, Fiserv's normal course of performance with Bessemer was to coordinate the installation and updating of antivirus software on Bessemer's systems.  Yet Fiserv inexplicably stopped doing so without explanation, despite the growing prevalence of cyberattacks.

39.     In August 2018, *Krebs on Security* reported that a customer of a small financial institution discovered a security vulnerability with Fiserv that permitted unauthorized individuals to see customers' account and transactional records, and to add or delete phone numbers and email addresses used to receive alerts about account transactions.  *See* "Fiserv Flaw Exposed Customer Data at Hundreds of Banks," https://krebsonsecurity.com/2018/08/fiserv-flaw-exposed-customer-data-at-hundreds-of-banks/ (August 28, 2018).

40.     According to this article, the customer contacted Fiserv through multiple outlets, including messages sent to the social media accounts of various individuals who were identified as affiliated with Fiserv.  Fiserv, however, failed to fix this known security vulnerability in response to these consumer complaints.

41.     Fiserv's Code of Conduct & Business Ethics contains a social media policy that covers the use of LinkedIn, Twitter, Facebook, forums, and blogs, and Fiserv regulates its employees' use of Fiserv's trademarks on social media.  Fiserv notes that social media "is an established part of many people's personal and professional lives—and the lines have blurred." *See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (last visited

April 25, 2018). Accordingly, Fiserv knows, or should have known, about communications sent to the social media accounts of its agents who have identified themselves as Fiserv representatives on social media platforms.

42.    Fiserv spokesperson Ann Cave confirmed that Fiserv did not make efforts to remediate this known threat until *after* receiving an inquiry from a *reporter*—when negative press coverage was imminent. According to Ms. Cave, "After receiving [the reporter's] email, [Fiserv] promptly engaged appropriate resources and worked around the clock to research and remediate the situation. [Fiserv] developed a security patch within 24 hours of receiving notification and deployed the patch to clients that utilize a hosted version of the solution. [Fiserv] will be deploying the patch this evening to clients that utilize an in-house version of the solution." Thus, only after Fiserv faced the imminent prospect of negative press attention did Fiserv "promptly engage[] appropriate resources" to fix its security lapse.

43.    According to this press report, customer information at hundreds of financial institutions remained vulnerable to this security lapse.

44.    Fiserv did not notify Bessemer and its customers about this security lapse until after Fiserv received negative press coverage.

45.    Unfortunately, Fiserv's internal culture actively discouraged emphasis on data security. For example, even one of Fiserv's own employees recognizes the inadequate state of the security at Fiserv and the inadequacy of Fiserv's support and outreach channels. In a post responding to the *Krebs on Security* article, Adam Kindler, Fiserv's Information Security Manager, invited customers to message him through his personal social media account so that he "can use what influence [and] means I have at our company, above and beyond customer support and outreach branches, to address their concerns."

46.     On the heels of the *Krebs on Security* article indicating that Fiserv's online banking system contains security vulnerabilities, as well as a history of other problems Bessemer had with Fiserv, Bessemer conducted a review of Fiserv's security controls.

47.     The security review uncovered critical security flaws with the online banking system Fiserv was providing Bessemer.

48.     At the time, all that Fiserv required to register for an online banking account with Bessemer was an account number and the last four digits of the member's Social Security number.  Given the weak security controls Fiserv implemented on Bessemer's online banking system, an unauthorized individual can access a member's online banking account by obtaining the member's account number (such as from the face of a check or guessing an account number based upon the sequence used to assign account numbers), and then either knowing or guessing the last four digits of a member's Social Security number.

49.     Because Fiserv did not impose rate limiting, there was no "lockout" enforced by the online banking system to stop unauthorized individuals from using a pure trial-and-error guessing process (which can easily be automated) to gain access to Bessemer's online banking accounts.

50.     It would be expected that a company as sophisticated as Fiserv would implement appropriate controls to safeguard Bessemer's online banking accounts against unauthorized access through trial-and-error or "guessing."  With respect to Bessemer's online banking website, Fiserv failed to implement reasonable security controls such as those that:

        (a)     require the use of an authentication procedure with sufficient complexity and secrecy;

(b)      implement a rate-limiting mechanism to effectively limit the number of failed authentication attempts that can be made on an online banking account;

(c)      require an individual to complete a "captcha" (a simple puzzle used to thwart automated access attempts);

(d)      impose an adequate waiting or lockout period following a failed login attempt; and

(e)      leverage other risk-based or adaptive authentication techniques to identify user behavior that falls outside typical norms, including repetitive, highly anomalous behavior consistent with a "guessing" or trial-and-error method to gain access to Bessemer's online banking website.

51.      In the course of Bessemer's security review, Fiserv scrambled to place additional security controls on Bessemer's online banking website.  These, too, were pitifully deficient and ineffective.

52.      Fiserv attempted to fortify Bessemer's online banking website by requiring users registering for an account to supply a member's house number.  This was ineffective because residential street addresses can readily be found on the internet and through other public sources. Moreover, this information can be guessed through a trial-and-error process.  Most alarmingly, this security control was purely illusory.  Because some servers were not enforcing this security check, it could be readily bypassed.

53.      The security review also uncovered that when a user turns off JavaScript, it is possible to bypass the web page that was supposed to enforce a member's acceptance of the Bessemer online banking website's terms of service.

54.     Promptly after their discovery, Bessemer reported to Fiserv security vulnerabilities with the online banking website Fiserv maintains for Bessemer.

55.     Upon reporting these security problems to Fiserv, Bessemer requested documentation and assurances that its confidential member information was being properly safeguarded.

56.     Adding insult to injury, rather than fixing these security problems and providing the requested assurances that information was being adequately safeguarded, Fiserv issued Bessemer a "notice of claims" claiming that Bessemer's security review of its own online banking system gives rise to civil and criminal claims, and demanding that Bessemer not disclose information relating to the security review to any third parties, including Fiserv's other clients (who presumably were affected with the same security problems at their financial institutions) as well as media sources.

57.     Fiserv knew it had no proper basis for threatening Bessemer for conducting a security review of Bessemer's account records and information in Fiserv's custody. The Master Agreement acknowledges that Bessemer's records and information ███████████████ ████████████████████████████████ (Master Agreement § 3(b)). Indeed, Fiserv's Forms 10-K filed with the United States Securities and Exchange Commission for at least the past several years concede that Fiserv expects that its financial institution clients will "conduct ongoing monitoring and risk management for third-party relationships," and that "independent auditors annually review many of our operations to provide internal control evaluations for our clients."

58.     In addition, Fiserv lacked a good-faith basis when threatening Bessemer with legal claims or criminal prosecution if Bessemer were to disclose Fiserv's security weaknesses to

others.  The Master Agreement expressly gives Bessemer ████████████████████████████

███████████████████████████████████████████████████████████████████████████████

(Master Agreement § 11(k)).

59.     Upon information and belief, Fiserv has issued threats to others who have

discovered security vulnerabilities, as well as to members of the press, in an effort to conceal

these problems from affected financial institutions and consumers.

60.     Fiserv wishes to keep its security failures under wraps because it desires to

mislead its customers into continuing to entrust their confidential information with Fiserv, while

maintaining a high stock price and artificially inflating the value of Fiserv's corporate goodwill.

Fiserv's 2018 SEC Form 10-K admits that a security incident allowing unauthorized access to

clients' data could give "a loss of confidence in our ability to serve clients and cause current or

potential clients to choose another service provider...which could have a material adverse impact

on our business."  By intentionally failing to disclose or suppressing information about its

security problems, Fiserv misled Bessemer, its members, and other customers into continuing to

use Fiserv's service offerings, thus providing Fiserv with ill-gotten gains, thwarting its

competitors, and artificially fattening its stock price and goodwill.  Fiserv has a particular interest

in artificially increasing the value of its goodwill and intangible assets, as they represent over

70% of Fiserv's total assets.

61.     As a financial institution, Bessemer has a continuing interest in ensuring that the

integrity of its member information is maintained, and that such information is safeguarded from

future breaches.

62.     Because Bessemer's core function is serving its members' financial needs,

Bessemer is faced with increased costs of dealing with members who have placed fraud alerts or

credit freezes in response to Fiserv's data breaches, making it impossible or burdensome for Bessemer to evaluate members' creditworthiness for current or potential credit or loans.  In addition, given Fiserv's delays in returning Bessemer's information so that Bessemer can transition to a new vendor (*see infra*), Bessemer faces the dilemma that, in order to function, it must share its member information with Fiserv, which has proven to lack the ability to safeguard member information.

63.     Fiserv was aware of the risks posed by its weak security controls and the extraordinarily sensitive nature of the personal member information it maintains, as well as the resulting impact that a data breach would have on a financial institution such as Bessemer.

64.     Unfortunately, Fiserv's approach to maintaining the privacy and security of its customer data was grossly negligent and reckless, or, at the very least, negligent.  Fiserv failed to follow industry standard precautions in response to known risks, and Fiserv knew that its security controls were substandard and deficient.

65.     Bessemer now faces years of constant surveillance and increased vigilance against fraudulent activity involving its members.  While consumers are ultimately protected from most fraud losses, Bessemer is not, as financial institutions bear primary responsibility for reimbursing members for fraudulent transactions.

### Bessemer's Member Information Is Very Valuable on the Black Market

66.     The types of information Fiserv maintains for Bessemer are highly valuable to identity thieves.  The names, email addresses, recovery email accounts, telephone numbers, birthdates, passwords, security question answers, and other valuable member information can all be used to gain access to a variety of existing accounts and websites.

67.     Identity thieves can also use Bessemer's member information for embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including

obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and

obtaining government benefits.  A report from the United States Government Task Force on

Identity Theft explains the harm befallen to Bessemer and its members:

> Businesses suffer most of the direct losses from … identity theft because individual victims generally are not held responsible for fraudulent charges. Individual victims, however, also collectively spend billions of dollars recovering from the effects of the crime.
>
> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly, individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit.…
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves.  Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[3]

68.     To put it into context, as demonstrated in the chart below, the 2013 Norton

Report, based on one of the largest consumer 

cybercrime studies ever conducted, estimated that

the global price tag of cybercrime was around $113

billion at that time, with an average cost per victim

of $298.

69.     Once stolen, member information can be used in a number of different ways.  One

of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of

---

[3]     The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan, Federal Trade Commission, 11 (April 2007).

the internet that makes it difficult for authorities to detect a website's location or owners.  The dark web is not indexed by normal search engines such as Google and is accessible only using a Tor browser (or similar tool), which aims to conceal users' identities and online activity.  The dark web is notorious for hosting marketplaces selling items such as weapons, drugs, and member information.  Sites on the dark web appear and disappear quickly, providing cover for illegal transactions.

70.     Once someone buys member information, it is then used to gain access to different areas of the victim's digital life, including financial accounts, social media, and credit card details.  During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

71.     In addition to member information that can be accessed, a hacked online banking account can be very valuable to cyber criminals for other attacks.  Since online banking accounts are linked to other accounts (for example, to transfer funds between financial institutions), a hacked online banking account serves as a springboard for a hacker that opens up a number of other accounts.

72.     The problems associated with identity theft are exacerbated by the fact that many identity thieves will wait years before attempting to use the member information they have obtained.  Indeed, in order to protect its member information, Bessemer will need to remain vigilant against unauthorized use of its member information for years and decades to come.

**Fiserv Has Falsified and Misrepresented Bessemer's Member and Transactional Records**

73.     In addition to failing to safeguard confidential member information against access by unauthorized parties, Fiserv has falsified and misreported that information to Bessemer, its members, and other authorized individuals.

74.     In or around July 2018, Fiserv falsely represented to Bessemer that a member's account was closed.  In fact, the member did not close the account.  Fiserv also made unauthorized changes to the member's account information, which prevented dividends owed to the member from being applied and posted to the account.  Fiserv falsely reported to Bessemer that this member was owed no dividends, when in fact the member was owed dividends from Bessemer.  Based upon Fiserv's false reporting of information and unauthorized changes to account information, this member was not timely paid dividends that were owed to him, and the member was prohibited by Bessemer from making deposits into the account based on Fiserv's false representations that the account was closed.  What's more, after Fiserv reported to Bessemer that this account was closed, Fiserv accepted an incoming transfer on that member's behalf of funds that were intended to be posted to that member's account.  Fiserv, however, failed to report this transfer on Bessemer's "exception list" (a list that contains incoming transfers that were intended for closed accounts) and instead transferred the member's funds to the account, which was no longer properly provisioned to accept funds and calculate dividends owed on the funds.  All of this caused consumer confusion and deprived a member of access to funds and dividends to which he was entitled.  In response to Fiserv's failure to properly post dividends to a member's account, Katherine King of Fiserv informed Bessemer's CEO that "I would agree you [Bessemer] need to post these dividends…. I am not sure how to work around this issue for you."

75.     After Bessemer reported that Fiserv was not properly allocating loan payments and was misreporting that a member still owed money on an already-paid-off loan, Mark Britton of Fiserv admitted on or about February 19, 2019 that he "told [Bessemer's Chief Executive Officer] that it should work."  But Fiserv lied when representing that its system would accurately

process loan payments and report loan balances. As a result of the Credit Union's persistent complaining, Fiserv later acknowledged that the Credit Union's Chief Executive Officer "was adamant that this wouldn't work *and she is correct*." Indeed, Mr. Britton acknowledged that one of his Fiserv colleagues completed a test of Fiserv's loan processing system and, with respect to a loan that should have been fully paid off, Fiserv confirmed that it falsely "put a negative balance of $15.41 on the loan history…and still shows late fees as $49.24."

76.    During the conversion of Bessemer's data from Fiserv's Loan Advantage platform[4] to Fiserv's Loancierge platform, Fiserv falsified documents by inserting what Bessemer believes to be another Fiserv customer's electronic documents (i.e., loan agreements, promissory notes, and loan disclosures) into Bessemer's Loancierge application. This caused incorrect language and terms to display on Bessemer's loan disclosures, which gave the false impression that the documents were authentic business records of Bessemer. Fiserv was provided the correct information by Bessemer, yet it reported false information and altered Bessemer's business records. For instance, language purporting to require Bessemer's members to pay the Credit Union certain late fees appeared, even when it was not the Credit Union's intent to charge those fees.

77.    Fiserv sent Credit Union members federal 1098 mortgage statements that falsely reported the principal balance of the loans in the field for Private Mortgage Insurance. Fiserv was provided with accurate information for these statements and assured the Credit Union that it

---

[4]    Loan Advantage is designed to package loan configuration and implementation. The services include "credit processing, contract funding, dealer integrations, accounting and cash management, default management, collateral management and customer care, which enable lenders to use a single partner for their origination, accounting and servicing needs." *See* http://investors.fiserv.com/news-releases/news-release-details/loan-advantage-fiserv-gives-lenders-seamless-route-automotive (last visited April 25, 2019).

would issue corrected 1098 statements, but Fiserv never provided documentation of these corrected statements.

78.     Fiserv has knowingly and repeatedly printed false mortgage interest, late-fee, and other transactional information on receipts and other documents provided to members, even though Bessemer informed Fiserv of the accurate information. For example, a January 4, 2017 share deposit receipt generated by Fiserv for a member falsely indicated that there were deposits of $300.00 in cash and a $69.68 check, when Bessemer informed Fiserv that the member actually deposited just $90.00 in cash and no checks.

79.     Fiserv has knowingly misrepresented due dates for loans. When Bessemer reported this issue to Fiserv, Fiserv explained that when a loan is entered with a due date on the 28th, 29th, 30th, or 31st of the month, it is Fiserv's practice to misreport the due date as the last day of the month, regardless of the loan's actual due date. Fiserv conceded that this false repeating of information is a "known issue" with its account processing system. Yet, despite having actual knowledge that it was supplying false information, Fiserv continued to supply false information.

80.     Currency adjustment transactions are inconsistent and intermittently fail to reflect correct cash or check adjustments for teller drawers. Fiserv assured the Credit Union that this issue would be corrected in a future software update release, but the update was consistently delayed. Fiserv never confirmed that this issue was fixed.

81.     In or around June 2018, Fiserv deleted transactions that should have been present on the Homebanking Register Report. This report was supposed to include a complete and accurate list of all the prior day's homebanking transactions.

82.     In or around July 2018, Bessemer completed a payment transfer transaction using the Fiserv system for a member with a mortgage through Bessemer.  The member owed $1,361.70 in late fees, which were fully paid by transferring funds from the member's share account to the member's home equity loan.  While the member's share account history showed that the full amount of $1,361.70 was transferred to pay off these late fees, the loan history showed that only $361.70 was received from this transfer and applied to the loan.  Thus, to the member it would appear that $1,000.00 was missing.  An excerpt of the inaccurate statement furnished by Fiserv is shown below, with the relevant transactions highlighted:



83.     When Bessemer contacted Fiserv about the false information being reported, Fiserv informed Bessemer that Fiserv's system knowingly falsely reports such transactions and cannot correctly report them when more than $999.99 is entered in the relevant system field, and that Fiserv would not correct the programming used to calculate transactions of this type. Several weeks later, Fiserv informed Bessemer that Fiserv was going to manually rebuild the statement for this member in order to properly reflect the total amount paid.

84.     In proceedings involving loans paid by the bankruptcy court, the court provides a single check with explicit instructions on how to apply the check to the specific loan.  But

Fiserv's software cannot accommodate the correct application of a check in a single transaction in the specific manner required by the bankruptcy court.  As a result, Bessemer is forced to apply the designated amounts of the check to principal and interest as separate check transactions, even though Bessemer receives only one check, because Fiserv's software cannot process multiple entries for interest, principal, and fees to a loan from a single check.  When the Credit Union asked Fiserv about these transactions, Fiserv responded that it will allocate only one payment per check.  Fiserv asked for a business justification for addressing this issue, and even when the Credit Union explained that the bankruptcy court requires these transactions to be handled in a particular way, Fiserv declined to correctly reflect these transactions, stating that it "has been this way for years and would require hours of programing changes, the programmer said this was not going to happen."

### Fiserv's Account Processing System Contains a Litany of Bugs and Defects

85.     Fiserv's services have been laden with bugs and defects.  Johnette Preddy of Fiserv admitted in an email to Bessemer's CEO that there was an "extreme number" of problems that Fiserv was inflicting upon Bessemer:

> *"Yes, we agree, Bessemer System FCU has experienced an extreme number of issues.*  Everyone on our team is aware of these issues and we continue to work for resolution.….  I sincerely apologize for the inconveniences and impact to your business."  (emphasis added)

86.     As one example, during the course of just one business day, April 5, 2019, Fiserv informed Bessemer that its systems were manifesting the following errors:

(a)     The Credit Union's document archive hosted through Fiserv's eFichency system experienced a service interruption;

(b)     Less than one hour later, Fiserv's eFichency system was experiencing time out errors;

(c)     Members logging into Virtual Branch would receive an "authentication error -1" error message when accessing their eStatements; and

(d)     Members using the search option in Virtual Branch would receive an "Exception: (503) Service Unavailable -1" error.

87.     On many occasions, Fiserv's Charlotte system was unavailable, causing Bessemer to be denied access to its account records and information needed to process member transactions and to function as a financial institution.

88.     Bessemer's members have reported that their bill payments were failing to be properly made in accordance with the members' instructions.  Fiserv conceded that this is another known defect with its account processing system.

89.     ACH and share draft returns fail to process during system-wide connection outages.  Fiserv issues a report each day and misrepresents that returns are in progress.  Although the Credit Union maintains documentation proving that the returns were processed through Fiserv's automated system and received by Fiserv, the funds for the returned items were not received by the Credit Union as expected.  Instead, Fiserv seemingly failed to present the returns to the Federal Reserve for credit.  These issues consistently arise when Fiserv experiences connectivity problems.

90.     Fiserv has outsourced many of its functions, which resulted in a degradation of and disruption in the service provided to Bessemer.  For example, when Fiserv looked up Bessemer in its system by the Credit Union's identification number, Fiserv's call center personnel were unable to identify which Fiserv platform Bessemer uses.  Fiserv even candidly admitted that since it has outsourced much of its call centers' personnel, Fiserv's support personnel may be unable to provide proper support functions.

91.     Bessemer's staff members constantly find themselves locked out of the system and unable to log on to or log off of the system, which inhibits Bessemer's ability to serve its customers.  For example, a teller's computer froze when the teller was processing a transaction for a member.  When the teller attempted to log off, a pop-up appeared with an Outlook Wizard asking to set up Outlook.  The teller was unable to log back on to the computer.  Although Fiserv previously instructed Bessemer employees to use the log-off button exclusively to prevent log-off problems, Fiserv has since instructed Bessemer staff members never to use the log-off button.

92.     Bessemer's staff members have reported frequent latency with the Charlotte teller platform.  Fiserv has blamed the Credit Union's internet connection, the amount of RAM in the Credit Union's computers, the way the Credit Union staff members were using the computers, the failure of the Credit Union's staff to log off at lunchtime, the need to reboot the server every Sunday, and a variety of possible equipment-related issues.  Fiserv's finger-pointing and reflexive "blame the customer" responses to these issues have caused Bessemer to incur losses for obtaining unneeded goods and services.  Eventually, Fiserv conceded that this issue was due to its own service not responding properly.

93.     All of Bessemer's networked front-line printers will periodically stop working, even when the software itself appears to be working.  This issue prevents the Credit Union from printing receipts, checks, or other documents for members.  As a result, the Credit Union has been unable to provide members with receipts or checks documenting the members' transactions, and the Credit Union is, therefore, unable to serve its members.

94.     The Credit Union is consistently blocked from printing checks on the check printer.  The Credit Union has continuous check activity, which the Credit Union logs in its system so that its checks are numbered consecutively.  However, periodically, front-line tellers

are suddenly unable to print the checks, unless all employees reboot their computers. When the Credit Union informed Fiserv of the issue, Fiserv's only solution was to have the Credit Union join a WebEx to replicate the issue. The Credit Union has done this at least 10 times, and the issue has yet to be fixed.

95.    On many occasions, including in or around May 2018, Fiserv's system returned errors and failed to provide correct information in response to Bessemer's attempts to look up members' account numbers, causing disruption of service to the members.

96.    On many occasions, including in or around July 2018 through April 2019, Bessemer informed Fiserv that it received ongoing error messages related to the Access Advantage[5] platform. Though Fiserv purported to solve the issue by moving Bessemer's data to another server, the errors continued, causing disruption to Bessemer's operations. As a result of these errors, sometimes transactions are processed, but a receipt of the transaction is not generated. Sometimes, the system reports that a transaction has failed, but the transaction actually goes through. Fiserv has informed Bessemer that multiple credit unions on different Fiserv core processing systems have experienced this problem.

97.    Bessemer's system continues to have delays and issues with programs not loading properly or continuing to freeze, which results in tellers and employees being unable to complete their tasks and meet the Credit Union's members' needs in a timely manner.

98.    The entire Fiserv system will periodically crash, be unavailable or not provide requested information, and both members and employees are then unable to process any transactions, access funds, or get truthful information concerning account records.

---

[5]    Access Advantage "easily enables real-time integration of third-party applications with Portico," a Fiserv operating platform. *See* https://www.fiserv.com/resources/Portico-Brochure-August-2015.pdf (version in effect on August 23, 2018).

99.     On or about November 21, 2017, a business listing was uploaded by the United States Treasury Department's Financial Crimes Enforcement Network ("**FinCEN**").  The Credit Union downloaded the business listing file.  When the Credit Union attempted to upload the file on ConfirmIT (Fiserv's website that was supposed to be available), the Credit Union repeatedly received an error message, and the upload failed.  Fiserv's errors frustrated Bessemer, consumed unnecessary time and resources, and caused delays in the Credit Union's efforts to comply with applicable law.

100.    In or around May 2018, Bessemer was unable to run a FinCEN 314(A) review using Fiserv's ConfirmIT product, and Bessemer received an error message when trying to upload both the individual and the business listings.  This issue has occurred many times previously.  Bessemer attempted to work with Fiserv to find a resolution, but no explanation or permanent solution was provided to Bessemer.  As a result of its inability to comply with this regulatory request, Bessemer may be subject to penalties based on Fiserv's failure to act. Fiserv's failures are directly impairing Bessemer's ability to comply with legally mandated processes, despite assurances that the Fiserv system would provide compliance.

101.    Despite representations that it would be accessible for required reporting, Fiserv scheduled maintenance of its eFichency platform on the same day that federally mandated reports were due to be filed, with knowledge that Bessemer and other credit unions would require access to eFichency for assistance in compiling and completing those reports.  On other occasions, eFichency is frequently nonfunctioning or unavailable.

### Fiserv Has Engaged in Bad Faith and Deceptive Practices

102.    Fiserv has repeatedly acted in bad faith and deceptively.

103.    Fiserv represented that it would utilize sufficient data security protocols and mechanisms to protect and accurately report Bessemer's member information.

104.    Bessemer stored its member information in Fiserv's systems based upon Fiserv's representations.

105.    Fiserv falsely represented that its systems were secure and that Bessemer's member information would remain private and accurate.  Fiserv knew or should have known that it did not employ reasonable, industry standard, and appropriate measures to ensure the security and accuracy of member information.

106.    Even without these misrepresentations, Bessemer was entitled to presume, and did expect, that Fiserv would take appropriate measures to keep Bessemer's member information safe and accurate.  Fiserv did not disclose at any time that Bessemer's member information was vulnerable to hackers or falsification because Fiserv's security and recordkeeping measures were inadequate, and Fiserv was the only one in possession of that material information, which it had a duty to disclose.  Fiserv misrepresented, both by affirmative conduct and by omission, the safety and soundness of its many systems and services, specifically the security and accuracy thereof, and their ability to safely store and process Bessemer's member information.  Fiserv also engaged in deception by failing to implement reasonable and appropriate security measures or to follow industry standards for data security, and by failing to comply with its own policies and agreements.

107.    As alleged above, Fiserv knew its data security and recordkeeping measures were grossly inadequate by, at the absolute latest, reports of security compromises and falsified customer information coming to light, exposing Fiserv's lax and inadequate approach to data security and recordkeeping.  At that time, Fiserv was on notice that its systems were extremely vulnerable to attack and that the account records and information it stores was subject to falsification—facts Fiserv already knew given its previous exposures and problems.

108.   In response to all of these facts, Fiserv failed to properly respond or warn Bessemer about these problems and, instead, openly represented that Fiserv had adequate security and recordkeeping practices and protocols.

109.   Fiserv had an obligation to disclose to Bessemer that its members were easy targets for hackers and that Fiserv was not implementing appropriate measures to protect them and the accuracy and safety of their information.

110.   Fiserv did not do these things.  Instead, Fiserv willfully deceived Bessemer by concealing the true facts concerning its data security and recordkeeping, which Fiserv was obligated to, and had a duty to, disclose.  Fiserv had exclusive knowledge of undisclosed material facts, namely, that Bessemer's member information in Fiserv's custody was unsecure and subject to unauthorized alteration and falsification, and Fiserv withheld that knowledge from Bessemer.  Additionally, Fiserv made numerous representations following the prior data security vulnerabilities to assure its customers that their member information and other data was safe, and that Fiserv was dedicated to maintaining that security.

111.   Had Fiserv disclosed the true facts about its poor data security and recordkeeping practices, Bessemer would have taken measures to protect itself.  Bessemer justifiably relied on Fiserv to provide accurate and complete information about its data security and processing of Bessemer's member information, and Fiserv did not do so.

112.   Alternatively, given the security lapses and other problems in Fiserv's services and Fiserv's refusal to take measures to detect, much less fix them, Fiserv simply should have shut down the services Bessemer was using and returned Bessemer's member information so that it could transition to another service.  Independent of any representations made by Fiserv, Bessemer justifiably relied on Fiserv to provide a service with at least minimally adequate

measures to protect the confidentiality and integrity of Bessemer's member information, and Bessemer justifiably relied on Fiserv to disclose facts that would undermine that reliance.

113.     Rather than ceasing to offer a clearly unsafe and defective service or disclosing to Bessemer that its services were unsafe and that member information was exposed to theft and falsification on a grand scale, Fiserv continued on and concealed any information relating to the inadequacy of its security and service offerings.

114.     In addition, Fiserv repeatedly has issued invoices that are erroneous, are false, and overstate the amount the Credit Union actually owes Fiserv.  The accuracy of Fiserv's invoices is very important because Fiserv purports to prohibit Bessemer from making any deduction or setoff from amounts invoiced by Fiserv, even though Fiserv knows its invoices are false.

(a)     For example, Fiserv wrongly billed the Credit Union for "Monthly CD Processing," after the Credit Union explicitly asked Fiserv to stop providing this service.  Yet, for at least the following seven months after Fiserv stopped performing this service for Bessemer, Fiserv nevertheless continued to invoice Bessemer for this cancelled service.

(b)     Fiserv invoiced the Credit Union ███████████████ for a backup connection that never worked.  Fiserv finally ceased charging the Credit Union for this backup connection in May 2017, yet Fiserv has not refunded these improperly charged fees.

(c)     Invoice charges in December 2018 included billing for IRA Fair Market Value reporting for 121 accounts ██████████████, while the January 2019 invoice includes billing for 115 IRA accounts at ████████████.  Fair Market Value reporting is done only once per year, at year-end.

(d)     Invoice totals also appear to be incorrectly reflected on the invoices, as the total of an invoice frequently does not equal the sum of the line items or amounts due to Fiserv.

      (e)     Fiserv has continued to invoice Bessemer for services after Bessemer terminated the Master Agreement and after Fiserv refused to promptly return Bessemer's account records and information as requested.

      (f)     Even though Fiserv agreed to deconvert Bessemer from its system, Fiserv's invoices to Bessemer reflected fees for the period occurring after the deconversion, such as an invoice sent to Bessemer in January 2019 for a year's worth of multi-factor authentication.

      (g)     Items that Fiserv had agreed to provide without cost appear on bills, in an express disregard of Fiserv's representations to Bessemer.  For example, Fiserv has billed the Credit Union for items that Fiserv agreed to pay for, including equipment and travel expenses related to attempts to address connectivity issues.  Additionally, Fiserv has sent the Credit Union a large bill for statement mailing services nearly one year late.  Moreover, Fiserv's November 2017 invoice to the Credit Union includes a line item for Vacation Club withdrawals and Christmas Club withdrawals, which should have been invoiced months earlier.  The amounts for these withdrawals are also incorrect and inconsistent with prior invoices from Fiserv.

115.    In or around August 2016, Fiserv insisted that the Credit Union add increased memory and a firewall to its system, based on Fiserv's assurances that these upgrades would fix various issues.  In fact, these hardware upgrades failed to resolve the issues that Fiserv represented they would fix.

116.    Fiserv has instructed Bessemer to install additional memory on computers that were ordered for Bessemer by Fiserv and according to Fiserv's specifications.  Fiserv represented that purchasing and installing new CAT6 cables for all workstations would provide relief for some issues the Credit Union was facing, but that has not been the case.

117.    Bessemer, in reliance on Fiserv's representations, procured and installed a new hub, and a new Cisco 24 port switch in an effort to solve connectivity problems.  Bessemer also upgraded its internet speed.  While Fiserv represented to Bessemer that obtaining these goods and services would fix various problems, that has not been the case.

118.    Fiserv forced the Credit Union to transition to its Loancierge[6] program with very little notice, and the program has been riddled with bugs and defects.  The Credit Union wished to stay with Loan Advantage for its loan processing, but Fiserv indicated that it was not willing to invest in the programming changes necessary to correct calculation problems that had been noticed in Loan Advantage.  Fiserv refused to support that software and insisted that the Credit Union pay thousands of dollars in implementation fees for continued viable use of this functionality through an "upsold" additional Fiserv product.  Unfortunately, Loancierge has similar defects.

119.    Fiserv's Sellstation/Charlotte Teller[7] and other Fiserv software platforms have connectivity issues, causing the system to be down repeatedly, together with other serious defects affecting Bessemer's operations.  In particular, the freezing of the software seemed to become more prominent when Bessemer was handling an increased number of transactions, which meant that on its busiest days, the Credit Union suffered the worst issues with the software.  Despite Bessemer having informed Fiserv of the issue, as recently as June 27, 2018, the software was severely lagging, causing a serious delay in servicing members.  At the

---

[6]    Loancierge is a loan processing system that purports to provide member information to a credit union "on demand" and with "first-in-class functionality with a native, browser-based interface users can access anytime, anywhere."  *See* https://www.fiserv.com/industries/credit-unions/loancierge.aspx (last visited April 25, 2019).

[7]    Sellstation/Charlotte Teller is Fiserv's transaction processing software that is a part of Fiserv's Charlotte core processing system.

suggestion of Fiserv, the Credit Union has made a significant investment to have both a Public

(Internet) and a Private (MPLS) connection to Fiserv in order to avoid inconvenience to

Bessemer's members. However, the problem is at the host (Fiserv) rather than with the type of

connection Bessemer has.

120.    Bessemer asked Fiserv initially for a proposal to implement "real-time" negative

balance reporting through the MasterCard debit network, and Fiserv responded that this update

would be "simple" and would require ███████████████ to make negative balances

within the ATM/debit system available. Bessemer, in reliance on this representation by Fiserv,

began a six-week implementation process with its Courtesy Pay provider as a result of Fiserv's

assurances that the update would be "simple" and cost efficient, and would require ███████

███████ Four weeks into the process, the Credit Union tested a Courtesy Pay debit card at an

ATM, and the transaction was unsuccessful. When the Credit Union informed Fiserv of the

defect, Fiserv responded that it "just realized" that the Credit Union's debit cards and debit

program were not "real-time," even though Fiserv was previously aware of this information.

Fiserv then indicated that █████████████████████████████████

would be required to obtain the functionality originally promised by Fiserv ███████████

121.    The Office of Foreign Assets Control ("**OFAC**") scans are mandated to ensure

that financial institutions such as Bessemer are in compliance with regulations designed to curb

transactions that may funnel resources to terrorists, narcotics traffickers, and other problematic

individuals and entities. Since at least 2005, the biweekly scans had been automatic, and

Fiserv's system would send an automatic email to indicate that the scan had been done and to

note whether any further research was needed for potential "hits" on the OFAC sanctions lists.

Recently, when Bessemer stopped receiving notice of the automatic scans, Fiserv indicated that

it no longer would perform the required scans. Fiserv, however, failed to provide the required written notice to Bessemer regarding its to change and/or discontinuance of this process. Instead, Fiserv stopped performing this account processing service altogether without providing proper notice to Bessemer. From April 1, 2017 through July 27, 2017, Fiserv did not perform OFAC system scans. When the Credit Union asked Fiserv about an alternative procedure in July 2017, Fiserv tasked the Credit Union with manually performing OFAC scans through a burdensome process requiring 18 pages of instructions for manual work that involve Bessemer personnel manually editing text files, manipulating Excel files, and opening multiple windows and lists in Sellstation. This procedure is not only burdensome for Credit Union personnel, but it is inefficient, impractical, and a waste of Credit Union resources. Fiserv, however, previously represented to Bessemer that Fiserv would provide this functionality, and it has continued to invoice Bessemer for these OFAC scans, even though Fiserv's system was no longer performing this service.

122.   Even though Fiserv had knowledge that its system was malfunctioning, insecure, and reporting false information to the Credit Union and its members, Fiserv failed to properly address these issues, including by failing to put the Credit Union on notice of them, failing to report accurate information, refusing to return the Credit Union's information to it, and insisting that the Credit Union continue to receive services from Fiserv on an exclusive basis.

123.   The Credit Union frequently opens up support requests with Fiserv, sometimes as frequently as each business day. Fiserv has improperly closed the Credit Union's technical support requests without resolving them, or it has falsely mischaracterized issues reported to Fiserv. When the Credit Union reports an issue, Fiserv routinely marks these reports as either "no priority" or "medium priority," despite the issues being of high priority to the Credit Union.

Fiserv unilaterally makes these priority determinations and considers these matters closed without providing solutions. Support requests are routinely closed after a period of time even though no resolution has been provided. Fiserv's responses to support requests sometimes include verbiage to which the Credit Union can "Accept" or "Reject" Fiserv's response. Yet even when the Credit Union rejects a "proposed solution," Fiserv improperly closes the support request. Similarly, Fiserv has falsely mischaracterized the Credit Union as being satisfied with Fiserv's efforts to attempt to address problems, when that has not been the case.

### Fiserv Fails to Properly Respond to Bessemer's Claims and Reneges on a Settlement Agreement

124.     Prior to seeking redress in court, Bessemer availed itself of the Master Agreement's dispute-resolution provision, which requires the parties to work in good faith to resolve disputes prior to commencing litigation.

125.     **Exhibit 2** hereto is a true and correct copy of Bessemer's notice of breach, which invoked the dispute-resolution provision of the Master Agreement.

126.     As part of the notice of breach, Bessemer issued an audit demand for several categories of documents that Fiserv was required to produce to Bessemer under various provisions of the Master Agreement. These requested documents included documents related to the amounts Fiserv invoiced Bessemer, and documentation relating to the security of Bessemer's records and information in Fiserv's custody. Auditing these documents was important to Bessemer because, as a regulated financial institution, it is required to audit and manage its vendor relationships, improper charges have appeared on Fiserv invoices, and Fiserv has previously compromised the security of Bessemer's account records and information and permitted them to be accessed by unauthorized individuals. Fiserv, however, refused to timely participate in the audit and failed to provide the requested audit documents. Accordingly, Fiserv

was unable to establish that its invoices were proper or to provide adequate, let alone any, assurances that Bessemer's account records and information were being properly safeguarded in accordance with applicable requirements.

127.     **Exhibit 3** hereto is a true and correct copy of Bessemer's supplemental notice of breach.

128.     Under the dispute-resolution provision of the Master Agreement, Fiserv was required to designate an officer or other management employee with authority to bind Fiserv to meet with Bessemer to resolve Bessemer's claims. Fiserv, in breach of its express duty under the Master Agreement, did not participate in this process as required by the Master Agreement, much less in good faith. On the contrary, Fiserv delayed, waiting until April 5, 2018—months after Bessemer provided its notice of breach—to designate a representative. Then, the individual representative Fiserv designated to meet with Bessemer lacked adequate knowledge of the relevant events and appeared to lack the sufficient authority to bind Fiserv to any good-faith resolution of Bessemer's claims, as required by the Master Agreement. That individual did not make a sufficient effort to resolve the dispute, nor did he do so within the 30-day deadline, as required by the Master Agreement. After the required dispute-resolution meeting, only then did Fiserv inform Bessemer that the "cure team" had been assembled only recently, and that it would require an additional two-week time frame for a "next discussion" in advance of arriving at a satisfactory resolution. To date, that proposed time has elapsed, and a satisfactory resolution has still not been provided. Fiserv has further failed to take appropriate actions, including making proper adjustments to its systems, to address Bessemer's claims.

129.     On April 11, 2018, Bessemer sent Fiserv a notice of termination, indicating that it was providing notice that Bessemer was terminating the Master Agreement. **Exhibit 4** hereto is

a true and correct copy of Bessemer's notice of termination.  Bessemer demanded that Fiserv

return Bessemer's files and information in a reasonable, commercially usable form and that

Fiserv take appropriate measures to ensure an orderly transition of services to the successor

vendor(s) that Bessemer may select.  In response, however, Fiserv has refused to promptly return

the files and information in response to Bessemer's demand.

130.    Fiserv has continued to invoice Bessemer for services "performed" after

Bessemer sent Fiserv the notice of termination, while also continuing to withhold Bessemer's

account records and information as an apparent bargaining chip.  **Exhibit 5** hereto is a true and

correct copy of the dispute letter concerning a post-termination invoice Fiserv issued to

Bessemer.

131.    In this dispute letter, Bessemer requested that Fiserv provide audit records

substantiating its invoices.

132.    Fiserv again was nonresponsive to Bessemer's audit demands.  Accordingly, on

July 18, 2018, Bessemer demanded that Fiserv refund the amounts that it was unable to

substantiate with supporting documentation.  **Exhibit 6** hereto is a copy of this correspondence.

133.    Fiserv continued to delay, responding to the Credit Union's audit demands for the

first time on September 11, 2018, but Fiserv's response was an incomplete, perfunctory summary

and contrived by Fiserv for litigation purposes.  **Exhibit 7** hereto is a copy of Fiserv's response,

with attachments omitted.

134.    Bessemer responded by indicating numerous deficiencies in Fiserv's audit

documentation and requested that Fiserv provide sufficient audit documentation, including

accurate copies of the documents Fiserv referred to in its September 11, 2018 summary.

**Exhibit 8** hereto is a copy of this correspondence.

135.    Fiserv responded later that day, refusing to provide the requested audit records. **Exhibit 9** hereto is a copy of this correspondence.

136.    On the heels of a litany of misconduct by Fiserv, including its failure to provide requested information while keeping Bessemer's member information hostage in an insecure environment vulnerable to security risks, Bessemer commenced a replevin action in this Court to recover Bessemer's member information from Fiserv.

137.    Bessemer and Fiserv agreed to settle the replevin action in accordance with an October 19, 2018 letter agreement.

138.    It was understood that the agreement settling and the dismissal of the replevin action " ███████████████████████████████████    Under this agreement, ███████████████████████████████████████████████ ████████████████████████████

139.    **Exhibit 10**, to be filed under seal separately from this Complaint but referenced herein, is a true and correct copy of this letter agreement.

140.    Given the security vulnerabilities and other problems Fiserv was having, Bessemer desired to deconvert its account records and information from Fiserv to Bessemer's successor vendor at the earliest possible opportunity.  In the letter agreement, however, Fiserv represented that ████████████████████████████████████████████ ██████████████████████████████ Fiserv, however, falsely represented to Bessemer that it would comply with the terms of this letter agreement and that such an expansive lead time was required, when Fiserv had no intent to honor that agreement or the need for such an expansive lead time.  Fiserv made these misrepresentations to falsely induce Bessemer into accepting a settlement agreement and dismissing the replevin action filed in this Court, and

Bessemer justifiably relied on Fiserv's misrepresentations when deciding whether to enter into that agreement and dismiss the replevin action.

141.    Fiserv has repudiated the letter agreement by refusing to accept Bessemer's tender of performance, refusing to perform as required by that agreement, and conditioning Fiserv's performance under that agreement on Bessemer's assent to additional and different terms.  For example, Fiserv insisted that Bessemer make an advance deposit of certain fees and charges before the deadline contained in the letter agreement for Bessemer to pay them, then Fiserv stopped work on the deconversion and refused to provide Bessemer's successor vendor a test file while insisting that Bessemer pay a "deconversion charge" that was not included in the letter agreement and that Fiserv changed ███████████████████████████

142.    After attempting to extort additional fees from Bessemer for weeks, Fiserv later retreated on some of its demands and to agreed re-commence the deconversion.  However, but for Fiserv's duplicity and illegitimate cessation of work while trying to extract additional money from Bessemer, Bessemer would have achieved an earlier deconversion to a superior vendor. Fiserv's representation in the letter agreement that "given the lead time required, deconversion is not likely to happen until near the June 30, 2019 expiration of the Master Agreement" is false. Rather, Fiserv misrepresented the need for such an expansive lead time in an attempt to have time to re-negotiate the terms of the settlement, while holding Bessemer's data hostage as a bargaining chip.  Fiserv made these misrepresentations to falsely induce Bessemer into accepting a settlement agreement and dismissing the replevin action filed in this Court, and Bessemer justifiably relied on Fiserv's misrepresentations when deciding whether to enter into that agreement and dismiss the replevin action.

**First Claim for Relief**
**Breach of Contract**
**(Against Defendant Fiserv Solutions Only)**

143.    Bessemer incorporates and realleges the preceding paragraphs.

144.    The Master Agreement and the October 19, 2018 letter agreement are valid and
binding obligations of Fiserv Solutions.

145.    In addition to the express terms of those contracts, the implied covenant of good
faith and fair dealing applies to Fiserv Solutions's contracts with Bessemer. When reasonably
read, the terms of these contracts imply certain other obligations that are necessary to vindicate
the parties' apparent intentions and reasonable expectations. By entering into the contracts,
Fiserv Solutions impliedly covenanted that it would act in good faith, including by providing
account processing and deconversion services suitable for the proper functioning of a credit
union and issuing invoices that were legitimate, bona fide, good faith, and supported.

146.    Bessemer has duly performed all obligations and satisfied all conditions required
of it under its contracts with Fiserv Solutions, except for those that were waived or excused by
Fiserv Solutions.

147.    Bessemer remains ready, willing, and able to perform its obligations under the
October 19, 2018 letter agreement.

148.    Fiserv Solutions has materially breached its obligations under its contracts with
Bessemer by failing to perform as required, repudiating its obligations, and breaching the
implied covenant of good faith and fair dealing.

149.    Fiserv Solutions has demonstrated a lack of good faith and fair dealing by, among
other things, unreasonably failing to provide account processing and promptly providing
deconversion services suitable for the proper functioning of a credit union and issuing improper
invoices and payment demands to Bessemer overstating the amounts Bessemer owes (while

correspondingly prohibiting Bessemer from asserting any right of deduction or setoff from amounts invoiced), thereby depriving Bessemer of the benefit of the bargains the parties struck.

150.    Fiserv Solutions's conduct is inconsistent with the terms and purposes of its contracts with Bessemer.  Fiserv Solutions's lack of good faith and fair dealing has had the effect of preventing Bessemer from receiving the reasonably expected benefit of the parties' bargain by, among other things, unreasonably and unnecessarily depriving Bessemer of the benefit of the account processing and deconversion services which were to be provided by Fiserv Solutions, exposing Bessemer to vastly greater harm than it had bargained for and well outside of commercially reasonable norms, and causing Bessemer to remit payments to Fiserv Solutions that are not justly due Fiserv Solutions or supported by any good-faith basis.

151.    Fiserv Solutions's contract breaches were caused by bad faith and its willful, malicious, reckless, or grossly negligent conduct, were not reasonably contemplated by Bessemer, were so unreasonable as to constitute an abandonment of Fiserv Solutions's agreements, and were breaches of Fiserv Solutions's fundamental obligations.

152.    Indeed, despite a pattern of recurring and known breaches, Fiserv Solutions was grossly negligent and reckless, failed to use even a slight degree of care, and acted with complete disregard for Bessemer's rights.  Although Fiserv Solutions had knowledge that its system was malfunctioning, reporting false information to Bessemer, and susceptible to vulnerabilities that compromised the confidentiality of member information, Fiserv Solutions failed to address properly these issues, including by failing to put Bessemer on notice of them, and refusing to promptly return Bessemer's account records and information to it so that Bessemer could transition to an alternative provider.

153.    As a result of Fiserv Solutions's contract breaches, Bessemer has suffered and will continue to suffer damages and harm.

WHEREFORE, Bessemer respectfully requests that this Court:

    (i)     enter judgment in Bessemer's favor for all damages allowed by law—including, without limitation, compensatory, consequential, incidental, reliance, restitutionary, delay, treble, and punitive—in amounts to be determined at trial and that exceed the amount specified in Rule 4301 for submission to a board of arbitrators;

    (ii)    award Bessemer its attorneys' fees, its costs, and the maximum prejudgment and postjudgment interest allowed by law;

    (iii)   issue an order of specific performance requiring Fiserv Solutions to specifically perform its obligations to Bessemer;

    (iv)   issue an injunction to prevent Bessemer from suffering or continuing to suffer harm; and

    (v)    grant Bessemer any further relief that may be necessary to achieve justice or that is deemed proper and appropriate under the circumstances by this Court.

### Second Claim for Relief
### Negligence

154.    Bessemer incorporates and realleges the preceding paragraphs.

155.    Fiserv owed a duty to Bessemer because in affirmatively collecting, storing, and processing sensitive personal and financial information on internet-accessible computer systems, Fiserv owed a duty to Bessemer to exercise reasonable care under the circumstances, which includes using reasonable measures to protect the information from the foreseeable risk of a data

breach, unauthorized third-party access, or loss or alteration.  Troves of highly sensitive personal and financial data are stored on internet-accessible systems administered by Fiserv and are obvious targets for cyber criminals.  A reasonable entity in Fiserv's position should foresee that a failure to use reasonable security measures, or a failure to maintain and provide complete and accurate information, can lead to serious financial consequences.  Accordingly, in collecting, storing, and processing Bessemer's member information on internet-accessible computer systems, Fiserv owed a duty to exercise reasonable care to protect Bessemer against unreasonable risks of harm arising out of those acts.  Fiserv, as the entity with custody of that information, was the only party that realistically could ensure that its systems were sufficient to properly handle and protect the sensitive member information that Bessemer entrusted to Fiserv.

156.    Fiserv also owed a duty to Bessemer because Fiserv was certain that Bessemer would suffer, and Bessemer did in fact suffer and will continue to suffer, monetary and reputational injury.

157.    Fiserv also owed a duty to Bessemer because there is a close connection between Fiserv's conduct and Bessemer's injuries insofar as Bessemer would not have been injured but for Fiserv's negligence.

158.    Fiserv also owed a duty to Bessemer because there is a strong public policy interest in banking given that it is an essential service on which consumers must rely, as well as a strong public policy interest in preventing Fiserv from behaving in such a reckless, careless, and negligent fashion and from shifting blame to others.

159.    Fiserv further owed a duty to Bessemer because the burden on Fiserv is minimal and the consequences in the community are positive as a result of imposing a duty on Fiserv under these circumstances.

160.    Fiserv also owes a duty because, upon information and belief, there is insurance available for this risk.  Moreover, Fiserv, which reported annual revenues in excess of $5 billion, can afford any damages awarded by the trier of fact.

161.    Through its acts, omissions, concealments, and misrepresentations, Fiserv failed to act with the care that a reasonably prudent person would exercise in the same or similar circumstances.

162.    Fiserv was grossly negligent and reckless, failed to use even a slight degree of care, and acted with complete disregard for Bessemer's rights.

163.    Without limitation, Fiserv failed to institute appropriate protective measures to maintain the safety, security, and accuracy of the confidential member information to which it was entrusted.

164.    Fiserv failed to inform or warn Bessemer of at least the following:

- that Fiserv had failed to enact appropriate measures to protect the safety, security, and accuracy of Bessemer's member information;

- that in the absence of such measures, Fiserv would permit unauthorized individuals to access, delete, or modify Bessemer's member information, and that member information provided to authorized individuals would not be accurate;

- that Bessemer should independently take any protective measures to ensure that the safety, security, and accuracy of its member information would be maintained; and

- that Bessemer's member information had been, or was reasonably believed to have been, compromised or falsely reported.

165.    Fiserv's negligence has occurred on many occasions during the course of the parties' relationship and after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.

166.    Fiserv's acts, omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a tort because the relevant duties (e.g., the duties to act in a reasonable, nonnegligent manner) arose regardless of any contract between Fiserv Solutions and Bessemer, and Fiserv has violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the law of torts.

167.    Fiserv's negligence has harmed Bessemer, including physical harm in the form of loss of and alterations to Bessemer's account records and information.  These records and information are stored in a tangible format in information technology systems or other media administered by Fiserv.  Fiserv Solutions acknowledged that Bessemer's records and information ███████████████████████████ (Master Agreement § 3(b)).  Further, such property is identifiable with, merged into, or of the kind customarily identified with and merged into documents.  Indeed, such records and information embody and represent, without limitation, the title to the shares Bessemer members own as well as debts and other obligations of Bessemer to its members.  Such records and information thus embody, represent the title to, and are essential to protecting and enforcing property rights and other legally enforceable obligations.  Moreover, such records and information were created and maintained as a result of Bessemer's substantial investment of time, effort, and money.

168.    As a direct and proximate result of Fiserv's negligence, Bessemer has suffered and will continue to suffer damages and harm.  Such damages and harm include payments made to Fiserv for services that were not properly performed, damage to Bessemer's business, being

placed at an imminent, immediate, and continuing increased risk of harm from utilizing inaccurate information and being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, cancelling and reissuing payment cards, imposing withdrawal and transactional limits on accounts, and losing interest revenue and fees due to reduced account usage.

WHEREFORE, Bessemer respectfully requests that this Court:

    (i)    enter judgment in Bessemer's favor for all damages allowed by law— including, without limitation, compensatory, consequential, incidental, reliance, restitutionary, statutory, delay, treble, and punitive—in amounts to be determined at trial and that exceed the amount specified in Rule 4301 for submission to a board of arbitrators;

    (ii)    award Bessemer its attorneys' fees, its costs, and the maximum prejudgment and postjudgment interest allowed by law;

    (iii)    issue an injunction to prevent Bessemer from suffering or continuing to suffer harm; and

    (iv)    grant Bessemer any further relief that may be necessary to achieve justice or that is deemed proper and appropriate under the circumstances by this Court.

### Third Claim for Relief
**Unfair and Deceptive Trade Acts and Practices**

169.    Bessemer incorporates and realleges the preceding paragraphs.

170.    As a credit union, Bessemer is a not-for-profit cooperative owned and controlled by individual consumers who pool their resources to provide credit to one another.  Bessemer's purpose, as expressed in its bylaws, is to be "a member-owned, democratically operated, not-for-profit managed by a volunteer board of directors, with the specified mission of meeting the credit and savings needs of consumers, especially persons of modest means."  Bessemer thus exists to serve its members and their individual consumer savings needs, rather than to engage in business activities that generate profits.  Further, the extent of Bessemer's activities is limited by its bylaws and applicable law, which generally restrict Bessemer to conducting activities necessary to perform its not-for-profit, consumer-service mission.  Accordingly, the relevant goods and services provided by Fiserv (e.g., Bessemer's online banking website and bill payment service) are consumer-oriented and primarily for the personal, family, or household purposes of Bessemer's members, who are individual consumers belonging to a cooperative.  Indeed, such members are intended to benefit from Fiserv's relevant goods and services, and such consumers receive certain of such goods and services directly from Fiserv for the members' personal, family, or household purposes.

171.    As set forth in the preceding paragraph and incorporated herein by reference, by and through its acts, omissions, concealments, and misrepresentations, Fiserv violated nonfederal laws prohibiting unfair and deceptive trade acts and practices by engaging in acts and practices that materially affect consumers at large, including Bessemer and its several thousand members who are individual consumers.  These acts and practices constitute a pattern of behavior on the part of Fiserv, pursued as a wrongful business practice, that has victimized and continues to victimize consumers, including not-for-profit cooperatives owned by individual consumers.

172.    Fiserv's unlawful acts and practices include, without limitation:

(a)    causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods and services that Fiserv provided or contemplated providing to Bessemer's members;

(b)    representing that its goods and services have sponsorship, approval, characteristics, uses, benefits, or quantities that they do not have;

(c)    falsely representing that its goods and services are of particular standards, qualities, or grades;

(d)    advertising goods or services with the intent not to sell them as advertised;

(e)    advertising goods and services with the intent not to supply reasonably expectable public demand of Bessemer's members and the other individual end-user consumers on Fiserv's shared systems, without adequate disclosures of quantity limitations;

(f)    making false and misleading statements of fact concerning the reasons for, existence of, or amounts of prices and price reductions, including failing to clearly set forth prices in a manner in which can reasonably be ascertained;

(g)    failing to comply with the terms of written guarantees or warranties provided prior to or after contracts for the purchase of goods and services are made;

(h)    knowingly misrepresenting that services, replacements, or repairs are needed when they are not needed;

(i)      making repairs, improvements, or replacements on

tangible, real, or personal property, of a nature or quality inferior to or below the

standard of that agreed to in writing; and

(j)      engaging in other fraudulent and deceptive conduct that

creates a likelihood of confusion or misunderstanding.

173.    Fiserv's acts, omissions, concealments, and misrepresentations are part of a

pattern or practice that has harmed individual consumers, including thousands of individual

consumers who are Bessemer's members.  Fiserv provides Bessemer and its members with a

standardized account processing system that is shared with other Fiserv customers, and Fiserv

adopts standardized coding in performing its services.  Indeed, according to Fiserv, it supports

more than 80 million online banking end users.  Further, Fiserv has employed standardized

policies and business practices.  In addition, some of Fiserv's acts, omissions, concealments, and

misrepresentations were communicated to the public at large as part of an extensive marketing

scheme conducted through the publicly accessible website www.fiserv.com.  Thus, Fiserv's acts,

omissions, concealments, and misrepresentations are part of a pattern or practice directed at the

public generally and that has harmed Bessemer and its members (who are individual consumers),

as well as other financial institutions that are customers of Fiserv and those financial institutions'

customers (who are individual consumers).

174.    Fiserv's acts, omissions, concealments, and misrepresentations are fraudulent in

that they are likely to mislead reasonable consumers acting reasonably under the circumstances

and they have deceived Bessemer, its members, and the public.  For example, Fiserv has made

numerous misrepresentations about consumers' financial account information, including the

amounts consumers have on deposit with Bessemer, the amounts members owe Bessemer, the

amounts Bessemer owes its members, and the existence and status of members' accounts.  As a further example, Fiserv has made numerous misrepresentations about the capabilities and prices of its service offerings, the security of confidential information entrusted to Fiserv, the necessity for certain repairs or additional services, and the amounts Bessemer owes Fiserv as reflected on Fiserv's invoices or in Fiserv's payment demands.  As an additional example, Fiserv's acts, omissions, concealments, and misrepresentations have undermined consumers' abilities to evaluate their market options and to make free and intelligent choices to receive services from Bessemer, thereby harming Bessemer by reducing the number of consumers who are able to, or desire to, receive services from Bessemer.

175.    Bessemer and its members-consumers have relied, and continue to rely, on Fiserv's acts, omissions, concealments, and misrepresentations to their detriment.  For example, Bessemer has engaged in transactions with members, refused to engage in transactions with members (including withholding funds justly owing to members), or otherwise dealt with members based upon the false account records and information provided by Fiserv.  As a further example, Bessemer has made overpayments to Fiserv based on Fiserv's false representations on invoices that certain fees were due and owing to Fiserv, and Fiserv falsely represented the soundness and security of its system, inducing Bessemer and its members to entrust Fiserv with their sensitive information.

176.    Fiserv's acts, omissions, concealments, and misrepresentations are directly contradicted by information that either (a) originated from or concerns Fiserv and its product and service offerings, and was thereby already known by Fiserv, or (b) was provided to Fiserv by third parties such as Bessemer and its members, and such information was thereby known by Fiserv.  Fiserv is responsible for knowing the existence and contents of information within its

custody and control.  Accordingly, Fiserv's acts, omissions, concealments, and misrepresentations were knowingly false when made or recklessly made without regard to their falsity.

177.    Fiserv knew, or should have known in the exercise of reasonable care, that its acts, omissions, concealments, and misrepresentations were untrue, were misleading, and did deceive members of the general public, and that consumers and their not-for-profit cooperatives would rely, and did in fact rely, on Fiserv's acts, omissions, concealments, and misrepresentations.

178.    Fiserv's acts, omissions, concealments, and misrepresentations offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

179.    Fiserv's unfair and deceptive trade acts and practices have occurred on many occasions during the course of the parties' relationship and after Bessemer provided a notice of termination of the Master Agreement with Fiserv Solutions on April 11, 2018.

180.    Fiserv's acts, omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a statutory claim because the relevant statutory duties arose regardless of any contract between Fiserv Solutions and Bessemer, and Fiserv has violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018. Accordingly, the duties violated by Fiserv are defined by the social policies enshrined by legislatures in enacting laws prohibiting deceptive trade acts and practices.

181.     Fiserv has benefited from Bessemer's and its members' reliance on its acts, omissions, concealments, and misrepresentations by, among other things, causing Bessemer to enter into transactions that provided Fiserv with additional and excessive profits, collecting amounts that were not justly due to it or legally chargeable against Bessemer and Fiserv's other customers, and preventing Bessemer and its members from using vendors that are competitive with Fiserv.

182.     In addition to the misconduct occurring in the Commonwealth of Pennsylvania, New York law governs the Master Agreement, and Fiserv conducts activities in other states and has caused harm to Bessemer and its members in other states.

183.     Fiserv has engaged in unfair and deceptive trade acts and practices in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law as well as New York's General Business Law (N.Y. GEN. BUS. LAW §§ 349, *et seq.*), Ohio's Deceptive Trade Practices Law (OHIO REV. CODE §§ 4165.02, *et seq.*) and Consumer Sales Practices Act (OHIO REV. CODE §§ 1345.01, *et seq.*), Wisconsin's Deceptive Trade Practices Act (WIS. STAT. §§ 100.18, *et seq.*) and, to the extent applicable, other nonfederal laws of other states or jurisdictions.  This complaint expressly excludes any claim arising under the United States Constitution, laws, or treaties of the United States.

184.     As a direct and proximate result of Fiserv's unfair and deceptive trade acts and practices, Bessemer has suffered and will continue to suffer damages and harm.  Such damages and harm include payments made to Fiserv for services that were not properly performed, damage to Bessemer's business, being placed at an imminent, immediate, and continuing increased risk of harm from utilizing inaccurate information and being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of

Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, cancelling and reissuing payment cards, imposing withdrawal and transactional limits on accounts, and losing interest revenue and fees due to reduced account usage.

WHEREFORE, Bessemer respectfully requests that this Court:

     (i)     enter judgment in Bessemer's favor for all damages allowed by law— including, without limitation, statutory, compensatory, consequential, incidental, reliance, restitutionary, statutory, treble, delay, and punitive— in amounts to be determined at trial and that exceed the amount specified in Rule 4301 for submission to a board of arbitrators;

     (ii)     award Bessemer its attorneys' fees, its costs, and the maximum prejudgment and postjudgment interest allowed by law;

     (iii)     issue an injunction to prevent Bessemer from suffering or continuing to suffer harm; and

     (iv)     grant Bessemer any further relief that may be necessary to achieve justice or that is deemed proper and appropriate under the circumstances by this Court.

### Fourth Claim for Relief
### Fraud

185.    Bessemer incorporates and realleges the preceding paragraphs.

186.    As set forth in the preceding paragraphs incorporated herein by reference, on many occasions during the course of the parties' relationship and after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018, Fiserv made false acts, omissions, concealments, and misrepresentations.  For example, Fiserv has made numerous

misrepresentations about consumers' financial account information, including the amounts

consumers have on deposit with Bessemer, the amounts members owe Bessemer, the amounts

Bessemer owes its members, and the existence and status of members' accounts. As a further

example, Fiserv has made numerous misrepresentations about the capabilities and prices of its

service offerings, the necessity for certain repairs or additional services, the amounts Bessemer

owes Fiserv as reflected on Fiserv's invoices, and the security of member information while in

Fiserv's custody.

187.   Fiserv's acts, omissions, concealments, and misrepresentations are directly

contradicted by information that either (a) originated from or concerns Fiserv and its product and

service offerings, and was thereby known by Fiserv, or (b) was provided to Fiserv by third

parties such as Bessemer and its members, and such information was thereby known by Fiserv.

Fiserv is responsible for knowing the existence and contents of information within its custody

and control. Accordingly, Fiserv's acts, omissions, concealments, and misrepresentations were

knowingly false when made or recklessly made without regard to their falsity.

188.   Fiserv knew or should have known that its acts, omissions, concealments, and

misrepresentations were material to Bessemer and were made with the intent of misleading

Bessemer into relying upon them, and Bessemer did so justifiably rely. Indeed, as Fiserv

acknowledges in its own Code of Conduct & Business Ethics, "Fiserv is committed to

maintaining full, fair, accurate and timely accounting and business records. This … protects our

legal interests; and helps us preserve the trust of our clients." *See*

https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (version in

effect on August 22, 2018). As further explained by Fiserv, "[t]he unique nature of our business

requires that all Fiserv computer systems and networks operate with the availability, efficiency,

reliability and integrity that are expected of systems that process financial transactions and store financial data. The company is firmly committed to operating and maintaining its technology assets in a manner that merits the trust and confidence of the clients and consumers we serve." *Id.* What's more, as Fiserv explains, "[b]ecause the principal market for our products and services is the regulated financial services industry, the consequences of non-compliant offerings could seriously damage our reputation and financial interests." *Id.* Fiserv thus knew, in light of the unique nature of its business providing services to regulated financial institutions, that a failure to supply full, fair, accurate, and timely information to a financial institution such as Bessemer would not only undermine a client's justifiable trust in Fiserv, but also cause serious damage and give rise to legal liability.

189.    Bessemer has justifiably relied on Fiserv's acts, omissions, concealments, and misrepresentations to Bessemer's detriment by, among other things, entering into transactions that provided Fiserv with additional and excessive profits, paying Fiserv amounts that were not justly due to it or legally chargeable against Bessemer, and engaging in transactions with Bessemer's members, refusing to engage in transactions with members (including withholding funds justly owing to members), or otherwise dealing with members based upon the false account records and information provided by Fiserv.

190.    Fiserv's acts, omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer. The duties violated by Fiserv are in the nature of a tort because the relevant duties (e.g., the duty to not make false acts, omissions, concealments, and misrepresentations) arose regardless of any contract between Fiserv Solutions and Bessemer, and Fiserv has violated such duties after Bessemer provided a notice of

termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the law of torts.

191.    By its acts, omissions, concealments, and misrepresentations, Fiserv defrauded Bessemer.

192.    As a direct and proximate result of Fiserv's fraud, Bessemer has suffered and will continue to suffer damages and harm.  Such damages and harm include payments made to Fiserv for services that were not properly performed, damage to Bessemer's business, being placed at an imminent, immediate, and continuing increased risk of harm from utilizing inaccurate information and being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, cancelling and reissuing payment cards, imposing withdrawal and transactional limits on accounts, and losing interest revenue and fees due to reduced account usage.

WHEREFORE, Bessemer respectfully requests that this Court:

(i)     enter judgment in Bessemer's favor for all damages allowed by law—including, without limitation, compensatory, consequential, incidental, reliance, restitutionary, delay, treble, and punitive—in amounts to be determined at trial and that exceed the amount specified in Rule 4301 for submission to a board of arbitrators;

(ii)    award Bessemer its attorneys' fees, its costs, and the maximum prejudgment and postjudgment interest allowed by law;

(iii)   issue an injunction to prevent Bessemer from suffering or continuing to

suffer harm; and

(iv)    grant Bessemer any further relief that may be necessary to achieve justice

or that is deemed proper and appropriate under the circumstances by this

Court.

### Fifth Claim for Relief
### Constructive Fraud

193.    Bessemer incorporates and realleges the preceding paragraphs.

194.    The parties were in a relationship of trust and confidence in which Fiserv wielded superior knowledge, skill, expertise, and influence over Bessemer. Among other reasons, Fiserv controls Bessemer's records and information, Fiserv refused to promptly return Bessemer's records and information to it, Fiserv was in an exclusive relationship with Bessemer, Fiserv prohibited Bessemer from performing certain services on its own account or through other service providers, and Fiserv sought to induce the dependence and trust of Bessemer.

195.    As set forth in the preceding paragraphs incorporated herein by reference, on many occasions during the course of the parties' relationship and after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018, Fiserv made false acts, omissions, concealments, and misrepresentations. For example, Fiserv has made numerous misrepresentations about consumers' financial account information, including the amounts consumers have on deposit with Bessemer, the amounts members owe Bessemer, the amounts Bessemer owes its members, and the existence and status of members' accounts. As a further example, Fiserv has made numerous misrepresentations about the capabilities and prices of its service offerings, the necessity for certain repairs or additional services, the amounts Bessemer owes Fiserv as reflected on Fiserv's invoices, and the security of member information while in Fiserv's custody.

196.    Fiserv's acts, omissions, concealments, and misrepresentations were false or recklessly made without regard to their falsity, and were material to Bessemer, and Bessemer did justifiably rely on them.

197.    Fiserv knew or should have known that its acts, omissions, concealments, and misrepresentations were material to Bessemer, and Bessemer did justifiably rely on them. Indeed, as Fiserv acknowledges in its own Code of Conduct & Business Ethics, "Fiserv is committed to maintaining full, fair, accurate and timely accounting and business records.  This … protects our legal interests; and helps us preserve the trust of our clients." *See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (version in effect on August 22, 2018).  As further explained by Fiserv, "[t]he unique nature of our business requires that all Fiserv computer systems and networks operate with the availability, efficiency, reliability and integrity that are expected of systems that process financial transactions and store financial data.  The company is firmly committed to operating and maintaining its technology assets in a manner that merits the trust and confidence of the clients and consumers we serve." *Id*.  What's more, as Fiserv explains, "[b]ecause the principal market for our products and services is the regulated financial services industry, the consequences of non-compliant offerings could seriously damage our reputation and financial interests."  *Id*.  Fiserv thus knew, in light of the unique nature of its business providing services to regulated financial institutions, that a failure to supply full, fair, accurate, and timely information to a financial institution such as Bessemer would not only undermine a client's justifiable trust in Fiserv, but also cause serious damage and give rise to legal liability.

198.    Bessemer has justifiably relied on Fiserv's acts, omissions, concealments, and misrepresentations to Bessemer's detriment by, among other things, entering into transactions

that provided Fiserv with additional and excessive profits, paying Fiserv amounts that were not justly due to it or legally chargeable against Bessemer, and engaging in transactions with Bessemer's members, refusing to engage in transactions with members (including withholding funds justly owing to members), or otherwise dealing with members based upon the false account records and information provided by Fiserv.

199.    Fiserv's acts, omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a tort because the relevant duties (e.g., the duty to not make false acts, omissions, concealments, and misrepresentations) arose regardless of any contract between Fiserv Solutions and Bessemer, and Fiserv has violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the law of torts.

200.    By its acts, omissions, concealments, and misrepresentations, Fiserv constructively defrauded Bessemer.

201.    As a direct and proximate result of Fiserv's constructive fraud, Bessemer has suffered and will suffer damages and harm.  Such damages and harm include payments made to Fiserv for services that were not properly performed, damage to Bessemer's business, being placed at an imminent, immediate, and continuing increased risk of harm from utilizing inaccurate information and being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, cancelling and reissuing payment cards,

imposing withdrawal and transactional limits on accounts, and losing interest revenue and fees due to reduced account usage.

WHEREFORE, Bessemer respectfully requests that this Court:

      (i)     enter judgment in Bessemer's favor for all damages allowed by law—including, without limitation, compensatory, consequential, incidental, reliance, restitutionary, delay, treble, and punitive—in amounts to be determined at trial and that exceed the amount specified in Rule 4301 for submission to a board of arbitrators;

      (ii)    award Bessemer its attorneys' fees, its costs, and the maximum prejudgment and postjudgment interest allowed by law;

      (iii)   issue an injunction to prevent Bessemer from suffering or continuing to suffer harm; and

      (iv)   grant Bessemer any further relief that may be necessary to achieve justice or that is deemed proper and appropriate under the circumstances by this Court.

### Sixth Claim for Relief
### Negligent Misrepresentation

202.    Bessemer incorporates and realleges the preceding paragraphs.

203.    Fiserv assumed a duty to provide accurate information to Bessemer, and Fiserv had the means to determine the accuracy of the information it was providing to Bessemer.

204.    As set forth in the preceding paragraphs incorporated herein by reference, on many occasions during the course of the parties' relationship and after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018, Fiserv made false acts, omissions, concealments, and misrepresentations.

205.     Fiserv's acts, omissions, concealments, and misrepresentations were false, were caused by Fiserv's negligence, gross negligence, or recklessness, were material to Bessemer, and were justifiably relied on by Bessemer.  For example, Fiserv has made numerous misrepresentations about consumers' financial account information, including the amounts consumers have on deposit with Bessemer, the amounts members owe Bessemer, the amounts Bessemer owes to members, and the existence and status of members' accounts.  As a further example, Fiserv has made numerous misrepresentations about the capabilities and prices of its service offerings, the necessity for certain repairs or additional services, the amounts Bessemer owes Fiserv as reflected on Fiserv's invoices, and the security of member information while in Fiserv's custody.

206.     Fiserv's acts, omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a tort because the relevant duties (e.g., the duty to not make false acts, omissions, concealments, and misrepresentations) arose regardless of any contract between Fiserv Solutions and Bessemer, and Fiserv has violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the law of torts.

207.     By its acts, omissions, concealments, and misrepresentations, Fiserv made negligent misrepresentations to Bessemer.

208.     Fiserv knew or should have known that its acts, omissions, concealments, and misrepresentations were material to Bessemer, and Bessemer did justifiably rely on them. Indeed, as Fiserv acknowledges in its own Code of Conduct & Business Ethics, "Fiserv is

committed to maintaining full, fair, accurate and timely accounting and business records.  This

… protects our legal interests; and helps us preserve the trust of our clients." *See*

https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (version in

effect on August 22, 2018).  As further explained by Fiserv, "[t]he unique nature of our business

requires that all Fiserv computer systems and networks operate with the availability, efficiency,

reliability and integrity that are expected of systems that process financial transactions and store

financial data.  The company is firmly committed to operating and maintaining its technology

assets in a manner that merits the trust and confidence of the clients and consumers we serve."

*Id*.  What's more, as Fiserv explains, "[b]ecause the principal market for our products and

services is the regulated financial services industry, the consequences of non-compliant offerings

could seriously damage our reputation and financial interests." *Id.*  Fiserv thus knew, in light of

the unique nature of its business providing services to regulated financial institutions, that a

failure to supply full, fair, accurate, and timely information to a financial institution such as

Bessemer would not only undermine a client's justifiable trust in Fiserv, but also cause serious

damage and give rise to legal liability.

209.    Bessemer has justifiably relied on Fiserv's acts, omissions, concealments, and

misrepresentations to Bessemer's detriment by, among other things, entering into transactions

that provided Fiserv with additional and excessive profits, paying Fiserv amounts that were not

justly due to it or legally chargeable against Bessemer, and engaging in transactions with

Bessemer's members, refusing to engage in transactions with members (including withholding

funds justly owing to members), or otherwise dealing with members based upon the false

account records and information provided by Fiserv.

210.    Fiserv's negligence has harmed Bessemer, including physical harm in the form of loss of and alterations to Bessemer's account records and information.  These records and information are stored in a tangible format in information technology systems or other media administered by Fiserv.  Fiserv Solutions acknowledged that Bessemer's records and information ██████████████████████████ (Master Agreement § 3(b)).   Further, such property is identifiable with, merged into, or of the kind customarily identified with and merged into documents.  Indeed, such records and information embody and represent, without limitation, the title to the shares Bessemer members own as well as debts and other obligations of Bessemer to its members.  Such records and information thus embody, represent the title to, and are essential to protecting and enforcing property rights and other legally enforceable obligations.  Moreover, such records and information were created and maintained as a result of Bessemer's substantial investment of time, effort, and money.

211.    As a direct and proximate result of Fiserv's negligent misrepresentations, Bessemer has suffered and will continue to suffer damages and harm.  Such damages and harm include payments made to Fiserv for services that were not properly performed, damage to Bessemer's business, being placed at an imminent, immediate, and continuing increased risk of harm from utilizing inaccurate information and being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, cancelling and reissuing payment cards, imposing withdrawal and transactional limits on accounts, and losing interest revenue and fees due to reduced account usage.

WHEREFORE, Bessemer respectfully requests that this Court:

(i)     enter judgment in Bessemer's favor for all damages allowed by law—
        including, without limitation, compensatory, consequential, incidental,
        reliance, restitutionary, delay, treble, and punitive—in amounts to be
        determined at trial and that exceed the amount specified in Rule 4301 for
        submission to a board of arbitrators;

(ii)    award Bessemer its attorneys' fees, its costs, and the maximum
        prejudgment and postjudgment interest allowed by law;

(iii)   issue an injunction to prevent Bessemer from suffering or continuing to
        suffer harm; and

(iv)    grant Bessemer any further relief that may be necessary to achieve justice
        or that is deemed proper and appropriate under the circumstances by this
        Court.

### Seventh Claim for Relief
**Conversion/Misappropriation**

212.    Bessemer incorporates and realleges the preceding paragraphs.

213.    Bessemer has a property interest in its account records and information.  These
records and information are stored in a tangible format in information technology systems or
other media administered by Fiserv.  Fiserv Solutions acknowledged that Bessemer's records and
information █████████████████████████ (Master Agreement § 3(b)).   Further,
such property is identifiable with, merged into, or of the kind customarily identified with and
merged into documents.  Indeed, such records and information embody and represent, without
limitation, the title to the shares Bessemer members own as well as debts and other obligations of
Bessemer to its members.  Such records and information thus embody, represent the title to, and
are essential to protecting and enforcing property rights and other legally enforceable

obligations.  Moreover, such records and information were created and maintained as a result of Bessemer's substantial investment of time, effort, and money.

214.   Bessemer also has a property interest in funds deposited in members' share draft accounts or otherwise in the custody of Bessemer, as well as in funds that are due and owing to Bessemer and its members.  Such funds are specifically identifiable and subject to an obligation to be treated in a particular manner.

215.   Bessemer's property interest in the foregoing assets arises from Bessemer's ownership of such property.  Alternatively, to the extent such property is owned by Bessemer's members, those members have authorized Bessemer to possess such property.

216.   As between Bessemer and Fiserv, Bessemer has superior possessory rights in this property.

217.   Bessemer and its authorized members have demanded that Fiserv return and make available such property, or such demand was excused and rendered unreasonable by Fiserv's acts and omissions.

218.   Fiserv has converted and misappropriated this property by refusing to return it, destroying it, compromising its integrity, misusing it, interfering with Bessemer's use and possession of it, and otherwise dealing with it in a manner inconsistent with Bessemer's superior possessory rights.  Fiserv's conversion and misappropriation of such property was done without Bessemer's consent and without lawful justification.

219.   Fiserv's misconduct has had the effect of allowing it to reap the benefits of unlawfully possessing such property by, among other things, insisting that Bessemer pay Fiserv for additional services and prohibiting Bessemer from performing such services on its own

account or through Fiserv competitors while Fiserv holds Bessemer's account records and information hostage.

220.    Fiserv's interference with Bessemer's property rights has occurred on many occasions during the course of the parties' relationship and after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.

221.    Fiserv's interference with Bessemer's property rights violates broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a tort because the relevant duties (e.g., the duties to respect Bessemer's property rights) arose regardless of any contract between the parties, the Master Agreement specifically acknowledged that Bessemer's account records and information ███████████████████████ (Master Agreement § 3(b)), and, in any event, Fiserv has violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the law of torts.

222.    As a direct and proximate result of Fiserv's conversion and misappropriation, Bessemer has suffered and will continue to suffer damages and harm.

WHEREFORE, Bessemer respectfully requests that this Court:

        (i)     enter judgment in Bessemer's favor for all damages allowed by law—including, without limitation, compensatory, consequential, incidental, reliance, restitutionary, statutory, delay, treble, and punitive—in amounts to be determined at trial and that exceed the amount specified in Rule 4301 for submission to a board of arbitrators;

       (ii)    award Bessemer its attorneys' fees, its costs, and the maximum

prejudgment and postjudgment interest allowed by law;

(iii)  issue an injunction to prevent Bessemer from suffering or continuing to

suffer harm; and

(iv)  grant Bessemer any further relief that may be necessary to achieve justice

or that is deemed proper and appropriate under the circumstances by this

Court.

### Eighth Claim for Relief
### Bailment

223.   Bessemer incorporates and realleges the preceding paragraphs.

224.   Bessemer has a property interest in its account records and information.  These

records and information are stored in a tangible format in information technology systems or

other media administered by Fiserv.  Fiserv Solutions acknowledged that Bessemer's records and

information ███████████████████████ (Master Agreement § 3(b)).   Further,

such property is identifiable with, merged into, or of the kind customarily identified with and

merged into documents.  Indeed, such records and information embody and represent, without

limitation, the title to the shares Bessemer members own as well as debts and other obligations of

Bessemer to its members.  Such records and information thus embody, represent the title to, and

are essential to protecting and enforcing property rights and other legally enforceable

obligations.  Moreover, such records and information were created and maintained as a result of

Bessemer's substantial investment of time, effort, and money.

225.   Bessemer's property interest in the foregoing assets arises from Bessemer's

ownership of such property.  Alternatively, to the extent such property is owned by Bessemer's

members, those members have authorized Bessemer to possess such property.

226.    Fiserv has accepted delivery of Bessemer's account records and information and became a bailee of such property, thereby undertaking duties, independent of any contractual duty, to account for such property and to care for it.

227.    As part of this bailment, it was understood that Fiserv would use such property for the limited purposes authorized by Bessemer and would return it as agreed or upon demand.

228.    Bessemer and those authorized to receive its property have demanded that Fiserv return such property, or such demand was excused and rendered unreasonable by Fiserv's acts and omissions.

229.    Fiserv breached its duty as a bailee by refusing to return Bessemer's account records and information, destroying them, compromising their integrity, misusing them, interfering with them, and otherwise dealing with them in a manner inconsistent with Fiserv's bailee duties and Bessemer's superior possessory rights.

230.    Fiserv's breaches of its bailee duties occurred on many occasions during the course of the parties' relationship and after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.

231.    Fiserv's interference with Bessemer's property rights violates broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer. The duties violated by Fiserv are in the nature of a bailment claim because the relevant duties (e.g., the duties imposed on a bailee of another's property) arose regardless of any contract between the parties, the Master Agreement specifically acknowledged that Bessemer's account records and information ███████████████████ ████████ (Master Agreement § 3(b)), and, in any event, Fiserv has violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.

Accordingly, the duties violated by Fiserv are defined by the social policies governing the law of bailments.

232.    As a direct and proximate result of Fiserv's breach of its bailee duties, Bessemer has suffered and will continue to suffer damages and harm.

WHEREFORE, Bessemer respectfully requests that this Court:

(i)     enter judgment in Bessemer's favor for all damages allowed by law—including, without limitation, compensatory, consequential, incidental, reliance, restitutionary, delay, treble, and punitive—in amounts to be determined at trial and that exceed the amount specified in Rule 4301 for submission to a board of arbitrators;

(ii)    award Bessemer its attorneys' fees, its costs, and the maximum prejudgment and postjudgment interest allowed by law;

(iii)   issue an injunction to prevent Bessemer from suffering or continuing to suffer harm; and

(iv)    grant Bessemer any further relief that may be necessary to achieve justice or that is deemed proper and appropriate under the circumstances by this Court.

## Ninth Claim for Relief
### Unjust Enrichment

233.    Bessemer incorporates and realleges the preceding paragraphs.

234.    Fiserv has induced Bessemer to make payments and to furnish its account records and information as a result of Fiserv's unjust and unconscionable misconduct.  As a result of this misconduct, Fiserv has been, and will continue to be, unjustly enriched at Bessemer's expense,

and under circumstances that would make it unjust and inequitable for Fiserv to retain

Bessemer's payments, and Bessemer's account records and information.

235.    Fiserv's unjust enrichment violates broad social duties that are separate and

distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions

made to Bessemer.  The duties violated by Fiserv are in the nature of a claim for unjust

enrichment because the relevant duties (e.g., the duty to make restitution when unjustly enriched)

arose regardless of any contract between the parties, and Fiserv violated such duties after

Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.

Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the

principles of equity.

236.    Accordingly, equity and good conscience require that Fiserv make restitution to

Bessemer.

WHEREFORE, Bessemer respectfully requests that this Court:

    (i)    order Fiserv to make restitution to Bessemer, in amounts to be determined at trial and that exceed the amount specified in Rule 4301 for submission to a board of arbitrators;

    (ii)    award Bessemer its attorneys' fees, its costs, and the maximum prejudgment and postjudgment interest allowed by law;

    (iii)    issue an injunction to prevent Bessemer from suffering or continuing to suffer harm; and

    (iv)    grant Bessemer any further relief that may be necessary to achieve justice or that is deemed proper and appropriate under the circumstances by this Court.

**Tenth Claim for Relief**
**Punitive Damages**

237.    Bessemer incorporates and realleges the preceding paragraphs.

238.    Fiserv's acts, omissions, concealments, and misrepresentations as set forth herein were intentional, willful, wanton, malicious, reckless, oppressive, egregious, and outrageous, are torts or actionable as independent torts, jeopardize the public and are part of a pattern directed at the public generally, offend public policy, are based on evil and reprehensible motives, involve an extraordinarily disingenuous and dishonest failure to carry out Fiserv's obligations, and involve a high degree of moral turpitude demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations.

239.    Indeed, as Fiserv acknowledges in its own Code of Conduct & Business Ethics, "Fiserv is committed to maintaining full, fair, accurate and timely accounting and business records. This … protects our legal interests; and helps us preserve the trust of our clients." *See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (version in effect August 22, 2018).  As further explained by Fiserv, "[t]he unique nature of our business requires that all Fiserv computer systems and networks operate with the availability, efficiency, reliability and integrity that are expected of systems that process financial transactions and store financial data.  The company is firmly committed to operating and maintaining its technology assets in a manner that merits the trust and confidence of the clients and consumers we serve." *Id*.  What's more, as Fiserv explains, "[b]ecause the principal market for our products and services is the regulated financial services industry, the consequences of non-compliant offerings could seriously damage our reputation and financial interests." *Id*.  Fiserv thus knew, in light of the unique nature of its business providing services to regulated financial institutions, that its

acts, omissions, concealments, and misrepresentations would cause serious damage and give rise to legal liability.

240.    Fiserv has engaged in and has knowledge of prior similar injury-causing incidents, including through complaints made by Bessemer, other Fiserv customers, and security researchers.

241.    The parties were in a relationship of trust and confidence in which Fiserv wielded superior knowledge, skill, expertise, and influence over Bessemer.  Among other reasons, Fiserv controls Bessemer's account records and information, Fiserv refused to promptly return Bessemer's records and information to it, Fiserv was in an exclusive relationship with Bessemer, Fiserv prohibited Bessemer from performing certain services on its own account or through other service providers, and Fiserv sought to induce the dependence and trust of Bessemer.

242.    Fiserv has received ill-gotten gains from its acts, omissions, concealments, and misrepresentations by, among other things, causing Bessemer and Fiserv's other customers to enter into transactions that provided Fiserv with additional and excessive profits, and collecting amounts that were not justly due to it or legally chargeable against Bessemer and Fiserv's other customers.

243.    Fiserv's acts, omissions, concealments, and misrepresentations have harmed the public generally.  Such harm has befallen Bessemer, a not-for-profit cooperative, as well as the thousands of individual consumers who are Bessemer members.  Moreover, Fiserv provides Bessemer and its members a standardized account processing system that is shared with other Fiserv customers and that adopts standardized coding.  Further, Fiserv has employed standardized policies and business practices.  Accordingly, such harm has befallen other financial institutions that are customers of Fiserv, as well as those institutions' own customers,

including individual consumers.  These harms are part of a pattern of behavior Fiserv directs at the public generally.

244.    Public policy supports an award of punitive damages, given that Bessemer is a not-for-profit consumer financial institution, banking is an essential public service on which consumers must rely, and Fiserv targeted its business operations to regulated financial institutions and the consumers they serve.

245.    Accordingly, punitive damages are appropriate in addition to any compensatory damages for harm done to Bessemer.  Such damages are necessary to deter Fiserv and others from committing similar incidents in the future, and the amount of such punitive damages awarded should be sufficient to have a deterrent effect on Fiserv.

WHEREFORE, Bessemer respectfully requests that this Court:

(i)      award Bessemer punitive damages;

(ii)     award Bessemer its attorneys' fees, its costs, and the maximum prejudgment and postjudgment interest allowed by law; and

(iii)    grant Bessemer any further relief that may be necessary to achieve justice or that is deemed proper and appropriate under the circumstances by this Court.

### Jury Trial Demand

Bessemer requests a trial by jury of all issues so triable.

[*Continued on following page.*]

## Demand for Relief

WHEREFORE, Bessemer respectfully requests that this Court award Bessemer the relief

requested above on its claims for relief or that is deemed proper and appropriate under the

circumstances by this Court.

Dated: April 25, 2019

*Jury Trial Demanded*

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

By: _____
Richard J. Parks
PA ID #40477
7 West State Street, Suite 100
Sharon, PA  16146
Tel:  (724) 981-1397
Fax:  (724) 981-1398
Email:  rjp@pietragallo.com

Charles J. Nerko (admitted *pro hac vice*)
Joel S. Forman (*pro hac vice* to be filed)
VEDDER PRICE P.C.
1633 Broadway
New York, NY  10019
Tel.:  (212) 407-7700
Fax:  (212) 407-7799
Email:  cnerko@vedderprice.com
        jforman@vedderprice.com

*Attorneys for Plaintiff*
*Bessemer System Federal Credit Union*

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

BESSEMER SYSTEM FEDERAL CREDIT
UNION, a not-for-profit federal credit union,

              Plaintiff,

      -against-

FISERV SOLUTIONS, LLC, a Wisconsin
limited liability corporation
f/k/a
FISERV SOLUTIONS, INC., a Wisconsin
corporation,

and

FISERV, INC., a Wisconsin corporation,

              Defendants.

CIVIL DIVISION
No. 2018-01130

## VERIFICATION

    I, Joy E. Peterson, as the duly authorized representative and agent for Bessemer System Federal Credit Union, having read the foregoing Complaint, aver that it is accurate and correct to the best of my personal knowledge, information and belief.

    This statement of verification is made subject to the penalties of 18 PA. CONS. STAT. § 4904 relating to unsworn falsification to authorities, which provides that if I knowingly make false statements, I may be subject to criminal penalties.

                      BESSEMER SYSTEM FEDERAL CREDIT UNION

Dated: April 25, 2019

                      By:    Joy E. Peterson
                            Chief Executive Officer

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania:  Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than nonconfidential information and documents.

Submitted by: Richard J. Parks

Signature:

Name: Richard J. Parks

Attorney No. (if applicable): 40477

Exhibit 1
To be Filed Under Seal

Exhibit 2



Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore

January 8, 2018

Charles J. Nerko
+1 212 407 6933
cnerko@vedderprice.com

**VIA FEDEX OVERNIGHT**

Fiserv Solutions, Inc.
2601 Network Blvd., Ste. 600
Frisco, TX  75034

Re:     <u>Bessemer System Federal Credit Union</u>

Ladies and Gentlemen:

We represent Bessemer System Federal Credit Union (the "**Credit Union**") in connection with its claims against Fiserv Solutions, Inc. ("**Fiserv**," "**you**," or "**your**").

The claims arise out of the parties' relationship and a Master Agreement as may have been amended or supplemented (the "**Master Agreement**") between you and the Credit Union.

**Notice of Breach**

As you are no doubt aware from your prior interactions with the Credit Union, Fiserv's performance under the Master Agreement has been plagued with a litany of problems and deficiencies.  We briefly recount below some illustrative examples of these problems, and such examples do not limit the Credit Union's claims against Fiserv.  All communications that evidence or concern breaches of the Master Agreement, including, without limitation, technical support communications with the Credit Union, its members, as well as other affected Fiserv customers and their members or customers, are incorporated into this notice by reference.

***Fiserv has had data breaches that exposed the Credit Union's confidential member information.***

- In or around February and March 2016, Fiserv unlawfully provided confidential member information to an unauthorized third party.  The information Fiserv disclosed without authority included members' names, tax identification numbers, and masked account numbers.

- In March 2017, Fiserv put an invalid return address on member account statements for the required bi-annual verification of accounts, although the correct address was supplied by the Credit Union using Fiserv's required format. Members who received the statements were alarmed to receive these irregular statements with an unrecognized name or address.  Statements of members who had recently moved or had supplied incorrect addresses were earmarked to be sent to a U.S. Postal Service "dump pile" because of the invalid return address on the statements.  This was the U.S. Postal service procedure according to the

Vedder Price P.C., is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore.

NEWYORK/#485188

Fiserv Solutions, Inc.
January 8, 2018
Page 2

Postmaster of the post office for the city incorrectly included in the invalid return address. The purpose of the verification is to return undeliverable statements to the Chairperson of the Supervisory Committee in order to detect internal fraud. However, the undeliverable statements with a completely invalid return address were untraceable and unprotected in the postal system.  These statements contain confidential member information.  Because of Fiserv's mistake, the Credit Union was forced to hire an outside firm to re-complete the verification of accounts at a cost of nearly $1,000.  In addition, members were again alarmed to receive yet another statement with the unfamiliar return address of the outside firm.  This incident caused compliance risks and reputational damage as well as unnecessary labor and costs to complete this procedure and to protect the risk to member information.

***Fiserv has repeatedly denied the Credit Union and its members access to information and funds, compromised the integrity of the Credit Union's information, and misrepresented information to the Credit Union and its members.*** These misrepresentations concern not only account information, but also information about Fiserv's system capabilities and intentions.  For example:

- During the conversion of the Credit Union's data from Loan Advantage to Loancierge, Fiserv falsified documents by inserting another credit union's electronic documents into the Credit Union's Loancierge application (i.e., loan agreements, promissory notes, and loan disclosures).  This caused incorrect language and terms to display on the Credit Union's loan disclosures, which gave the false impression that the documents were authentic business records of the Credit Union.  For instance, language requiring the member to pay the Credit Union late fees appeared, even when it was not the Credit Union's intent to charge those fees.  The Credit Union ultimately implemented the late fees that were falsely displayed by Fiserv without authority on the electronic documents. However, the Credit Union was unable to use the electronic loan documents and manually prepared loan documents because changes in fees have to be disclosed to Credit Union members with at least 45-days' notice.  Fiserv refused to take responsibility for this error when the Credit Union raised the issue to Fiserv.

- Fiserv sent Credit Union members federal 1098 mortgage statements which erroneously listed the principal balance of the loans in the field for Private Mortgage Insurance.  Fiserv assured the Credit Union that it would issue corrected 1098 statements, though Fiserv never provided documentation of these corrected statements.  Fiserv consistently misreports mortgage interest amounts on receipts when Credit Union members attempt to make a payment on a mortgage loan, which includes uncollected late charges.  The receipts also indicate erroneous amounts being applied to escrow, though the Credit Union does not even have escrow general ledger accounts.  In addition, a Credit Union member has received a payment receipt with an incorrect mortgage interest amount when the member was making the final payment on the mortgage.

Fiserv Solutions, Inc.
January 8, 2018
Page 3

- Fiserv has misrepresented due dates for loans.  When the Credit Union reported this issue to Fiserv, Fiserv explained that when a loan is entered with a due date on the 28th, 29th, 30th, or 31st of the month, the Fiserv system misreports the due date as the last day of the month, regardless of the loan's actual due date.

- Currency adjustment transactions are inconsistent and intermittently fail to reflect correct cash or check adjustments for teller drawers.  Fiserv assured the Credit Union that this issue would be corrected in the 167 release, but the release was consistently delayed.  Fiserv never confirmed that this issue was fixed.

- Fiserv repeatedly has issued invoices that are erroneous, false and overstate the amount, if any, the Credit Union actually owes Fiserv.  For example, Fiserv wrongly bills the Credit Union for "Monthly CD Processing" which the Credit Union does not use.  The Credit Union explicitly asked Fiserv to stop sending the CDs, which Fiserv stopped sending in February.  Yet, for at least the following eight months, a CD fee was included on every Fiserv invoice.  Invoice totals also appear to be incorrectly reflected on the invoices, as the total of an invoice frequently does not equal the sum of the line items.

- In August 2016, Fiserv insisted that the Credit Union obtain additional memory and add a firewall to its system.  Fiserv installed these hardware and software upgrades on Credit Union computers at Fiserv's suggestion and based on its assurances to the Credit Union that these upgrades would fix various issues.  In fact, Fiserv misrepresented that the upgrades would fix the issues because the hardware and software changes failed to resolve any of the Credit Union's issues.

- ACH and share draft returns fail to process during system-wide connection outages.  Fiserv issues a report each day and misrepresents that returns are in progress.  Although the Credit Union maintains documentation proving that the returns were processed through Fiserv's automated system and received by Fiserv, the funds for the returned items were not received by the Credit Union as expected.  Instead, Fiserv lost the returns.  These issues consistently arise when Fiserv experiences connectivity problems.  In response, the Credit Union has had to implement additional checks and balances in an attempt to mitigate the risk caused by the failures and shortcomings of the Fiserv system.

- Even though Fiserv had knowledge that its system was malfunctioning and reporting erroneous information to the Credit Union and its members, Fiserv failed to properly address these issues, including by failing to put the Credit Union on notice of them and insisting that the Credit Union continue to receive services from Fiserv on an exclusive basis.

***Fiserv's software is inundated with bugs and defects.*** In addition to the problems described above, Fiserv's software is inundated with flaws:

Fiserv Solutions, Inc.
January 8, 2018
Page 4

- Credit Union staff members are constantly locked out of the system and unable to log in or log off of the system, which inhibits the Credit Union's ability to serve its customers.  For example, a teller's computer froze when the teller was doing an entry for a member.  When the teller attempted to log off, a pop-up appeared with Outlook Wizard asking to set up Outlook.  The teller was unable to log back on to the computer.

- All of Fiserv's front-line printers will periodically stop working, even when the software itself appears to be working.  This issue prevents the Credit Union from printing receipts, checks, or other documents on member-facing printers.  As a result, the Credit Union is unable to provide members with a receipt or check documenting the members' transactions.  Although the Credit Union has informed Fiserv of this issue multiple times, Fiserv has yet to provide a solution.  Instead, the Credit Union re-starts all of its front-line computers to remedy the issue, which causes inefficient member services and reputational damage.

- Fiserv forced the Credit Union to transition to its Loancierge program with very little notice, and the program has been riddled with bugs and defects.  The Credit Union wished to stay with Loan Advantage for its loan processing, but Fiserv refused to support that software and insisted the Credit Union pay an implementation fee for continued viable use of this functionality through an "upsold" additional Fiserv product.  Fiserv sought to charge the Credit Union a ███████████████████ for the transition to Loancierge, even though the Credit Union did not want to use Loancierge.

- Fiserv's Sellstation software has connectivity issues causing it to be down repeatedly and other serious defects.  The freezing of the software would become more prominent when the Credit Union was handling an increased number of transactions, which meant that on its busiest days, the Credit Union suffered the worst issues with the software.

- Fiserv invoices the Credit Union ███████████████ for a backup connection that never works.  Fiserv finally ceased charging the Credit Union for this backup connection in May 2017.  However, as this charge was never warranted, the Credit Union demands a full refund for the failed backup connection.

- The Courtesy Pay feature consistently has issues.  The Credit Union asked Fiserv initially for a proposal to implement "real-time" data processing, and Fiserv responded that this update would be "simple" and would only require ███████ ███████████ to make negative balances within the ATM/debit system available.  The Credit Union thus began the six-week implementation process with the Courtesy Pay provider as a result of Fiserv's assurances that the update would be "simple."  Four weeks into the process, the Credit Union tested a Courtesy Pay debit card at an ATM, and the transaction was unsuccessful.  When the Credit Union informed Fiserv of the defect, Fiserv responded that it "just realized" the Credit Union's debit cards and debit program were not "real-time."  However, when the Credit Union first approached Fiserv about the update, the Credit Union

Fiserv Solutions, Inc.
January 8, 2018
Page 5

filled out Fiserv's forms and indicated that the Credit Union's debit program was a positive balance file program, and not a "real-time" program. Fiserv then sent the Credit Union a proposal for real-time debit cards  The Credit Union abandoned the project due to these increased fees. However, by the time the Credit Union stopped the project, it had already invested hours of time and effort.

- On November 21, 2017, a business listing was uploaded by FinCEN. The Credit Union downloaded the business listing file. When the Credit Union attempted to upload the file on ConfirmIt, Fiserv's website, the Credit Union repeatedly received an error message. This issue was finally resolved on December 14, 2017. The Credit Union changed the name of the file being uploaded when Mark Britton, of Fiserv, requested the Credit Union re-name the file with various burdensome requirements. When the Credit Union removed the term "Fincen" from the file, the file was able to be uploaded. However, the Credit Union has been using the same naming format for FinCEN uploads since 2005 without issue. The Credit Union was not in compliance with a federally mandated procedure because the FinCEN file dated November 21, 2017 was not uploaded until December 14, 2017.

- The Credit Union is consistently blocked from printing checks on the check printer. The Credit Union has continuous check activity, which the Credit Union logs in its system so that its checks are consecutive. However, front-line tellers are unable to print the checks. This is an intermittent problem that has recurred numerous times since 2015. The only way to resolve this issue is for every employee to reboot his/her computer. When the Credit Union informed Fiserv of the issue, Fiserv's only solution was to have the Credit Union join a WebEx to replicate the issue. The Credit Union has done this at least 10 times, and the issue has yet to be fixed. Fiserv has yet to provide a solution, and also refuses to acknowledge that they are aware of this problem.

- In proceedings involving loans paid by the bankruptcy court, the court provides a single check with explicit instructions on how to apply the check to the specific loan. However, Fiserv's software cannot accommodate the correct application of a check to be applied in the specific manner required by the bankruptcy court. As a result, the Credit Union is forced to apply the designated amounts of the check to principal and interest as separate check transactions, even though the Credit Union receives only one check, because Fiserv's software cannot process multiple entries from a single check. When the Credit Union asked Fiserv about these transactions, Fiserv responded that it only will service one payment for one account. Fiserv asked for a business justification for addressing this issue, and when the Credit Union explained that the bankruptcy court requires these transactions to be handled a certain way, Fiserv declined to correctly reflect these transactions, stating it would require hours of programming service.

*Fiserv has violated legal requirements:*

Fiserv Solutions, Inc.
January 8, 2018
Page 6

- OFAC scans are federally mandated.  Since 2005, the bi-weekly scans had been automatic and Fiserv's system would send an automatic e-mail to indicate that the scan had been done and whether any further research of potential "hits" was needed.  Recently, when the Credit Union stopped receiving notice of the automatic scans, Fiserv indicated it no longer will do the scans.  However, Fiserv failed to provide written notice to the Credit Union regarding its change in this federally mandated process, as Fiserv was required to do under Section 11(f) of the Master Agreement.  Instead, Fiserv has stopped performing this account processing service altogether.  From April 1, 2017 through July 27, 2017, no OFAC scan took place, as the Credit Union was never informed that Fiserv would cease performing the automated process.  When the Credit Union asked Fiserv about an alternative procedure in July 2017, Fiserv tasked the Credit Union with manually performing this work that Fiserv was tasked with automatically performing.  Fiserv has insisted the Credit Union follow a burdensome 18-page process for manual work and editing of text files, manipulating excel formats, and opening multiple windows and lists in Sellstation.  This procedure is not only burdensome for Credit Union personnel, but inefficient, impractical, and a waste of Credit Union resources.  Indeed, the Credit Union is still being charged for these OFAC scans, even though Fiserv's system no longer performs this service.

- The Credit Union was forced to hire an outside auditor to complete the required bi-annual verification of accounts.  Fiserv has failed to reimburse the Credit Union for the outside auditor the Credit Union was required to hire due to Fiserv's errors.

***Fiserv's performance under the Agreement has been marked with repeated incidents of bad faith:***

- The Credit Union opens up support requests with Fiserv daily.  Fiserv has improperly closed the Credit Union's technical support requests without resolving them.  When the Credit Union reports an issue, Fiserv routinely marks these reports as either "no priority" or "medium priority," despite the issues being of high priority to the Credit Union.  Fiserv unilaterally makes these priority determinations and closes the tickets without providing solutions.

- Fiserv has repeatedly acted in bad faith and violated legal requirements, including by soliciting unearned fees beyond those contemplated by the Master Agreement for continued viable use of Fiserv's services and to comply with applicable law.  Fiserv's billing procedures are inconsistent and subject to frequent errors.  Items that Fiserv had agreed to provide without cost appear on bills in error.  For example, Fiserv has billed the Credit Union for items that Fiserv agreed to pay for, including equipment and travel expenses related to connectivity issues.  Additionally, Fiserv has sent the Credit Union a large bill for statement mailing services nearly one year late.  Moreover, Fiserv's November 2017 invoice to the Credit Union mistakenly includes a line item for Vacation Club withdrawals and Christmas Club withdrawals, which should have been invoiced

Fiserv Solutions, Inc.
January 8, 2018
Page 7

months earlier.  The amounts for these withdrawals are also incorrect and inconsistent with prior invoices from Fiserv.

It is evident that Fiserv's repeated failures and deficiencies are not providing the Credit Union with the promised benefits.  Accordingly, we hereby notify you that you are in material breach of the Master Agreement.

The Credit Union demands that you immediately take all appropriate actions to cure these harms (including, as required by Section 5(e) of the ASP Services Exhibit to the Master Agreement, by promptly recomputing accounts affected by errors or discrepancies caused by the Fiserv system at Fiserv's expense).  Further, the Credit Union demands that you pay the Credit Union all damages allowed by law—including, without limitation, compensatory, consequential, incidental, reliance, restitutionary, statutory, and punitive—plus prejudgment interest, along with the Credit Union's attorneys' fees and costs.  Notwithstanding the foregoing, Fiserv's actions and omissions have left the Credit Union with the conviction that Fiserv has repudiated its obligations and that there is no genuine prospect of a cure.  Accordingly, this leaves little room but to enforce the Credit Union's rights to terminate the Agreement and seek damages from Fiserv.

Moreover, some of Fiserv's acts and omissions have resulted in the loss, destruction, or improper withholding of the Credit Union's information.  Accordingly, the Credit Union demands that complete and accurate copies of its information be returned to the Credit Union in a usable form reasonably acceptable to the Credit Union, and that Fiserv provide such information and assistance as is reasonable and customary to enable the Credit Union to deconvert from the Fiserv system and achieve an orderly transition of services back to the Credit Union or any successor vendor(s) selected by the Credit Union.

### Notice of Invocation of Dispute Resolution Procedures

By this notice, the Credit Union commences informal efforts to work with you in good faith to resolve this dispute before commencing litigation or formal dispute resolution procedures.  Accordingly, in accordance with Section 9 of the Master Agreement, the Credit Union requests that you promptly designate an officer of Fiserv with authority to bind Fiserv and to meet to resolve these claims.

So that our upcoming discussion can be productive, we request that Fiserv respond to this communication in writing setting forth:  (a) when each issue first affected the Credit Union; (b) when each issue was first known by Fiserv; (c) when Fiserv first notified the Credit Union of each issue; (d) the impact to the Credit Union and its members; (e) Fiserv's fees for the affected service; (6) the status of any resolution/fix; (f) Fiserv's position as to whether each issue is a violation of Fiserv's obligations; (g) the individual at Fiserv most knowledgeable about each issue who will be participating in the discussion.  We also request that Fiserv furnish complete and accurate copies of all documents, things, and electronically stored information that relates to the subject matter of this dispute.

### Compliance Audit

In accordance with Section 10(b) of the Master Agreement, the Credit Union requests that Fiserv promptly provide all documentation relating to the amounts invoiced by Fiserv in the prior twelve-month

Fiserv Solutions, Inc.
January 8, 2018
Page 8

period, including, without limitation, all documents concerning Fiserv's performance or non-performance of the invoiced items.[1]

In accordance with Section 4(a) of the Master Agreement, the Credit Union requests that Fiserv provide copies of all audit reports, and summaries of test results or equivalent measures taken by Fiserv, in effect during the parties' relationship, to assess whether Fiserv's information security program meets the objectives set forth in the Master Agreement.

In accordance with Section 4(b) of the Master Agreement, the Credit Union requests that Fiserv provide the Credit Union summaries of the written information security plans in effect during the parties' relationship, and continue to provide updates on the status of such information security plans on a weekly basis as well as promptly upon any material change to those plans or upon any information security incident.

In accordance with Section 4(d) of the ASP Services Exhibit to the Master Agreement, the Credit Union requests that Fiserv provide a copy of its most recent security certification, if any, for the applicable Fiserv service center(s) providing services, and copies of the security certifications in effect during the parties' relationship.

In accordance with Section 4(h) of the ASP Services Exhibit to the Master Agreement, the Credit Union requests that Fiserv provide a copy of its independent audit reports of the Fiserv service center(s) providing services and copies of the action plans, if any, implemented by Fiserv to address and resolve deficiencies.

### Notice of Non-Renewal

Without waiver of its other rights, the Credit Union provides notice that it will not be renewing any agreement with you, including, without limitation, the Master Agreement.

### Preservation Notice

As circumstances have arisen that may foreseeably give rise to a legal proceeding, you must preserve all documents, things, and electronically stored information that may be potentially relevant, including, without limitation, complete and accurate copies of Credit Union information. The duty to preserve potentially relevant materials arises under applicable law and not this letter, so your duties are not in any way limited by this letter. If you fail to preserve materials as required, our client will rely on this letter as notice of your preservation obligations.

### Reservation of Rights

This notice and any action taken in connection therewith is without prejudice to any of the Credit Union's rights, powers, privileges, remedies, and defenses, now existing or hereafter arising, all of which are hereby expressly reserved. Without limitation, the Credit Union reserves the right to amend,

---

[1] For the avoidance of doubt, the Credit Union does not request Fiserv's "assistance" in connection with the Credit Union's audit of these documents. Thus, such documents should be provided without charge to the Credit Union.

Fiserv Solutions, Inc.
January 8, 2018
Page 9

update, supplement, modify, increase, withdraw, or otherwise change its claims.  By providing this notice or taking any action in connection therewith, including, without limitation, invoking the dispute resolution provisions of the Master Agreement, our client is not (a) in any manner whatsoever waiving or relinquishing any rights it may have, including, without limitation, any right to terminate or rescind the Master Agreement or have it deemed previously terminated, void, unenforceable, rescinded, or subject to defenses; (b) electing any remedy which waives or otherwise affects any other remedy; (c) acknowledging or admitting any fact, legal conclusion, or liability; (d) limiting its claims to the stated amounts or theories; or (e) estopped or prevented from taking any other action or position.

The Credit Union's failure to require strict performance by Fiserv or to exercise any rights, powers, privileges, remedies, and defenses will not be deemed a waiver of any of them.  Further, no representative of the Credit Union has authority to waive them or to amend or supplement the Master Agreement; to be effective, any such waiver, amendment, or supplement must be (a) in a writing clearly stating the Credit Union's intent to grant a waiver, amendment, or supplement; (b) signed non-electronically by the Credit Union's Chief Executive Officer; (c) if requested by Fiserv, in a writing presented to us as the Credit Union's outside counsel.

*          *          *

While we are authorized to take all appropriate actions to zealously protect the Credit Union's interests, we hope that this matter can be amicably resolved.  Please direct any further communications regarding this matter to me at cnerko@vedderprice.com and Kimberly R. Greer at kgreer@vedderprice.com.

Very truly yours,

Charles J. Nerko

Exhibit 3



Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore

March 7, 2018

Charles J. Nerko
+1 212 407 6933
cnerko@vedderprice.com

**VIA FEDEX OVERNIGHT AND EMAIL**

Fiserv Solutions, Inc.
2601 Network Blvd., Ste. 600
Frisco, TX  75034
amy.vandamme@fiserv.com
Attn: Amy L. Vandamme, Esq.

Re:   Bessemer System Federal Credit Union – Supplemental Notice of Breach

Dear Amy:

As you know, we represent Bessemer System Federal Credit Union (the "**Credit Union**") in connection with its claims against Fiserv Solutions, Inc. ("**Fiserv**," "**you**," or "**your**").  The claims arise out of the parties' relationship and a Master Agreement as may have been amended or supplemented (the "**Master Agreement**") between you and the Credit Union.

On January 8, 2018, the Credit Union served a Notice of Breach (the "**Notice of Breach**"), with an accompanying demand for a compliance audit requesting certain documents and information in accordance with Sections 4(a), 4(b), and 10(b) of the Master Agreement and Sections 4(d) and 4(h) of the ASP Services Exhibit to that agreement.

The Credit Union is providing this supplemental notice of breach in an abundance of caution and specifically denies that serving a supplemental notice of breach is a requirement for exercising any of the Credit Union's rights, powers, privileges, remedies, and defenses against Fiserv.  As with the Notice of Breach, the examples in this notice are illustrations only.

In addition to the breaches that were described in the Notice of Breach, Fiserv has continued to materially breach the Master Agreement:

- Fiserv's system continues to manifest bugs and defects, including service interruptions and extended outages.

- Fiserv continues to issue invoices that are erroneous, false and overstate the amount, if any, the Credit Union actually owes Fiserv.  For example, the invoice dated February 28, 2018 includes charges for various "optional services", ███████████████ for 1099-SA, a reference to an IRS form that the Credit Union does not issue to its members.

- Fiserv has failed to provide requested documents and information in response to the Credit Union's audit request, in violation of Sections 4(a), 4(b), and 10(b) of

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore.

NEWYORK/#495947

Fiserv Solutions, Inc.
March 7, 2018
Page 2

the Master Agreement and Sections 4(d) and 4(h) of the ASP Services Exhibit to that agreement.

- Fiserv has failed to comply with the dispute resolution procedures in Section 9 of the Master Agreement. This provision requires Fiserv to work in good faith to resolve disputes and claims arising out of the Master Agreement and to take various other actions within 30 days of the Credit Union's commencement of informal efforts under that section. On January 8, 2018, the Credit Union issued a notice commencing such informal efforts. Fiserv violated this provision by (i) failing to provide information requested in connection with the Credit Union's good-faith effort to resolve this dispute; (ii) refusing to designate an officer or other management employee with authority to bind Fiserv to meet to resolve the Credit Union's claim in the 30-day time frame required by the Master Agreement; and (iii) failing to timely participate in such meeting or take any other efforts to work in good faith to resolve the parties' dispute, in the 30-day time frame required by the Master Agreement.

Accordingly, the Credit Union continues to regard Fiserv as being in material breach of the Master Agreement. The Credit Union therefore demands that your breaches be promptly cured.

Further, as Fiserv has breached the Master Agreement and has failed to furnish documentation in response to the Credit Union's audit, Fiserv has failed to support or establish Fiserv's entitlement to the amounts that it invoiced the Credit Union. Accordingly, the Credit Union demands that Fiserv promptly remit to the Credit Union the payments it made to Fiserv during the period for which Fiserv was audited, with interest. Any payments made by the Credit Union to Fiserv are with full reservation of the Credit Union's right to demand the return of any amounts, with interest, not justly owed to Fiserv.

All communications between you and the Credit Union that evidence or concern breaches of the Master Agreement, including the Credit Union's technical support communications, are incorporated into this notice by reference. This notice confirms that the Credit Union has not waived the breaches specified in the Notice of Breach or elsewhere. This notice is without prejudice to any of the Credit Union's rights, powers, privileges, remedies, and defenses, now existing or hereafter arising, all of which are hereby expressly reserved, including, without limitation, the right to declare the Master Agreement terminated. The failure of the Credit Union to exercise any such rights, powers, privileges, and remedies is not intended, and shall not be construed, to be a waiver of any such breach. The Credit Union may elect to exercise any or all of its rights, powers, privileges, and remedies at its sole option, at any time hereafter, without the necessity of any further notice, demand, or other action on the part of the Credit Union. Without limitation, the holding of any discussions between the parties shall not constitute any waiver of any breach of the Master Agreement (including the breaches specified herein or the Notice of Breach), or an agreement to forbear from the exercise of the Credit Union's rights, nor shall it be construed as an undertaking by the Credit Union to continue such discussions.

*     *     *

Ms. Joy Peterson, the CEO and designated representative of the Credit Union, and I, are generally available for a teleconference during any afternoon the first week of April. Please let us know your and

Fiserv Solutions, Inc.
March 7, 2018
Page 3

Mr. Brennan's availability.  So that our discussion may be productive, we request that you furnish the
documents and information previously requested in our January 8, 2018 letter without further delay.

Very truly yours,

Charles J. Nerko

Exhibit 4



Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore

April 11, 2018

Charles J. Nerko
+1 212 407 6933
cnerko@vedderprice.com

**VIA FEDEX OVERNIGHT AND EMAIL**

Fiserv Solutions, Inc.
2601 Network Blvd., Ste. 600
Frisco, TX  75034
amy.vandamme@fiserv.com
Attn: Amy L. Vandamme, Esq.

Re:     Bessemer System Federal Credit Union – Notice of Termination

Dear Amy:

As you know, we represent Bessemer System Federal Credit Union (the "**Credit Union**") in connection with its claims against Fiserv Solutions, Inc. ("**Fiserv**," "**you**," or "**your**").  The claims arise out of the parties' relationship and a Master Agreement as may have been amended or supplemented (the "**Master Agreement**") between you and the Credit Union.

The Credit Union provides notice that it is terminating the Master Agreement.  This termination is based on Fiserv's acts and omissions, including:

  1.     Fiserv's failure to perform as required under the Master Agreement;

  2.     Fiserv's failure and inability to cure material breaches of the Master Agreement (including those with respect to the Credit Union's information or other intellectual property), despite demands from the Credit Union;

  3.     Fiserv's anticipatory repudiation of the Master Agreement through its manifestation of intent not to timely perform as required under the Master Agreement, including by the statements made by Vincent Brennan of Fiserv in his April 5, 2018 email correspondence to the Credit Union that Fiserv's "cure team" was only being recently assembled months after the Credit Union provided its notice of breach, and that Fiserv would require a "2 week timeframe" for a "next discussion" in advance of arriving at a "satisfactory resolution"; and

  4.     Fiserv's breaches of the implied covenant of good faith and fair dealing by acting in a manner that deprives the Credit Union of the right to receive the benefits of the Master Agreement.

The Credit Union demands that Fiserv return the Credit Union's files and information in a reasonable, commercially usable form, that Fiserv take appropriate measures to ensure an orderly transition of

Vedder Price P C is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte, Ltd , which operates in Singapore.

NEWYORK/#500571

Fiserv Solutions, Inc.
April 11, 2018
Page 2

services to the successor vendor(s) the Credit Union may select, and that Fiserv provide any other cooperation or assistance that may be reasonably requested by the Credit Union.

We provide notice that Fiserv's failure to comply with the foregoing would cause irreparable injury by jeopardizing the provision of essential banking services.  Accordingly, our client reserves its right to seek injunctive or other appropriate relief.

This notice is without prejudice to any of the Credit Union's rights, powers, privileges, remedies, and defenses, now existing or hereafter arising, all of which are hereby expressly reserved.

Very truly yours,

Charles J. Nerko

Exhibit 5



Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore

June 13, 2018

Charles J. Nerko
+1 212 407 6933
cnerko@vedderprice.com

**VIA FEDEX OVERNIGHT AND EMAIL**

Fiserv Solutions, Inc.
2601 Network Blvd., Ste. 600
Frisco, TX  75034
amy.vandamme@fiserv.com
Attn: Amy L. Vandamme, Esq.

Re:   Bessemer System Federal Credit Union – Invoice Matters

Dear Amy:

On behalf of Bessemer System Federal Credit Union (the "**Credit Union**"), we write concerning Invoice No. 91318571 dated May 31, 2018, which was issued to our client for the April 2018 billing period (the "**Invoice**").

Fiserv has materially breached its obligations to the Credit Union, and such breaches have remained uncured or are incapable of a cure.  What's more, the Credit Union issued a Notice of Termination to Fiserv on April 11, 2018.  As a result, the Credit Union disputes the Invoice, and we request that you provide us all documentation relating to the amounts invoiced.

We also request that Fiserv provide all documentation relating to the amounts invoiced to our client in the period after our client's last invoice audit request, which was issued to Fiserv on January 8, 2018 in accordance with Section 10(b) of the parties' Master Agreement.

The requested documents include, without limitation, all documents concerning Fiserv's performance or non-performance of the invoiced items.  By way of example, this would also include documents sufficient to permit a determination as to whether the invoiced amounts, if any, were earned by Fiserv prior to the Credit Union issuing the April 11, 2018 Notice of Termination.

This notice is without prejudice to any of the Credit Union's rights, powers, privileges, remedies, and defenses, now existing or hereafter arising, all of which are hereby expressly reserved.

Very truly yours,

Charles J. Nerko

1633 Broadway, 31st Floor  |  New York, New York 10019  |  T +1 212 407 7700  |  F +1 212 407 7799

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore.

NEWYORK/#507695

Exhibit 6

**Vedder**Price

Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore

July 18, 2018

Charles J. Nerko
+1 212 407 6933
cnerko@vedderprice.com

**VIA FEDEX OVERNIGHT AND EMAIL**

Fiserv Solutions, Inc.
2601 Network Blvd., Ste. 600
Frisco, TX 75034
amy.vandamme@fiserv.com
Attn: Amy L. Vandamme, Esq.

Re:   Bessemer System Federal Credit Union -- Invoice Matters

Dear Amy:

In response to our June 13, 2018 letter on behalf of Bessemer System Federal Credit Union (the "**Credit Union**"), Fiserv has been unable to provide any supporting documentation to substantiate its invoices. Accordingly, the Credit Union demands that Fiserv promptly refund, with interest, all amounts the Credit Union paid in connection with invoices that Fiserv has been unable to substantiate with supporting documentation.

For the reasons stated in the aforementioned letter, the Credit Union disputes any invoices that have been unpaid or that will be subsequently issued by Fiserv. The Credit Union hereby makes a continuing dispute and continuing request that Fiserv provide the documentation requested in the June 13, 2018 letter with respect to any invoices that have been or will subsequently be issued after that letter.

We note that Ms. Anita Sharma of Fiserv has attempted to contact the Credit Union's Chief Executive Officer regarding payment for the disputed invoices. We reiterate our request that further communications regarding this matter be through counsel.

This notice is without prejudice to any of the Credit Union's rights, powers, privileges, remedies, and defenses, now existing or hereafter arising, all of which are hereby expressly reserved.

Very truly yours,

*Charles Nerko*

Charles J. Nerko

1633 Broadway, 31st Floor  |  New York, New York 10019  |  T +1 212 407 7700  |  F +1 212 407 7799

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore.

NEWYORK/#510476

Exhibit 7



**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202-5306
414.271.2400 TEL
414.297.4900 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
414.297.5518
awronski@foley.com EMAIL

CLIENT/MATTER NUMBER
012474-0426

September 11, 2018

**Via Email**

Charles J Nerko
Vedder Price, P.C.
1633 Broadway, 31st Floor
New York, NY 10019

Re:   *Bessemer System Federal Credit Union –Unpaid and
      Delinquent Invoices*

Dear Charles:

As you know, Elizabeth Haas and I have been retained to represent Fiserv Solutions, LLC (and its affiliates) with respect to all aspects of the current dispute with Bessemer System Federal Credit Union ("Bessemer"). Fiserv hereby renews its demand that Bessemer immediately pay all outstanding and delinquent invoices, including the following:

| Invoice Date | Invoice No. | Amount Outstanding | Due Date |
|---|---|---|---|
| 05/31/2018 | 91318571 | $12,632.03 | 06/30/2018 |
| 06/28/2018 | 91335209 | $12,883.80 | 07/28/2018 |
| 07/30/2018 | 91351988 | $13,418.69 | 08/30/2018 |

In addition, Fiserv's most recent invoice (91369294) dated August 30, 2018, in the amount of $12,746.67 is due on or before September 30, 2018. Fiserv hereby demands that Bessemer remit the sum of **$51,681.19** to satisfy these invoices not later than September 30. If Bessemer fails to remit payment in full by that date, Fiserv intends to pursue an appropriate counterclaim in the action that Bessemer has filed and to seek all available remedies, including the imposition of late fees and attorneys' fees.

In the past, and most recently in your letter to Ms. Vandamme dated July 18, 2018, you have contended that Bessemer need not pay the amounts clearly due under the Master Agreement, claiming without basis that "Fiserv has been unable to provide any supporting documentation to substantiate its invoices." As Ms. Vandamme has informed you repeatedly, including in her email dated July 25, 2018, that Fiserv's invoices charges are based on the express provisions of the Master Agreement. Nonetheless, and despite Bessemer's failure to request any specific categories of "supporting documentation," Bessemer has repeatedly attempted to set up its "audit demand" as a pretextual basis for its bad faith failure to pay what it indisputably owes.

| BOSTON | JACKSONVILLE | MILWAUKEE | SAN DIEGO | TAMPA |
|---|---|---|---|---|
| BRUSSELS | LOS ANGELES | NEW YORK | SAN FRANCISCO | TOKYO |
| CHICAGO | MADISON | ORLANDO | SILICON VALLEY | WASHINGTON, D.C. |
| DETROIT | MIAMI | SACRAMENTO | TALLAHASSEE | |

4831-1344-3442.1



**FOLEY**

FOLEY & LARDNER LLP

September 11, 2018
Page 2

      In anticipation of that gambit, Fiserv has reviewed the invoices issued to Bessemer since the beginning of 2018, and is providing that analysis in the accompanying Excel spreadsheet. As the tab "2018 Invoice Analysis" makes clear, there have been only isolated and immaterial billing errors – **each of which has been in Bessemer's favor.** Specifically, the only "errors" were occasions on which Fiserv under-billed Bessemer; the largest single-month discrepancy was an under-billing of $61.87; and the aggregate under-billing from January 1, through August 31, 2018 equals $441.92. Bessemer's repeated (and completely unsupported) suggestions that Fiserv has been over-billing under the Master Agreement are simply wrong.

      Finally, you have previously claimed (including with respect to other clients of yours) to be unable to determine from the Master Agreement what fees are owed for particular services. The spreadsheet contains a "Contract to Invoice Mapping" tab that correlates the relevant provisions of the Master Agreement to specific fees for specific services. (This was not difficult and certainly could have been performed by you or your client with a modicum of effort.)

      Fiserv's analysis substantiates all of Fiserv's 2018 billings under the Master Agreement and reveals Bessemer's claims of "over-billing" to be pretextual and without basis. Fiserv does not intend to address any further "audit" demand from Bessemer unless the demand details specific questions regarding specific charges on specific invoices, as Bessemer has no evidence of any billing issues. Neither you nor Bessemer has provided any other explanation for Bessemer's refusal to pay Fiserv's outstanding invoices in full. No legitimate explanation exists, and Fiserv expects that Bessemer will make full payment on or before September 30.

                Very truly yours,

                *Andrew J. Wronski*

                Andrew J. Wronski

cc:    Amy L. Vandamme
       Elizabeth A.N. Haas

Exhibit 8

# Vedder Price

Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore

Charles J. Nerko
+1 212 407 6933
cnerko@vedderprice.com

September 14, 2018

**VIA EMAIL**

Andrew J. Wronski, Esq.
Foley & Lardner LLP
777 E. Wisconsin Ave.
Milwaukee, WI 53202

Re:     *Bessemer System Federal Credit Union v. Fiserv Solutions, LLC*

Dear Andy:

We were disappointed to receive your letter of September 11, 2018, which appears to confirm that Fiserv Solutions, LLC ("Fiserv") will continue to not productively engage with Bessemer System Federal Credit Union ("Bessemer") to address the issues Bessemer has raised.

We have a couple of questions and comments in response to your letter:

      1.     Your letter states that your firm has been retained to represent Fiserv, the defendant in this lawsuit, along with other undefined "affiliates [of Fiserv] with respect to all aspects of the current dispute with Bessemer." Please identify all Fiserv affiliates that you represent with respect to all aspects of the current dispute with Bessemer.

      2.     Please send us the analysis prepared by Fiserv in its original Excel format with accompanying metadata. Frankly, it looks like a contrived document created for litigation purposes, and given your client's position on it, we would like to confirm its original status and use. If there are multiple versions of the document, we would like to see them all. We also request that you send us complete copies of all documents referenced in the analysis. We certainly will seek them formally as part of the lawsuit, and we presume that Fiserv has preserved all such documents, interim drafts, and associated metadata.

      3.     The analysis prepared by Fiserv provides no evidence supporting the supposed quantities furnished by Fiserv, Fiserv's performance of the invoiced items, or refuting our client's allegations of breach. As Fiserv knows, it cannot enforce a claim to payment unless it can prove proper performance, and that Fiserv is not in material breach of its obligations to Bessemer. We would appreciate it if you would supplement the analysis so we can see the documents supporting or refuting each entry in the analysis (e.g., the quantities supposedly furnished), the extent to which the services have or have not been performed, and each allegation of breach made by our client. As we have already learned from our experience (which has been confirmed in recent press reports concerning—and we say it advisedly—absurd and amateurish data breaches caused by your client[1]), your client has

---

[1]   *See* Krebs on Security, "Fiserv Flaw Exposed Customer Data at Hundreds of Banks,"
    https://krebsonsecurity.com/2018/08/fiserv-flaw-exposed-customer-data-at-hundreds-of-banks/.

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore.

Andrew J. Wronski, Esq.
September 14, 2018
Page 2

a penchant for claiming it has done things properly when that has not been the case.  This documentation will give us greater clarity with respect to your client's position.

      4.     Your letter references that Bessemer has failed "to request any specific categories of 'supporting documentation'" in its audit demands.  What language in the audit provision permits Fiserv to decline to participate in an audit until Bessemer identifies specific categories of audit documentation?  What categories of supporting documentation does Fiserv maintain?  Our client's audit demands have been clear, and we expect that all documents called for in our client's audit demands would have been produced, regardless of how they are internally categorized by Fiserv.  It seems that your client is trying to unilaterally impose additional terms and limitations on Bessemer's audit rights.  As you know, the parties' agreement contains none of the terms and limitations that Fiserv has sought to unilaterally impose in response to our client's audit demands.  We request that your client produce all requested audit documents without further delay (though doing so will not waive any past breach).  If there is a reason why Fiserv believes there should be a deviation from the audit procedure that was set out in the parties' agreement, please advise how and why.

In closing, we note that the positions taken in your letter are contrary to fact and wholly without merit.  Fiserv's threats seem driven by Fiserv's false hope that it can wield its superior resources to bully and intimidate a small, not-for-profit credit union.  That tactic will fail here.  Your client would be well advised to consider all the adverse consequences of prosecuting a meritless counterclaim against a customer that has been victimized by a multitude of problems, including ***several data breaches caused by Fiserv***.

If Fiserv tests its laughable sue-the-victim gambit, we are well prepared to protect our client's rights in court.

Very truly yours,

Charles J. Nerko

cc:    Richard J. Parks, Esq.

Exhibit 9



**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202-5306
414.271.2400 TEL
414.297.4900 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
414.297.5518
awronski@foley.com EMAIL

CLIENT/MATTER NUMBER
012474-0426

September 14, 2018

**Via Email**

Charles J Nerko
Vedder Price, P.C.
1633 Broadway, 31st Floor
New York, NY 10019

Re:   *Bessemer System Federal Credit Union – Unpaid and
        Delinquent Invoices*

Dear Charles:

I just received your September 14, 2018 correspondence and find it simply
befuddling. You contend that my letter confirms that Fiserv "will not continue to productively
engage with Bessemer." Your client filed suit against Fiserv in April (though it has yet to serve an
actual complaint) and has stopped paying Fiserv's invoices while continuing to accept its services.
If that is your definition of "productive engagement," we'll have to agree to disagree. If your client
moves forward with the lawsuit and refuses to pay Fiserv's invoices, there will be counterclaims.
Your repeated threats of negative publicity and "adverse consequences" reveal an unwillingness or
inability to engage on the merits and will meet with no more success here than they have with your
other credit union clients. If Bessemer would like to "productively engage" – by paying its invoices
and discussing the timing and logistics of its deconversion and transition – Fiserv remains, as it has
been throughout, fully prepared to discuss those issues.

As to the balance of your letter: (1) I represent any and every Fiserv affiliate that
your client may attempt to involve in this dispute; (2) the spreadsheet we sent you was intended to
convey the information that it contains in response to your "audit demands"; we have no obligation
to provide you with anything more; (3) you can continue to play "hide the ball" all you like; your
inability to point to any particular invoice discrepancy or to request any particular category of
documents reveals this as an attempt to impose expense and inconvenience on Fiserv in service of a
fishing expedition; and (4) see No. (3), although I must add that all of Bessemer's contractual rights,
including those in Section 10 of the Master Agreement, must be exercised in good faith, and you
seem far more interested in manufacturing a dispute than resolving one, as Section 10 intends.

BOSTON        JACKSONVILLE      MILWAUKEE        SAN DIEGO        TAMPA
BRUSSELS      LOS ANGELES       NEW YORK         SAN FRANCISCO    TOKYO
CHICAGO       MADISON           ORLANDO          SILICON VALLEY   WASHINGTON, D.C.
DETROIT       MIAMI             SACRAMENTO       TALLAHASSEE

4838-1347-1346.1



**FOLEY & LARDNER LLP**

September 14, 2018
Page 2

If there is something productive to discuss, let me know.  Otherwise, file your complaint and we'll get on with it.  I don't intend to engage in a prolonged and unproductive letter-writing campaign.

Very truly yours,

*Andrew J. Wronski*

Andrew J. Wronski

cc:    Amy L. Vandamme
       Elizabeth A.N. Haas

Exhibit 10
To be Filed Under Seal

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

| | |
|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION, a not-for-profit federal credit union, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS, INC., a Wisconsin corporation and FISERV, INC., a Wisconsin corporation, | ) ) ) ) ) ) ) |
| Defendant. | ) |

CIVIL DIVISION

No.: 2018 - 01130

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Complaint has been served via First Class U.S. Mail, on *April 26, 2019*, upon the following parties:

Richard W. Epstein
Ekker, Kuster, McCall & Epstein, LLP
68 Buhl Boulevard
PO Box 91
Sharon, PA 16146-3706

Andrew J. Wronski
Elizabeth A.N. Haas
Timothy J. Patterson
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee WI 53202-5306

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

By: _____
Richard J. Parks, Esquire (PA40477)
7 West State Street, Suite 100
Sharon, PA 16146
724-981-1397
724-981-1398(fax)
rjp@pietragallo.com

*Attorney for Plaintiff, Bessemer System Federal Credit Union*

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION, a not-for-profit federal credit union, | ) ) ) | CIVIL DIVISION |
| | ) | No.:  2018 - 01130 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS, INC., a Wisconsin corporation and FISERV, INC., a Wisconsin corporation, | ) ) ) ) ) ) | |
| Defendant. | ) | |

*FILED IN MERCER COUNTY*
*2019 APR 26  AM 11:31*
*RUTH A. BICE*
*PROTHONOTARY*

## SCHEDULING ORDER

AND NOW, this 26th day of April, 2019, upon consideration of the Motion

to File Exhibits Under Seal submitted by Bessemer System Federal Credit Union it is hereby

**ORDERED** that the motion be placed on this Court's Motions Calendar for Monday,

May 6, 2019 at 9:00 A.M. IN COURTROOM NO. 1.

BY THE COURT:

_Christofer J Spol_ S.J.

rec'd.
5/4/19

05/01/2019   16:02   7249612007                                                           #7497 P.002/002

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

BESSEMER SYSTEM FEDERAL          )
CREDIT UNION a not-for-profit federal )
credit union,                    )
                                 )
                                 )
              Plaintiff,          )          Case No. 2018-01130
                                 )
                                 )
       vs.                       )
                                 )
                                 )
FISERV SOLUTIONS, LLC, a Wisconsin )
limited liability corporation f/k/a FISERV )
SOLUTIONS INC., a Wisconsin      )
corporation,                     )
                                 )
              Defendant.          )

## ORDER

AND NOW, this 2nd day of May, 2019, it is hereby ORDERED AND DECREED that

the hearing regarding Plaintiff's Motion to file Documents Under Seal originally scheduled to be

heard in Motions Court on Monday, May 6, 2019, is being moved and will be heard in Motions

Court on Monday, May 20, 2019, at 9:00AM in Courtroom No. 1 of the Mercer County

Courthouse, Mercer, Pennsylvania

BY THE COURT,

_Christopher J St. John_ S.J.

{CLIENT CABINET/9160/00000/00515710.DOC}

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

| | |
|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION, a not-for-profit federal credit union, | ) CIVIL DIVISION<br>)<br>) No.: 2018 - 01130<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS, INC., a Wisconsin corporation and FISERV, INC., a Wisconsin corporation, | )<br>)<br>)<br>)<br>)<br>) |
| Defendant. | ) |

## AFFIDAVIT OF SERVICE

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) |
| | ) SS |
| COUNTY OF MERCER | ) |

Before me, the undersigned authority, a notary public in and for said County and State, personally appeared John W. Kettering, who, being duly sworn according to law, deposes and states that a true and correct copy of the Complaint filed at the above term and number was served upon the defendant, Fiserv Inc.., c/o Corporation Service Company Madison, WI 53717 by Federal Express with signature required, as evidenced by the Receipt of Service attached hereto as Exhibit "A".

Richard J. Parks (Pa. I.D. No. 40477)
John W. Kettering (Pa. I.D. No. 316945)
PIETRAGALLO GORDON ALFANO
BOSICK & GORDON LLP
7 West State Street, Suite 100
Sharon, PA  16146
(724) 981-1397
Attorneys for Plaintiff

Sworn to and subscribed before me
this _16th_ day of May, 2019.

_____
Notary Public

> Commonwealth of Pennsylvania – Notary Seal
> MARJII SER – Notary Public
> Mercer County
> My Commission Expires Dec 18, 2021
> Commission Number 1263235



775173983279 



# Delivered
# Tuesday 5/14/2019 at 10:15 am



**DELIVERED**

Signed for by: J.LONG

**GET STATUS UPDATES**

**OBTAIN PROOF OF DELIVERY**

| FROM | TO |
|---|---|
| PIETRAGALLO GORDON ALFANO BOS | Corporation Service Company |
| Marjii Ser | MADISON, WI US 53717 |
| 7 West State Street, Suite 100 | 608 824-7000 |
| Sharon, PA US 16146 | |
| 724 981-1397 | |

## Shipment Facts

| | | |
|---|---|---|
| **TRACKING NUMBER** | **SERVICE** | **WEIGHT** |
| 775173983279 | FedEx Express Saver | 2 lbs / 0.91 kgs |
| **SIGNATURE SERVICES** | **DELIVERY ATTEMPTS** | **DELIVERED TO** |
| Adult signature required | 1 | Receptionist/Front Desk |
| **TOTAL PIECES** | **TOTAL SHIPMENT WEIGHT** | **TERMS** |
| 1 | 2 lbs / 0.91 kgs | Shipper |
| **SHIPPER REFERENCE** | **PACKAGING** | **SPECIAL HANDLING SECTION** |
| BSFCU-111886 | FedEx Envelope | Deliver Weekday, Adult Signature Required |
| **STANDARD TRANSIT** | **SHIP DATE** | **ACTUAL DELIVERY** |
| 5/14/2019 by 4:30 pm | Thu 5/09/2019 | Tue 5/14/2019 10:15 am |

**EXHIBIT A**

Travel History                                                      Local Scan Time

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION, a not-for-profit federal credit union, | ) ) ) ) | CIVIL DIVISION<br><br>No.:  2018 - 01130 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| FISERV SOLUTIONS, LLC, a Wisconsin limited liability corporation f/k/a FISERV SOLUTIONS, INC., a Wisconsin corporation and FISERV, INC., a Wisconsin corporation, | ) ) ) ) ) ) ) | |
| Defendant. | | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Affidavit of Service has been served via First Class U.S. Mail, on 5/16/2019, upon the following party:

Richard W. Epstein
Ekker, Kuster, McCall & Epstein, LLP
68 Buhl Boulevard
PO Box 91
Sharon, PA 16146-3706
*Counsel for Fiserv Solutions LLC*

Andrew J. Wronski
Elizabeth A.N. Haas
Timothy J. Patterson
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee WI 53202-5306
*Counsel for Fiserv Solutions LLC*

Corporation Service Company
8040 Excelsior Dr
Ste 400
Madison, WI 53717-2915
*Agent for Fiserv Inc.*

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

By: _____
Richard J. Parks, Esquire (PA40477)
John W. Kettering, Esquire (PA 316945)
7 West State Street, Suite 100
Sharon, PA 16146
724-981-1397
724-981-1398(fax)

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania:  Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: John W. Kettering

Signature: _____

Name: John W. Kettering

Attorney No. (if applicable): 316945

4875156v1

## IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA
## CIVIL ACTION - LAW

BESSEMER SYSTEM FEDERAL )
CREDIT UNION a not-for-profit federal )
credit union, )
                                  )
                    **Plaintiff,** )       Case No. 2018-01130
                                  )
       **vs.** )
                                  )
FISERV SOLUTIONS, LLC, a Wisconsin )
limited liability corporation f/k/a FISERV )
SOLUTIONS INC., a Wisconsin )
corporation, )
                                  )
              **Defendant.** )

## SCHEDULING ORDER

AND NOW, this _17th_ day of May, 2019, it is hereby ORDERED AND DECREED

that the Defendant Fiserv Solution, Inc.'s Request to File Related Materials Under Seal will be

heard in Motions Court on Monday, May 20, 2019, at 9:00 AM in Courtroom No.1 of the Mercer

County Courthouse, Mercer, Pennsylvania.


BY THE COURT,


_Christopher J. St. John_    S.J.


{CLIENT CABINET/9169/00000/00517671.DOC}

FILED IN MERCER
COUNTY

2019 MAY 21  AM 10: 15

RUTH A. BICE
PROTHONOTARY

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

CIVIL ACTION - LAW

BESSEMER SYSTEM FEDERAL      :
CREDIT UNION, a not-for-profit:
federal credit union        :
                            :
                            :
vs.                         :   No. 2018 - 1130
                            :
                            :
FISERV SOLUTIONS, LLC, a    :
Wisconsin limited liability :
corporation f/k/a/ FISERV   :
SOLUTIONS, INC., a Wisconsin :
corporation                 :

O R D E R

AND NOW, this 20th day of May, 2019, this matter is

before the Court at Motions Court for argument on the

Plaintiff's Motion to file exhibits under seal, and both

attorneys being present on behalf of their clients, and the

Defendant having consented to the entry of an Order on

Plaintiff's Motion but having filed a Response that the

Court deems to be a Motion seeking additional redactions

from the Complaint, IT IS HEREBY ORDERED that Plaintiff's

counsel shall submit a Memorandum in opposition to

Defendant's response to the Court by May 24, 2019, and that

defense counsel shall submit its Reply Memorandum to the Court by May 31, 2019.

THE COURT NOTES that the Order was signed this date granting Plaintiff's Motion and that the only outstanding issue at this time is Defendant's Response.

BY THE COURT,

_____, S.J.
Christopher J. St. John,
Senior Judge

m

5·21-19

CC: attys Parks, Nerko,
    Epstein, Kellogg,
    Wronski, Pattusa
    & Haas