## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| |
|---|
| **BESSEMER SYSTEM FEDERAL CREDIT UNION**, *on behalf of itself and its members*, |
| Plaintiff, |
| -against- |
| **FISERV SOLUTIONS, LLC**, *formerly known as* FISERV SOLUTIONS, INC., and **FISERV, INC.**, |
| Defendants. |

No. 19 Civ. 624 (MJH)

### SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Charles J. Nerko
VEDDER PRICE P.C.
1633 Broadway, 31st Floor
New York, NY 10019
(212) 407-7700
cnerko@vedderprice.com

Richard J. Parks
PIETRAGALLO GORDON
ALFANO BOSICK & RASPANTI, LLP
7 West State Street, Suite 100
Sharon, PA 16146
(724) 981-1397
rjp@pietragallo.com

*Attorneys for Plaintiff*
*Bessemer System Federal Credit Union*

## Table of Contents

                                                                                    Page

Nature of the Action .................................................................................... 1

Parties ....................................................................................................... 4

Jurisdiction and Venue .............................................................................. 5

Factual Background ................................................................................... 5

Fiserv Deceives Bessemer by Misrepresenting Its Security Practices and Service
   Offerings ............................................................................................ 7

Fiserv's History of Failing to Protect Confidential Financial Records ...................... 12

Bessemer's Member Information Is Very Valuable on the Black Market ................... 22

Fiserv Falsified and Misrepresented Bessemer's Member and Transactional Records ....... 25

Fiserv's Account Processing System Contained a Litany of Bugs and Defects ............. 29

Fiserv Has Engaged in Bad Faith and Deceptive Practices ................................. 34

Fiserv Failed to Properly Respond to Bessemer's Claims ................................... 41

Fiserv Reneged on the Replevin Action Settlement Agreement ............................. 45

Fiserv Withheld Bessemer's Credit Report Records During the Deconversion .............. 51

Fiserv Withholds Bessemer's Archived Documents ........................................... 53

Punitive Damages and Injunctive Relief Are Required for Complete Redress ............. 55

First Claim for Relief:  Breach of Contract .................................................. 57

Second Claim for Relief:  Negligence ........................................................ 60

Third Claim for Relief:  Unfair and Deceptive Trade Acts and Practices ................. 63

Fourth Claim for Relief Fraud / Fraudulent Inducement ................................... 69

Fifth Claim for Relief:  Constructive Fraud ................................................. 72

Sixth Claim for Relief:  Negligent Misrepresentation ...................................... 75

Seventh Claim for Relief:  Conversion / Misappropriation ................................. 79

Eighth Claim for Relief:  Bailment .......................................................... 81

Ninth Claim for Relief:  Misappropriation of Trade Secrets ............................... 83

Tenth Claim for Relief:  Defend Trade Secrets Act ........................................ 86

Eleventh Claim for Relief:  Unjust Enrichment ............................................. 86

Twelfth Claim for Relief:  Promissory Estoppel ............................................ 87

Thirteenth Claim for Relief:  Declaratory Relief ........................................... 88

Jury Trial Demand ................................................................................ 90

Demand for Relief ................................................................................ 90

NEWYORK-#544467

Plaintiff Bessemer System Federal Credit Union ("**Bessemer**" or the "**Credit Union**"), on behalf of itself and its members, for its first amended complaint ("**Complaint**") against Defendants Fiserv Solutions, LLC, formerly known as Fiserv Solutions, Inc. ("**Fiserv Solutions**") and Fiserv, Inc. (collectively with Fiserv Solutions, "**Fiserv**"), states as follows upon knowledge as to its own actions and upon information and belief as to others' actions:

<u>**Nature of the Action**</u>

1.      Maintaining accurate account information and safeguarding the confidentiality of personal information are vital to the success of a financial institution such as Bessemer.  This action arises from the widespread, systematic misconduct of Fiserv, a vendor that claims expertise in providing technology solutions to financial institutions.

2.      Fiserv's technology was the lifeblood of Bessemer:  Fiserv tracked Bessemer's deposits, generated its statements, and powered its online banking website.  Despite Fiserv's claimed expertise, Fiserv has misreported Bessemer's account records and information, while having security vulnerabilities that affected the privacy of thousands of Bessemer's members.  Given the serious pattern of problems, Fiserv itself conceded in an email to Bessemer's Chief Executive Officer: "***Yes, we agree, Bessemer System FCU has experienced an extreme number of issues***."

3.      Even after knowing that its problems were "extreme," Fiserv stuck its head in the sand.  For example, after Bessemer reported that Fiserv was not properly allocating loan payments and was falsely reporting that a member still owed on a loan that had already been paid off, Fiserv admitted that it "told [Bessemer's Chief Executive Officer] that it should work."  But Fiserv lied when representing that its system would accurately process loan payments and correctly report loan balances to members.  As a result of the Credit Union's persistent

questioning, Fiserv later acknowledged that the Credit Union's Chief Executive Officer "was adamant that this wouldn't work *and she is correct*."

4.      Even more astoundingly, Fiserv has failed to properly safeguard the confidential and highly sensitive financial information Bessemer and its members have entrusted to Fiserv. Bessemer's member information has been subject to several instances of critical security vulnerabilities while in Fiserv's custody.

5.      Although Fiserv asserts that it takes privacy and confidentiality very seriously, the facts show otherwise.  Indeed, after Bessemer conducted a security review of Fiserv and discovered that there were security vulnerabilities in the online banking website Fiserv was providing for Bessemer that would allow hackers to take over online banking accounts, Fiserv implemented a cosmetic "fix" that was readily bypassed and did not address the problem. Meanwhile, Fiserv "thanked" Bessemer by issuing an aggressive "notice of claims," attempting to silence Bessemer by threatening civil and criminal prosecution if Bessemer discussed Fiserv's security problems with third parties, including Fiserv's other clients (who presumably were affected with the same security problems at their own financial institutions).  Thus, to Fiserv, it was more important to keep its security problems under wraps than to fix security holes that potentially threatened scores of financial institutions and consumers.

6.      Fiserv's duplicity knows no bounds.  After agreeing to a settlement agreement to effectuate the parties' separation, Fiserv reneged on that agreement by failing to provide Bessemer with documents needed for Bessemer to transition away from Fiserv.  Fiserv sent Bessemer a hard drive purportedly containing Bessemer's documents, but that drive was encrypted and could not be unlocked using the instructions Fiserv provided.  When Bessemer attempted to obtain a temporary restraining order to effectuate the settlement agreement and

-2-

obtain the decryption password, Fiserv misled the Court.  Fiserv falsely claimed that the issue was a technical one in nature, and Fiserv assured the Court that it sent Bessemer's records and was not denying access to them.  Fiserv lied to the Court.  After the hearing on the temporary restraining order, Fiserv conceded that the drive it sent Bessemer was actually missing over 900 documents belonging to Bessemer.

7.     According to *The Wall Street Journal*, Fiserv's misconduct is part of a pattern of victimizing small financial institutions and the consumers they serve.  After decades of acquiring other technology providers, Fiserv and its two largest competitors now dominate the market, servicing 90% of U.S. banks with less than $1 billion in assets.  Fiserv's strategy is to buy up its smaller competitors to stymie competition.  Meanwhile, Fiserv ceases to make the proper financial investments to keep up with emerging technology and security risks—while locking financial institutions into long-term contracts, silencing its clients from disclosing to other affected clients when there are security problems, and holding customers' data hostage when those customers seek to go to competitors.  This gambit has fattened Fiserv's profits, while exploiting smaller financial institutions and the consumers they serve.  While midsize and local banks hold 13% of primary banking relationships, they capture only 7% of the customers who switch banks.  *See* "Frustrated by the Tech Industry, Small Banks Start to Rebel," *The Wall Street Journal*, April 11, 2019, https://www.wsj.com/articles/small-banks-rebel-against-the-most-important-tech-firms-you-have-never-heard-of-11554975000?mod=hp_lead_pos4.  **Exhibit 1** is a true and correct copy of this article.

8.     Bessemer brings this action to protect itself and thousands of its members from the wide-ranging harm that Fiserv has inflicted.

9.      In addition to harming Bessemer and its members, Fiserv's misconduct significantly harms credit unions, small financial institutions, and all the consumers they serve. If Fiserv is allowed to continue its course of misconduct, it will be encouraged to continue threatening its clients when security issues are reported, rather than making the proper investments to ensure that consumers' information is being properly safeguarded and accurately reported.  That result would significantly threaten the thousands of financial institutions that Fiserv services and the innumerable consumers whose financial institutions entrust Fiserv to safeguard their most sensitive financial information.

**<u>Parties</u>**

10.      Plaintiff Bessemer System Federal Credit Union is a federally chartered not-for-profit credit union.  Bessemer has a principal place of business at 106 Woodfield Drive, Greenville, Pennsylvania 16125.

11.      Bessemer has over 4,000 members and also seeks relief against Fiserv on its members' behalf under the associational standing doctrine.  Bessemer's members would otherwise have standing to sue Fiserv in their own right, the interests Bessemer is protecting are germane to its purpose as a federal credit union, and the participation of Bessemer's members is not required for adjudicating the associational claims or awarding relief on them.

12.      Defendant Fiserv Solutions, LLC is a limited liability corporation organized under the laws of the State of  Wisconsin with a principal place of business at 255 Fiserv Drive, Brookfield, Wisconsin 53008.  Defendant Fiserv Solutions, LLC was formerly known as Fiserv Solutions, Inc., a Wisconsin corporation.

13.      Defendant Fiserv, Inc. is a corporation organized under the laws of the State of Wisconsin with a principal place of business at 255 Fiserv Drive, Brookfield, Wisconsin 53008.

-4-

**Jurisdiction and Venue**

14.     Fiserv has removed this action from the Court of Common Pleas of Mercer County, Pennsylvania by claiming that, under 28 U.S.C. § 1332(a), this action is between citizens of different states, and that the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

15.     Venue in the Court of Common Pleas of Mercer County, Pennsylvania was proper pursuant to PA. R.C.P. No 2179 because: (i) Fiserv regularly conducts business in Mercer County; (ii) the cause of action arose from actions in Mercer County; and (iii) the transactions and occurrences relating to the cause of action arose in Mercer County.

16.     This Court has subject matter jurisdiction over the claims in this Complaint under 28 U.S.C. § 1331 (federal question).

17.     Venue in this district is proper under 28 U.S.C. § 1441(a) because this action was removed from a state court within this district and/or under 28 U.S.C. § 1391.

18.     This Court has personal jurisdiction over Fiserv because Fiserv resides in this district and/or has contacts with this jurisdiction sufficient to subject it to personal jurisdiction in this district.

**Factual Background**

19.     Founded in 1943 by employees of the Bessemer and Lake Erie Railroad, Bessemer is a member-owned, not-for-profit consumer cooperative headquartered in Greenville, Pennsylvania.  Bessemer is committed to serving the financial needs of its several thousand members,[1] many of whom live in Pennsylvania and Ohio.  Bessemer has earned the National

---

[1]     Bessemer may sometimes provide certain services to nonmembers.  References to "members" in this Complaint apply to members of Bessemer and, where applicable, any nonmember customer of Bessemer.

Credit Union Administration's low-income designation, reflecting Bessemer's dedication to helping consumers who are underserved by mainstream financial institutions.

20.     Founded in 1984, Fiserv is one of the world's largest providers of technology solutions to credit unions, banks, and other financial services providers.  According to Fiserv's website, it has more than 12,000 clients in more than 50 countries, and Fiserv reported $5.82 billion of revenue in 2018.  Fiserv provides core processing services to more than one in three financial institutions in the United States.  Fiserv administers 135 million deposit accounts, more than 80 million online banking end users, and approximately 28 million active bill payment end users.  More than $75 trillion of transactions each year move through Fiserv's systems.

21.     Fiserv provided account processing services for Bessemer, including through a core processing system known as "Charlotte."  An account processing system is the "brains" behind a financial institution, processing and recording all transactions for the financial institution.  For example, Fiserv provided the technology that powers tellers' computers and maintained Bessemer's account records.

22.     Fiserv also hosted Bessemer's online banking website, which was called "Virtual Branch."  Fiserv processed members' transactions originating from that website.  Once a person accessed Virtual Branch, he or she could engage in transactions affecting a Bessemer account, including transferring funds in and out of the account.

23.     According to Fiserv, "processing account-based transactions is at the very heart of [a credit union's] business.  Each transaction is a reference point that reflects the speed, service, efficiency and overall competitiveness of your organization.  When you get account processing right, your customers are satisfied and your workforce is maximally utilized—and your profits go up as a result.  When you get it wrong, you can expect it to wreak havoc throughout the

enterprise, especially on the bottom line." *See* https://www.fiserv.com/processing-

services/account-processing.aspx (last visited July 24, 2019).

24.     Fiserv further explains in its Code of Conduct & Business Ethics, "[t]he nature of

our business requires that all Fiserv computer systems and networks that process financial

transactions and store financial data operate with the availability, efficiency, reliability and

integrity that are expected of systems that process financial transactions and store financial data.

The company is firmly committed to operating and maintaining its technology assets in a manner

that merits the trust and confidence of the clients and consumers we serve." *See*

https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (last visited

July 24, 2019).  As for protecting confidential information, Fiserv acknowledges that "[i]t is our

responsibility to safeguard confidential information when it is collected, used, transmitted and

stored to prevent any unauthorized disclosure…. This includes the personal information that we

store for our clients' customers...." *See id.*

25.     Just as Fiserv recognized and acknowledges in its promotional material and Code

of Conduct & Business Ethics, the failure by Fiserv to provide the account processing services as

represented to Bessemer has been wreaking havoc throughout Bessemer's operations and

business.

### *Fiserv Deceives Bessemer by Misrepresenting Its Security Practices and Service Offerings*

26.     Bessemer and Fiserv Solutions entered into a "master agreement" (the "**Master**

**Agreement**") so that Bessemer could obtain the services promised by Fiserv Solutions.

27.     **Exhibit 2** is a true and correct copy of the Master Agreement.

28.     Among the misrepresentations made by Fiserv to induce Bessemer to enter into

the Master Agreement was that Fiserv would provide adequate security for Bessemer's member

information stored in "Virtual Branch," hosted by Fiserv Solutions, which was to become

Bessemer's online banking website.

29.     For example, prior to executing the Master Agreement, Bessemer's then-current

Chief Executive Officer emailed Richard Reynolds of Fiserv on February 12, 2012 to inquire

whether Fiserv's authentication process for "Virtual Branch" provided adequate safeguards and

satisfied Federal Financial Institutions Examination Council ("**FFIEC**") requirements:

> Hi Richard - my NCUA examiner is hitting in March - with respect to the
> January 2012 updates by FFIEC to the authentication process, how does our
> Virtual Branch match up to their expectations?  Anything I need to be aware of or
> concerned about?  Thanks, Linda

30.     Mr. Reynolds of Fiserv responded on February 27, 2012, assuring Bessemer that

Virtual Branch satisfied FFIEC authentication requirements and that there was nothing for

Bessemer to be aware of or concerned about:

> There shouldn't be a problem with this.  I think VB is up to their requirements.

**Exhibit 3** hereto is a true and correct copy of this email chain.

31.     As set forth in greater detail below, Fiserv's representations concerning the

adequacy of its authentication process for its Virtual Branch online banking website were false.

In reality, Fiserv employed a deficient authentication process that was not compliant with FFIEC

requirements.  Fiserv's lax security controls permitted unauthorized individuals to take over

online banking accounts, view member information, and engage in unauthorized transactions.

32.     **Exhibit 4** hereto is a true and correct copy of FFIEC online banking

authentication requirements in effect when Fiserv made its misrepresentations to Bessemer.   At

the time, the FFIEC required, among other things, the following authentication safeguards for

online banking websites:

(i)    Online banking websites should "use effective methods to authenticate the identity of customers using those products and services…[with] authentication techniques…appropriate to the risks associated with those products and services." (Ex. 3 at 1.)

(ii)    Online banking websites should "implement multifactor authentication, layered security, or other controls" when "single-factor authentication is inadequate." (*Id.* at 1– 2.)

(iii)    Online banking websites should "implement appropriate risk mitigation strategies." (*Id.* at 2.)

(iv)    "The level of authentication used by the financial institution should be appropriate to the risk associated with those products and services." (*Id.* at 6.)

(v)    "Single-factor authentication, as the only control mechanism, [is] inadequate for high-risk transactions involving access to customer information or the movement of funds to other parties." (*Id.* at 4.)

33.    As set forth in greater detail below, Fiserv's Virtual Branch system did not comply with FFIEC authentication requirements for online banking transactions, although Fiserv falsely represented to Bessemer that the system did comply with the requirements.

34.    In addition to Mr. Reynolds's false representations made to Bessemer's Chief Executive Officer concerning the security of Virtual Branch, Fiserv made other false representations to Bessemer.

35.    Fiserv advertised and represented to Bessemer that its account processing system offers "all the components required for credit union operations, plus established interfaces to a full range of ancillary products and services."  *See* https://www.fiserv.com/resources/charlotte-brochure.aspx (last visited July 24, 2019).

36.    According to Fiserv, "Charlotte offers flexible features designed to help you improve productivity, train employees faster and implement new products and services with ease.  Backed by a world-class customer support team that is dedicated to helping credit unions achieve their growth goals, Charlotte delivers all of your essential account processing functions,

along with a wide range of integrated add-on tools." *See*
https://www.fiserv.com/resources/charlotte-brochure.aspx (last visited July 24, 2019).

37.     Fiserv represented that its Charlotte platform is "equipped with indispensable
functionality and an array of integrated add-on options for seamless responsiveness that allows
credit unions to stay competitive.  Charlotte has a wide array of advanced solutions such as
lending, Internet banking, document imaging and more capabilities to choose from aimed at
helping credit unions increase productivity and efficiency." *See*
https://www.fiserv.com/industries/credit-unions/account-processing-platforms/charlotte.aspx
(last visited July 24, 2019).

38.     As part of Fiserv's "Commitment to Accurate Accounting and Recordkeeping,"
Fiserv represented that "Fiserv is committed to maintaining full, fair, accurate and timely
accounting and business records.  This … protects our legal interests; and helps us preserve the
trust of our clients."  *See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-
70ccedbdb25c (version in effect on August 22, 2018).

39.     Fiserv also represented that its Charlotte system will allow financial institutions to
"[s]tay current with technology requirements and regulatory compliance without increasing
staff," and that "[a]s technology tools become more advanced, so does the Charlotte solution.
Fiserv continues to make timely updates and enhancements to the Charlotte system to ensure that
this robust solution remains competitive by using the most up-to-date technologies available."
*See* https://www.fiserv.com/resources/Charlotte-Brochure-November-2014.pdf (last visited July
24, 2019).

40.     Indeed, Fiserv recognized its affirmative obligation to provide services that
continuously comply with applicable law and not harm consumers.  As Fiserv explained:  "[a]ll

Fiserv associates have an affirmative obligation to design, deliver and support our products and services in a manner that continuously complies with applicable laws and regulations…. Because the principal market for our products and services is the regulated financial services industry, the consequences of non-compliant offerings could seriously damage our reputation and financial interests.  Fiserv should use all reasonable measures to avoid consumer harm, to assist our clients in avoiding consumer harm and in diligently investigating any claims by our clients or others that our products or services are harming consumers." *See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (last visited July 24, 2019).

41.      Fiserv's privacy policy claimed that "Fiserv maintains physical, electronic, and procedural safeguards … designed to provide a level of security appropriate to the risk of processing Personal Information." *See* https://www.fiserv.com/about/privacypolicy.aspx (last visited July 24, 2019).

42.      Fiserv asserted that it is a "a proven ally in securing your IT infrastructure from increasingly sophisticated and targeted cyber-attacks….  That's why we deliver a layered and comprehensive approach to keep your financial institution's data and reputation safe…  Our Cybersecurity Solutions are designed and managed for financial institutions by experts in the financial industry and cybersecurity." *See* https://www.fiserv.com/risk-compliance/cybersecurity-solutions.aspx (last visited July 24, 2019).

43.    Fiserv has not performed in accordance with the Master Agreement, has breached the express and implied terms of the Master Agreement, and has engaged in other misconduct that has harmed Bessemer.[2]

### *Fiserv's History of Failing to Protect Confidential Financial Records*

44.    In February 2019, security analyst SecurityScorecard, Inc. rated Fiserv a "C" on its A to F scale.  **Exhibit 5** hereto is a true and correct copy of SecurityScorecard's analysis of Fiserv.

45.    According to SecurityScorecard, Inc., a company such as Fiserv rated below a B is *5.4 times more likely to suffer a consequential breach* than a company with proper security practices.

46.    In the course of conducting a security review of Fiserv, SecurityScorecard, Inc. uncovered over 40 weaknesses in Fiserv's security, including the following:

(a)    Fiserv fails to promptly update and patch affected systems to protect against commonly known security vulnerabilities and exposures, including delaying remediation of high-severity vulnerabilities for more than 30 days after publication.

(b)    Fiserv employs products and services past their end-of-life or end-of-service deadlines.  As these products and services are no longer marketed, sold, or upgraded by the manufacturers, they are more likely to be exploited and to have unpatched security vulnerabilities.

---

[2]    The incidents described in this Complaint are illustrations only.  Fiserv has engaged in other relevant acts, omissions, concealments, and misrepresentations.  Bessemer believes that additional incidents of Fiserv's misconduct will be identified after a reasonable opportunity for further investigation and discovery.

(c)     In March 2018, Fiserv was observed engaging in communications indicative of a malware infection.

(d)     In June 2018, Fiserv was observed engaging in communications indicative of yet another malware infection.

(e)     Fiserv runs servers using an obsolete Secure Shell (SSH) network protocol that contains fundamental weaknesses that can be readily exploited by hackers, including a design flaw that allows a man-in-the-middle attack.

(f)     Fiserv employs weak ciphers and encryption certificates that are expired, are self-signed, and have weak signatures.

(g)     Fiserv's web applications do not implement X-XSS-Protection best practices, meaning that hackers can send malicious URLs that inject code into Fiserv-hosted websites.

(h)     Fiserv's web applications do not implement X-Content-Type-Options Best Practices, which could lead to security issues and the execution of malicious code.

(i)     Fiserv's websites do not implement HSTS best practices, which render Fiserv-hosted sites vulnerable to a man-in-the-middle attack that can divert users to malicious websites.

(j)     Fiserv's websites do not enforce HTTPS encryption, leaving users vulnerable to man-in-the-middle attackers who can falsify data and inject malicious code.

(k)     Fiserv's websites redirect users to a new URL in a way that cannot be secured with HTTPS and HSTS headers, leaving users vulnerable to being redirected to spoofed or malicious versions of the sites.

NEWYORK-#544467

(l)     When a user is redirected to his or her ultimate URL destination, the user passes through one or more URLs served over HTTP (instead of HTTPS), which weakens other security technologies (such as HTTPS and HSTS headers) that are deployed elsewhere.

(m)     Fiserv does not implement X-Frame-Options best practices, which allows other, untrusted websites to embed a Fiserv-hosted website in a frame on their page.  This can be used to make social-engineering attacks appear more legitimate, or it can be used for clickjacking attacks.

47.     Fiserv's lax security controls have harmed Bessemer on multiple occasions. Fiserv has been repeatedly put on notice that its security measures were deficient, leaving Bessemer's member information at risk.  Rather than addressing the problems by updating its security, Fiserv continued to use outdated security methods long after vulnerabilities were brought to Fiserv's attention.  This left Bessemer, Bessemer's members, Fiserv's other customers, and those customers' own customers at risk.

48.     In 2016, Fiserv had a security breach and improperly and unlawfully provided Bessemer's confidential member information to unauthorized third parties, which Bessemer believes were employees of another financial institution using Fiserv's services.  The information Fiserv disclosed without authority included members' names, tax identification numbers, and portions of account numbers.  This incident should have served as a "wake-up call" to Fiserv that its security controls were inadequate.  Unfortunately, Fiserv ignored multiple warning signs and failed to fix its shoddy security.

49.     In or around March 2017, Fiserv put an invalid return address on member account statements for Bessemer's biannual verification of accounts, although the correct address was supplied by the Credit Union to Fiserv.  Members were alarmed to receive these irregular

statements with an unrecognized name or address.  Statements of members who had recently

moved or had supplied incorrect addresses were earmarked to be sent to a United States Postal

Service "dump pile" because of the invalid return address Fiserv placed on the statements.  Many

of the undeliverable statements, which contain confidential member information, were

untraceable and unprotected in the postal system.  Like the 2016 data breach, this incident

threatened the confidentiality of the sensitive financial information entrusted to Fiserv.

50.     As another example, Fiserv's normal course of performance with Bessemer was

to coordinate the installation and updating of antivirus software on Bessemer's systems.  Yet

Fiserv inexplicably stopped doing so without explanation, despite the growing prevalence of

cyberattacks.

51.     In August 2018, *Krebs on Security* reported that a customer of a small financial

institution discovered a security vulnerability with Fiserv that permitted unauthorized individuals

to see customers' account and transactional records, and to add or delete phone numbers and

email addresses used to receive alerts about account transactions.  *See* "Fiserv Flaw Exposed

Customer Data at Hundreds of Banks," https://krebsonsecurity.com/2018/08/fiserv-flaw-

exposed-customer-data-at-hundreds-of-banks/ (August 28, 2018).

52.     According to this article, the customer contacted Fiserv through multiple outlets,

including messages sent to the social media accounts of various individuals who were identified

as affiliated with Fiserv.  Fiserv, however, failed to fix this known security vulnerability in

response to these consumer complaints.

53.     Fiserv's Code of Conduct & Business Ethics contains a social media policy that

covers the use of LinkedIn, Twitter, Facebook, forums, and blogs, and Fiserv regulates its

employees' use of Fiserv's trademarks on social media.  Fiserv notes that social media "is an

NEWYORK-#544467

established part of many people's personal and professional lives—and the lines have blurred."
*See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (last visited
July 24, 2019).  Accordingly, Fiserv knows, or should have known, about communications sent
to the social media accounts of its agents who have identified themselves as Fiserv
representatives on social media platforms.

54.    Fiserv spokesperson Ann Cave confirmed that Fiserv did not make efforts to
remediate this known threat until ***after*** receiving an inquiry from a ***reporter***—when negative
press coverage was imminent.  According to Ms. Cave, "After receiving [the reporter's] email,
[Fiserv] promptly engaged appropriate resources and worked around the clock to research and
remediate the situation.  [Fiserv] developed a security patch within 24 hours of receiving
notification and deployed the patch to clients that utilize a hosted version of the solution.
[Fiserv] will be deploying the patch this evening to clients that utilize an in-house version of the
solution."  Thus, only after Fiserv faced the imminent prospect of negative press attention did
Fiserv "promptly engage[] appropriate resources" to fix its security lapse.

55.    According to this press report, customer information at hundreds of financial
institutions remained vulnerable to this security lapse.

56.    Fiserv did not notify Bessemer and its customers about this security lapse until
after Fiserv received negative press coverage.

57.    Unfortunately, Fiserv's corporate culture discouraged emphasis on data security.
For example, even one of Fiserv's own employees recognized the inadequacy of Fiserv's support
and outreach channels.  In a post responding to the *Krebs on Security* article, Adam Kinder,
Fiserv's Information Security Manager, invited customers to message him through his personal

-16-

social media account so that he "can use what influence [and] means I have at our company, above and beyond customer support and outreach branches, to address their concerns."

58.     On the heels of the *Krebs on Security* article indicating that Fiserv's online banking system contains security vulnerabilities, as well as a history of other problems Bessemer had with Fiserv, Bessemer conducted a review of Fiserv's security controls.

59.     The security review uncovered critical security flaws with the online banking system Fiserv was providing to Bessemer.

60.     At the time, all that Fiserv required to register for an online banking account with Bessemer was an account number and the last four digits of the member's Social Security number.  Given the weak security controls Fiserv implemented on Bessemer's online banking system, an unauthorized individual can access a member's online banking account by obtaining the member's account number (such as from the face of a check or guessing an account number based upon the sequence used to assign account numbers), and then either knowing or guessing the last four digits of a member's Social Security number.

61.     Fiserv knew that the security controls it placed on Bessemer's online banking website were inadequate.  Indeed, Fiserv's own website notes that that using the last four digits of a Social Security number is insufficient to authenticate an authorized user of an online banking account because fraudsters already have that information:

> Fraudsters look for ways to take over customers' and members' accounts, often with online banking credentials….  Any vulnerabilities in the account-opening process will likely be tested….  If I call my bank to reset my password, and they ask my mother's maiden name ***or last four digits of my Social Security number, that's not enough… Fraudsters already have that information***.

*See* https://www.fiserv.com/en/about-fiserv/the-point/managing-p2p-payment-risk-real-time-environment.html (last visited July 24, 2019) (emphasis added).

62.     Even if fraudsters did not already know the last four digits of a member's Social Security number, Fiserv did not impose rate limiting.  Accordingly, there was no "lockout" enforced by the online banking system to stop unauthorized individuals from using a pure trial-and-error guessing process (which can easily be automated) to guess the last four digits of a member's Social Security number and gain access to Bessemer's online banking accounts.  As a consequence, an unauthorized individual could take over an online banking account merely by guesswork, or cycling through "0001" to "9999."

63.     It would be expected that a company as sophisticated as Fiserv would implement appropriate controls to safeguard Bessemer's online banking accounts against unauthorized access through trial-and-error or "guessing."  With respect to Bessemer's online banking website, Fiserv failed to implement reasonable security controls such as those that:

(a)     require the use of an authentication procedure with sufficient complexity and secrecy;

(b)     implement a rate-limiting mechanism to effectively limit the number of failed authentication attempts that can be made on an online banking account;

(c)     require an individual to complete a "captcha" (a simple puzzle used to thwart automated access attempts);

(d)     impose an adequate waiting or lockout period following a failed login attempt; and

(e)     leverage other risk-based or adaptive authentication techniques to identify user behavior that falls outside typical norms, including repetitive, highly anomalous behavior consistent with a "guessing" or trial-and-error method to gain access to Bessemer's online banking website.

64.    In the course of Bessemer's security review, Fiserv scrambled to place additional security controls on Bessemer's online banking website.  These, too, were pitifully deficient and ineffective.

65.    Fiserv attempted to fortify Bessemer's online banking website by requiring users registering for an account to supply a member's house number.  This was ineffective because residential street addresses can readily be found on the internet and through other public sources.  Moreover, this information can be guessed through a trial-and-error process.  Most alarmingly, this security control was illusory.  Because some servers were not enforcing this security check, it could easily be bypassed.

66.    The security review also uncovered that when a user turns off JavaScript, it is possible to bypass the web page that was supposed to enforce a member's acceptance of the Bessemer online banking website's terms of service.

67.    Bessemer promptly reported to Fiserv the security vulnerabilities of the online banking website that Fiserv maintains for Bessemer.  **Exhibit 6** hereto is a true and correct copy of Bessemer's letter to Fiserv concerning the security review.  This letter also requested that Fiserv provide documents to permit an audit of its security practices to ensure that Bessemer's member information was being properly safeguarded.

68.    Adding insult to injury, rather than fixing these security problems and providing the requested assurances that information was being adequately safeguarded, Fiserv issued Bessemer a "notice of claims" contending that Bessemer's security review of its own online banking system "gives rise to claims (both civil and criminal)," and demanding that Bessemer not disclose information relating to the security review to any third parties, including Fiserv's other clients (who presumably were affected with the same security problems at their financial

-19-

institutions), as well as to media sources.  **Exhibit 7** hereto is a true and correct copy of Fiserv's notice of claims.

69.     Fiserv knew it had no proper basis for threatening Bessemer for conducting a security review of Bessemer's account records and information in Fiserv's custody.  The Master Agreement acknowledges that Bessemer's records and information "shall remain the property of [Bessemer]," even while in Fiserv Solutions's custody or control (Master Agreement § 3(b)). Indeed, Fiserv's Forms 10-K filed with the United States Securities and Exchange Commission for at least the past several years concede that Fiserv expects that its financial institution clients will "conduct ongoing monitoring and risk management for third-party relationships," and that "independent auditors annually review many of our operations to provide internal control evaluations for our clients."

70.     In addition, Fiserv lacked a good-faith basis when threatening Bessemer with legal claims or criminal prosecution if Bessemer were to disclose Fiserv's security weaknesses to others.  The Master Agreement expressly gives Bessemer "the right to make general references about [Fiserv Solutions] and the type of Deliverables being provided hereunder to third parties" (Master Agreement § 11(k)).

71.     Upon information and belief, Fiserv issued threats to others who have discovered or reported security vulnerabilities, in an effort to conceal these problems from affected financial institutions and consumers.

72.     On October 2, 2019, Bessemer's counsel responded to Fiserv's notice of claims. Bessemer's letter set forth the federal laws and regulatory guidance authorizing Bessemer to conduct security reviews of service providers.  However, in an effort to avoid protracted disputes, and facing the threat of Fiserv potentially prosecuting civil and criminal claims against

Bessemer, Bessemer agreed to stay its security review and temporarily agreed to not publicly disclose the specific security vulnerabilities Bessemer identified.  **Exhibit 8** hereto is a true and correct copy of Bessemer's response to Fiserv's notice of claims.

73.     Fiserv concedes that it may not be able to protect its customers' records from future data breaches.  Indeed, in its 2018 SEC Form 10-K, Fiserv admits that cybersecurity threats "continue to evolve" and that Fiserv "may not be able to prevent a material event in the future" with respect to unauthorized access to its customers' data.  **Exhibit 9** hereto is a true and correct copy of Fiserv's 2018 SEC Form 10-K.

74.     Fiserv strives to keep its security failures under wraps because it desires to mislead its customers into continuing to entrust their confidential information with Fiserv, while maintaining a high stock price, artificially inflating the value of its corporate goodwill, and continuing to receive payments from financial institutions.  Fiserv's 2018 SEC Form 10-K admits that a security incident allowing unauthorized access to clients' data could give "a loss of confidence in our ability to serve clients and cause current or potential clients to choose another service provider…which could have a material adverse impact on our business."  By intentionally failing to disclose or suppressing information about its security problems, Fiserv misled Bessemer, its members, and other Fiserv customers into using and continuing to use Fiserv's service offerings, thus providing Fiserv with ill-gotten gains, thwarting its competitors, and artificially fattening its stock price and goodwill.  Fiserv has a particular interest in artificially increasing the value of its goodwill and intangible assets, as they represent over 70% of Fiserv's total assets.

NEWYORK-#544467

75.     As a financial institution, Bessemer has a continuing interest in ensuring that the integrity of its member information is maintained, and that such information is safeguarded from future breaches.

76.     Because Bessemer's core function is serving its members' financial needs, Bessemer is faced with increased costs of dealing with members who have placed fraud alerts or credit freezes in response to Fiserv's data breaches, making it impossible or burdensome for Bessemer to evaluate members' creditworthiness for current or potential credit or loans.  In addition, given Fiserv's delays in returning Bessemer's information (*see infra*), Bessemer faces the dilemma that, in order to function, it must share its member information with Fiserv, which has proven to lack the ability to safeguard member information.

77.     Fiserv was aware of the risks posed by its weak security controls and the extraordinarily sensitive nature of the personal member information it maintains, as well as the resulting impact that a data breach would have on a financial institution such as Bessemer.

78.     Unfortunately, Fiserv's approach to maintaining the privacy and security of its customer data was knowingly deficient, grossly negligent and reckless, or, at the very least, negligent.  Fiserv failed to follow industry standard precautions in response to known risks, and Fiserv knew that its security controls were substandard and deficient.

79.     Bessemer now faces years of constant surveillance and increased vigilance against fraudulent activity involving its members.  While consumers are ultimately protected from most fraud losses, Bessemer is not, as financial institutions bear primary responsibility for reimbursing members for fraudulent transactions.

### Bessemer's Member Information Is Very Valuable on the Black Market

80.     The types of information Fiserv maintained for Bessemer are highly valuable to identity thieves.  The names, email addresses, recovery email accounts, telephone numbers,

NEWYORK-#544467

birthdates, passwords, security question answers, and other valuable member information can all be used to gain access to a variety of existing accounts and websites.

81.     Identity thieves can also use Bessemer's member information for embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits.  A report from the United States Government Task Force on Identity Theft explains the harm befallen to Bessemer and its members:

> Businesses suffer most of the direct losses from … identity theft because individual victims generally are not held responsible for fraudulent charges. Individual victims, however, also collectively spend billions of dollars recovering from the effects of the crime.
>
> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly, individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit….
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves.  Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[3]

---

[3]     The President's Identity Theft Task Force, <u>Combating Identity Theft: A Strategic Plan</u>, Federal Trade Commission, 11 (April 2007).

82.     To put it into context, as demonstrated in the chart below, the 2013 Norton

Report, based on one of the largest consumer
cybercrime studies ever conducted, estimated that
the global price tag of cybercrime was around $113
billion at that time, with an average cost per victim
of $298.



83.     Once stolen, member information can be used in a number of different ways.  One

of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of

the internet that makes it difficult for authorities to detect a website's location or owners.  The

dark web is not indexed by normal search engines such as Google and is accessible only by using

a Tor browser (or similar tool), which aims to conceal users' identities and online activity.  The

dark web is notorious for hosting marketplaces selling items such as weapons, drugs, and

member information.  Sites on the dark web appear and disappear quickly, providing cover for

illegal transactions.

84.     Once someone buys member information, it is then used to gain access to

different areas of the victim's digital life, including financial accounts, social media, and credit

card details.  During that process, other sensitive data may be harvested from the victim's

accounts, as well as from those belonging to family, friends, and colleagues.

85.     In addition to member information that can be accessed, a hacked online banking

account can be very valuable to cyber criminals for other attacks.  Since online banking accounts

are linked to other accounts (for example, to transfer funds between financial institutions), a

hacked online banking account serves as a springboard for a hacker that opens up a number of

other accounts.

-24-

86.     The problems associated with identity theft are exacerbated by the fact that many identity thieves will wait years before attempting to use the member information they have obtained.  Indeed, in order to protect its member information, Bessemer will need to remain vigilant against unauthorized use of its member information for years and decades to come.

***Fiserv Falsified and Misrepresented Bessemer's Member and Transactional Records***

87.     In addition to failing to safeguard confidential member information against access by unauthorized parties, Fiserv has falsified and misreported that information to Bessemer, its members, and other authorized individuals.

88.     In or around July 2018, Fiserv falsely represented to Bessemer that a member's account was closed.  In fact, the member did not close the account.  Fiserv also made unauthorized changes to the member's account information, which prevented dividends owed to the member from being applied and posted to the account.  Fiserv falsely reported to Bessemer that this member was owed no dividends when, in fact, the member was owed dividends from Bessemer.  Based upon Fiserv's false reporting of information and unauthorized changes to account information, this member was not timely paid dividends that were owed to him, and the member was prohibited by Bessemer from making deposits into the account based on Fiserv's false representations that the account was closed.  What's more, after Fiserv reported to Bessemer that this account was closed, Fiserv accepted an incoming transfer on that member's behalf of funds that were intended to be posted to that member's account.  Fiserv, however, failed to report this transfer on Bessemer's "exception list" (a list that contains incoming transfers that were intended for closed accounts) and instead transferred the member's funds to the account, which was no longer properly provisioned to accept funds and calculate dividends owed on the funds.  All of this caused consumer confusion and deprived a member of access to funds and dividends to which he was entitled.  In response to Fiserv's failure to properly post

-25-

dividends to a member's account, Katherine King of Fiserv informed Bessemer's CEO that "I would agree you [Bessemer] need to post these dividends…. I am not sure how to work around this issue for you."

89.     After Bessemer reported that Fiserv was not properly allocating loan payments and was misreporting that a member still owed money on an already-paid-off loan, Mark Britton of Fiserv admitted on or about February 19, 2019 that he "told [Bessemer's Chief Executive Officer] that it should work." But Fiserv lied when representing that its system would accurately process loan payments and report loan balances. As a result of the Credit Union's persistent complaints, Fiserv later acknowledged that the Credit Union's Chief Executive Officer "was adamant that this wouldn't work *and she is correct*." Indeed, Mr. Britton acknowledged that one of his Fiserv colleagues completed a test of Fiserv's loan processing system and, with respect to a loan that should have been fully paid off, Fiserv confirmed that it falsely "put a negative balance of $15.41 on the loan history…and still shows late fees as $49.24."

90.     During the conversion of Bessemer's data from Fiserv's Loan Advantage platform[4] to Fiserv's Loancierge platform, Fiserv falsified documents by inserting what Bessemer believes to be another Fiserv customer's electronic documents (i.e., loan agreements, promissory notes, and loan disclosures) into Bessemer's Loancierge application. This caused incorrect language and terms to display on Bessemer's loan disclosures, which gave the false impression that the documents were authentic business records of Bessemer. Fiserv was

---

[4]     Loan Advantage is designed to package loan configuration and implementation. The services include "credit processing, contract funding, dealer integrations, accounting and cash management, default management, collateral management and customer care, which enable lenders to use a single partner for their origination, accounting and servicing needs." *See* http://investors.fiserv.com/news-releases/news-release-details/loan-advantage-fiserv-gives-lenders-seamless-route-automotive (last visited July 24, 2019).

provided the correct information by Bessemer, yet it reported false information and altered Bessemer's business records.  For instance, language purporting to require Bessemer's members to pay the Credit Union certain late fees appeared, even when it was not the Credit Union's intent to charge those fees.

91.     Fiserv sent Credit Union members federal 1098 mortgage statements that falsely reported the principal balance of the loans in the field for Private Mortgage Insurance.  Fiserv was provided with accurate information for these statements and assured the Credit Union that it would issue corrected 1098 statements, but Fiserv never provided documentation of these corrected statements.

92.     Fiserv has knowingly and repeatedly printed false mortgage interest, late-fee, and other transactional information on receipts and other documents provided to members, even though Bessemer informed Fiserv of the accurate information.  For example, a January 4, 2017 share deposit receipt generated by Fiserv for a member falsely indicated that there were deposits of $300.00 in cash and a $69.68 check, when Bessemer informed Fiserv that the member actually deposited just $90.00 in cash and no checks.

93.     Fiserv has knowingly misrepresented due dates for loans.  When Bessemer reported this issue to Fiserv, Fiserv explained that when a loan is entered with a due date on the 28th, 29th, 30th, or 31st of the month, it is Fiserv's practice to misreport the due date as the last day of the month, regardless of the loan's actual due date.  Fiserv conceded that this false repeating of information is a "known issue" with its account processing system.  Yet, despite having actual knowledge that it was supplying false information, Fiserv continued to supply false information.

94.     Currency adjustment transactions were inconsistent and intermittently failed to reflect correct cash or check adjustments for teller drawers.  Fiserv assured the Credit Union that this issue would be corrected in a future software update release, but the update was consistently delayed.

95.     In or around June 2018, Fiserv deleted transactions that should have been present on the Homebanking Register Report.  This report was supposed to include a complete and accurate list of all the prior day's homebanking transactions.

96.     In or around July 2018, Bessemer completed a payment transfer transaction using the Fiserv system for a member with a mortgage through Bessemer.  The member owed $1,361.70 in late fees, which were fully paid by transferring funds from the member's share account to the member's home equity loan.  While the member's share account history showed that the full amount of $1,361.70 was transferred to pay off these late fees, the loan history showed that only $361.70 was received from this transfer and applied to the loan.  Thus, to the member it would appear that $1,000.00 was missing.  An excerpt of the inaccurate statement furnished by Fiserv is shown below, with the relevant transactions highlighted:

```
         016    SHARE ACCOUNT                      PREVIOUS BALANCE          50.53
062818 DEPOSIT                                              33516.53      33567.06
062818 PAYMENT      TRANSFER                                  907.77-     32659.29
062818 PMT TFR      LATE CHARGE                               1361.70-    31297.59
062818 PAYMENT      TRANSFER                                 31247.06-       50.53
063018 DIVIDEND                                                   .03        50.56
         ANNUAL PERCENTAGE YIELD EARNED IS 00.24%
         FOR APRIL 01, 2018      THRU JUNE 30, 2018
063018                                                NEW  BALANCE          50.56
       --------------------------------------------------------------------------
         036 HOME EQUITY          LOAN              PREVIOUS BALANCE       32806.32
060118 PAYMENT                             132.12            775.88-      32030.44
062818 PAYMENT      TRANSFER                124.39            783.88-      31247.06
062818 PMT TFR      LATE CHARGE             361.70                        31247.06
062818 PAYMENT      TRANSFER                                31247.06-          .00
063018                                                NEW  BALANCE            .00
```

97.     When Bessemer contacted Fiserv about the false information being reported, Fiserv informed Bessemer that Fiserv's system knowingly falsely reports such transactions and

-28-

cannot correctly report them when more than $999.99 is entered in the relevant system field, and that Fiserv would not correct the programming used to calculate transactions of this type. Several weeks later, Fiserv informed Bessemer that Fiserv was going to manually rebuild the statement for this member in order to properly reflect the total amount paid.

98.     In proceedings involving loans paid by the bankruptcy court, the court provides a single check with explicit instructions on how to apply the check to the specific loan.  But Fiserv's software cannot accommodate the correct application of a check in a single transaction in the specific manner required by the bankruptcy court.  As a result, Bessemer was forced to apply the designated amounts of the check to principal and interest as separate check transactions, even though Bessemer receives only one check, because Fiserv's software cannot process multiple entries for interest, principal, and fees to a loan from a single check.  When the Credit Union asked Fiserv about these transactions, Fiserv responded that it will allocate only one payment per check.  Fiserv asked for a business justification for addressing this issue, and even when the Credit Union explained that the bankruptcy court requires these transactions to be handled in a particular way, Fiserv declined to correctly reflect these transactions, stating that it "has been this way for years and would require hours of programing changes, the programmer said this was not going to happen."

### *Fiserv's Account Processing System Contained a Litany of Bugs and Defects*

99.     Fiserv's services were laden with bugs and defects.  Johnette Preddy of Fiserv admitted in an email to Bessemer's CEO that there was an "extreme number" of problems that Fiserv was inflicting upon Bessemer:

> "***Yes, we agree, Bessemer System FCU has experienced an extreme number of issues***.  Everyone on our team is aware of these issues and we continue to work for resolution..…  I sincerely apologize for the inconveniences and impact to your business."

(Emphasis added.)

100.    As one example, during the course of just one business day, April 5, 2019, Fiserv

informed Bessemer that its systems were manifesting the following errors:

        (a)    The Credit Union's document archive hosted through Fiserv's eFichency

system experienced a service interruption;

        (b)    Less than one hour later, Fiserv's eFichency system was experiencing

time-out errors;

        (c)    Members logging into Virtual Branch would receive an "authentication

error -1" error message when accessing their eStatements; and

        (d)    Members using the search option in Virtual Branch would receive an

"Exception: (503) Service Unavailable -1" error.

101.    On many occasions, Fiserv's Charlotte system was unavailable, causing Bessemer

to be denied access to its account records and information needed to process member

transactions and to function as a financial institution.

102.    Bessemer's members have reported that their bill payments were failing to be

properly made in accordance with the members' instructions.  Fiserv conceded that this is

another known defect with its account processing system.

103.    ACH and share draft returns failed to process during system-wide connection

outages.  Fiserv issued a report each day and misrepresents that returns are in progress.

Although Bessemer believes that the returns were processed and received by Fiserv, the funds

for the returned items were not received by the Credit Union as expected.  Instead, Fiserv

seemingly failed to present the returns to the Federal Reserve for credit.  These issues

consistently arose when Fiserv experiences connectivity problems.

104.     Fiserv has outsourced many of its functions, which resulted in a degradation of and disruption in the service provided to Bessemer.  For example, when Fiserv looked up Bessemer in its system by the Credit Union's identification number, Fiserv's call center personnel were unable to identify which Fiserv platform Bessemer uses.  In fact, Fiserv candidly admitted that since it has outsourced much of its call centers' personnel, Fiserv's support personnel may be unable to provide proper support functions.

105.     Bessemer's staff members constantly found themselves locked out of the system and unable to log on to or log off of the system, which inhibits Bessemer's ability to serve its customers.  For example, a teller's computer froze when the teller was processing a transaction for a member.  When the teller attempted to log off, a pop-up appeared with an Outlook Wizard asking to set up Outlook.  The teller was unable to log back on to the computer.  Although Fiserv previously instructed Bessemer employees to use the log-off button exclusively to prevent log-off problems, Fiserv has since instructed Bessemer staff members never to use the log-off button.

106.     Bessemer's staff members reported frequent latency with the Charlotte teller platform.  Fiserv blamed the Credit Union's internet connection, the amount of RAM in the Credit Union's computers, the way the Credit Union staff members were using the computers, the failure of the Credit Union's staff to log off at lunchtime, the need to reboot the server every Sunday, and a variety of possible equipment-related issues.  Fiserv's finger-pointing and reflexive "blame the customer" responses to these issues have caused Bessemer to incur losses for obtaining unneeded goods and services.  Eventually, Fiserv conceded that these issues were caused by Fiserv.

107.     All of Bessemer's networked front-line printers have periodically stopped working, even when the software itself appears to be working.  This issue prevents the Credit

-31-

Union from printing receipts, checks, or other documents for members.  As a result, the Credit Union has been unable to provide members with receipts or checks documenting the members' transactions, and the Credit Union is, therefore, unable to serve its members.

108.   Bessemer was consistently blocked from printing checks.  The Credit Union has continuous check activity, which the Credit Union logs in its system so that its checks are numbered consecutively.  However, periodically, front-line tellers are suddenly unable to print the checks, unless all employees reboot their computers.  When Bessemer informed Fiserv of the issue, Fiserv's only solution was to have the Credit Union join a WebEx to replicate the issue.  The Credit Union has done this at least 10 times, without Fiserv resolving the issue.

109.   On many occasions, including in or around May 2018, Fiserv's system returned errors and failed to provide correct information in response to Bessemer's attempts to look up members' account numbers, causing disruption of service to members.

110.   On many occasions, including in or around July 2018 through April 2019, Bessemer informed Fiserv that it received ongoing error messages related to the Access Advantage[5] platform.  Though Fiserv purported to solve the issue by moving Bessemer's data to another server, the errors continued, causing disruption to Bessemer's operations.  As a result of these errors, some transactions were processed, but a receipt of the transaction was not generated.  Other times, the system reported a failed transaction when the transaction was processed.  Fiserv informed Bessemer that multiple credit unions using different Fiserv core processing systems have experienced this very same problem.

---

[5]   Access Advantage "easily enables real-time integration of third-party applications with Portico," a Fiserv operating platform.  *See* https://www.fiserv.com/resources/Portico-Brochure-August-2015.pdf (version in effect on August 23, 2018).

-32-

111.    Bessemer's system had delays and issues with programs not loading properly or continuing to freeze, which results in tellers and employees being unable to complete their tasks and meet the Credit Union's members' needs in a timely manner.

112.    The entire Fiserv system periodically crashed, was unavailable, or not provide requested information, and both members and employees were then unable to process transactions, access funds, or get truthful information concerning account records.

113.    On or about November 21, 2017, a business listing was uploaded by the United States Treasury Department's Financial Crimes Enforcement Network ("**FinCEN**").  The Credit Union downloaded the business listing file.  When the Credit Union attempted to upload the file on ConfirmIT (Fiserv's website that was supposed to be available), the Credit Union repeatedly received an error message, and the upload failed.  Fiserv's errors frustrated Bessemer, consumed unnecessary time and resources, and caused delays in the Credit Union's efforts to comply with applicable law.

114.    In or around May 2018, Bessemer was unable to run a FinCEN 314(A) review using Fiserv's ConfirmIT product, and Bessemer received an error message when trying to upload both the individual and the business listings.  This issue has occurred many times previously.  Bessemer attempted to work with Fiserv to find a resolution, but no explanation or permanent solution was provided to Bessemer.  As a result of its inability to comply with this regulatory request, Bessemer may be subject to penalties based on Fiserv's failure to act.  Fiserv's failures are directly impairing Bessemer's ability to comply with legally mandated processes, despite assurances that the Fiserv system would provide compliance.

115.    Despite representations that it would be accessible for required reporting, Fiserv scheduled maintenance of its eFichency platform on the same day that federally mandated

reports were due to be filed, with knowledge that Bessemer and other credit unions would require access to eFichency for assistance in compiling and completing those reports.  On other occasions, eFichency was frequently nonfunctioning or unavailable.

### *Fiserv Has Engaged in Bad Faith and Deceptive Practices*

116.    Fiserv has repeatedly acted in bad faith and deceptively.

117.    Fiserv represented that it would utilize sufficient data security protocols and mechanisms to protect and accurately report Bessemer's member information.

118.    Bessemer contracted with Fiserv and provided Fiserv with Bessemer's member information, based upon Fiserv's false representations.

119.    Fiserv falsely represented that its systems were secure, had adequate authentication procedures, and that Bessemer's member information would remain private and accurate.  Fiserv knew or should have known that it did not employ reasonable, industry standard, and appropriate measures to ensure the security and accuracy of member information.

120.    Even without these misrepresentations, Bessemer was entitled to presume, and did expect, that Fiserv would take appropriate measures to keep Bessemer's member information safe and accurate.  Fiserv did not disclose at any time that Bessemer's member information was vulnerable to hackers or falsification because Fiserv's security and recordkeeping measures were inadequate, and Fiserv was the only one in possession of that material information, which it had a duty to disclose.  Fiserv misrepresented, both by affirmative conduct and by omission, the safety and soundness of its many systems and services, specifically the security and accuracy thereof, and their ability to authenticate authorized users and to safely store and process Bessemer's member information.  Fiserv also engaged in deception by failing to implement reasonable and appropriate security measures or to follow industry standards for data security, and by failing to comply with its own policies and agreements.

-34-

121.    As alleged above, Fiserv knew its data security and recordkeeping measures were grossly inadequate by, at the absolute latest, reports of security compromises and falsified customer information coming to light, exposing Fiserv's lax and inadequate approach to data security and recordkeeping.  At that time, Fiserv was on notice that its systems were extremely vulnerable to attack and that the account records and information it stores was subject to falsification—facts Fiserv already knew given its previous exposures and problems.

122.    In response to all of these facts, Fiserv failed to properly respond or warn Bessemer about these problems and, instead, openly represented that Fiserv had adequate security and recordkeeping practices and protocols.

123.    Fiserv had an obligation to disclose to Bessemer that its members were easy targets for hackers and that Fiserv was not implementing appropriate measures to protect them and the accuracy and safety of their information.

124.    Fiserv did not do these things.  Instead, Fiserv willfully deceived Bessemer by concealing the true facts concerning its data security and recordkeeping, which Fiserv was obligated to, and had a duty to, disclose.  Fiserv had exclusive knowledge of undisclosed material facts, namely, that Bessemer's member information in Fiserv's custody was unsecure and subject to unauthorized alteration and falsification, and Fiserv withheld that knowledge from Bessemer.  Additionally, Fiserv made numerous representations following the prior data security vulnerabilities to assure its customers that their member information and other data was safe, and that Fiserv was dedicated to maintaining that security.

125.    Had Fiserv disclosed the true facts about its poor data security and recordkeeping practices, Bessemer would have taken measures to protect itself.  Bessemer justifiably relied on

-35-

Fiserv to provide accurate and complete information about its data security and processing of Bessemer's member information, and Fiserv did not do so.

126.    Alternatively, given the security lapses and other problems in Fiserv's services and Fiserv's refusal to take measures to detect them, much less fix them, Fiserv simply should have shut down the services Bessemer was using and returned Bessemer's member information so that Bessemer could transition to another service.  Independent of any representations made by Fiserv, Bessemer justifiably relied on Fiserv to provide a service with at least minimally adequate measures to protect the confidentiality and integrity of Bessemer's member information, and Bessemer justifiably relied on Fiserv to disclose facts that would undermine that reliance.

127.    Rather than ceasing to offer a clearly unsafe and defective service or disclosing to Bessemer that its services were unsafe and that member information was exposed to theft and falsification on a grand scale, Fiserv continued to conceal information relating to the inadequacy of its security and service offerings.

128.    In addition, Fiserv repeatedly has issued invoices that are erroneous, are false, and overstate the amount the Credit Union actually owes Fiserv.  The accuracy of Fiserv's invoices is very important because Fiserv purports to prohibit Bessemer from making any deduction or setoff from amounts invoiced by Fiserv, even though Fiserv knows its invoices are false.

(a)     For example, Fiserv improperly billed the Credit Union for "Monthly CD Processing," after the Credit Union explicitly asked Fiserv to stop providing this service.  Yet, for at least the following seven months after Fiserv stopped performing this service for Bessemer, Fiserv nevertheless continued to invoice Bessemer for this cancelled service.

(b)      Fiserv invoiced the Credit Union an extra $100 per month for a backup connection that never worked.  Fiserv finally ceased charging the Credit Union for this backup connection in May 2017, yet Fiserv has not refunded these improperly charged fees.

(c)      Invoice charges in December 2018 included billing for IRA Fair Market Value reporting for 121 accounts at $0.32 per account, while the January 2019 invoice includes billing for 115 IRA accounts at $0.336 per account.  Fair Market Value reporting is done only once per year, at year-end.

(d)      Invoice totals also appear to be incorrectly reflected on the invoices, as the total of an invoice frequently does not equal the sum of the line items or amounts due to Fiserv.

(e)      Fiserv has continued to invoice Bessemer for services after Bessemer terminated the Master Agreement and after Fiserv refused to promptly return Bessemer's account records and information as requested.

(f)      Even though Fiserv agreed to deconvert Bessemer from its system, Fiserv's invoices to Bessemer reflected fees for the period occurring after the deconversion, such as an invoice sent to Bessemer in January 2019 for a year's worth of multifactor authentication.

(g)      Items that Fiserv had agreed to provide without cost appear on bills, in an express disregard of Fiserv's representations to Bessemer.  For example, Fiserv billed the Credit Union for items that Fiserv agreed to pay for, including equipment and travel expenses related to attempts to address connectivity issues.  Additionally, Fiserv sent the Credit Union a large bill for statement mailing services nearly one year late.  Moreover, Fiserv's November 2017 invoice to the Credit Union included a line item for Vacation Club withdrawals and Christmas Club withdrawals, which should have been invoiced months earlier.  The amounts for these withdrawals are also incorrect and inconsistent with prior invoices from Fiserv.

-37-

129.    In or around August 2016, Fiserv insisted that the Credit Union add increased memory and a firewall to its system, based on Fiserv's assurances that these upgrades would fix various issues.  In fact, these hardware upgrades failed to resolve the issues that Fiserv represented they would fix.

130.    Fiserv instructed Bessemer to install additional memory on computers that were ordered for Bessemer by Fiserv and according to Fiserv's specifications.  Fiserv represented that purchasing and installing new CAT6 cables for all workstations would provide relief for some issues the Credit Union was facing, but that has not been the case.

131.    Bessemer, in reliance on Fiserv's representations, procured and installed a new hub and a new Cisco 24 port switch in an effort to solve connectivity problems.  Bessemer also upgraded its internet speed.  While Fiserv represented to Bessemer that obtaining these goods and services would fix various problems, that has not been the case.

132.    Fiserv forced the Credit Union to transition to its Loancierge[6] program with very little notice, and the program has been riddled with bugs and defects.  The Credit Union wished to stay with Loan Advantage for its loan processing, but Fiserv indicated that it was not willing to invest in the programming changes necessary to correct calculation problems that had been noticed in Loan Advantage.  Fiserv refused to support that software and insisted that the Credit Union pay thousands of dollars in implementation fees for continued viable use of this functionality through an "upsold" additional Fiserv product.  Unfortunately, Loancierge had similar defects.

---

[6]    Loancierge is a loan processing system that purports to provide member information to a credit union "on demand" and with "first-in-class functionality with a native, browser-based interface users can access anytime, anywhere."  *See* https://www.fiserv.com/industries/credit-unions/loancierge.aspx (last visited July 24, 2019).

NEWYORK-#544467

133.    Fiserv's Sellstation/Charlotte Teller[7] and other Fiserv software platforms had connectivity issues, causing the system to shut down repeatedly, together with other serious defects affecting Bessemer's operations.  In particular, the freezing of the software seemed to become more prominent when Bessemer was handling an increased number of transactions, which meant that on its busiest days, the Credit Union suffered the worst issues with the software.  Despite Bessemer having informed Fiserv of the issue, the software was severely lagging, causing a serious delay in servicing members.  At the suggestion of Fiserv, the Credit Union made a significant investment to have both a Public (Internet) and a Private (MPLS) connection to Fiserv in order to avoid inconvenience to Bessemer's members.  However, the problem is at the host (Fiserv) rather than with the type of connection Bessemer has.

134.    Bessemer asked Fiserv initially for a proposal to implement "real-time" negative balance reporting through the MasterCard debit network, and Fiserv responded that this update would be "simple" and would require a one-time charge of only $37 to make negative balances within the ATM/debit system available.  Bessemer, in reliance on this representation by Fiserv, began a six-week implementation process with its Courtesy Pay provider as a result of Fiserv's assurances that the update would be "simple" and cost efficient, and would require a charge of only $37.  Four weeks into the process, the Credit Union tested a Courtesy Pay debit card at an ATM, and the transaction was unsuccessful.  When the Credit Union informed Fiserv of the defect, Fiserv responded that it "just realized" that the Credit Union's debit cards and debit program were not "real-time," even though Fiserv was previously aware of this information.

---

[7]    Sellstation/Charlotte Teller is Fiserv's transaction processing software that is a part of Fiserv's Charlotte core processing system.

NEWYORK-#544467

Fiserv then indicated that an additional $3,500 fee, along with increased monthly support costs, would be required to obtain the functionality originally promised by Fiserv at a cost of $37.

135.    The Office of Foreign Assets Control ("**OFAC**") scans are mandated to ensure that financial institutions such as Bessemer are in compliance with regulations designed to curb transactions that may funnel resources to terrorists, narcotics traffickers, and other problematic individuals and entities.  Since at least 2005, the biweekly scans had been automatic, and Fiserv's system would send an automatic email to indicate that the scan had been done and to note whether any further research was needed for potential "hits" on the OFAC sanctions lists. Recently, when Bessemer stopped receiving notice of the automatic scans, Fiserv indicated that it no longer would perform the required scans.  Fiserv, however, failed to provide the required written notice to Bessemer regarding its change to and/or discontinuance of this process. Instead, Fiserv stopped performing this account processing service altogether without providing proper notice to Bessemer.  From April 1, 2017 through July 27, 2017, Fiserv did not perform OFAC system scans.  When the Credit Union asked Fiserv about an alternative procedure in July 2017, Fiserv tasked the Credit Union with manually performing OFAC scans through a burdensome process requiring 18 pages of instructions for manual work that involve Bessemer personnel manually editing text files, manipulating Excel files, and opening multiple windows and lists in Sellstation.  This procedure is not only burdensome for Credit Union personnel, but it is inefficient, impractical, and a waste of Credit Union resources.  Fiserv, however, previously represented to Bessemer that Fiserv would provide this functionality, and it has continued to invoice Bessemer for these OFAC scans, even though Fiserv's system was no longer performing this service.

136.    Even though Fiserv had knowledge that its system was malfunctioning, insecure, and reporting false information to the Credit Union and its members, Fiserv has failed to properly address these issues, including by failing to put the Credit Union on notice of them, failing to report accurate information, refusing to return the Credit Union's information to it, and insisting that the Credit Union continue to receive services from Fiserv on an exclusive basis.

137.    The Credit Union frequently opened up support requests with Fiserv, sometimes as frequently as each business day.  Fiserv has improperly closed the Credit Union's technical support requests without resolving them, or it has falsely mischaracterized issues reported to Fiserv.  When the Credit Union reported an issue, Fiserv routinely marked these reports as either "no priority" or "medium priority," despite the issues being of high priority to the Credit Union. Fiserv unilaterally made these priority determinations and considered these matters closed without providing solutions.  Support requests were routinely closed after a period of time even though no resolution has been provided.  Fiserv's responses to support requests sometimes included verbiage to which the Credit Union can "Accept" or "Reject" Fiserv's response.  Yet even when the Credit Union rejected a "proposed solution," Fiserv improperly closed the support request.  Similarly, Fiserv has falsely mischaracterized the Credit Union as being satisfied with Fiserv's efforts to attempt to address problems, when that has not been the case.

### *Fiserv Failed to Properly Respond to Bessemer's Claims*

138.    Prior to seeking redress in court, Bessemer availed itself of the Master Agreement's dispute-resolution provision, which requires the parties to work in good faith to resolve disputes prior to commencing litigation.

139.    **Exhibit 10** hereto is a true and correct copy of Bessemer's notice of breach, which invoked the dispute-resolution provision of the Master Agreement.

140.     As part of the notice of breach, Bessemer issued an audit demand for several categories of documents that Fiserv was required to produce to Bessemer under various provisions of the Master Agreement.  These requested documents included documents related to the amounts Fiserv invoiced Bessemer, and documentation relating to the security of Bessemer's records and information in Fiserv's custody.

141.     Under Section 4(a) of the Master Agreement, Fiserv Solutions was required to provide Bessemer with copies of "audit reports, summaries of test results or other equivalent measures taken by Fiserv to assess whether its information security program meets the [Master Agreement's] objectives."

142.     Under Section 4(b) of the Master Agreement, Fiserv Solutions was required to provide Bessemer with "a summary of Fiserv's written Information security plan for the applicable Services received by" Bessemer.

143.     Under Section 4(d) of the ASP Services Exhibit to the Master Agreement, Fiserv Solutions was obligated to provide Bessemer with "a copy of [Fiserv Solutions's] most recent security certification, if any, for the applicable Fiserv service center providing such Services."

144.     Under Section 4(h) of the ASP Services Exhibit to the Master Agreement, Fiserv Solutions was obligated to provide Bessemer with "a copy of [an] independent audit report of the Fiserv service center providing Services within a reasonable time after its completion."

145.     Auditing these documents was important to Bessemer because, as a regulated financial institution, it is required to audit and manage its vendor relationships, improper charges have appeared on Fiserv invoices, and Fiserv has previously compromised the security of Bessemer's account records and information and permitted them to be accessed by unauthorized individuals.

146.     Fiserv, however, refused to timely participate in the audit and failed to provide the requested audit documents.  Indeed, Fiserv Solutions refused to provide a single document required by the foregoing audit provisions in response to Bessemer's audit of Fiserv Solutions's security practices—despite multiple contractual provisions imposing audit requirements on Fiserv.

147.     The audit provisions in the Master Agreement were a material obligation of Fiserv Solutions.  This is because federal regulations state that a credit union "should review audits, summaries of test results, or other equivalent evaluations of its service providers."  *See* 12 C.F.R. Part 748, Appendix A, at D(3).  These legal requirements are particularly important given that the National Credit Union Administration (the "**NCUA**"), the federal credit union regulatory agency, lacks authority over a credit union's vendors and counts on credit unions to audit and oversee their vendor relationships.  Thus, the NCUA counts on credit unions to police their third-party vendors.

148.     Accordingly, Fiserv was unable to establish that its invoices were proper or to provide adequate, let alone any, assurances that Bessemer's account records and information were being properly safeguarded in accordance with applicable requirements.

149.     **Exhibit 11** hereto is a true and correct copy of Bessemer's supplemental notice of breach.

150.     Under the dispute-resolution provision of the Master Agreement, Fiserv was required to designate an officer or other management employee with authority to bind Fiserv to meet with Bessemer to resolve Bessemer's claims.  Fiserv, in breach of its express duty under the Master Agreement, did not participate in this process as required by the Master Agreement, much less in good faith.  On the contrary, Fiserv delayed, waiting until April 5, 2018—months

-43-

after Bessemer provided its notice of breach—to designate a representative.  Then, the individual representative Fiserv designated to meet with Bessemer lacked adequate knowledge of the relevant events and appeared to lack the sufficient authority to bind Fiserv to any good-faith resolution of Bessemer's claims, as required by the Master Agreement.  That individual did not make a sufficient effort to resolve the dispute, nor did he do so within the 30-day deadline, as required by the Master Agreement.  After the required dispute-resolution meeting, only then did Fiserv inform Bessemer that the "cure team" had been assembled only recently, and that it would require an additional two-week time frame for a "next discussion" in advance of arriving at a satisfactory resolution.  To date, that proposed time has elapsed, and a satisfactory resolution has still not been provided.  Fiserv has further failed to take appropriate actions, including making proper adjustments to its systems, to address Bessemer's claims.

151.    Fiserv continued to remain in material breach of the Master Agreement.  Indeed, Fiserv provided no documents whatsoever concerning its security practices in response to Bessemer's audit demands.

152.    On April 11, 2018, Bessemer sent Fiserv a notice of termination, indicating that it was providing notice that Bessemer was terminating the Master Agreement.  **Exhibit 12** hereto is a true and correct copy of Bessemer's notice of termination.  Bessemer demanded that Fiserv return Bessemer's files and information in a reasonable, commercially usable form and that Fiserv take appropriate measures to ensure an orderly transition of services to the successor vendor(s) that Bessemer may select.  In response, however, Fiserv has refused to promptly return the files and information in response to Bessemer's demand.

153.    Fiserv has continued to invoice Bessemer for services "performed" after Bessemer sent Fiserv the notice of termination, while also continuing to withhold Bessemer's

-44-

account records and information as an apparent bargaining chip and to prevent Bessemer from switching vendors.  **Exhibit 13** hereto is a true and correct copy of Bessemer's dispute letter concerning a post-termination invoice Fiserv issued to Bessemer.

154.     In this dispute letter, Bessemer requested that Fiserv provide audit records substantiating its invoices.

155.     Fiserv again was nonresponsive to Bessemer's audit demands.  Accordingly, on July 18, 2018, Bessemer demanded that Fiserv refund the amounts that it was unable to substantiate with supporting documentation.  **Exhibit 14** hereto is a copy of this correspondence.

156.     Fiserv continued to delay, responding to the Credit Union's audit demands pertaining to Fiserv's invoices for the first time on September 11, 2018, but Fiserv's response was an incomplete, perfunctory summary and contrived by Fiserv for litigation purposes. **Exhibit 15** hereto is a copy of Fiserv's response, with attachments omitted.  Notably, Fiserv continued to refuse to provide any audit documentation concerning its security practices.

157.     Bessemer responded by indicating numerous deficiencies in Fiserv's invoice audit documentation and requesting that Fiserv provide sufficient audit documentation, including accurate copies of the documents Fiserv referred to in its September 11, 2018 summary. **Exhibit 16** hereto is a copy of this correspondence.

158.     Fiserv responded later that day, refusing to provide the requested audit records. **Exhibit 17** hereto is a copy of this correspondence.

### *Fiserv Reneged on the Replevin Action Settlement Agreement*

159.     On the heels of a litany of misconduct by Fiserv, including its failure to provide requested information while keeping Bessemer's member information hostage in an insecure environment vulnerable to security risks, Bessemer commenced a replevin action in the Court of

-45-

Common Pleas of Mercer County, Pennsylvania to recover Bessemer's member information from Fiserv.

160.     Bessemer and Fiserv agreed to settle the replevin action in accordance with an October 19, 2018 letter agreement prepared by Fiserv's counsel the ("**Replevin Action Settlement Agreement**"), which was subsequently executed by Bessemer.  **Exhibit 18** hereto is a true and correct copy of the Replevin Action Settlement Agreement.

161.     Under the Replevin Action Settlement Agreement:

(i)     Bessemer agreed to withdraw its replevin action without prejudice, without affecting Bessemer's damages action.

(ii)     The parties would work in good faith to negotiate a global resolution of Bessemer's damages action.

(iii)     Fiserv would participate in a "deconversion" of Bessemer's records to Bessemer's successor vendor, with Fiserv representing that "given the lead time required, deconversion is not likely to happen until near the June 30, 2019 expiration of the Master Agreement in any event."

(iv)     Bessemer agreed to pay Fiserv "for the fees and expenses of deconversion, and that such amounts be paid before the agreed-upon deconversion date."

(v)     Bessemer agreed to remit payment for outstanding invoices (subject, of course, to the reservation of rights that dismissing the replevin action "would not affect Bessemer's other pending action," which sought, among other things, refunds of overpayments made to Fiserv for services deficiently performed).

162.     It was critical that Bessemer regain its records as promptly as possible, given the security and other problems at Fiserv.  However, the only reason Bessemer agreed to wait until nearly June 2019 to effect the deconversion was based upon Fiserv's representation in the Replevin Action Settlement Agreement that such an expansive time frame was necessary "given the lead time required."  It was Bessemer's understanding, based on Fiserv's representations, that it was impossible to obtain its records sooner than what Fiserv represented.  Bessemer had no

-46-

choice but to wait, because without those records, Bessemer would effectively have been unable to function.

163.    Fiserv itself acknowledged how essential the records it maintains are to financial institutions' legal compliance.  In its 2018 SEC Form 10-K, Fiserv acknowledged that its account processing "solutions also include extensive security, report generation and other features that financial institutions need to process transactions for their customers, as well as to comply with applicable regulations."  **Exhibit 19** hereto is a true and correct copy of an excerpt from Fiserv's 2018 SEC Form 10-K.

164.    As required by the Replevin Action Settlement Agreement, Bessemer issued Fiserv payment on all outstanding invoices, with a reservation of rights.

165.    Fiserv, however, rejected Bessemer's check and returned it to Bessemer.

166.    Bessemer sent the check again to Fiserv, now to the attention of Fiserv's outside counsel.  That check, however, was kept without being deposited.  Per a notation on the front of the check, the check becomes void sixty days after issuance, and, per standard credit union operating practices, payment on it would be stopped at that time.

167.    As a result, Bessemer issued another check to Fiserv to pay the outstanding invoices.

168.    On December 3, 2018, Fiserv's counsel sent Bessemer's counsel an email with "deconversion materials."  The email noted that, "The material items are an amendment to the Master Agreement that provides for deconversion and sets the deconversion date and a summary of Fiserv's standard deconversion charges and related payments, which are to be paid at the time of execution of the amendment."  **Exhibit 20** hereto is a true and correct copy of this email (without attachments).

-47-

169.     One of the attachments to the aforementioned email was a letter dated

November 30, 2018 from Richard Reynolds of Fiserv.  According to Fiserv's letter, Fiserv stated

that an advance payment "is required prior to the creation of data files or deconversion reports.

This payment represents the estimated total deconversion charges for all Fiserv-provided

services as well as an estimate of your final two month's processing charges, plus one (1) month

of access to the Fiserv system post deconversion.  Any funds remaining from these advance

payments will be returned to you after the final reconciliation of all deconversion related charges

have occurred."  **Exhibit 21** hereto is a true and correct copy of this letter.

170.     The Replevin Action Settlement Agreement did not require Bessemer to pay the

fees and expenses of deconversion until "before the agreed-upon deconversion date" (i.e., near

June 2019).  In addition to wrongfully rejecting Bessemer's payment, Fiserv's communications

repudiated the Replevin Action Settlement Agreement.  Fiserv's letter and email from its counsel

indicated that Fiserv was refusing to take steps required to complete the deconversion, unless

Bessemer made an advance deposit of money of certain estimated "charges."  Not only were

these charges not contained in the Replevin Action Settlement Agreement, Bessemer's deadline

to pay any fees and expenses of deconversion was not yet due for at least another six months

(i.e., until before the anticipated June 2019 deconversion).

171.     Another attachment to Fiserv's December 3, 2018 email was a purported

"Amendment to Agreement" to amend the Master Agreement to include the deconversion

services.  Fiserv's proposed amendment purported to obligate Bessemer to pay various fees prior

to Fiserv providing deconversion services, and it claimed that the Master Agreement "shall

remain in full force and effect."  **Exhibit 22** hereto is a true and correct copy of Fiserv's

proposed amendment to the Master Agreement.

172.    Bessemer refused to sign Fiserv's proposed "Amendment to Agreement" because Fiserv had a preexisting duty under the Replevin Action Settlement Agreement to effectuate Bessemer's deconversion under the terms contained in the Replevin Action Settlement Agreement.  Further, as the Master Agreement was previously terminated, there was no basis for that agreement to be amended (and thereby ratified) by Bessemer.

173.    Counsel to the parties engaged in a series of emails regarding the deconversion. In the course of the emails, Fiserv's counsel indicated on December 19, 2018 that Fiserv's standard deconversion fee for credit unions of Bessemer's size was a certain amount when Fiserv issued its proposed "Amendment to Agreement" on December 3, 2018—but that, in just the span of two weeks, that fee was now increased by 12.5%.  But Fiserv would "if this is resolved now…abide by the fee schedule it provided.  Fiserv is a Fortune 500 Company with around $6 billion in annual revenue.  Your suggestion that it is 'making up' a…fee here makes no sense." **Exhibit 23** hereto is a true and correct copy of this email chain.  Fiserv, however, had no explanation for the basis of how it calculated this fee, and in agreeing to the Replevin Action Settlement Agreement, Bessemer certainly did not agree to pay a "standard" fee not referenced in that agreement, let alone one that would increase by 12.5% in the course of just two weeks.

174.    Although Fiserv kept stalling the deconversion and holding Bessemer's records hostage as a bargaining chip and to prevent Bessemer from using other vendors, Bessemer continued refusing to agree to the additional and different terms that Fiserv was attempting to condition its performance under the Replevin Action Settlement Agreement.

175.    In a March 1, 2018 letter, Fiserv's counsel indicated that "at this point…Fiserv has determined that its immediate priority is to complete the parties' separation as soon as possible.  To that end, Fiserv will provide Bessemer with Client Files and ordinary-course

services normally attendant to deconversion in order to facilitate deconversion as soon as possible, despite Bessemer's refusal to make payment in advance." **Exhibit 24** hereto is a true and correct copy of this letter.

176.    Based upon Fiserv's statements in its November 20, 2018 letter that Fiserv would not create files or reports needed for the deconversion without an advance deposit of payment, from at least November 20, 2018 to on or around March 1, 2019, Fiserv did not take steps necessary to facilitate the parties' deconversion. Fiserv delayed the deconversion process for over three months in an effort to keep Bessemer's data hostage and to extract additional money from Bessemer and attempt to have it ratify the already-terminated Master Agreement.

177.    Fiserv's improper cessation of work for this period of time establishes that its representation in the Replevin Action Settlement Agreement that "given the lead time required, deconversion is not likely to happen until near the June 30, 2019 expiration of the Master Agreement" is untrue. When executing the Replevin Action Settlement Agreement, it was understood that Fiserv required such a lead time for technical reasons—not for improperly ceasing work for several months in an attempt to renegotiate the deal the parties agreed to when settling the replevin action.

178.    Fiserv has repudiated the Replevin Action Settlement Agreement by refusing to accept Bessemer's tender of performance, refusing to perform as required by that agreement, and conditioning Fiserv's performance under that agreement on Bessemer's assent to additional and different terms. For example, Fiserv insisted that Bessemer make an advance deposit of certain fees and charges before the deadline contained in the Replevin Action Settlement Agreement for Bessemer to pay them, then Fiserv stopped work on the deconversion and refused to provide Bessemer's successor vendor a test file while insisting that Bessemer pay a "deconversion

charge" that was not included in the Replevin Action Settlement Agreement and that Fiserv

changed from $40,000 to $45,000, and then back to $40,000.

179.    After attempting to extract additional fees from Bessemer for weeks, Fiserv later

retreated on some of its demands and agreed to recommence the deconversion.  However, but for

Fiserv's duplicity and illegitimate cessation of work while trying to extract additional money

from Bessemer, Bessemer would have achieved an earlier deconversion to a superior vendor.

Fiserv's representation in the Replevin Action Settlement Agreement that "given the lead time

required, deconversion is not likely to happen until near the June 30, 2019 expiration of the

Master Agreement" is false.  Rather, Fiserv misrepresented the need for such an expansive lead

time in an attempt to have time to renegotiate the terms of the settlement, while holding

Bessemer's data hostage as a bargaining chip and to force Bessemer to continue using Fiserv.

Fiserv made these misrepresentations to falsely induce Bessemer into accepting a settlement

agreement and dismissing the replevin action filed in the Court of Common Pleas of Mercer

County, and Bessemer justifiably relied on Fiserv's misrepresentations when deciding whether to

enter into that agreement and dismiss the replevin action.

### *Fiserv Withheld Bessemer's Credit Report Records During the Deconversion*

180.    As part of Bessemer's deconversion from Fiserv, Fiserv refused to provide credit

reporting records containing Bessemer members' loan histories reported to a credit bureau.

Rather than providing these files, Fiserv proposed coding members' loans with an "AT/05"

designation.  Such a coding would reflect on a member's credit report that the loan was

transferred, potentially opening up a new entry on a member's credit report.  This, however, was

unacceptable to Bessemer because it would misdescribe the status of the loan and result in

consumer confusion.

-51-

181.     Accurately reporting loans on credit reports is particularly important because, in light of Fiserv's security problems, Bessemer recently urged its members to carefully monitor their credit reports in order to detect potential suspicious activity.

182.     In an April 26, 2019 email, Jane Bennet of Fiserv informed Bessemer that "We are unable to give you a file for your credit bureau reporting, we can if you authorize us to, report your loans with the codes AT/05 which is what we have done in the past with [Bessemer's successor vendor]." **Exhibit 25** hereto is a true and correct copy of this email chain.

183.     Fiserv advised Bessemer to contact Experian to obtain these records.  Experian, however, advised Bessemer that it would have to obtain the records from Fiserv.  **Exhibit 26** hereto is a true and correct copy of this email chain with Experian.

184.     In its May 28, 2019 email to Fiserv, Bessemer advised Fiserv that "Experian is stating that Fiserv will need to provide the necessary copy of the final credit reporting file sent to Experian on our behalf since it was initially transmitted by Fiserv.  It is critical that this information be provided to us immediately following its final transmission to Experian.  Again, this is an important part of our member data and part of the data that was negotiated in the letter agreement in October 2018."  **Exhibit 27** hereto is a true and correct copy of this email chain.

185.     In a May 30, 2019 email, Jane Bennett of Fiserv emailed Bessemer, stating that "I am sorry but we do not have previous files to provide to [Bessemer's successor vendor].  We can provide the current file after it is created in June and sent to the bureau.  We can either report the loans as we are currently reporting them or code them with AT/05."  (*See id.*)

186.     Bessemer responded to Fiserv on May 31, 2019 saying, in part, "[t]hese files contain so much personal member data I cringe to think what would happened if they were not maintained and destroyed according to regulations." (*See id.*)

187.    Later that day, Fiserv responded by email, informing Bessemer that the "credit bureau files submitted on behalf of your credit union are co-mingled with other credit union data. After processing the files are archived.  We do not have the ability to provide you an individual file with just your data.  Our only option at this point is to process your last bureau file with AT/05."  (*See id.*)

188.    After first claiming that these records could not be furnished, Fiserv subsequently advised Bessemer that "[p]roviding you a single file with your credit bureau data will require custom programming.  Our standard deconverison process is to provide a status of AT/05 [i.e., designating the loan as transferred].  Should you want us to separate the data and provide you with the information as outlined below we will need to scope the work and then provide you a quote for this effort."  (*See id.*)  After falsely claiming that these records could not be furnished, Fiserv ultimately provided them to the credit union.

### *Fiserv Withholds Bessemer's Archived Documents*

189.    Although they were required to be provided as part of the deconversion, Fiserv refused to provide Bessemer with documents stored in Fiserv's "eFichency" archive.

190.    The eFichency archive houses important records of Bessemer, such as tax forms and past member statements.  Documents from the eFichency archive are made available to Bessemer as PDF images of the actual documents.

191.    Although the Replevin Action Settlement Agreement set forth a time frame for the deconversion of Bessemer's records, on May 16, 2019, Shaun Gehman of Fiserv emailed Bessemer, stating that "EFichency deconversion data is typically ready to be shipped 9-12 weeks after the deconversion date."  **Exhibit 28** hereto is a true and correct copy of this email chain.

192.     Thereafter, Fiserv claimed to produce documents in Bessemer's eFichency archive via a hard drive sent to Bessemer that appeared to be secured with a proprietary on-device encryption method.  Fiserv, however, provided Bessemer with incorrect instructions to decrypt the documents and retrieve the documents from the hard drive.  Indeed, the instruction manual provided by Fiserv to Bessemer does not even correspond with the type of drive that Fiserv produced.

193.     Bessemer filed a motion for a temporary restraining order and preliminary injunction in order to effectuate the deconversion.

194.     Fiserv's opposition (ECF No. 24) filed with the Court claimed that "[d]efendants indisputably sent the records" and "[a]ny claim that [d]efendants are 'denying access' to this data is simply false."

195.     At a hearing on this motion, Fiserv agreed to provide Bessemer with the password and technical assistance necessary to access information on the hard drive at issue, and to take Bessemer's member information offline.

196.     Fiserv's aforementioned representations to the Court that it sent the records to Bessemer and was not denying it access to records were false.  Rather, in a gambit to defeat Bessemer's motion, Fiserv concealed from the Court that it was in fact withholding from Bessemer over 900 of its documents that were not in the hard drive Fiserv provided.  This fact did not surface until after the hearing on the temporary restraining order, when Fiserv provided access to the documents on the hard drive, then informed Bessemer of the missing documents orally during a teleconference.

197.     While Fiserv provided certain documents in the eFichency archive, most of the records produced by Fiserv were not the actual documents themselves.  Rather, Fiserv produced

-54-

text files containing information from those records.  Fiserv claimed that producing PDF images of the actual documents in batch form was not possible as part of the deconversion without investing hundreds or thousands of hours of labor.

198.    Meanwhile, Fiserv represented that its eFichency service is an "imaging solution" that allows archived documents to "be exported into various applications in a matter of days." *See* https://www.fiserv.com/en/industries/credit-unions/account-processing-platforms/efichency-for-credit-unions.html (last visited July 24, 2019).

199.    Bessemer still has not received from Fiserv images of Bessemer's documents maintained in the eFichency archive.

### *Punitive Damages and Injunctive Relief Are Required for Complete Redress*

200.    Fiserv's acts, omissions, concealments, and misrepresentations as set forth herein were intentional, willful, wanton, malicious, reckless, oppressive, egregious, and outrageous, are torts or actionable as independent torts, jeopardize the public and are part of a pattern directed at the public generally, offend public policy, are based on evil and reprehensible motives, involve an extraordinarily disingenuous and dishonest failure to carry out Fiserv's obligations, and involve a high degree of moral turpitude demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations.

201.    Indeed, as Fiserv acknowledges in its own Code of Conduct & Business Ethics, "Fiserv is committed to maintaining full, fair, accurate and timely accounting and business records.  This … protects our legal interests; and helps us preserve the trust of our clients."  *See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (version in effect August 22, 2018).  As further explained by Fiserv, "[t]he unique nature of our business requires that all Fiserv computer systems and networks operate with the availability, efficiency,

-55-

reliability and integrity that are expected of systems that process financial transactions and store financial data.  The company is firmly committed to operating and maintaining its technology assets in a manner that merits the trust and confidence of the clients and consumers we serve." *Id*.  What's more, as Fiserv explains, "[b]ecause the principal market for our products and services is the regulated financial services industry, the consequences of non-compliant offerings could seriously damage our reputation and financial interests."  *Id.*  Fiserv thus knew, in light of the unique nature of its business providing services to regulated financial institutions, that its acts, omissions, concealments, and misrepresentations would cause serious damage and give rise to legal liability.

202.    Fiserv has engaged in and has knowledge of prior similar injury-causing incidents, including through complaints made by Bessemer, other Fiserv customers, and security researchers.

203.    The parties were in a relationship of trust and confidence in which Fiserv wielded superior knowledge, skill, expertise, and influence over Bessemer.  Among other reasons, Fiserv controls Bessemer's account records and information, Fiserv refused to promptly return Bessemer's records and information to it, Fiserv was in an exclusive relationship with Bessemer, Fiserv prohibited Bessemer from performing certain services on its own account or through other service providers, and Fiserv sought to induce the dependence and trust of Bessemer.

204.    Fiserv has received ill-gotten gains from its acts, omissions, concealments, and misrepresentations by, among other things, causing Bessemer and Fiserv's other customers to enter into transactions that provided Fiserv with additional and excessive profits, and collecting amounts that were not justly due to it or legally chargeable against Bessemer and Fiserv's other customers.

205.     Fiserv's acts, omissions, concealments, and misrepresentations have harmed the public generally.  Such harm has befallen Bessemer, a not-for-profit cooperative, as well as the thousands of individual consumers who are Bessemer members.  Moreover, Fiserv provides Bessemer and its members a standardized account processing system that is shared with other Fiserv customers and that adopts standardized coding.  Further, Fiserv has employed standardized policies and business practices.  Accordingly, such harm has befallen other financial institutions that are customers of Fiserv, as well as those institutions' own customers, including individual consumers.  These harms are part of a pattern of behavior Fiserv directs at the public generally.

206.     Public policy supports an award of punitive damages, given that Bessemer is a not-for-profit consumer financial institution, banking is an essential public service on which consumers must rely, and Fiserv targeted its business operations to regulated financial institutions and the consumers they serve.

207.     Accordingly, punitive damages are appropriate in addition to any compensatory damages for harm done to Bessemer.  Such damages are necessary to deter Fiserv and others from committing similar incidents in the future, and the amount of such punitive damages awarded should be sufficient to have a deterrent effect on Fiserv.

208.     Further, Fiserv has violated Bessemer's rights to the detriment of Bessemer and its members, and future violations of Bessemer's rights and harm to its members are threatened and imminent.  Bessemer has no adequate remedy at law, an injunction will prevent Bessemer and its members from suffering irreparable injury, and the equities favor such relief.

**<u>First Claim for Relief</u>**
**Breach of Contract**
**(Against Defendant Fiserv Solutions Only)**

209.     Bessemer incorporates and realleges the preceding paragraphs.

210.    The Master Agreement and the Replevin Action Settlement Agreement are valid and binding obligations of Fiserv Solutions.

211.    In addition to the express terms of those contracts, the implied covenant of good faith and fair dealing applies to Fiserv Solutions's contracts with Bessemer.  When reasonably read, the terms of these contracts imply certain other obligations that are necessary to vindicate the parties' apparent intentions and reasonable expectations.  By entering into the contracts, Fiserv Solutions impliedly covenanted that it would act in good faith, including by providing account processing and deconversion services suitable for the proper functioning of a credit union and issuing invoices that were legitimate, bona fide, good faith, and supported.

212.    Bessemer has duly performed all obligations and satisfied all conditions required of it under its contracts with Fiserv Solutions, except for those that were waived or excused by Fiserv Solutions.

213.    Bessemer remains ready, willing, and able to perform any remaining obligations of it arising under the Replevin Action Settlement Agreement.

214.    Fiserv Solutions has materially breached its obligations under its contracts with Bessemer by failing to perform as required, repudiating its obligations, and breaching the implied covenant of good faith and fair dealing.

215.    Fiserv Solutions has demonstrated a lack of good faith and fair dealing by, among other things, unreasonably failing to provide account processing and promptly providing deconversion services suitable for the proper functioning of a credit union and issuing improper invoices and payment demands to Bessemer overstating the amounts Bessemer owes (while correspondingly prohibiting Bessemer from asserting any right of deduction or setoff from amounts invoiced), thereby depriving Bessemer of the benefit of the bargains the parties struck.

NEWYORK-#544467

216.    Fiserv Solutions's conduct is inconsistent with the terms and purposes of its contracts with Bessemer.  Fiserv Solutions's lack of good faith and fair dealing has had the effect of preventing Bessemer from receiving the reasonably expected benefit of the parties' bargain by, among other things, unreasonably and unnecessarily depriving Bessemer of the benefit of the account processing and deconversion services which were to be provided by Fiserv Solutions, exposing Bessemer to vastly greater harm than it had bargained for and well outside of commercially reasonable norms, and causing Bessemer to remit payments to Fiserv Solutions that are not justly due Fiserv Solutions or supported by any good-faith basis.

217.    Fiserv Solutions's contract breaches were caused by bad faith and its willful, malicious, reckless, or grossly negligent conduct, were not reasonably contemplated by Bessemer, were so unreasonable as to constitute an abandonment of Fiserv Solutions's agreements, and were breaches of Fiserv Solutions's fundamental obligations.

218.    Indeed, despite a pattern of recurring and known breaches, Fiserv Solutions was grossly negligent and reckless, failed to use even a slight degree of care, and acted with complete disregard for Bessemer's rights.  Although Fiserv Solutions had knowledge that its system was malfunctioning, reporting false information to Bessemer, and susceptible to vulnerabilities that compromised the confidentiality of member information, Fiserv Solutions failed to address properly these issues, including by failing to put Bessemer on notice of them, and refusing to promptly return Bessemer's account records and information to it so that Bessemer could transition to an alternative provider.

219.    As a result of Fiserv Solutions's contract breaches, Bessemer and its members have suffered and will continue to suffer damages and harm.

## Second Claim for Relief
### Negligence

220.     Bessemer incorporates and realleges the preceding paragraphs.

221.     Fiserv owed a duty to Bessemer because in affirmatively collecting, storing, and processing sensitive personal and financial information on internet-accessible computer systems, Fiserv owed a duty to Bessemer to exercise reasonable care under the circumstances, which includes using reasonable measures to protect the information from the foreseeable risk of a data breach, unauthorized third-party access, or loss or alteration.  Troves of highly sensitive personal and financial data are stored on internet-accessible systems administered by Fiserv and are obvious targets for cyber criminals.  A reasonable entity in Fiserv's position should foresee that a failure to use reasonable security measures, or a failure to maintain and provide complete and accurate information, can lead to serious financial consequences.  Accordingly, in collecting, storing, and processing Bessemer's member information on internet-accessible computer systems, Fiserv owed a duty to exercise reasonable care to protect Bessemer against unreasonable risks of harm arising out of those acts.  Fiserv, as the entity with custody of that information, was the only party that realistically could ensure that its systems were sufficient to properly handle and protect the sensitive member information that Bessemer entrusted to Fiserv.

222.     Fiserv also owed a duty to Bessemer because Fiserv was certain that Bessemer would suffer, and Bessemer did in fact suffer and will continue to suffer, monetary and reputational injury.

223.     Fiserv also owed a duty to Bessemer because there is a close connection between Fiserv's conduct and Bessemer's injuries insofar as Bessemer would not have been injured but for Fiserv's negligence.

NEWYORK-#544467

224.    Fiserv also owed a duty to Bessemer because there is a strong public policy interest in banking, given that it is an essential service on which consumers must rely, as well as a strong public policy interest in preventing Fiserv from behaving in such a reckless, careless, and negligent fashion and from shifting blame to others.

225.    Fiserv further owed a duty to Bessemer because the burden on Fiserv is minimal and the consequences to the community are positive as a result of imposing a duty on Fiserv under these circumstances.

226.    Fiserv also owes a duty because, upon information and belief, there is insurance available for this risk.  Moreover, Fiserv, which reported annual revenues in excess of $5 billion, can afford any damages awarded by the trier of fact.

227.    Through its acts, omissions, concealments, and misrepresentations, Fiserv failed to act with the care that a reasonably prudent person would exercise in the same or similar circumstances.

228.    Fiserv was grossly negligent and reckless, failed to use even a slight degree of care, and acted with complete disregard for Bessemer's rights.

229.    Without limitation, Fiserv failed to institute appropriate protective measures to maintain the safety, security, and accuracy of the confidential member information to which it was entrusted.

230.    Fiserv failed to inform or warn Bessemer of at least the following:

- that Fiserv had failed to enact appropriate measures to protect the safety, security, and accuracy of Bessemer's member information;

- that in the absence of such measures, Fiserv would permit unauthorized individuals to access, delete, or modify Bessemer's member information, and that member information provided to authorized individuals would not be accurate;

NEWYORK-#544467

- that Bessemer should independently take any protective measures to ensure that the safety, security, and accuracy of its member information would be maintained; and

- that Bessemer's member information had been, or was reasonably believed to have been, compromised or falsely reported.

231. Fiserv's negligence has occurred on many occasions during the course of the parties' relationship and after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.

232. Fiserv's acts, omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer. The duties violated by Fiserv are in the nature of a tort because the relevant duties (e.g., the duties to act in a reasonable, nonnegligent manner) arose regardless of any contract between Fiserv Solutions and Bessemer, and Fiserv has violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018. Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the law of torts.

233. Fiserv's negligence has harmed Bessemer, including physical harm in the form of loss of and alterations to Bessemer's account records and information. These records and information are stored in a tangible format in information technology systems or other media administered by Fiserv. Fiserv Solutions acknowledged that Bessemer's records and information "shall remain the property of [Bessemer]" (Master Agreement § 3(b)). Further, such property is identifiable with, merged into, or of the kind customarily identified with and merged into documents. Indeed, such records and information embody and represent, without limitation, the title to the shares Bessemer members own as well as debts and other obligations of Bessemer to its members. Such records and information thus embody, represent the title to, and are essential

to protecting and enforcing property rights and other legally enforceable obligations. Moreover, such records and information were created and maintained as a result of Bessemer's substantial investment of time, effort, and money.

234. As a direct and proximate result of Fiserv's negligence, Bessemer and its members have suffered and will continue to suffer damages and harm. Such damages and harm include payments made to Fiserv for services that were not properly performed, damage to Bessemer's business, being placed at an imminent, immediate, and continuing increased risk of harm from utilizing inaccurate information and being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, cancelling and reissuing payment cards, imposing withdrawal and transactional limits on accounts, and losing interest revenue and fees due to reduced account usage.

### Third Claim for Relief
### Unfair and Deceptive Trade Acts and Practices

235. Bessemer incorporates and realleges the preceding paragraphs.

236. As a credit union, Bessemer is a not-for-profit cooperative owned and controlled by individual consumers who pool their resources to provide credit to one another. Bessemer's purpose, as expressed in its bylaws, is to be "a member-owned, democratically operated, not-for-profit managed by a volunteer board of directors, with the specified mission of meeting the credit and savings needs of consumers, especially persons of modest means." Bessemer thus exists to serve its members and their individual consumer savings needs, rather than to engage in business activities that generate profits. Further, the extent of Bessemer's activities is limited by its bylaws and applicable law, which generally restrict Bessemer to conducting activities necessary

NEWYORK-#544467

to perform its not-for-profit, consumer-service mission.  Accordingly, the relevant goods and services provided by Fiserv (e.g., Bessemer's online banking website and bill payment service) are consumer-oriented and primarily for the personal, family, or household purposes of Bessemer's members, who are individual consumers belonging to a cooperative.  Indeed, such members are intended to benefit from Fiserv's relevant goods and services, and such consumers receive certain of such goods and services directly from Fiserv for the members' personal, family, or household purposes.

237.    As set forth in the preceding paragraph and incorporated herein by reference, by and through its acts, omissions, concealments, and misrepresentations, Fiserv violated laws prohibiting unfair and deceptive trade acts and practices by engaging in acts and practices that materially affect consumers at large, including Bessemer and its several thousand members who are individual consumers.  These acts and practices constitute a pattern of behavior on the part of Fiserv, pursued as a wrongful business practice, that has victimized and continues to victimize consumers, including not-for-profit cooperatives owned by individual consumers.

238.    Fiserv's unlawful acts and practices include, without limitation:

(a)    causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods and services that Fiserv provided or contemplated providing to Bessemer's members;

(b)    representing that its goods and services have sponsorship, approval, characteristics, uses, benefits, or quantities that they do not have;

(c)    falsely representing that its goods and services are of particular standards, qualities, or grades;

(d)    advertising goods or services with the intent not to sell them as advertised;

(e)      advertising goods and services with the intent not to supply reasonably expectable public demand of Bessemer's members and the other individual end-user consumers on Fiserv's shared systems, without adequate disclosures of quantity limitations;

(f)      making false and misleading statements of fact concerning the reasons for, existence of, or amounts of prices and price reductions, including failing to clearly set forth prices in a manner in which can reasonably be ascertained;

(g)      failing to comply with the terms of written guarantees or warranties provided prior to or after contracts for the purchase of goods and services are made;

(h)      knowingly misrepresenting that services, replacements, or repairs are needed when they are not needed;

(i)      making repairs, improvements, or replacements on tangible, real, or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing; and

(j)      engaging in other fraudulent and deceptive conduct that creates a likelihood of confusion or misunderstanding.

239.      Fiserv's acts, omissions, concealments, and misrepresentations are part of a pattern or practice that has harmed individual consumers, including thousands of individual consumers who are Bessemer's members.  Fiserv provided Bessemer and its members with a standardized account processing system and online banking platform that is shared with other Fiserv customers, and Fiserv adopts standardized coding in performing its services.  Indeed, according to Fiserv, it supports more than 80 million online banking end users.  Further, Fiserv has employed standardized policies and business practices.  In addition, some of Fiserv's acts, omissions, concealments, and misrepresentations were communicated to the public at large as

part of an extensive marketing scheme conducted through the publicly accessible website www.fiserv.com.  Thus, Fiserv's acts, omissions, concealments, and misrepresentations are part of a pattern or practice directed at the public generally and that has harmed Bessemer and its members (who are individual consumers), as well as other financial institutions that are customers of Fiserv and those financial institutions' customers (who are individual consumers).

240.    Fiserv's acts, omissions, concealments, and misrepresentations are fraudulent in that they are likely to mislead reasonable consumers acting reasonably under the circumstances, and they have deceived Bessemer, its members, and the public.  For example, Fiserv has made numerous misrepresentations about consumers' financial account information, including the amounts consumers have on deposit with Bessemer, the amounts members owe Bessemer, the amounts Bessemer owes its members, and the existence and status of members' accounts.  As a further example, Fiserv has made numerous misrepresentations about the capabilities and prices of its service offerings, the security of confidential information entrusted to Fiserv, the necessity for certain repairs or additional services, and the amounts Bessemer owes Fiserv as reflected on Fiserv's invoices or in Fiserv's payment demands.

241.    Fiserv's acts, omissions, concealments, and misrepresentations have undermined consumers' abilities to evaluate their market options and to make free and intelligent choices to receive services from Bessemer, thereby harming Bessemer by reducing the number of consumers who are able to, or desire to, receive services from Bessemer.

242.    Bessemer and its members-consumers have relied, and continue to rely, on Fiserv's acts, omissions, concealments, and misrepresentations to their detriment.  For example, Bessemer has engaged in transactions with members, refused to engage in transactions with members (including withholding funds justly owing to members), or otherwise dealt with

members based upon the false account records and information provided by Fiserv.  As a further example, Bessemer has made overpayments to Fiserv based on Fiserv's false representations on invoices that certain fees were due and owing to Fiserv, and Fiserv falsely represented the soundness and security of its system, inducing Bessemer and its members to entrust Fiserv with their sensitive information and to pay Fiserv charges associated with such deceptive services.

243.    Fiserv's acts, omissions, concealments, and misrepresentations are directly contradicted by information that either (a) originated from or concerns Fiserv and its product and service offerings, and was thereby already known by Fiserv, or (b) was provided to Fiserv by third parties such as Bessemer and its members, and such information was thereby known by Fiserv.  Fiserv is responsible for knowing the existence and contents of information within its custody and control.  Accordingly, Fiserv's acts, omissions, concealments, and misrepresentations were knowingly false when made or recklessly made without regard to their falsity.

244.    Fiserv knew, or should have known in the exercise of reasonable care, that its acts, omissions, concealments, and misrepresentations were untrue, were misleading, and did deceive members of the general public, and that consumers and their not-for-profit cooperatives would rely, and did in fact rely, on Fiserv's acts, omissions, concealments, and misrepresentations.

245.    Fiserv's acts, omissions, concealments, and misrepresentations offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

246.    Fiserv's unfair and deceptive trade acts and practices have occurred on many occasions during the course of the parties' relationship, including prior to the execution of the

Master Agreement and after Bessemer provided a notice of termination of the Master Agreement with Fiserv Solutions on April 11, 2018.

247.    Fiserv's acts, omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a statutory claim because the relevant statutory duties arose regardless of any contract between Fiserv Solutions and Bessemer, and Fiserv has violated such duties prior to the execution of the Master Agreement as well as after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies enshrined by legislatures in enacting laws prohibiting deceptive trade acts and practices.

248.    Fiserv has benefited from Bessemer's and its members' reliance on its acts, omissions, concealments, and misrepresentations by, among other things, causing Bessemer to enter into transactions that provided Fiserv with additional and excessive profits, collecting amounts that were not justly due to it or legally chargeable against Bessemer and Fiserv's other customers, and preventing Bessemer and its members from using vendors that are competitive with Fiserv.

249.    In addition to the misconduct occurring in the Commonwealth of Pennsylvania, New York law governs the Master Agreement, and Fiserv conducted activities in other states (e.g., through the operation of an internet-accessible website accessible throughout the country containing false acts, omissions, concealments, and misrepresentations) and has caused harm to Bessemer and its members in other states.

NEWYORK-#544467

250.     Fiserv has engaged in unfair and deceptive trade acts and practices in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law as well as New York's General Business Law (N.Y. GEN. BUS. LAW §§ 349, *et seq.*), Ohio's Deceptive Trade Practices Law (OHIO REV. CODE §§ 4165.02 *et seq.*) and Consumer Sales Practices Act (OHIO REV. CODE §§ 1345.01 *et seq.*), Wisconsin's Deceptive Trade Practices Act (WIS. STAT. §§ 100.18 *et seq.*) and, to the extent applicable, other laws of other applicable jurisdictions.

251.     As a direct and proximate result of Fiserv's unfair and deceptive trade acts and practices, Bessemer and its members have suffered and will continue to suffer damages and harm.  Such damages and harm include payments made to Fiserv for services that were not properly performed, damage to Bessemer's business, being placed at an imminent, immediate, and continuing increased risk of harm from utilizing inaccurate information and being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, cancelling and reissuing payment cards, imposing withdrawal and transactional limits on accounts, and losing interest revenue and fees due to reduced account usage.

### Fourth Claim for Relief
### Fraud / Fraudulent Inducement

252.     Bessemer incorporates and realleges the preceding paragraphs.

253.     As set forth in the preceding paragraphs incorporated herein by reference, on many occasions during the course of the parties' relationship including prior to the execution of the Master Agreement as well as after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018, Fiserv made false acts, omissions, concealments, and misrepresentations.  For example, Fiserv has made numerous misrepresentations about

consumers' financial account information, including the amounts consumers have on deposit

with Bessemer, the amounts members owe Bessemer, the amounts Bessemer owes its members,

and the existence and status of members' accounts.  As a further example, Fiserv has made

numerous misrepresentations about the capabilities and prices of its service offerings, the

necessity for certain repairs or additional services, the amounts Bessemer owes Fiserv as

reflected on Fiserv's invoices, and the security of member information while in Fiserv's custody.

254.    Fiserv's acts, omissions, concealments, and misrepresentations are directly

contradicted by information that either (a) originated from or concerns Fiserv and its product and

service offerings, and was thereby known by Fiserv, or (b) was provided to Fiserv by third

parties such as Bessemer and its members, and such information was thereby known by Fiserv.

Fiserv is responsible for knowing the existence and contents of information within its custody

and control.  Accordingly, Fiserv's acts, omissions, concealments, and misrepresentations were

knowingly false when made or recklessly made without regard to their falsity.

255.    Fiserv knew or should have known that its acts, omissions, concealments, and

misrepresentations were material to Bessemer and were made with the intent of misleading

Bessemer into relying upon them, and Bessemer did so justifiably rely.  Indeed, as Fiserv

acknowledges in its own Code of Conduct & Business Ethics, "Fiserv is committed to

maintaining full, fair, accurate and timely accounting and business records.  This … protects our

legal interests; and helps us preserve the trust of our clients."  *See*

https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (version in

effect on August 22, 2018).  As further explained by Fiserv, "[t]he unique nature of our business

requires that all Fiserv computer systems and networks operate with the availability, efficiency,

reliability and integrity that are expected of systems that process financial transactions and store

financial data.  The company is firmly committed to operating and maintaining its technology assets in a manner that merits the trust and confidence of the clients and consumers we serve." *Id*.  What's more, as Fiserv explains, "[b]ecause the principal market for our products and services is the regulated financial services industry, the consequences of non-compliant offerings could seriously damage our reputation and financial interests." *Id.*  Fiserv thus knew, in light of the unique nature of its business providing services to regulated financial institutions, that a failure to supply full, fair, accurate, and timely information to a financial institution such as Bessemer would not only undermine a client's justifiable trust in Fiserv, but also cause serious damage and give rise to legal liability.

256.    Fiserv made its acts, omissions, concealments, and misrepresentations with the specific intent of, among other things, inducing Bessemer to enter into contracts with Fiserv Solutions, including the Master Agreement and the Replevin Action Settlement Agreement. These agreements did not disclaim reliance on the specific acts, omissions, concealments, and misrepresentations at issue, and their falsity was within Fiserv's peculiar knowledge and could not have been reasonably discovered by Bessemer at the time of execution.

257.    Bessemer has justifiably relied on Fiserv's acts, omissions, concealments, and misrepresentations to Bessemer's detriment by, among other things, entering into contracts with Fiserv that Bessemer had no duty to enter into, entering into transactions that provided Fiserv with additional and excessive profits, paying Fiserv amounts that were not justly due to it or legally chargeable against Bessemer, and engaging in transactions with Bessemer's members, refusing to engage in transactions with members (including withholding funds justly owing to members), or otherwise dealing with members based upon the false account records and information provided by Fiserv.

258.    Fiserv's acts, omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a tort because the relevant duties (e.g., the duty to not make false acts, omissions, concealments, and misrepresentations) arose regardless of any contract between Fiserv Solutions and Bessemer, and Fiserv has violated such duties prior to the execution of the Master Agreement as well as after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the law of torts.

259.    By its acts, omissions, concealments, and misrepresentations, Fiserv defrauded Bessemer and fraudulently induced Bessemer into contracting with Fiserv Solutions.

260.    As a direct and proximate result of Fiserv's fraud, Bessemer and its members have suffered and will continue to suffer damages and harm.  Such damages and harm include payments made to Fiserv for services that were not properly performed, damage to Bessemer's business, being placed at an imminent, immediate, and continuing increased risk of harm from utilizing inaccurate information and being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, cancelling and reissuing payment cards, imposing withdrawal and transactional limits on accounts, and losing interest revenue and fees due to reduced account usage.

### Fifth Claim for Relief
### Constructive Fraud

261.    Bessemer incorporates and realleges the preceding paragraphs.

NEWYORK-#544467

262.     The parties were in a relationship of trust and confidence in which Fiserv wielded superior knowledge, skill, expertise, and influence over Bessemer.  Among other reasons, Fiserv controls Bessemer's records and information, Fiserv refused to promptly return Bessemer's records and information to it, Fiserv was in an exclusive relationship with Bessemer, Fiserv prohibited Bessemer from performing certain services on its own account or through other service providers, and Fiserv sought to induce the dependence and trust of Bessemer.

263.     As set forth in the preceding paragraphs incorporated herein by reference, on many occasions during the course of the parties' relationship including prior to the execution of the Master Agreement as well as after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018, Fiserv made false acts, omissions, concealments, and misrepresentations.  For example, Fiserv has made numerous misrepresentations about consumers' financial account information, including the amounts consumers have on deposit with Bessemer, the amounts members owe Bessemer, the amounts Bessemer owes its members, and the existence and status of members' accounts.  As a further example, Fiserv has made numerous misrepresentations about the capabilities and prices of its service offerings, the necessity for certain repairs or additional services, the amounts Bessemer owes Fiserv as reflected on Fiserv's invoices, and the security of member information while in Fiserv's custody.

264.     Fiserv's acts, omissions, concealments, and misrepresentations were false or recklessly made without regard to their falsity, and were material to Bessemer, and Bessemer did justifiably rely on them.

265.     Fiserv knew or should have known that its acts, omissions, concealments, and misrepresentations were material to Bessemer, and Bessemer did justifiably rely on them. Indeed, as Fiserv acknowledges in its own Code of Conduct & Business Ethics, "Fiserv is

-73-

committed to maintaining full, fair, accurate and timely accounting and business records.  This

… protects our legal interests; and helps us preserve the trust of our clients."  *See*

https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (version in

effect on August 22, 2018).  As further explained by Fiserv, "[t]he unique nature of our business

requires that all Fiserv computer systems and networks operate with the availability, efficiency,

reliability and integrity that are expected of systems that process financial transactions and store

financial data.  The company is firmly committed to operating and maintaining its technology

assets in a manner that merits the trust and confidence of the clients and consumers we serve."

*Id*.  What's more, as Fiserv explains, "[b]ecause the principal market for our products and

services is the regulated financial services industry, the consequences of non-compliant offerings

could seriously damage our reputation and financial interests."  *Id.*  Fiserv thus knew, in light of

the unique nature of its business providing services to regulated financial institutions, that a

failure to supply full, fair, accurate, and timely information to a financial institution such as

Bessemer would not only undermine a client's justifiable trust in Fiserv, but also cause serious

damage and give rise to legal liability.

266.    Bessemer has justifiably relied on Fiserv's acts, omissions, concealments, and

misrepresentations to Bessemer's detriment by, among other things, entering into transactions

that provided Fiserv with additional and excessive profits, paying Fiserv amounts that were not

justly due to it or legally chargeable against Bessemer, and engaging in transactions with

Bessemer's members, refusing to engage in transactions with members (including withholding

funds justly owing to members), or otherwise dealing with members based upon the false

account records and information provided by Fiserv.

NEWYORK-#544467

267.    Fiserv's acts, omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a tort because the relevant duties (e.g., the duty to not make false acts, omissions, concealments, and misrepresentations) arose regardless of any contract between Fiserv Solutions and Bessemer, and Fiserv has violated such duties prior to the execution of the Master Agreement as well as after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the law of torts.

268.    By its acts, omissions, concealments, and misrepresentations, Fiserv constructively defrauded Bessemer.

269.    As a direct and proximate result of Fiserv's constructive fraud, Bessemer and its members have suffered and will suffer damages and harm.  Such damages and harm include payments made to Fiserv for services that were not properly performed, damage to Bessemer's business, being placed at an imminent, immediate, and continuing increased risk of harm from utilizing inaccurate information and being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, cancelling and reissuing payment cards, imposing withdrawal and transactional limits on accounts, and losing interest revenue and fees due to reduced account usage.

### Sixth Claim for Relief
### Negligent Misrepresentation

270.    Bessemer incorporates and realleges the preceding paragraphs.

-75-

271.     Fiserv assumed a duty to provide accurate information to Bessemer, and Fiserv had the means to determine the accuracy of the information it was providing to Bessemer.

272.     As set forth in the preceding paragraphs incorporated herein by reference, on many occasions during the course of the parties' relationship including prior to the execution of the Master Agreement as well as after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018, Fiserv made false acts, omissions, concealments, and misrepresentations.

273.     Fiserv's acts, omissions, concealments, and misrepresentations were false, were caused by Fiserv's negligence, gross negligence, or recklessness, were material to Bessemer, and were justifiably relied on by Bessemer.  For example, Fiserv has made numerous misrepresentations about consumers' financial account information, including the amounts consumers have on deposit with Bessemer, the amounts members owe Bessemer, the amounts Bessemer owes to members, and the existence and status of members' accounts.  As a further example, Fiserv has made numerous misrepresentations about the capabilities and prices of its service offerings, the necessity for certain repairs or additional services, the amounts Bessemer owes Fiserv as reflected on Fiserv's invoices, and the security of member information while in Fiserv's custody.

274.     Fiserv's acts, omissions, concealments, and misrepresentations violate broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a tort because the relevant duties (e.g., the duty to not make false acts, omissions, concealments, and misrepresentations) arose regardless of any contract between Fiserv Solutions and Bessemer, and Fiserv has violated such duties prior to the execution of the Master

-76-

Agreement as well as after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the law of torts.

275.    By its acts, omissions, concealments, and misrepresentations, Fiserv made negligent misrepresentations to Bessemer.

276.    Fiserv knew or should have known that its acts, omissions, concealments, and misrepresentations were material to Bessemer, and Bessemer did justifiably rely on them. Indeed, as Fiserv acknowledges in its own Code of Conduct & Business Ethics, "Fiserv is committed to maintaining full, fair, accurate and timely accounting and business records.  This … protects our legal interests; and helps us preserve the trust of our clients."  *See* https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c (version in effect on August 22, 2018).  As further explained by Fiserv, "[t]he unique nature of our business requires that all Fiserv computer systems and networks operate with the availability, efficiency, reliability and integrity that are expected of systems that process financial transactions and store financial data.  The company is firmly committed to operating and maintaining its technology assets in a manner that merits the trust and confidence of the clients and consumers we serve." *Id*.  What's more, as Fiserv explains, "[b]ecause the principal market for our products and services is the regulated financial services industry, the consequences of non-compliant offerings could seriously damage our reputation and financial interests."  *Id.*  Fiserv thus knew, in light of the unique nature of its business providing services to regulated financial institutions, that a failure to supply full, fair, accurate, and timely information to a financial institution such as Bessemer would not only undermine a client's justifiable trust in Fiserv, but also cause serious damage and give rise to legal liability.

NEWYORK-#544467

277.    Bessemer has justifiably relied on Fiserv's acts, omissions, concealments, and misrepresentations to Bessemer's detriment by, among other things, entering into transactions that provided Fiserv with additional and excessive profits, paying Fiserv amounts that were not justly due to it or legally chargeable against Bessemer, and engaging in transactions with Bessemer's members, refusing to engage in transactions with members (including withholding funds justly owing to members), or otherwise dealing with members based upon the false account records and information provided by Fiserv.

278.    Fiserv's negligence has harmed Bessemer, including physical harm in the form of loss of and alterations to Bessemer's account records and information.  These records and information are stored in a tangible format in information technology systems or other media administered by Fiserv.  Fiserv Solutions acknowledged that Bessemer's records and information "shall remain the property of [Bessemer]" (Master Agreement § 3(b)).   Further, such property is identifiable with, merged into, or of the kind customarily identified with and merged into documents.  Indeed, such records and information embody and represent, without limitation, the title to the shares Bessemer members own as well as debts and other obligations of Bessemer to its members.  Such records and information thus embody, represent the title to, and are essential to protecting and enforcing property rights and other legally enforceable obligations.  Moreover, such records and information were created and maintained as a result of Bessemer's substantial investment of time, effort, and money.

279.    As a direct and proximate result of Fiserv's negligent misrepresentations, Bessemer and its members have suffered and will continue to suffer damages and harm.  Such damages and harm include payments made to Fiserv for services that were not properly performed, damage to Bessemer's business, being placed at an imminent, immediate, and

continuing increased risk of harm from utilizing inaccurate information and being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, cancelling and reissuing payment cards, imposing withdrawal and transactional limits on accounts, and losing interest revenue and fees due to reduced account usage.

**Seventh Claim for Relief**
**Conversion / Misappropriation**

280.     Bessemer incorporates and realleges the preceding paragraphs.

281.     Bessemer has a property interest in its account records and information.  These records and information are stored in a tangible format in information technology systems or other media administered by Fiserv.  Fiserv Solutions acknowledged that Bessemer's records and information "shall remain the property of [Bessemer]" (Master Agreement § 3(b)).   Further, such property is identifiable with, merged into, or of the kind customarily identified with and merged into documents.  Indeed, such records and information embody and represent, without limitation, the title to the shares Bessemer members own as well as debts and other obligations of Bessemer to its members.  Such records and information thus embody, represent the title to, and are essential to protecting and enforcing property rights and other legally enforceable obligations.  Moreover, such records and information were created and maintained as a result of Bessemer's substantial investment of time, effort, and money.

282.     Bessemer also has a property interest in funds deposited in members' share draft accounts or otherwise in the custody of Bessemer, as well as in funds that are due and owing to Bessemer and its members.  Such funds are specifically identifiable and subject to an obligation to be treated in a particular manner.

NEWYORK-#544467

283.    Bessemer's property interest in the foregoing assets arises from Bessemer's ownership of such property.  Alternatively, to the extent such property is owned by Bessemer's members, those members have authorized Bessemer to possess such property.

284.    As between Bessemer and Fiserv, Bessemer has superior possessory rights in this property.

285.    Bessemer and its authorized members have demanded that Fiserv return and make available such property, or such demand was excused and rendered unreasonable by Fiserv's acts and omissions.

286.    Fiserv has converted and misappropriated this property by refusing to return it, destroying it, compromising its integrity, misusing it, interfering with Bessemer's use and possession of it, and otherwise dealing with it in a manner inconsistent with Bessemer's superior possessory rights.  Fiserv's conversion and misappropriation of such property was done without Bessemer's consent and without lawful justification.

287.    Fiserv's misconduct has had the effect of allowing it to reap the benefits of unlawfully possessing such property by, among other things, insisting that Bessemer pay Fiserv for additional services and prohibiting Bessemer from performing such services on its own account or through Fiserv competitors while Fiserv holds Bessemer's account records and information hostage.

288.    Fiserv's interference with Bessemer's property rights has occurred on many occasions during the course of the parties' relationship and after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.

289.    Fiserv's interference with Bessemer's property rights violates broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises

Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a tort because the relevant duties (e.g., the duties to respect Bessemer's property rights) arose regardless of any contract between the parties, the Master Agreement specifically acknowledged that Bessemer's account records and information "shall remain the property of [Bessemer]" (Master Agreement § 3(b)), and, in any event, Fiserv has violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the law of torts.

290.    As a direct and proximate result of Fiserv's conversion and misappropriation, Bessemer and its members have suffered and will continue to suffer damages and harm.

## Eighth Claim for Relief
### Bailment

291.    Bessemer incorporates and realleges the preceding paragraphs.

292.    Bessemer has a property interest in its account records and information.  These records and information are stored in a tangible format in information technology systems or other media administered by Fiserv.  Fiserv Solutions acknowledged that Bessemer's records and information "shall remain the property of [Bessemer]" (Master Agreement § 3(b)).   Further, such property is identifiable with, merged into, or of the kind customarily identified with and merged into documents.  Indeed, such records and information embody and represent, without limitation, the title to the shares Bessemer members own as well as debts and other obligations of Bessemer to its members.  Such records and information thus embody, represent the title to, and are essential to protecting and enforcing property rights and other legally enforceable obligations.  Moreover, such records and information were created and maintained as a result of Bessemer's substantial investment of time, effort, and money.

293.     Bessemer's property interest in the foregoing assets arises from Bessemer's ownership of such property.  Alternatively, to the extent such property is owned by Bessemer's members, those members have authorized Bessemer to possess such property.

294.     Fiserv has accepted delivery of Bessemer's account records and information and became a bailee of such property, thereby undertaking duties, independent of any contractual duty, to account for such property and to care for it.

295.     As part of this bailment, it was understood that Fiserv would use such property for the limited purposes authorized by Bessemer and would return it as agreed or upon demand.

296.     Bessemer and those authorized to receive its property have demanded that Fiserv return such property, or such demand was excused and rendered unreasonable by Fiserv's acts and omissions.

297.     Fiserv breached its duty as a bailee by refusing to return Bessemer's account records and information, destroying them, compromising their integrity, misusing them, interfering with them, and otherwise dealing with them in a manner inconsistent with Fiserv's bailee duties and Bessemer's superior possessory rights.

298.     Fiserv's breaches of its bailee duties occurred on many occasions during the course of the parties' relationship and after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.

299.     Fiserv's interference with Bessemer's property rights violates broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a bailment claim because the relevant duties (e.g., the duties imposed on a bailee of another's property) arose regardless of any contract between the parties, the Master Agreement specifically

-82-

acknowledged that Bessemer's account records and information "shall remain the property of [Bessemer]" (Master Agreement § 3(b)), and, in any event, Fiserv has violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018. Accordingly, the duties violated by Fiserv are defined by the social policies governing the law of bailments.

300.     As a direct and proximate result of Fiserv's breach of its bailee duties, Bessemer and its members have suffered and will continue to suffer damages and harm.

**Ninth Claim for Relief**
**Misappropriation of Trade Secrets**

301.     Bessemer incorporates and realleges the preceding paragraphs.

302.     Bessemer is the owner of all right, title, and interest in and to certain valuable trade secrets relating to financial, business, technical, economic, customer information, program devices, methods, programs, and codes.  Bessemer's trade secrets include, but are not limited to, its member information, accounts, account records and information, credit information, and methods, programs, and codes used by authorized members to access online banking accounts and to conduct and transact business through accounts maintained with Bessemer (including, without limitation, withdrawing and transferring funds), and confidential information regarding linked accounts accessible through Bessemer's online banking system that permit Bessemer and its members to transfer or withdraw funds from accounts maintained at Bessemer as well as other financial institutions.

303.     Other than through unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

NEWYORK-#544467

304.    Bessemer has taken reasonable measures to maintain the secrecy of its trade secrets, including requiring its members to maintain the confidentiality of online banking access codes.

305.    Bessemer has invested substantial resources in developing and protecting its trade secrets.  Bessemer's trade secrets provide it with economic advantages over its competitors.

306.    Fiserv knew or should have known that the trade secrets at issue comprised Bessemer's trade secrets.

307.    Fiserv misappropriated Bessemer's trade secrets by acquiring them through improper means consisting of false acts, omissions, concealments, and misrepresentations. These improper means include Fiserv misrepresenting to Bessemer the existence and nature of Fiserv's security controls, including falsely representing to Bessemer that the Fiserv-hosted online banking website that was used to store and access Bessemer's trade secrets had an adequate authentication process that was compliant with FFIEC standards.  Had Fiserv provided truthful information to Bessemer, Bessemer would not have furnished its trade secrets to Fiserv and allowed, and continued to allow, those trade secrets to be stored and accessible on an insecure Fiserv-hosted website.

308.    Fiserv has also misappropriated Bessemer's trade secrets by using them without Bessemer's express or implied consent.  Fiserv's improper use of Bessemer's trade secrets includes using them contrary to Bessemer's instructions and after being terminated as a vendor by Bessemer, such as by failing to return the trade secrets to Bessemer as directed and instead using them for Fiserv's own commercial advantage.

-84-

309.    Fiserv has also misappropriated Bessemer's trade secrets by disclosing them without Bessemer's express or implied consent, including by making the trade secrets available to hackers and other individuals not authorized to acquire the trade secrets.

310.    At the time of Fiserv's use and disclosure of Bessemer's trade secrets, Fiserv knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to Bessemer to maintain the trade secrets' secrecy and limit their use, or by mistake prior to a material change of Fiserv's position.

311.    Fiserv's misappropriation of Bessemer's trade secrets was done for its own commercial advantage, including for the purposes of preventing Bessemer from using vendors that are competitive with Fiserv and causing Bessemer to enter into transactions that provided Fiserv with additional and excessive profits, and collecting amounts that were not justly due to Fiserv or legally chargeable against Bessemer.

312.    Fiserv's misappropriation of Bessemer's trade secrets was carried out in a knowing, willful, reckless, and malicious manner in disregard and violation of Bessemer's rights.

313.    Fiserv's misappropriation of Bessemer's trade secrets violates broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a trade secret misappropriation claim because the relevant duties arose from the statutory protections for trade secrets, and Fiserv has violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are defined by the social policies enshrined by legislatures in enacting laws prohibiting the misappropriation of trade secrets.

NEWYORK-#544467

314.    As a direct and proximate result of Fiserv's misappropriation of Bessemer's trade

secrets, Bessemer and its members have suffered and will continue to suffer damages and harm.

**Tenth Claim for Relief**
**Defend Trade Secrets Act**

315.    Bessemer incorporates and realleges the preceding paragraphs.

316.    Bessemer's trade secrets are related to products and services used in and intended

to be used in interstate and foreign commerce.

317.    Fiserv's acts constitute violations of the Defend Trade Secrets Act, 18 U.S.C.

§ 1836.

318.    Fiserv's misappropriation was willful and malicious, entitling Bessemer to

exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18

U.S.C. § 1836(b)(3)(D).

319.    Fiserv's misappropriation of Bessemer's trade secrets violates broad social duties

that are separate and distinct from, and collateral to, any specific executory contractual promises

Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a trade

secret misappropriation claim because the relevant duties arose from the statutory protections for

trade secrets, and Fiserv has violated such duties after Bessemer provided a notice of termination

of the Master Agreement on April 11, 2018.  Accordingly, the duties violated by Fiserv are

defined by the social policies enshrined by legislatures in enacting laws prohibiting the

misappropriation of trade secrets.

320.    As a direct and proximate result of Fiserv's misappropriation of Bessemer's trade

secrets, Bessemer and its members have suffered and will continue to suffer damages and harm.

**Eleventh Claim for Relief**
**Unjust Enrichment**

321.    Bessemer incorporates and realleges the preceding paragraphs.

NEWYORK-#544467

322.    Fiserv has induced Bessemer to make payments, including overpayments not justly due to Fiserv, and to furnish Bessemer's account records and information as a result of Fiserv's unjust and unconscionable misconduct.  As a result of this misconduct, Fiserv has been, and will continue to be, unjustly enriched at Bessemer's expense, and under circumstances that would make it unjust and inequitable for Fiserv to retain the economic benefits of Bessemer's payments, and Bessemer's account records and information.

323.    Fiserv's unjust enrichment violates broad social duties that are separate and distinct from, and collateral to, any specific executory contractual promises Fiserv Solutions made to Bessemer.  The duties violated by Fiserv are in the nature of a claim for unjust enrichment because the relevant duties (e.g., the duty to make restitution when unjustly enriched) arose regardless of any contract between the parties, and Fiserv violated such duties after Bessemer provided a notice of termination of the Master Agreement on April 11, 2018. Accordingly, the duties violated by Fiserv are defined by the social policies embodied in the principles of equity.

324.    Accordingly, equity and good conscience require that Fiserv make restitution to Bessemer.

### Twelfth Claim for Relief
#### Promissory Estoppel

325.    Bessemer incorporates and realleges the preceding paragraphs.

326.    Fiserv denies that there was an agreement between the parties to settle Bessemer's replevin action.  To the extent the Replevin Action Settlement Agreement or other promises made by Fiserv to Bessemer are not valid or enforceable contracts, those promises were reasonably relied on by Bessemer to its detriment, including when deciding to transact business with Fiserv and to terminate the replevin action.

NEWYORK-#544467

327.     Fiserv violated its promises to Bessemer by, among other things, repudiating its promises and not fulfilling them.

328.     As a direct and proximate result of Fiserv's violation of its promises, Bessemer and its members have suffered and will continue to suffer damages and harm.

### Thirteenth Claim for Relief
### Declaratory Relief

329.     Bessemer incorporates and realleges the preceding paragraphs.

330.     Genuine disputes exist between the parties concerning their rights.

331.     These disputes affect the highly sensitive personal and financial information of Bessemer's members.  Bessemer thus seeks relief on its own behalf and on behalf of its members.

332.     A judicial declaration of the parties' and Bessemer's members' rights would resolve the legal relations of the parties to a justiciable controversy.

333.     One such dispute involves a June 14, 2019 letter in which Fiserv's counsel asserts that under the Master Agreement, Fiserv Solutions acquired ownership of the data, reports, documents, and information that Fiserv Solutions generated with respect to Bessemer. **Exhibit 29** hereto is a true and correct copy of this letter.  This information that Fiserv Solutions asserts now belongs to it includes Bessemer's member information Fiserv Solutions sent to credit bureaus on Bessemer's behalf.

334.     Bessemer denies that Fiserv acquired ownership of Bessemer's member information.  This property is the Credit Union's property, and it contains highly sensitive personal and financial information that implicates the privacy interests of Bessemer's several thousand members.

-88-

335.    Bessemer, on behalf of itself and its members, seeks a declaration concerning the parties' rights with respect to Bessemer's member information.

336.    As a terminated vendor, Fiserv has no legitimate purpose in asserting ownership over and continuing to possess Bessemer's member information.  Fiserv does not own Bessemer's member information for at least the following reasons:

(a)    Bessemer's member information constitutes "Client Information" under the Master Agreement and thus belongs to Bessemer.

(b)    Fiserv's construction of the Master Agreement is against the plain language of that agreement and would result in a commercially absurd result in which a credit union's terminated vendor would acquire ownership of a credit union's member information.

(c)    Fiserv's construction of the Master Agreement is contrary to public policy and would render that agreement an illegal bargain.  Fiserv's claim that it now owns Bessemer's member information violates 12 C.F.R. Part 748, which imposes nondelegable duties on federal credit unions to safeguard their member information and oversee their service providers that maintain, process, or are otherwise permitted to access member information.  Fiserv's claim that it now owns Bessemer's member information also violates the Federal Credit Union Act, which requires that "[a]ll books and records of Federal credit unions shall be kept" and limits a federal credit union's ability to dispose property only to circumstances in which such disposal is "necessary or incidental to [the credit union's] operations."  *See* 12 U.S.C. §§ 1757(4), 1766.

(d)    Fiserv has no right to enforce the Master Agreement, including due to its uncured material breaches, fraudulent inducement, failure of consideration, commercial impracticability, and frustration of purpose.

### Jury Trial Demand

Bessemer requests a trial by jury of all issues so triable.

### Demand for Relief

WHEREFORE, Bessemer respectfully requests that this Court:

(i)     enter judgment in Bessemer's favor for all damages allowed by law—
including, without limitation, compensatory, consequential, incidental,
reliance, restitutionary, statutory, delay, treble, and punitive—in amounts
to be determined at trial;

(ii)    award Bessemer its attorneys' fees, its costs, and the maximum
prejudgment and postjudgment interest allowed by law;

(iii)   on behalf of Bessemer and its members, declare the parties' rights and the
rights of Bessemer's members;

(iv)    on behalf of Bessemer and its members, issue an injunction to prevent
Bessemer and its members from suffering or continuing to suffer harm;
and

(v)     grant Bessemer any further relief that may be necessary to achieve justice
or that is deemed proper and appropriate under the circumstances by this
Court.

NEWYORK-#544467

Dated: October 30, 2019

VEDDER PRICE P.C.

By: /s/ Charles J. Nerko
    Charles J. Nerko (NY 4764338)
1633 Broadway, 31st Floor
New York, NY  10019
Tel.:  (212) 407-7700
Email: cnerko@vedderprice.com

Richard J. Parks (PA 40477)
PIETRAGALLO GORDON
ALFANO BOSICK & RASPANTI, LLP
7 West State Street, Suite 100
Sharon, PA  16146
Tel.:  (724) 981-1397
Email: rjp@pietragallo.com

*Attorneys for Plaintiff*
*Bessemer System Federal Credit Union*

-91-