**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BESSEMER SYSTEM FEDERAL CREDIT UNION, on behalf of itself and members, | ) ) ) | 2:19-cv-00624-RJC |
| Plaintiff, | ) ) ) | Judge Robert J. Colville |
| vs. | ) ) | |
| FISERV SOLUTIONS, LLC and FISERV, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

**OPINION**

Robert J. Colville, United States District Judge

Before the Court are the Motion to Strike Plaintiff's Jury Demand and Prayer for Punitive Damages (ECF No. 50) and the Motion to Dismiss Second Amended Complaint (ECF No. 52) filed by Defendants Fiserv Solutions, LLC, f/k/a Fiserv Solutions, Inc. ("Fiserv Solutions") and Fiserv, Inc. ("Fiserv, Inc.") (collectively, "Fiserv").[1] In its Motion to Dismiss, Fiserv requests dismissal pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b) of each of the thirteen claims set forth in Bessemer's Second Amended Complaint (ECF No. 48) ("Complaint"). In its Motion to Strike, Fiserv asserts that Fiserv Solutions and Plaintiff Bessemer System Federal Credit Union ("Bessemer") entered into a master agreement (the "Master Agreement") through which Bessemer agreed to not seek or recover punitive damages for disputes arising out of the agreement and

---

[1] Plaintiff's Complaint refers to the two Fiserv entities collectively as "Fiserv," and most of the allegations in the Complaint are assertions regarding the collective Fiserv. The Court notes that the contract at issue in this case, the Master Agreement, was executed by only Fiserv Solutions and Plaintiff.

through which the parties both waived their right to a jury trial for disputes arising out of the agreement.  The Motions at issue have been fully briefed, and are ripe for disposition.

## I.      Factual Background & Procedural History

In its Complaint, Bessemer sets forth the following allegations relevant to Fiserv's Motions:

Bessemer is a member-owned, federally chartered not-for-profit credit union.  Compl. ¶ 10, ECF No. 48.  Bessemer provides financial services to its more than 4,000 members.[2]  *Id.* at ¶ 11.  Fiserv provides technology solutions to credit unions, banks, and other financial services providers.  *Id.* at ¶ 20.  Bessemer and Fiserv Solutions were parties to the Master Agreement, pursuant to which Fiserv provided services and products to Bessemer.[3]  *Id.* at ¶ 26.  Fiserv provided account processing services to Bessemer, including a core processing system referred to as "Charlotte."  *Id.* at ¶ 21.  Core processing systems process and record all financial transactions for a financial institution.  *Id.*  Fiserv also hosted Bessemer's online banking website, "Virtual Branch," through which Fiserv processed Bessemer members' online account transactions.  *Id.* at ¶ 22.

Prior to entering into the Master Agreement, Fiserv represented to Bessemer, by way of a February 27, 2012 email, that the Virtual Branch online banking website satisfied Federal Financial Institutions Examination Council ("FFIEC") requirements despite the fact that Virtual Branch did not satisfy these requirements.  Compl. ¶ 29-33, ECF No. 48.  Despite several representations and advertisements asserting that Fiserv's services were of a certain quality, as well as secure and private, Fiserv's performance was not in accordance with such representations

---

[2] Bessemer asserts that it is seeking relief on its own behalf as well as on behalf of its members.  Compl. ¶ 11, ECF No. 48.
[3] The Master Agreement is attached to Bessemer's Complaint (ECF No. 48) as Exhibit 2.  For ease of reference, the Court will cite to the document as "Master Agreement."

or the Master Agreement. *Id.* at ¶¶ 34-43. Fiserv implemented lax and weak security controls to protect the accounts and valuable confidential information of Bessemer's members, and Fiserv was put on notice on several occasions such that Fiserv knew that its security measures were insufficient. *Id.* at ¶¶ 47-79. Fiserv suffered a security breach in 2016 which caused Fiserv to provide confidential Bessemer member information to another financial institution. *Id.* at ¶ 48, ECF No. 48. Fiserv also placed the wrong return address on biannual account verifications in 2017, placing the confidential information of Bessemer members who had moved at risk because the mail could not be delivered to the member or returned to the sender. *Id*. at ¶ 49. Fiserv also ceased installing and updating antivirus software on Bessemer's systems at some point without explanation. *Id.* at ¶ 50. Despite being aware of the aforementioned security lapses, and despite receiving notice from Bessemer, other customers, and the media that Fiserv's security measure were inadequate, Fiserv only took action to remedy its security deficiencies after receiving negative press coverage. *Id.* at ¶¶ 47-79. Fiserv's attempts to fortify its security after receiving notice of its security deficiencies were also ineffective and deficient. *Id.* at ¶¶ 64-65; 78.

Fiserv has also falsified and misrepresented confidential member information to Bessemer, its members, and other authorized individuals. Compl. ¶ 87, ECF No. 48. In July 2018, Fiserv falsely represented to Bessemer that a member's account had been closed and made changes to that member's account, temporarily depriving the member of dividends and access to the member's account. *Id.* at ¶ 88. On several occasions, Fiserv's system provided inaccurate and falsified loan information and documents to Bessemer and its members. *Id.* at ¶¶ 90-96. Despite being aware of problems with its system which caused these inaccuracies, Fiserv did not take action to remedy these problems. *Id.* at ¶¶ 93-94, 98.

Fiserv's account processing system suffered from a number of bugs and defects which resulted in, inter alia, Bessemer's and its members' inability to access account processing services, system crashes and errors, latency in the account processing services, errors in the information reported by Fiserv's system, and failure to perform the necessary services which the system was supposed to provide. Compl. ¶¶ 99-115, ECF No. 48. Fiserv repeatedly issued erroneous invoices to Bessemer that contained incorrect balances and also charged for services that did not function properly or that Bessemer had asked Fiserv to cease providing. *Id.* at ¶ 128. Fiserv represented that certain hardware upgrades would remedy the issues Bessemer was experiencing with Fiserv's system. *Id.* at ¶¶ 129-131. Bessemer made the recommended upgrades, but they did not remedy the issues Bessemer was experiencing with respect to Fiserv's system. *Id*. Fiserv also misrepresented the cost for an additional service under the Master Agreement requested by Bessemer. *Id.* at ¶ 134. Fiserv stopped providing Office of Foreign Assets Control scans for Bessemer, did not provide the requisite written notice to Bessemer regarding this service, and tasked Bessemer with performing these scans. *Id.* at ¶ 135. Fiserv did not adequately address support requests submitted by Bessemer with respect to issues with Fiserv's system. *Id.* at ¶ 137.

On January 8, 2018, Bessemer sent Fiserv Solutions a "Notice of Breach" invoking the dispute resolution provision of the Master Agreement. Compl. ¶ 139, ECF No. 48. By way of this Notice, Bessemer also requested that Fiserv provide documents to Bessemer related to Fiserv's security measures and to invoices that had been provided by Fiserv to Bessemer. *Id.* at ¶¶ 140-145. Fiserv failed to provide ay such documentation to Bessemer, and failed to participate in good faith in the dispute resolution process set forth in the Master Agreement. *Id.* at ¶ 146.

Bessemer sent a notice of termination of the Master Agreement to Fiserv on April 11, 2018. Compl. ¶ 152, ECF No. 48. Fiserv continued to send invoices to Bessemer after this notice of

termination, did not provide documentation related to the invoices in a timely manner when the same was requested by Bessemer, and ultimately did not provide all of the requested documentation. *Id.* at ¶¶ 153-158. Despite Bessemer's demand that Fiserv return Bessemer's account records and member information, Fiserv has not returned all of the requested information. *Id.* at ¶ 152. In an attempt to recover this information, Bessemer filed a replevin action in the Court of Common Pleas of Mercer County (the "Replevin Action"). *Id.* at ¶ 159. The parties agreed to settle the Replevin Action, and Fiserv's counsel sent what Bessemer characterizes as a settlement agreement to Bessemer, who executed the purported agreement.[4] *Id.* at ¶ 160. Under the purported settlement agreement: (1) the parties were required to work in good faith toward settling Bessemer's claim for damages; (2) Bessemer was required to withdraw the Replevin Action, pay outstanding invoices, and pay for deconversion of Bessemer's records by the date of deconversion; and (3) Fiserv was required to provide deconversion services to Bessemer.[5] *Id.* at ¶ 161.

Fiserv failed to perform in accordance with the purported Replevin Action settlement agreement by: (1) initially rejecting Bessemer's payment of outstanding invoices; (2) requiring Bessemer to pay for deconversion services before beginning the process of deconversion; (3) stalling the deconversion process; and (4) sending an amendment to the terminated Master Agreement in an attempt to modify the terms of the Replevin Action settlement agreement. Compl. ¶¶ 164-179, ECF No. 48. Bessemer asserts that Fiserv misrepresented the amount of time that would be required for deconversion services in the correspondence which Bessemer claims constitutes the Replevin Action settlement agreement, and that, but for Fiserv's delays in providing

---

[4] The purported Replevin Action settlement agreement is dated October 19, 2018 and is signed by Bessemer's counsel. It is attached as Exhibit 18 to Bessemer's Complaint.
[5] Deconversion is the process of transitioning to a new provider. Br. in Supp. of Mot. to Dismiss 1, ECF No. 53.

deconversion services in breach of that agreement, the process could have been completed much sooner.  *Id.* at ¶ 179.  Fiserv stated that it could not provide credit reporting records containing Bessemer members' loan histories to Bessemer before ultimately providing these records.  *Id.* at ¶ 188.  Fiserv failed to return Bessemer member information contained in Fiserv's eFichency archive in a timely and efficient manner, initially withheld certain eFichency documents without reason only to provide them at a later date, and has not returned Fiserv images of Bessemerr's documents maintained in the eFichency archive to date.  *Id.* at ¶¶ 189-199.  Bessemer asserts that all of the above allegations constitute willful, intentional, wanton, malicious, reckless, and outrageous conduct warranting the imposition of punitive damages.  *Id.* at ¶ 200.  Bessemer also asserts that the parties were in a relationship of trust and confidence and that Fiserv maintained superior knowledge, skill, expertise, and influence over Bessemer.  *Id.* at ¶ 203.

After seeking leave of Court to file a second amended complaint, Bessemer filed the Complaint (ECF No. 48) on October 30, 2019.  In its Complaint, Bessemer asserts claims for: (1) breach of contract against Fiserv Solutions only with respect to both the Master Agreement and the purported Replevin Action settlement agreement (Count I); (2) negligence (Count II); (3) unfair trade practices and deceptive trade acts in violation of the laws of Pennsylvania, New York, Ohio, Wisconsin, and other unidentified states (Count III); (4) fraud/fraudulent inducement (Count IV); (5) constructive fraud (Count V); (6) negligent misrepresentation (Count VI); (7) conversion/misappropriation (Count VII); (8) bailment (Count VIII); (9) misappropriation of trade secrets (Count IX); (10) violation of the Defend Trade Secrets Act (18 U.S.C. 1836) (Count X); (11) unjust enrichment (Count XI); (12) promissory estoppel (Count XII); and (13) declaratory relief (Count XIII).  Fiserv filed its Motion to Dismiss (ECF No. 50) and Motion to Strike (ECF No. 52) on November 13, 2019.  Bessemer filed Briefs in Opposition (ECF Nos. 54 and 55) to

Fiserv's Motions on November 20, 2019.  On November 27, 2019, Fiserv filed Reply Briefs (ECF Nos. 57 and 58).

## II.     Legal Standard

### A.  Motion to Dismiss

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff.  *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

*Connelly*, 809 F.3d at 787. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). When a document integral to or relied upon in the complaint is included, the court may also consider that document. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The United States Court of Appeals for the Third Circuit has explained:

> Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the "precise misconduct with which [it is] charged." *Lum v. Bank of America*, 361 F.3d 217, 223–224 (3d Cir.2004). To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.

*Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

"If a plaintiff requests leave to amend a complaint vulnerable to dismissal before a responsive pleading is filed," a court must permit amendment unless it would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." *Grayson*, 293 F.3d at 108.

### B.  Motion to Strike

With respect to motions to strike, Federal Rule of Civil Procedure 12(f) provides that "the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *Zaloga v. Provident Life & Acc. Ins. Co. of Am.*, 671 F. Supp. 2d 623, 633 (quoting *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F.Supp.2d 393, 402 (E.D. Pa.2002)). "A decision to grant or deny a motion to strike a pleading is vested in the trial court's discretion." *Zaloga*, 671 F. Supp. 2d at 633 (citing *Snare & Triest v. Friedman*, 169 F. 1, 6 (3d Cir.1909); *BJC Health System v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir.2007)). Motions to Strike "are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." *Hay v. Somerset Area Sch. Dist.*, No. 3:16-cv-229, 2017 WL 2829700, at *3 (W.D. Pa. June 29, 2017) (quoting *Tennis v. Ford Motor Co.*, 730 F.Supp.2d 437, 443 (W.D. Pa. 2010)).

### III.   Discussion

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Federal courts sitting in diversity apply the forum state's choice of law rules.  *Pac. Employers Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012).  Accordingly, this Court will apply Pennsylvania choice of law rules in determining which state's laws to apply to Bessemer's claims.  "With respect to breach of contract cases, Pennsylvania courts have adopted § 187 of the Restatement (Second) of Conflict of Laws, which generally honors the intent of the contracting parties and enforces choice of law provisions in contracts executed by them."  *Grimm v. Citibank (S. Dakota), N.A.*, Civ. A. No. 08-cv-788, 2008 WL 4925631, at *4 (W.D. Pa. Nov. 14, 2008) (citing *Knuzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir.1994)).  "Narrow choice of law provisions stating that a contract's terms or enforcement are to be governed, or construed, by the laws of another state," however, "are generally interpreted by Pennsylvania courts to relate only to the construction and interpretation of the contract at issue."  *Grimm*, 2008 WL 4925631, at *4 (citing *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.*, 848 F. Supp. 569 (E.D.Pa.1994)).

The parties agree that the Master Agreement is governed by New York law.  *See* Br. in Supp. of Mot. to Dismiss 6 n.2, ECF No. 53; Br. in Opp'n to Mot. to Dismiss 16, ECF No. 54. The choice of law provision in the Master Agreement provides that "the Agreement will be governed by the substantive laws of New York, without reference to provisions relating to conflict of laws."  Master Agreement § 11(d).  This provision is narrowly drawn because it provides only that the Master Agreement will be governed by New York law.  Accordingly, New York law applies to Bessemer's claim for breach of the Master Agreement.

In light of the above, the Master Agreement's choice of law provision applies only to Bessemer's claim for breach of the Master Agreement, and does not apply to the remaining claims set forth in Bessemer's Complaint.  "Under Pennsylvania's choice of law rules, when no choice of

law provision governs what law to apply in a dispute, the first step is to determine 'whether a conflict exists between the laws of [the competing states].'" *Miller v. Native Link Constr., LLC*, Civ. A. No. 15-cv-1605, 2017 WL 3536175, at \*10 (W.D. Pa. Aug. 17, 2017) (quoting *Budtel Assocs., LP v. Cont'l Cas. Co.*, 915 A.2d 640, 643 (Pa. Super. 2006)). If there is no conflict between the laws of the competing states, the law of the forum state applies and no further analysis is required. *Miller*, 2017 WL 3536175, at \*10 (citing *State Farm Fire & Cas. Co. v. Holmes Prods.*, 165 Fed.Appx. 182, 185 n.1 (3d Cir. 2006)).

Initially, the Court notes that the parties do not raise any potential conflict and seemingly agree that Bessemer's claims (other than breach of the Master Agreement) are governed by Pennsylvania law. *See* Br. in Supp. of Mot. to Dismiss 9 n.4, ECF No. 53; Br. in Opp'n to Mot. to Dismiss 18-20, ECF No. 54. In *Lucker Mfg., A Unit of Amclyde Engineered Prod., Inc. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994), the United States Court of Appeals for the Third Circuit cited *Melville v. American Home Assur. Co.*, 584 F.2d 1306, 1311 (3d Cir.1978) for the proposition that courts should avoid dicta on conflict of law questions where the same has not been put at issue. The Court further notes that its research has revealed no conflict between the laws of New York and Pennsylvania with respect to Bessemer's claims. Accordingly, the Court shall apply Pennsylvania law to any claim other than Bessemer's claim for breach of the Master Agreement.

### A.  Motion to Dismiss

Fiserv seeks dismissal of each of the claims set forth in Bessemer's Complaint. Fiserv first asserts all of Bessemer's tort claims are barred as a matter of law. Br. in Supp. of Mot. to Dismiss 5, ECF No. 53. In support of this argument, Fiserv relies on several provisions of the Master Agreement whereby Fiserv asserts that: 1) Bessemer agreed to waive its right to recover tort damages and remedies (Master Agreement § 7); 2) Bessemer accepted limited contractual

warranties and assumed the responsibility of determining whether Fiserv's services met Bessemer's needs (Master Agreement § 6(c); and 3) the parties agreed that their contractual promises would define the parties relationship completely pursuant to an integration clause. *Id.* at 5-7. Fiserv further argues that, even absent these provisions, each of Bessemer's tort claims is barred by the gist of the action doctrine and/or the economic loss doctrine. *Id.* at 9.

Bessemer argues that the exculpatory clause on which Fiserv relies is unenforceable in this matter because parties to a contract cannot, under New York public policy, contractually limit liability for intentional or grossly negligent conduct. Br. in Opp'n to Mot. to Dismiss 8, ECF No. 54. Bessemer further argues that its fraudulent inducement claim is not barred because the Master Agreement's disclaimer of reliance on noncontractual promises is not specific enough, and also argues that this claim is not barred due to the peculiar knowledge doctrine. *Id.* at 10-11. Bessemer asserts that its tort claims rely on duties owed to Bessemer that were independent from the Master Agreement, and that the gist of the action doctrine and economic loss doctrine are thus inapplicable in this action. *Id.* at 13-14. Bessemer also asserts that Fiserv breached the duties at issue both before and after the parties executed the Master Agreement, thus barring application of the gist of the action doctrine or economic loss doctrine. *Id.* Finally, Bessemer argues that only Fiserv Solutions, and not Fiserv, Inc., is subject to the terms of the Master Agreement, and that its claims against Fiserv, Inc. should survive Fiserv's Motion to Dismiss for that reason. *Id.* at 12.

Preliminarily, the Court notes that Bessemer is correct that New York public policy does not allow parties to a contract to contractually limit liability for intentional or grossly negligent conduct. *See Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 967 N.E.2d 666, 669 (N.Y. 2012) ("However, it is New York's public policy that a party cannot 'insulate itself from damages caused by grossly negligent conduct'" (quoting *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554,

583 N.Y.S.2d 957, 593 N.E.2d 1365 1992))); *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d

413, 416-17 (N.Y. 1983) ("More pointedly, an exculpatory clause is unenforceable when, in

contravention of acceptable notions of morality, the misconduct for which it would grant immunity

smacks of intentional wrongdoing.  This can be explicit, as when it is fraudulent, malicious or

prompted by the sinister intention of one acting in bad faith.  Or, when, as in gross negligence, it

betokens a reckless indifference to the rights of others, it may be implicit." (footnotes omitted)

(citation omitted)).  Bessemer avers that it has set forth allegations that rise to the level of gross

negligence and/or intentional conduct on the part of Fiserv, including intentional tort claims for

fraud and conversion, and that the Master Agreement's exculpatory clause respecting tort claims

is thus unenforceable.  Br. in Opp'n to Mot. to Dismiss 10-11, ECF No. 54.  Pursuant to New York

public policy, the Master Agreement's tort damages exculpatory clause is only potentially

enforceable with respect to Fiserv's claims sounding in ordinary negligence.  Accordingly, the

Court shall first address the gist of the action doctrine and, to the extent necessary, the economic

loss doctrine and any independent basis for dismissal in addressing each of Bessemer's tort claims,

and only determine whether the Master Agreement's tort damages exculpatory clause is

enforceable with regard to Bessemer's negligence claims if necessary.

With respect to the gist of the action doctrine, "[a]s a practical matter, the doctrine

precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims."  *eToll,*

*Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002).  The Supreme Court of

Pennsylvania has explained:

> The general governing principle which can be derived from our prior cases
> is that our Court has consistently regarded the nature of the duty alleged to have
> been breached, as established by the underlying averments supporting the claim in
> a plaintiff's complaint, to be the critical determinative factor in determining
> whether the claim is truly one in tort, or for breach of contract.  In this regard, the
> substance of the allegations comprising a claim in a plaintiff's complaint are of

paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling.  If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract.  If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort. . . .  Although this duty-based demarcation was first recognized by our Court over a century and a half ago, it remains sound, as evidenced by the fact that it is currently employed by the high Courts of the majority of our sister jurisdictions to differentiate between tort and contract actions.  We, therefore, reaffirm its applicability as the touchstone standard for ascertaining the true gist or gravamen of a claim pled by a plaintiff in a civil complaint.

Notably, and of relevance to the case at bar, our prior decisions in *Zell* and *Krum* underscore that the mere existence of a contract between two parties does not, *ipso facto*, classify a claim by a contracting party for injury or loss suffered as the result of actions of the other party in performing the contract as one for breach of contract.  Indeed, our Court has long recognized that a party to a contract may be found liable in tort for negligently performing contractual obligations and thereby causing injury or other harm to another contracting party. . . .

Consequently, a negligence claim based on the actions of a contracting party in performing contractual obligations is not viewed as an action on the underlying contract itself, since it is not founded on the breach of any of the specific executory promises which comprise the contract.  Instead, the contract is regarded merely as the vehicle, or mechanism, which established the relationship between the parties, during which the tort of negligence was committed.

*Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68-69 (Pa. 2014) (footnotes omitted) (citations omitted).

In ultimately finding that the Brunos' negligence claim was not barred by the gist of the action doctrine, Supreme Court of Pennsylvania held:

Accordingly, while Erie had contractual obligations under its policy to investigate whether mold was present, and also to pay for all property damage caused by mold, the substance of the Brunos' allegations is not that it failed to meet these obligations; rather, it is that Erie, during the course of fulfilling these obligations through the actions of its agents, acted in a negligent manner by making false assurances regarding the toxicity of the mold and affirmatively recommending to the Brunos that they continue their renovation efforts, which caused them to suffer physical harm because of their reasonable reliance on those assurances.  Consequently, these allegations of negligence facially concern Erie's alleged breach of a general social duty, not a breach of any duty created by the insurance policy itself.  The policy in this instance merely served as the vehicle which

established the relationship between the Brunos and Erie, during the existence of
which Erie allegedly committed a tort.

*Bruno*, 106 A.3d at 71.  The United States District Court for the Middle District of Pennsylvania

has explained:

> A certain tension exists, at the motion to dismiss stage, between Pennsylvania's
> "gist of the action" doctrine and Rules 8(d)(2) and (3) of the Federal Rules of Civil
> Procedure, which expressly condone pleading in the alternative.  District courts in
> Pennsylvania have noted that caution should be exercised in determining the "gist
> of an action" at the motion to dismiss stage.

*Odgers v. Progressive N. Ins. Co.*, 112 F. Supp. 3d 286, 292 (M.D. Pa. 2015).

In light of the above, the natures of the duties alleged to have been breached in this action

are essential in determining whether Bessemer's tort claims are barred by the gist of the action

doctrine.  In explaining the tort duties that Bessemer believes Fiserv breached in the present case,

Bessemer explains:

> Bessemer's tort claims do not seek the benefit of any contractual bargain.  Rather,
> Bessemer seeks redress for Fiserv's violation of independent, noncontractual legal
> duties to respect Bessemer's property rights and trade secrets, to not negligently
> expose Bessemer to a data breach and fail to warn of data breach risks, and to not
> misrepresent information.

Br. in Opp'n to Mot. to Dismiss 15, ECF No. 54.

## 1.  Tort Claims

### i.  Bessemer's Negligence Claim (Count II)

To succeed in a negligence action, a plaintiff "must establish the defendant owed a duty of

care to the plaintiff, that duty was breached, the breach resulted in the plaintiff's injury, and the

plaintiff suffered an actual loss or damages."  *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980

A.2d 502, 506 (Pa. 2009) (citing *Martin v. Evans*, 551 Pa. 496, 711 A.2d 458, 461 (1998)).  With

respect to its claim for negligence, Bessemer asserts that Fiserv violated its duty to take reasonable

measures to protect Bessemer's confidential member information from the foreseeable risk of data

breach, unauthorized third-party access, and loss or alteration. Compl. ¶ 221, ECF No. 48. Bessemer asserts that Fiserv breached these duties by not implementing effective safety measures, and by failing to inform or warn Bessemer of the inadequacy of Fiserv's security system, the danger posed by inadequate security systems, or the necessity that Bessemer take independent action to protect the information at issue. *Id.* at ¶¶ 229-30.

Bessemer seemingly seeks to distinguish its breach of contract claim and its negligence claim by asserting that its claim for breach of the Master Agreement is based upon the allegedly deficient account processing services provided by Fiserv, and that its claim for negligence is based upon Fiserv's allegedly inadequate security services. The Court agrees that the Master Agreement provides the basis for Fiserv's alleged duty to provide the contractually agreed upon account processing services.[6] The Master Agreement, however, also includes a provision that specifically outlines Fiserv Solutions's duties with respect to its provision of security services to Bessemer. Section 4 of the Master Agreement is titled "Information Security," and provides, in relevant part:

> (a) <u>General</u>. Fiserv [Solutions] has implemented and shall maintain an information security program that is designed to meet the following objectives: (i) protect the security and confidentiality of customer information (as defined in [Title V of the Gramm–Leach–Bliley Act or the regulations issued thereunder]); (ii) protect against any anticipated threats or hazards to the security or integrity of such information; (iii) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer; and (iv) ensure the proper disposal of "consumer information[.]" . . . Upon Client's written request, Fiserv [Solutions] shall allow Client to review any associated audit reports, summaries of test results or equivalent measures taken by Fiserv [Solutions] to assess whether its information security program meets the foregoing objectives, to the extent and on the same terms such information is made generally available to Fiserv [Solutions's] other clients. Fiserv [Solutions] shall also take appropriate actions to address incidents of unauthorized access to Client's "sensitive customer information" (as defined in [Title V of the Gramm–Leach–Bliley Act or the regulations issued thereunder]), including notification to Client as soon as possible of any such incident. . . .

---

[6] Specifically, the "ASP Services Exhibit to Master Agreement."

(b) <u>Fiserv Plan</u>.   Within 30 days of Client's written request, Fiserv [Solutions] shall provide to Client a summary of Fiserv [Solutions's] written information security plan for the applicable services received by Client, and thereafter upon Client's request will provide updates of the status of such information security plan.

Master Agreement § 4(a)-(b).

Two time periods are relevant with respect to Bessemer's negligence claim: (1) the time period during which the Master Agreement was in place; and (2) the time period directly following Bessemer's April 11, 2018 notice of termination to Fiserv.  With regard to Bessemer's negligence claim as it relates to pre-termination conduct, the nature of the duty allegedly breached, i.e. the duty to safeguard Bessemer's confidential member information, very clearly lies in contract, as the parties agreed to a specific and thorough contractual provision which provided the manner in which Fiserv Solutions would protect Bessemer's confidential information.  Section 4 of the Master Agreement clearly acknowledges the importance of the information at issue and anticipates the dangers presented by inadequate security measures and unauthorized access.

The Court further notes that Bessemer itself acknowledges in its Complaint that Fiserv owed Bessemer a duty under the Master Agreement with respect to the security of Bessemer's member information and records.  *See* Compl. ¶ 140, ECF No. 48 ("As part of the notice of breach, Bessemer issued an audit demand for several categories of documents that *Fiserv* was required to produce to Bessemer *under various provisions of the Master Agreement*.  These requested documents included documents related to the amounts Fiserv invoiced Bessemer, and *documentation relating to the security of Bessemer's records and information* in Fiserv's custody." (emphasis added));[7] *see also id.* at ¶ 218 (In support of its breach of contract claim, Bessemer

---

[7] It is important to note that Bessemer refers to "Fiserv" owing a duty under the Master Agreement in these paragraphs. While Bessemer has sued only Fiserv Solutions for breach of the Master Agreement and argues that Fiserv, Inc. is not subject to the Master Agreement, Bessemer has not set forth any basis or argument that would allow this Court to

asserts: "[a]lthough Fiserv Solutions had knowledge that its system was malfunctioning, reporting false information to Bessemer, and susceptible to vulnerabilities that compromised the confidentiality of member information, Fiserv failed to address properly these issues . . . ."); *id.* at ¶¶ 141-144 (citing subsections of Section 4 of the Master Agreement which require Fiserv Solutions to provide information regarding Fiserv's security services to Bessemer).

In asserting that the duty at issue in this case is an independent, noncontractual duty, Bessemer cites to the Supreme Court of Pennsylvania's decision in *Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018), which held that, "in collecting and storing [defendant's employees'] data on its computer systems, [defendant] owed Employees a duty to exercise reasonable care to protect them against an unreasonable risk of harm arising out of that act." *Dittman*, 196 A.3d at 1047. The present case is distinguishable from *Dittman*. *Dittman* involved allegations that an employer required employees to provide personal information to the employer as a condition of employment, and that the employer failed to provide adequate security measures in storing that information. *Id*. In the present case, the parties entered into a contract which included an express provision regarding the security services Fiserv Solutions was required to provide to Bessemer and the manner in which Fiserv Solutions was required to protect Bessemer's confidential member information. The Court finds that Fiserv's duty to protect Bessemer's confidential member information is contractual in nature, and, accordingly, the gist of the action doctrine bars Bessemer's negligence claim as it relates to pre-alleged termination conduct.

Bessemer also asserts that Fiserv continued its negligent security practices after Bessemer had provided a notice of termination on April 11, 2018, and that the duty to protect Bessemer's confidential member information could no longer be provided by the Master Agreement following

conclude that Bessemer has an independent right to recovery as to Fiserv, Inc. that is not based upon the contractual relationship between Fiserv Solutions and Bessemer.

18

that notice of termination.  Compl. ¶ 232, ECF No. 48.  The Court notes that the Master Agreement contains provisions regarding: (1) ownership of confidential information (*see* Master Agreement § 3(a)-(c)); (2) return of confidential information (*see* Master Agreement § 3(b); ASP Services Exhibit to the Master Agreement § 8(e)); (3) deconversion services (*see* ASP Services Exhibit to the Master Agreement § 8(e) and § 10(c)); (4) the cost of services provided after termination (*see* ASP Services Exhibit to the Master Agreement § 10(b)); and (5) a survival clause (*see* Master Agreement § 11(i)).  Each of these provisions sets forth post-termination requirements of the Master Agreement.  While the "Information Security" provision of the Master Agreement is silent as to its applicability following termination, the Court notes that Fiserv Solutions, pursuant to § 3 of the Master Agreement, is required to hold "Client Information," which includes any information received from Bessemer that Fiserv could reasonably be expected to know is confidential, and keep said information confidential.  Master Agreement § 3.  This Section of the Master Agreement explicitly survives the termination of the Master Agreement.  *Id.*  This provision provides a contractual basis to find that Fiserv Solutions maintained a duty to protect the confidential information at issue following termination of the Master Agreement.

Further, with respect to Bessemer's argument that the terminated Master Agreement cannot serve as the basis for Fiserv's duty to protect Bessemer's confidential information following Bessemer's April 11, 2018 notice of termination, the allegations of the Complaint tend to establish either: (1) that the Master Agreement was not, in fact, terminated; or (2) despite the notice of termination, the parties continued to act according to the Master Agreement.  The Court notes that Bessemer's Complaint contains many allegations, seemingly in support of its claim for breach of the Master Agreement, regarding Fiserv's provision of allegedly deficient account processing services from July 2018 until at least May 2019.  *See* Compl. ¶¶ 88-110, ECF No. 48.  Fiserv

Solutions's duty to provide account processing services clearly arises exclusively from the Master Agreement.[8] Thus, as currently pled, Bessemer's Complaint sets forth facts which tend to establish that, despite the April 11, 2018 notice of termination, the parties continued to act as though the Master Agreement had not been terminated.[9]  In light of Section 3 of the Master Agreement and Bessemer's allegations regarding the actions of the parties following Bessemer's notice of termination, the Court concludes that any duty to protect Bessemer's confidential member information arises from the Master Agreement.

For all of the reasons discussed above, the allegations set forth in Bessemer's Complaint establish that any duty to provide effective security services and to protect Bessemer's confidential member information is contractual in nature, even after Bessemer's April 11, 2018 notice of termination.  As such, Bessemer's negligence claim, which relies on allegations of Bessemer's deficient security practices, is barred by the gist of the action doctrine.  The Court finds that amendment as to Bessemer's negligence claim would be futile.  Accordingly, the Court will grant Fiserv's Motion to Dismiss as to this claim and dismiss Bessemer's negligence claim with prejudice.

ii.     Negligent Misrepresentation Claim (Count VI)

---

[8] To the extent that Bessemer asserts that Fiserv provided these services pursuant to the purported Replevin Action settlement agreement, the Court notes that the purported Replevin Action settlement agreement is dated October 19, 2018, and at least some of the allegedly deficient account processing services were allegedly provided between the alleged termination of the Master Agreement in April 2018 and the execution of the purported Replevin Action settlement agreement in October 2018.  *See* Compl. ¶¶ 88-110, ECF No. 48.  Further, the purported Replevin Action settlement agreement is silent as to account processing services.  Finally, as explained in detail below, Fiserv undertook no additional duty by way of the purported Replevin Action settlement agreement that it was not already subject to under the terms of the Master Agreement, regardless of the termination of the Master Agreement.

[9] *See EFCO Importers v. Halsobrunn*, 500 F. Supp. 152, 158 (E.D. Pa. 1980) (In a case involving a March 18, 1974 letter of termination, the United States District Court for the Eastern District of Pennsylvania explained: "Initially, I must point out that plaintiff has misconceived the effect of the actions of the parties after April 10, 1975.  Because plaintiff and defendant continued to deal with one another as they had in the past, the original agreement did not expire on this date.  Rather it continued in effect-but it was terminable at the will of either party.  The contract did not terminate until defendant began acting inconsistently with the exclusive distribution terms.  Until this time, however, the terms of the April 10, 1970 agreement defined the rights and obligations of the parties.").

To sufficiently set forth a claim for negligent misrepresentation, a plaintiff must allege "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Gongloff Contracting, L.L.C. v. L. Robert Kimball & Assocs., Architects & Engineers, Inc.*, 119 A.3d 1070, 1076 (Pa. Super. 2015) (quoting *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 277 (Pa. 2005)). In support of its negligent misrepresentation claim, Bessemer asserts that Fiserv made numerous misrepresentations regarding members' financial account information, the payment amount due to Fiserv as reflected in invoices, the capabilities and prices of Fiserv's services, the necessity of additional repairs and services, and the security of Bessemer's confidential member information. Compl. ¶ 273, ECF No. 48.

With respect to Bessemer's assertions that Fiserv provided inaccurate documents and information to Bessemer regarding members' financial account information, and other related loan and mortgage information, the Court notes that Fiserv's duty to provide account processing services is exclusively contractual in nature. The Master Agreement, the ASP Services Exhibit to the Master Agreement, and each of the Schedules thereto describe in detail the account processing services Fiserv Solutions agreed to provide to Bessemer and the costs associated with those services. Bessemer's assertions regarding inaccuracies in the documents and information provided by Fiserv to Bessemer regarding members' financial account information, and other related loan and mortgage information, are assertions that Fiserv did not provide effective and accurate account processing services, and are thus governed by the Master Agreement. The ASP Services Exhibit to the Master Agreement explicitly provides that "Fiserv [Solutions] represents and warrants that: . . . (ii) Fiserv [Solutions] will perform Services accurately provided that Client supplies accurate

data and information . . . ."  ASP Services Exhibit to the Master Agreement § 4(e).  As such, the

duty to provide the financial account services at issue and the duty to do so accurately both arise

from the Master Agreement.  With regard to Bessemer's assertions regarding inaccurate invoices,

the Court notes that the parties' requirements regarding invoices and billing are also provided in

the Master Agreement.  *See* Master Agreement § 2(d); § 10(b), ASP Services Exhibit § 10.  The

specific costs associated with the services provided pursuant to the Master Agreement are also

explicitly set forth in the Schedules to the ASP Services Exhibit of Master Agreement.  Thus, to

the extent that Fiserv overcharged Bessemer in any particular invoice, any claim asserting such an

overcharge lies in contract.

Bessemer's argument regarding continued incorrect billing, as well as continued

misrepresentations respecting Bessemer member financial account information, following

Bessemer's April 11, 2018 notice of termination is unavailing.  The Court again notes that both

the invoices at issue and the information provided in the course of Fiserv's provision of account

processing services are explicitly created by and subject to the terms of the Master Agreement.

Further, as discussed above, Bessemer alleges that Fiserv continued to provide account processing

services to Bessemer after Bessemer served its notice of termination.  Compl. ¶¶ 88-110, ECF No.

48.  The ASP Services Exhibit to the Master Agreement provides:

> Upon *termination* or expiration of  the Agreement or an Exhibit, Services provided
> after the applicable *termination date*, expiration date, or final processing date
> specified by Client will be provided subject to Fiserv [Solutions]'s capacity and
> will be invoiced at then current fees under the applicable Schedule plus a holdover
> premium of 25%, unless such holdover is due to Fiserv [Solutions]'s action or
> inaction.

ASP Services Exhibit to the Master Agreement § 10(b) (emphasis added).  As alleged, Fiserv

continued to provide "Services" after the purported termination date, and "Services" are subject to

the Master Agreement's accuracy requirement and invoice provisions.  Thus, Fiserv's duty to

provide accurate information regarding members' financial account information and accurate invoices arose from the Master Agreement even after Bessemer's purported termination.  As such, any assertions that these representations constitute negligent misrepresentations are barred by the gist of the action doctrine.

The Master Agreement also contains provisions which detail Fiserv Solutions's duty to provide effective security with respect to Bessemer's confidential information, its duty to notify Bessemer of unauthorized access to its confidential information, and its duty to address issues with regard to security.  Master Agreement § 4(a)-(b).  To the extent that Bessemer asserts that Fiserv misrepresented that Fiserv's security system satisfied the requirements of the Master Agreement, such a claim necessarily arises under the terms and requirements of the Master Agreement.  Further, with respect to any representations regarding the necessity of additional repairs and services, the Master Agreement also contains a provision that requires Fiserv Solutions to provide a list of compatible equipment and software in the event that Bessemer elects to provide its own equipment.  *See* ASP Services Exhibit to the Master Agreement § 5(b).  To the extent Bessemer alleges that Fiserv advised Bessemer to acquire or repair incompatible equipment or software, Fiserv Solutions's duty to provide accurate information arises under this provision, as well as ASP Services Exhibit to the Master Agreement Section 4(e), and not in tort.   For these reasons, any assertion of a negligent misrepresentation with respect to Fiserv's alleged representation that its security system satisfied the requirements of the Master Agreement or its alleged representation regarding the necessity of certain equipment, services, repairs, or software is barred by the gist of the action doctrine.

As discussed above, Bessemer has not set forth any basis or argument for this Court to conclude that Bessemer has an independent right to recovery as to Fiserv, Inc. that is not based

upon the contractual relationship between Fiserv Solutions and Bessemer.  As such, to the extent Bessemer's negligent misrepresentation claim is based upon any of the above assertions, the claim is barred by the gist of the action doctrine.

Further, to the extent that Bessemer asserts that Fiserv's February 27, 2012 email, which allegedly misrepresented that the Virtual Branch online banking website satisfied FFIEC requirements, also constituted a negligent misrepresentation, the Court finds that the Master Agreement's tort damages exculpatory clause clearly bars this claim.[10]  While parties may not contractually limit liability for intentional or grossly negligent conduct under New York law, parties to a contract may disclaim ordinary negligence claims.  *See E\*Trade Fin. Corp. v. Deutsche Bank AG*, No. 05 CIV.0902, 2008 WL 2428225, at \*27 (S.D.N.Y. June 13, 2008) ("[C]lauses limiting the amount of damages are treated the same as exculpatory clauses in general: that is, both are enforceable against ordinary negligence claims, but are unenforceable against claims of gross negligence or intentional misconduct." (quoting *Cirillo v. Slomin's Inc.*, 196 Misc.2d 922, 768 N.Y.S.2d 759, 772-73 (N.Y.Sup.2003))); *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 417 (N.Y. 1983) (Gross negligence "betokens a reckless indifference to the rights of others.").  If Bessemer can establish that Fiserv recklessly or intentionally misrepresented a material fact, Bessemer will have proven a fraudulent, and not a negligent, misrepresentation.  As such, a negligent misrepresentation claim related to the 2012 email at issue sounds in ordinary negligence, and is thus barred by the express terms of the Master Agreement.  Accordingly, for the reasons discussed above, this Court will grant Fiserv's Motion to Dismiss with respect to Bessemer's

---

[10] This clause applies to any claims arising out of or related to the Master Agreement.  Master Agreement § 7.  Bessemer's negligent misrepresentation claim asserting a misrepresentation in the 2012 email at issue clearly relates to the Master Agreement.

negligent misrepresentation claim.  The Court finds that amendment as to Bessemer's negligent misrepresentation claim would be futile, and will thus dismiss this claim with prejudice.

### iii.     Fraud/Fraudulent Inducement Claim (Count IV)

The elements of fraud are:

> (1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.

*Joyce v. Erie Ins. Exch.*, 74 A.3d 157, 166–67 (Pa. Super. 2013) (quoting *Weston v. Northampton Pers. Care, Inc.*, 62 A.3d 947, 960 (Pa. Super. 2013)).  A fraudulent inducement claim requires that "the misrepresentation was made with the specific intent to induce another to enter into a contract when the person had no duty to enter into the contract." *Goldstein v. Murland*, No. CIV.A. 02-247, 2002 WL 1371747, at *1 (E.D. Pa. June 24, 2002) (citing *In Re Allegheny Internat'l, Inc.*, 954 F.2d 167, 178 (3d Cir.1992)).

Bessemer's assertions of fraud largely mirror its assertions in support of its negligent misrepresentation claim.  Bessemer asserts that Fiserv misrepresented Bessemer's members' financial account information, the capabilities and prices of Fiserv's services, the necessity of repairs and services, the payment amount due to Fiserv as reflected in invoices, and the security of Bessemer's confidential member information.  Compl. ¶ 253, ECF No. 48.  For the same reasons discussed above with respect to Bessemer's claim for negligent misrepresentation, these assertions of fraud are barred by the gist of the action doctrine and will be dismissed with prejudice.

Bessemer also asserts, however, that Fiserv, in its October 19, 2018 correspondence which Bessemer asserts was a settlement agreement with respect to Bessemer's Replevin Action, misrepresented the amount of time that would be required for deconversion services, and that, but

for Fiserv's delays in providing deconversion services, the process could have been completed much sooner. *Id.* at ¶ 179. Bessemer alleges that Fiserv misrepresented the required lead time for deconversion services in an attempt to get Bessemer to withdraw the Replevin Action, prevent Bessemer from switching vendors at an earlier date, and extract extra fees from Bessemer while Bessemer continued using Fiserv as a vendor. *Id.* While the Master Agreement anticipates and provides for the deconversion process, it does not explicitly set forth the length of time required to complete the process or require that Fiserv Solutions provide an estimate for the amount of time that the process would require. *See* ASP Services Exhibit to the Master Agreement § 8(e); (10)(c). Bessemer asserts that Fiserv affirmatively misrepresented the amount of time required for deconversion in stating that it was not likely to occur until around June 30, 2019. While this alleged misrepresentation involves a service provided pursuant to the Master Agreement, Fiserv's duty to honestly convey information regarding the length of time required to complete the service does not, necessarily, arise from the Master Agreement.[11] Rather, these allegations seem to implicate the general societal duty not to affirmatively mislead or advise without a factual basis. *See Telwell Inc. v. Grandbridge Real Estate Capital, LLC*, 143 A.3d 421, 429 (Pa. Super. 2016); *see generally Bruno v. Erie Ins. Co.*, 106 A.3d 48 (Pa. 2014). The Court finds that these assertions sufficiently set forth a claim for fraud that lies outside of the Master Agreement at this time.[12] As such, the Court will deny Fiserv's Motion with respect to this assertion of fraud.

With respect to Bessemer's assertion of fraud in the inducement of the Master Agreement, Bessemer alleges that, prior to entering into the Master Agreement, Fiserv represented to

---

[11] It is for this same reason that the economic loss doctrine also cannot be applied to this assertion of fraud at this juncture. *See Dittman v. UPMC*, 196 A.3d 1036, 1056 (Pa. 2018) ("As this legal duty exists independently from any contractual obligations between the parties, the economic loss doctrine does not bar Employees' claim.").

[12] As discussed in further detail later in this Opinion, the Court finds that Bessemer does not sufficiently plead the existence of a contract with respect to the purported Replevin Action settlement agreement. As such, the Court refers to this claim as one for fraud as opposed to fraudulent inducement.

Bessemer, in a February 27, 2012 email, that the Virtual Branch online banking website satisfied FFIEC requirements despite the fact that Virtual Branch did not satisfy these requirements. Compl. ¶ 29-33, ECF No. 48.   In arguing that Bessemer cannot bring a claim based upon representations made prior to the execution of the Master Agreement, Fiserv relies on the Master Agreement's integration clause, which provides:

> This Agreement, including its Exhibits and Schedules, which are expressly incorporated herein by reference, constitutes the complete and exclusive statement of the agreement between the parties as to the subject matter hereof and supersedes all previous agreements with respect thereto and the terms of all existing or future purchase orders and acknowledgments.  Each party hereby acknowledges that it has not been induced to enter into this Agreement by virtue of, and is not relying on, any representation made by the other party not embodied herein, any term sheets or other correspondence preceding the execution of this Agreement, or any prior course of dealing between the parties, including without limitation any statements concerning product or service usage or the financial condition of the parties.

Master Agreement § 11(b).  The Master Agreement further contains a "Warranties" section which provides: "CLIENT ACKNOWLEDGES THAT IT HAS INDEPENDENTLY EVALUATED THE DELIVERABLES AND THEIR APPLICATION TO CLIENT'S NEEDS."  *Id.* at § 6(c).

With respect to general and vague integration clauses and disclaimers of representations made prior to the execution of a contract, the New York Court of Appeals has explained: "where the complaint states a cause of action for fraud, the parol evidence rule is not a bar to showing the fraud either in the inducement or in the execution despite an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made."  *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 598–99 (N.Y. 1959) (citations omitted).  The *Danann* Court explained that the plaintiff in that case, however, had "in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded.  Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations."  *Danann*,

157 N.E.2d at 599.   The *Danann* court further explained that, where a party has read and understood a specific disclaimer of representation clause, that party is bound by the clause.   *Id.*

With regard to the rule discussed in *Danann*, the United States Court of Appeals for the Second Circuit has explained: "[f]or [plaintiff's] argument to be persuasive, then, *Danann* must be read to require the existence of a precise identity between the misrepresentation and the particular disclaimer.   Neither *Danann* nor its progeny supports such a reading, however."   *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984).   The *Grumman* court went on to hold that "[t]he *Danann* rule operates where the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations, notwithstanding semantical discrepancies."   *Grumman*, 748 F.2d at 735.   "Thus, when a contract contains an 'omnibus statement' disclaiming that any representations outside the contract were made, it will not preclude a claim for fraud.   When, however, the contracting party disclaims 'the existence of or reliance on specified representations,' it will not be allowed to claim it entered the contract in reliance thereon."   *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 575–76 (2d Cir. 2005) (internal citation omitted) (quoting *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir.1993)).   The *Aetna* court explained:

> The specificity requirement is further relaxed when the contracting parties are "sophisticated business people," and the disclaimer clause is the result of negotiations between them.   *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 311-12, 485 N.E.2d 974 (Ct.App.1985).   Thus, in *Citibank*, the Court enforced a guarantee of corporate indebtedness which recited that it was absolute and unconditional regardless of its enforceability or any available defense, although the Court acknowledged that the term did not rise to the level of specificity described in *Danann*.   *Id.* at 312.

*Aetna*, 404 F.3d at 576.   The *Aetna* court further explained that a "general disclaimer that a party has relied on any representations of the other signatory, coupled with the disclaiming party's assertion of familiarity with a particular subject area, is specific enough to preclude a claim of

reliance on statements falling within that topic." *Id*.  Even an explicit disclaimer, however, will not be given effect "when the facts are peculiarly within the knowledge of the party invoking the disclaimer." *Id.* (quoting *Banque Arabe Et Internationale v. Md. Nat. Bank*, 57 F.3d 146, 155 (2d Cir.1995)).

In the Master Agreement, Bessemer "acknowledge[d] that it ha[d] independently evaluated the deliverables and their application to [Bessemer's] needs."  Master Agreement § 6(c).  Further, the integration clause at issue provides that the parties had "not been induced to enter into this Agreement by virtue of, and is not relying on, any representation made by the other party not embodied herein, any term sheets *or other correspondence* preceding the execution of this Agreement, . . . including without limitation any statements concerning product or service usage."  Master Agreement § 11(b) (emphasis added).  Given the relaxed specificity standard for sophisticated business entities, the disclaimer in this case is arguably sufficiently specific such that Bessemer effectively disclaimed reliance on pre-contract representations made by way of correspondence, such as the 2012 email at issue, regarding the quality and capabilities of Fiserv's products and services, such as its security system.[13]  The Court notes, however, that these provisions do not explicitly mention the level of security that would be provided by Fiserv.  The integration clause does not provide that Bessemer did not rely on a statement specifically regarding the security provided by Fiserv's systems, and the warranty does not state that Bessemer has any knowledge or familiarity regarding the provision of security services and the requirements associated with such provision.

---

[13] The Court notes that the United States District Court for the Eastern District of Michigan, in interpreting the exact same clause but applying Delaware law, has explained that "one would be hard-pressed to articulate a more comprehensive statement of anti-reliance principles than that."  *Wildfire Credit Union v. Fiserv, Inc.*, No. 14-CV-14359, 2015 WL 13840889, at *4 (E.D. Mich. Aug. 10, 2015).

The Court need not determine whether this provision is sufficiently specific at this time, however, because the Court cannot determine, at this juncture, whether the facts at issue, i.e. whether Virtual Bank was compliant with FFIEC requirements, were peculiarly within the knowledge of Fiserv at the time the representation was made. Bessemer asserts that it could not have reasonably discovered that Fiserv had misrepresented that Virtual Bank satisfied FFIEC requirements. Compl. ¶ 256, ECF No. 48. "The peculiar-knowledge exception is designed to address circumstances where a party would face high costs in determining the truth or falsity of an oral representation, and those costs are sufficiently great to render reliance upon the representation reasonable." *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998) (internal citations omitted).

The Court is limited to review of the 2014 Master Agreement in deciding the instant Motion, though it is apparent that the parties' relationship predates the 2014 Master Agreement. *See* Br. in Supp. of Mot. to Dismiss 3, ECF No. 53 ("Bessemer was a Fiserv Solutions client for nearly 40 years. Most recently, the parties renewed their relationship through a Master Agreement, dated July 1, 2014."). While the 2014 Master Agreement allows Bessemer to audit FFIEC records directly from the FFIEC and to request information regarding Fiserv Solutions's security services directly from Fiserv Solutions,[14] the Court cannot determine, at this stage, whether such provisions were also present in the agreement in place between the parties before the parties entered into the Master Agreement. For this reason, the Court cannot dismiss Bessemer's claim for fraudulent inducement of the Master Agreement based upon the Master Agreement's integration clause at this time, and the Court will deny Fiserv's Motion without prejudice as to this issue.

---

[14] *See* Master Agreement § 10(a).

Further, with respect to Fiserv's assertion that Bessemer's fraudulent inducement claim is time-barred, the Court finds that consideration of this issue would be premature in light of Bessemer's assertion of the discovery rule.  "As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause." *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005).  As discussed above, Bessemer asserts that it could not have reasonably discovered that Fiserv had misrepresented that Virtual Bank satisfied FFIEC requirements.  Compl. ¶ 256, ECF No. 48.  The Court cannot determine, based on the record before it, when Bessemer could have discovered the fact that it had been injured and by what cause.  This inquiry is essential in determining whether Bessemer's fraudulent inducement of the Master Agreement claim is barred by the applicable two-year statute of limitations.   For this reason, the Court cannot dismiss Bessemer's claim for fraudulent inducement of the Master Agreement based upon the applicable statute of limitations at this time, and the Court will deny Fiserv's Motion without prejudice as to this issue to raise the issue at a later date.

The Court also cannot determine at this juncture whether Bessemer's claim for fraudulent inducement of the Master Agreement is barred by the gist of the action doctrine.  "Although under Pennsylvania law, the gist of the action doctrine is applicable to claims of fraud in the performance of a contract, it is generally held not to apply to claims of fraud in the inducement." *Partners Coffee Co., LLC v. Oceana Servs. & Prod. Co.*, 700 F. Supp. 2d 720, 728 (W.D. Pa. 2010) (citing *Advanced Tubular Prods. v. Solar Atmospheres, Inc.*, 149 Fed.Appx. 81, 85 (3d Cir. 2005)).  While the Master Agreement provides that Fisev's security system will "protect the security and confidentiality of customer information," and while it further provides that Fiserv is subject to

FFIEC examinations, it is not clear whether the parties intended to contract for a security system that was compliant with FFIEC requirements. *See* Master Agreement § 4(a); § 10(a).

### iv.   Constructive Fraud Claim (Count V)

A claim for constructive fraud "requires a false statement (or omission) on which the other party acts to his injury, without the element of dishonest intent." *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 784 (E.D. Pa. 2008). The Court need not address Bessemer's constructive fraud claim in detail, as the allegations set forth in support of this claim are identical to those which this Court has already held are barred by the gist of the action doctrine. Further, for the same reasons discussed above respecting Bessemer's assertion of a negligent misrepresentation claim with respect to Fiserv's 2012 email, Bessemer's claim for constructive fraud, which does not require a finding of dishonest intent, is barred by the Master Agreement's tort damages exculpatory clause. For these reasons, this Court will grant Fiserv's Motion as to Bessemer's constructive fraud claim and dismiss this claim with prejudice.

### v.   Conversion Claim (Count VII)

Under Pennsylvania law, "conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification." *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 581 (Pa. Super. 2003) (citing *Chrysler Credit Corporation v. Smith*, 643 A.2d 1098, 1100 (Pa. Super. 1994)). The United States District Court for the Eastern District of Pennsylvania has held that, "[i]f a plaintiff's rights to property are defined by a contract with a defendant, then that plaintiff may not sue that defendant in tort for conversion of that property." *Phoenix Four Grantor Tr. #1 v. 642 N. Broad St. Assocs.*, No. CIV. A. 00-597, 2000 WL 876728, at *9 (E.D. Pa. June 29, 2000). In support of its claim for conversion, Bessemer asserts that it has a property interest

in its account records and information, and that this property interest is recognized in Section 3(b) of the Master Agreement, which discusses "Client Information."  Compl. ¶ 281, ECF No. 48.

Bessemer relies on the Master Agreement in arguing that it has a legal right to the property at issue.  The Master Agreement defines "Client Information," sets forth the parties' responsibilities with respect to Client Information, and sets forth what information is owned by Bessemer and what information that is owned by Fiserv Solutions.  *See* Master Agreement § 3(a)-(c).  The Master Agreement further provides the procedure for the return of Client Information and Files following the termination or expiration of the Master Agreement, and sets forth conditions that must be satisfied prior to the return of such information.  *Id.* at § 3(b); ASP Services Exhibit to the Master Agreement § 8(e).  Bessemer acknowledges that the information at issue is defined in the Master Agreement as information that it retains ownership over.  *See* Compl. ¶ 281, ECF No. 48; Br. in Opp'n to Mot. to Dismiss, ECF No. 54.  To the extent that Fiserv Solutions[15] was required to return this information at a certain point, this duty is clearly defined by and governed by the express terms of the Master Agreement.  Bessemer's assertions that Fiserv converted the information at issue after termination of the agreement is unavailing, as the Master Agreement provides the procedure for the return of Client Information and Files *following the termination* or expiration of the Master Agreement.  Accordingly, Bessemer's conversion claim is barred by the gist of the action doctrine.  Amendment of this claim would be futile, and the Court will thus grant Fiserv's Motion as to Bessemer's conversion claim and dismiss the claim with prejudice.[16]

---

[15] The Court again notes that Bessemer has not set forth any basis or argument for this Court to conclude that Bessemer has an independent relationship with Fiserv, Inc. such that Fiserv, Inc. owes a separate duty to Bessemer that is not based upon the contractual relationship between Fiserv Solutions and Bessemer.

[16] Bessemer also alleges in conclusory fashion that it has a right to funds deposited in members' share draft accounts and funds due and owing to Bessemer and its members.  Compl. ¶ 282, ECF No. 54.  Bessemer provides no argument or support regarding Fiserv's alleged conversion of this property in its Brief in Opposition.  *See* Br. in Opp'n 18, ECF No. 54 ("Bessemer sufficiently alleges Fiserv's unauthorized dominion over Bessemer's property (i.e., its account records and information) and data.").  The Court again notes that the parties' requirements regarding invoices, billing,

33

### 2.   Remaining Claims

Fiserv also asserts that each of the claims not addressed above fails for failure to plead all essential elements.

#### i.   Bailment Claim (Count VIII)

"A bailment is a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it." *Price v. Brown*, 680 A.2d 1149, 1151–52 (Pa. 1996) (citing *Smalich v. Westfall*, 440 Pa. 409, 413, 269 A.2d 476, 480 (1970)).  A cause of action sounding in bailment "arises if the bailor can establish that personalty has been delivered to the bailee, a demand for return of the bailed goods has been made, and the bailee has failed to return the personalty." *Price*, 680 A.2d at 1152.[17]

The Court finds that Bessemer sufficiently sets forth a claim for bailment at this stage of the proceedings.  Bessemer alleges that it provided its account records and information in a tangible format to Fiserv, and that Fiserv has not returned these records and has otherwise damaged these records despite Bessemer's request that Fiserv return the account information and records.  Compl. ¶¶ 292-297, ECF No. 48.  While the Court acknowledges Fiserv's arguments regarding whether the information and records at issue include only electronic personal identifying information and

---

and provision of account processing services are provided by the Master Agreement.  Master Agreement § 2(d); § 10(b), ASP Services Exhibit § 10.

[17] The Court notes that "it is well established that the parties to a bailment enjoy a contractual relationship." *Mon River Towing, Inc. v. Indus. Terminal & Salvage Co.*, No. CIV.A 06-1499, 2009 WL 904701, at *5 (W.D. Pa. Mar. 31, 2009).  New York law's definition of bailment is materially similar to Pennsylvania's definition.  "Under New York law, 'bailment' is defined as a 'delivery of personal property for some particular purpose, or a mere deposit, upon a contract express or implied, providing that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be.'" *Morgan Stanley & Co. Inc. v. JP Morgan Chase Bank, N.A.*, 645 F. Supp. 2d 248, 256 (S.D.N.Y. 2009) (quoting *Herrington v. Verrilli*, 151 F.Supp.2d 449, 457 (S.D.N.Y. 2001)).

whether Fiserv maintained exclusive control over the records and information, the Court reviews the allegations of a complaint in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).   In doing so, the Court finds that Plaintiff has sufficiently alleged a claim for bailment at this time.   Fiserv's Motion to Dismiss will be denied as to this issue without prejudice to raise the issue at a later date.

### ii.   Unjust Enrichment Claim (Count XI)

In Pennsylvania, "the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract." *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006).   Even where a contract would preclude recovery under unjust enrichment, a plaintiff may plead a claim for unjust enrichment in the alternative where "(i) the contract at issue covers only a part of the relationship between the parties, or [where] (ii) the existence of a contract is uncertain or its validity is disputed by the parties." *Vantage Learning (USA), LLC v. Edgenuity, Inc.*, 246 F. Supp. 3d 1097, 1100 (E.D. Pa. 2017) (footnotes omitted) (citations omitted).

In summarizing the basis of its unjust enrichment claim, Bessemer explains: "Bessemer asserts a claim for unjust enrichment to recover overpayments not justly due to Fiserv. (Compl. ¶¶ 321-324).   Fiserv has repeatedly issued invoices that are erroneous, false, and overstate the amount that Bessemer actually owed Fiserv.  (Compl. ¶ 128)."   Br. in Opp'n to Mot. to Dismiss 7, ECF No. 54.   Bessemer further describes the Master Agreement as a "binding contract[] under which Bessemer performed." *Id.* at 6.

As discussed above with respect to Bessemer's negligent misrepresentation claim, the parties' requirements regarding invoices and billing are provided in the Master Agreement.   Master Agreement § 2(d); § 10(b), ASP Services Exhibit § 10.   Further, the costs of the services provided

pursuant to the Master Agreement are also provided by the Schedules to the ASP Services Exhibit to the Master Agreement.  To the extent that Fiserv overcharged Bessemer, any claim asserting such an overcharge lies in contract.

Further, Bessemer's argument regarding continued incorrect billing following Bessemer's April 11, 2018 notice of termination are unavailing.  As discussed above, the invoices at issue and the cost of services provided by Fiserv were created by and are subject to the Master Agreement. Bessemer alleges that Fiserv continued to provide account processing services to Bessemer after Bessemer served its notice of termination.  Compl. ¶¶ 88-110, ECF No. 48.  The ASP Services Exhibit provides:

> Upon termination or expiration of  the Agreement or an Exhibit, Services provided after the applicable termination date, expiration date, or final processing date specified by Client will be provided subject to Fiserv's capacity and will be invoiced at then current fees under the applicable Schedule plus a holdover premium of 25%, unless such holdover is due to Fiserv's action or inaction.

ASP Services Exhibit to the Master Agreement § 10(b).  As alleged, Fiserv continued to provide "Services" after the purported termination date, and "Services" are subject to the Master Agreement's invoice provisions and costs provided by the applicable schedules.  Accordingly, under the allegations of Bessemer's Complaint, the Master Agreement covers the entire relationship between Fiserv and Bessemer with respect to billing, invoices, and costs of services, even after Bessemer's alleged termination of the Master Agreement.  Further, the parties do not contest the validity or enforceability of the Master Agreement, as Bessemer relies on it in asserting its breach of contract claim and Fiserv relies on the Master Agreement's provisions in bringing its Motion to Dismiss.  As such, Bessemer fails to state a claim for unjust enrichment that is plausible on its face.  Amendment as to this claim would be futile, and this Court will thus grant Fiserv's Motion to Dismiss as to this claim and dismiss Bessemer's unjust enrichment claim with prejudice.

### iii.    Breach of the Purported Replevin Action Settlement Agreement (Count I) and Promissory Estoppel Claim (Count XII)

Bessemer's claim for breach of the purported Replevin Action settlement agreement and its claim for promissory estoppel are pled in the alternative, and both arise out of the same nucleus of facts.  *See* Br. in Opp'n to Mot. to Dismiss 7, ECF No. 54.  Under the purported Replevin Action settlement agreement, Bessemer asserts that: (1) the parties were required to work in good faith toward settling Bessemer's claim for damages; (2) Bessemer was required to withdraw the Replevin Action, pay outstanding and future invoices, and pay for deconversion of Bessemer's records by the date of deconversion; and (3) Fiserv was required to provide deconversion services to Bessemer.  Compl. ¶ 161, ECF No. 48.  Bessemer asserts that Fiserv failed to perform in accordance with the purported Replevin Action settlement agreement by: (1) initially rejecting, before eventually accepting, Bessemer's payment of outstanding invoices; (2) requiring Bessemer to pay for deconversion services before beginning the process of deconversion; (3) stalling the deconversion process; and (4) sending an amendment to the terminated Master Agreement in an attempt to modify the terms of the Replevin Action settlement agreement.  *Id.* at ¶¶ 164-179.

To state a claim for breach of contract, a party must allege: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages."  *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa. Super. 2002)).  Under Pennsylvania law, "[t]o form a contract, there must be an offer, acceptance, and consideration."  *Reed v. Pittsburgh Bd. of Pub. Educ.*, 862 A.2d 131, 134 (Pa. Commw. Ct. 2004) (citing *Koken v. Steinberg*, 825 A.2d 723 (Pa. Commw. Ct. 2003)).  "Offering to perform a preexisting legal duty, i.e., something one is already bound to do, does not constitute

consideration." *In re 400 Walnut Assocs., L.P.*, 454 B.R. 60, 71–72 (Bankr. E.D. Pa. 2011) (citing *Vitow v. Robinson*, 823 A.2d 973, 977 (Pa. Super. 2003)).

Bessemer's assertions of breach of contract with respect to the purported Replevin Action settlement agreement rely exclusively on Fiserv's alleged failure to provide sufficient and timely deconversion services. Fiserv, however, undertook no additional duty by way of the purported Replevin Action settlement agreement with respect to provision of deconversion services. With regard to deconversion services, the correspondence which Bessemer asserts constitutes the Replevin Action settlement agreement explicitly provides: "Fiserv will, as the Master Agreement requires, fulfill its contractual obligations to work with Bessemer to effect deconversion." Compl. Ex. 19 at 2, ECF No. 48. The purported Replevin Action settlement agreement further provides: "Fiserv's intent is to perform its contractual obligations under the Master Agreement fully, including with respect to Bessemer's plan to deconvert and transition to a new service provider." *Id.* at 1. Bessemer concedes that "Fiserv's agreement to provide Bessemer with certain deconversion services" was "measured by the standards in the then-terminated Master Agreement." Br. in Opp'n to Mot. to Dismiss 24, ECF No. 54. Further, the Master Agreement affirmatively required Fiserv Solutions to provide deconversion services *following termination* of the Master Agreement under the Section titled "Term and Termination; Deconversion." *See* ASP Services Exhibit to the Master Agreement § 8(e) ("Upon expiration or termination of the Agreement or any schedule to this Exhibit, . . . Fiserv shall provide such information and assistance as is reasonable and customary to enable Client to deconvert from the Fiserv system . . . ."). With respect to payment for deconversion services, the purported Replevin Action settlement agreement provides: "*Bessemer understands that the Master Agreement requires* that it pay Fiserv for the fees and expenses of deconversion, and that such amounts be paid before the agreed-upon

deconversion date."  Compl. Ex. 19 at 2, ECF No. 48 (emphasis added).  The Master Agreement also provides: "Deconversion Charges.  Client agrees to pay Fiserv's then current deconversion charges in connection with Client's deconversion from the Fiserv System."  ASP Services Exhibit to the Master Agreement § 10(c).

Upon review of the Master Agreement and the purported Replevin Action settlement agreement, it is clear Fiserv undertook no additional responsibilities by way of the purported Replevin Action settlement agreement.  Rather, the parties explicitly agreed that Fiserv would provide the deconversion services that it was already obligated to perform in the manner provided by the Master Agreement, and Bessemer agreed to pay Fiserv for deconversion services as required by the Master Agreement.  The parties referenced the preexisting requirements of the Master Agreement in the correspondence which Bessemer asserts constitutes the Replevin Action settlement agreement.  These requirements existed under the Master Agreement at the time of the purported Replevin Action settlement agreement, and this purported settlement agreement in no way changed those requirements.  The Master Agreement provides the parties' responsibilities with respect to deconversion, and Bessemer has thus not set forth sufficient consideration with respect to the Replevin Action settlement agreement.

To the extent the deconversion services provided were insufficient under the terms of the Master Agreement, Bessemer may pursue a claim for breach of contract under the Master Agreement.  To the extent that Bessemer can establish that Fiserv affirmatively misrepresented the lead time required for deconversion services in an effort to prevent Bessemer from switching vendors at an earlier date, to extract extra fees from Bessemer while Bessemer continued using Fiserv as a vendor, and/or to get Bessemer to withdraw its Replevin Action, the Court has already held that Bessemer sufficiently stated a claim for fraud.  As alleged, however, Bessemer has not

sufficiently set forth a claim for breach of contract with respect to the purported Replevin Action settlement agreement.  Accordingly, this Court will grant Fiserv's Motion as to this claim and dismiss Bessemer's claim for breach of contract, only as it relates to the purported Replevin Action settlement agreement, with prejudice.

Bessemer also asserts that the terms of the Replevin Action settlement agreement are enforceable under the theory of promissory estoppel to the extent that the agreement itself is not an enforceable contract.  Br. in Opp'n to Mot. to Dismiss 7, ECF No. 54.  With respect to the elements of a claim for promissory estoppel, the United States Court of Appeals for the Third Circuit has explained:

> Promissory estoppel allows the court to enforce a party's promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise.

*Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) (citing *Cardmone v. Univ. of Pittsburgh*, 253 Pa.Super. 65, 74, 384 A.2d 1228, 1233. (1978)).  "Courts have held that breach of contract and promissory estoppel may be pleaded in the alternative, but that if the court finds that a contract exists, the promissory estoppel claim must fall."  *Iversen Baking Co. v. Weston Foods, Ltd.*, 874 F. Supp. 96, 102 (E.D. Pa. 1995) (citing *Carlson v. Arnot–Ogden Mem. Hosp.*, 918 F.2d 411, 416 (3d Cir.1990); *Atlantic Paper Box Co. v. Whitman's Chocolates*, 844 F. Supp. 1038, 1043 (E.D. Pa.1994); *United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1135 (E.D. Pa.1991)).  *See also Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) ("In light of our finding that the parties formed an enforceable contract, relief under a promissory estoppel claim is unwarranted.").

Bessemer's claim for promissory estoppel fails because an enforceable contract, the Master Agreement, controls with respect to Fiserv's provision of deconversion services.  As such, this Court will grant Fiserv's Motion as to this claim and dismiss Bessemer's claim for promissory estoppel with prejudice.

### iv.   Misappropriation of Trade Secrets Claim (Count IX) and Defend Trade Secrets Act Claim (Count X)

In support of both its claim for misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act ("PUTSA") and its claim for violation of the federal Defend Trade Secrets Act ("DTSA"), Bessemer asserts that its trade secrets include:

> [I]ts member information, accounts, account records and information, credit information, and methods, programs, and codes used by authorized members to access online banking accounts and to conduct and transact business through accounts maintained with Bessemer (including, without  limitation, withdrawing and transferring funds), and confidential information regarding linked accounts accessible through Bessemer's online banking system that permit Bessemer and its members to transfer or withdraw funds from accounts maintained at Bessemer as well as other financial institutions.

Compl. ¶ 302, ECF No. 48.  Bessemer asserts that Fiserv misappropriated Bessemer's trade secrets by acquiring them by way of improper means consisting of false acts, omissions, concealments, and misrepresentations specifically regarding the security controls that would be used to protect Bessemer's trade secrets.  *Id.* at ¶ 307.  Bessemer asserts that Fiserv further misappropriated Bessemer's trade secrets by using the trade secrets, and failing to return them, after Fiserv had been terminated as Bessemer's vendor and by exposing the trade secrets to the threat of hackers. *Id.* at ¶¶ 308-309.  Fiserv argues that the purported trade secrets asserted by Bessemer do not constitute protectable trade secrets because they have no independent economic value.  Br. in Supp. of Mot. to Dismiss 20, ECF No. 53.  Fiserv further argues that Bessemer has not sufficiently alleged that Fiserv misappropriated Bessemer's trade secrets because Fiserv was entitled, under the Master Agreement, to access and use Bessemer's information through the completion of the

deconversion process, and, thus, Fiserv neither acquired the trade secrets through improper means or disclosed the trade secrets. *Id.* at 21.

In discussing the DTSA and the PUTSA, the United State District Court for the Eastern District of Pennsylvania has explained:

> Although the DTSA and the PUTSA use different wording to define a trade secret, they essentially protect the same type of information. Both define a trade secret as information that: (a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use.

*Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018) (citing 18 U.S.C. § 1839(3); 12 Pa.C.S § 5302). Both the DTSA and the PUTSA define misappropriation of a trade secret as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent." 12 Pa.C.S § 5302; 18 U.S.C. § 1839(5).

Fiserv cites to *Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, a United States District Court for the District of Colorado case, in support of its assertion that Bessemer's purported trade secrets do not constitute trade secrets. The *Bellwether* court held:

> The Court finds that the payment card data has no independent economic value. Payment card data (including cardholder names, credit or debit card numbers, and corresponding CVVs) are akin to passwords and usernames that provide access to something of value. *See* [*N. Star Media, LLC v. Winogradsky-Sobel*, No. CV 11-466 PSG (CWX), 2011 WL 13220157, at *11 (C.D. Cal. May 23, 2011)]. Like the passwords and usernames at issue in *North Star Media*, payment card data merely provides access to an individual's line of credit with a financial institution or money in an account with a financial institution. Absent a connection to either a line of credit or a bank account, payment card data are simply a string of alpha or numeric (or indeed other typographical) symbols. Thus, the Court concludes that payment card data have no independent economic value.
> . . . .
> In addition to not having independent economic value, payment card data do not derive their value from their nondisclosure. Plaintiff argues that disclosure of payment card data to a third party renders "computer data for the specific payment

card ... susceptible to fraud" and therefore the data loses its integrity. (ECF No. 44 ¶ 119.)  This is partially correct.  While disclosure to unauthorized third parties may make the underlying data susceptible to fraud, disclosure to authorized third parties (such as merchants) is the *raison d'être* of payment cards.   In other words, disclosure to authorized parties is what makes the payment card valuable because it provides access to a line of credit or money in an account.   Thus, because it derives value solely from their authorized disclosure, payment card data are not a trade secret.  *See* 18 U.S.C. § 1839(3).

*Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F. Supp. 3d 1070, 1087–88

(D. Colo. 2018).  The *Bellwether* court cited to *North Star Media, LLC v. Winogradsky-Sobel*, No.

CV 11-466 PSG (CWX), 2011 WL 13220157, (C.D. Cal. May 23, 2011), a United States District

Court for the Central District of California case wherein the court explained:

> North Star's user name and password lack *independent* economic value as they were merely the key that guarded the presumably valuable information.  In fact, the gravamen of North Star's Complaint is not that Defendants took North Star's user name and passwords in order to profit from them, but rather that Defendants used the user name and passwords to transfer, to themselves, rights in North Star's music library in order to profit off those rights.

*N. Star Media, LLC*, 2011 WL 13220157, at *11.

While the Court finds the reasoning and analysis set forth in *Bellwether* and *North Star Media* cogent, the Court cannot determine at this stage of the proceedings whether the "member information" and other purported trade secrets asserted by Bessemer have some independent economic value in this case.  *Bellwether* dealt exclusively with the disclosure of payment card data, and *North Star Media* involved alleged unauthorized use of usernames and passwords to obtain rights to a music library.  To the extent that the information at issue in this case merely serves as a key to the true thing of value (i.e. money in a financial account), then the information does not constitute trade secrets under the holdings of *Bellwether* and *North Star Media*.  Bessemer has alleged that it provided several types of trade secret to Fiserv, and the Master Agreement itself provides that "Client Information" which may be provided to Fiserv by Bessemer could include

43

"(A) trade secrets and proprietary information; (B) customer lists, business plans, information security plans, business continuity plans, and proprietary software programs . . . ." Master Agreement § 3(a)(i). Accordingly, the Court cannot determine whether the information at issue constitutes a trade secret at this time, and will deny Fiserv's Motion as to this issue without prejudice. Further, the Court finds that Bessemer's Complaint sufficiently alleges that Fiserv acquired Bessemer's purported trade secrets by improper means. For the reasons discussed above, Fiserv's Motion will be denied with respect to Bessemer's claims under the PUTSA and DTSA.

### v.    Unfair and Deceptive Trade Acts and Practices Claims (Count III)

Bessemer's claims for unfair and deceptive trade acts and practices under the laws of Pennsylvania, Wisconsin, New York, and Ohio, as well as other unidentified states, largely mirror its assertions in support of its fraud and negligent misrepresentation claims. Bessemer asserts that Fiserv misrepresented Bessemer's members' financial account information, the capabilities and prices of Fiserv's services, the necessity of repairs and services, the payment amount due to Fiserv as reflected in invoices, and the security of Bessemer's confidential member information. Compl. ¶¶ 238; 240, ECF No. 48. Bessemer asserts that these actions have harmed Bessemer and its more than 4,000 members who utilized Fiserv's account processing system and online banking platform. *Id.* at ¶ 239. As a result of Fiserv's alleged misrepresentations, concealments, omissions, and acts, Bessemer alleges that Bessemer dealt with its members in an incorrect manner based upon misinformation provided by Fiserv, and that it made overpayments to Fiserv. *Id.* at ¶ 242. Bessemer further alleges that, in relying on Fiserv's alleged misrepresentations, both Bessemer and its members entrusted their confidential information to Fiserv's insufficient security system, unknowingly placing such information at risk of hackers and security breaches. *Id.* at ¶¶ 242; 251.

Bessemer alleges that it and its members paid to use this insufficient system, and were required to

pay costs to mitigate these security risks. *Id.* at ¶ 251.

With respect to private causes of action, the Pennsylvania Unfair Trade Practices and

Consumer Protection Law ("UTPCPL") provides:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater.

73 P.S. § 201-9.2(a) (footnote omitted).   The UTPCPL defines person as: "natural persons,

corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal

entities." 73 P.S. § 201-2(2).

The gist of the action doctrine may be applied to claims arising under the UTPCPL. *See*

*Knight v. Springfield Hyundai*, 81 A.3d 940, 951 (Pa. Super. 2013) (evaluating whether a UTPCPL

claim was barred by the gist of the action doctrine); *see also Pansini v. Trane Co.*, No. CV 17-

3948, 2018 WL 1172461, at *7 (E.D. Pa. Mar. 6, 2018) (holding that a UTPCPL claim was barred

by the gist of the action doctrine (citing *Dixon v. Nw. Mut.*, 146 A.3d 780, 788-790 (Pa. Super.

2016); *Knight v. Springfield Hyundai*, 81 A.3d 940, 950-51 (Pa. Super. 2013))).   For the same

reasons discussed above with respect to Bessemer's fraud and misrepresentation claims,

Bessemer's assertions regarding Fiserv's alleged misrepresentations of Bessemer's members'

financial account information, the capabilities and prices of Fiserv's services, the necessity of

repairs and services, the payment amount due to Fiserv as reflected in invoices, and the security of

Bessemer's confidential member information during the course of Fiserv's performance under the

Master Agreement and after Bessemer's provision of its April 11, 2018 notice of termination are

barred by the gist of the action doctrine.[18]   As such, Bessemer's claim for a UTPCPL violation based upon such allegations will be dismissed with prejudice.

The Court has also held, however, that Bessemer's claim for fraudulent inducement regarding Fiserv's February 27, 2012 email and its claim for fraudulent misrepresentation regarding the October 19, 2018 correspondence which Bessemer asserts was a settlement agreement survive at this stage of the proceedings.   If Bessemer has standing to bring a private action under the UTPCPL, these claims also sufficiently state a claim for unfair or deceptive acts under the UTPCPL.   *See* 73 P.S. § 201-2(4)(vii); 73 P.S. § 201-2(4)(xxi).   Bessemer cites to the Superior Court of Pennsylvania's decision in *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641 (Pa. Super. 1990) in support of its argument that it has standing in this case to bring a UTPCPL claim on behalf of its members in a representative capacity.   Br. in Opp'n to Mot. to Dismiss 16, ECF No. 54.

Courts in Pennsylvania have recognized that representatives may bring UTPCPL actions on behalf of those they represent in certain circumstances.   In order to bring a private cause of action under the UTPCPL, a claimant must be: "a 'person,' who made a 'purchase,' 'primarily for personal, family, or household purposes.'"   *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 645 (Pa. Super. 1990), *aff'd*, 605 A.2d 798 (Pa. 1992).   In *Valley Forge*, the Superior Court of Pennsylvania held that a condominium association was a "person" under the UTPCPL authorized by statute to sue on behalf of condominium unit owners, that the purchase of a roof was a "purchase" giving rise to liability on the part of a party who provided a warranty on the roof, and that, giving the plaintiff the benefit of all facts pled and all favorable inferences reasonably derivable therefrom, the primary purpose for the condominium association's

---

[18] With the exception of Fiserv's alleged misrepresentation in the October 19, 2018 correspondence which Bessemer asserts was a settlement agreement regarding the amount of time required for deconversion services.

purchase was to cover a residential unit, and was thus purchased "primarily for a personal, family, or household use."[19] *Valley Forge*, 574 A.2d at 645-649.  The Superior Court of Pennsylvania explained that, in resolving the primary purpose inquiry, the court looks "solely to the *purpose* of the purchase, not the *type of product* purchased."  *Id.* at 648.  The *Valley Forge* court further explained that, "[w]hen a condominium association acts in its representative capacity on behalf of unit owners, it is the purpose of the unit owners' purchases which controls for the purposes of the primary purpose restriction of 73 P.S. § 201–9.2."  *Id.*

Courts interpreting and applying *Valley Forge* have held that representatives other than condominium associations may bring suit on behalf of those they represent.  *See Am. Fed'n of State Cty. & Mun. Employees v. Ortho-McNeil-Janssen Pharm., Inc.*, No. 08-CV-5904, 2010 WL 891150, at *4 (E.D. Pa. Mar. 11, 2010) (holding that because third-party payors "purchased the fentanyl patches on behalf of their members in their representative capacity, and those patches were purchased for the personal, family and household use of their members, Plaintiffs have properly asserted a claim under the UTPCPL[,]" and explaining that "Pennsylvania courts, however, have long recognized the ability of third-party trusts and associations to assert UTPCPL claims on behalf of their constituent members based on the statute's broad definition of 'person.'"); *In re Actiq Sales & Mktg. Practices Litig.*, 790 F. Supp. 2d 313, 326 (E.D. Pa. 2011) (holding that a third-party payor constituted a "person" under the UTPCPL "who purchases or leases goods or services primarily for personal, family or household purposes.").  *But see Meyer v. Cmty. Coll. of*

---

[19] The Court notes that, while the plaintiff in *Valley Forge* had statutory standing to represent condominium unit holders, the Superior Court of Pennsylvania explained "[i]n *1000 Grandview Association v. Mt. Washington Association*, 290 Pa.Super. 365, 434 A.2d 796 (1981), this Court held that even in absence of express legislative authorization for an incorporated association of condominium unit owners to sue in a representative capacity on behalf of unit members, representative standing would nonetheless be recognized generally." *Valley Forge*, 574 A.2d at 645 (1990).

*Beaver Cty.*, 93 A.3d 806, 815 (Pa. 2014) (holding that the UTPCPL's definition of person does not include political subdivision agencies).

A credit union may, in some instances, bring a claim on behalf of its members.  *See N.B.A. Credit Union, Inc. v. Hargrove*, 846 F. Supp. 387, 396 (E.D. Pa.), *aff'd*, 46 F.3d 1117 (3d Cir. 1994) (holding that the plaintiff credit union and its members' interests were not coextensive, and that credit union lacked standing in that case to assert its members' claims, but explaining that the case raised "the threshold issue of [plaintiff credit union's] standing to assert the claims of its members" and citing to the United States Supreme Court's decision in *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977)).  In *Hunt*, the Supreme Court explained:

> Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt*, 432 U.S. at 343.

In the present case, Bessemer asserts that it is a member-owned, federally chartered not-for-profit credit union.  Compl. ¶ 10, ECF No. 48.  Bessemer asserts that it purchases the goods and services at issue, which includes account processing services, online banking capabilities, and member information security, primarily for the personal, family, and household purposes of its members, who are individual consumers.  *Id.* at ¶ 236.  Bessemer's claim for a UTPCPL based upon either the 2012 email or the 2018 correspondence which Bessemer refers to as the Replevin Action settlement agreement fail, however, because Bessemer fails to allege facts sufficient to establish that its members would have the right to bring suit in their own right.  The UTPCPL violations at issue require Bessemer to establish reliance.  *See Kern v. Lehigh Valley Hosp., Inc.*, 108 A.3d 1281, 1289–90 (Pa. Super. 2015) ("Consistent with the foregoing cases, we conclude

that the trial court here was correct in its determination that justifiable reliance is an element of private actions under Section 201–9.2 of the UTPCPL.").  The misrepresentations at issue were allegedly made only to Bessemer, and there is no allegation that a single Bessemer customer was aware of these representations or in any way relied on these representations in either choosing to become a Bessemer member or choosing to remain a Bessemer member.  As such, Bessemer cannot bring its claim for a UTPCPL violation in a representative capacity on its members' behalf because its individual members could not bring such claims in their own right.

Further, Bessemer may not pursue UTPCPL violations on its own behalf because it fails to allege that *its* primary purpose in purchasing the goods at issue is for personal, family, or household purposes.  Bessemer's claim for violation of the UTPCPL relies exclusively on its members' primary purpose for purchase in asserting that the primary purpose of its purchase was for personal, family, or household purposes.  Bessemer may only rely on its members' purpose for purchase if it has standing to bring this suit in a representative capacity.  *Valley Forge*, 574 A.2d at 648.  As discussed above, Bessemer has not set forth sufficient facts to support its standing to bring suit in a representative capacity on its members' behalf.  Thus, as currently pled, there is no basis on which Bessemer can proceed on its claim for a UTPCPL violation respecting the 2012 email or the 2018 correspondence.   Accordingly, for the reasons discussed above, while Bessemer, on its own behalf, may pursue causes of action lying in tort with respect to its allegations regarding the 2012 email and the 2018 correspondence, it may not pursue UTPCPL claims either on its own behalf or on its members' behalf under the facts alleged in its Complaint.

Bessemer also asserts UTPCPL claims with respect Fiserv's marketing and advertising scheme.  Compl. ¶ 239, ECF No. 48.  In its Complaint, Bessemer fails to assert when the advertisements at issue were utilized by Fiserv and/or who viewed and relied on these

advertisements and/or when they were viewed.  Bessemer's citations to the advertisements at issue are all dated well after the Master Agreement was entered into, and in no way indicate that the specific advertisements cited were utilized by Fiserv before the parties executed the Master Agreement.  Such allegations are not pled with sufficient specificity to plead a claim for a UTPCPL violation that is plausible on its face.  With respect to Bessemer's assertions in support of its claims under other states' consumer protection laws, these claims seemingly rely on individual Bessemer members' reliance on Fiserv's misrepresentations.  *See* Br. in Opp'n to Mot. to Dismiss 16, ECF No. 54 ("The question of which other states' laws apply or were violated involves fact-intensive determinations (e.g., which states['] Bessemer's members received false information from Fiserv).").  Bessemer fails to allege a single instance wherein any of its members in any specific state relied on any specific representation of Fiserv.  This claim is also not pled with sufficient specificity.[20]

For the reasons discussed above, the Court will grant Fiserv's Motion to Dismiss as to Bessemer's claims for unfair and deceptive trade acts and practices.  The Court notes that Bessemer opposes Fiserv's Motion to Dismiss on the merits, and has not requested an opportunity to amend its Complaint.  *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007) (the United States Court of Appeals for the Third Circuit explaining that "[d]oing so, we implicitly rejected any argument that, outside of civil rights cases, district courts must *sua sponte* grant leave to amend before dismissing a complaint for failure to state a claim.  Thus, we

---

[20] The Court also notes that it is unclear to this Court how such claims could be asserted without the participation of individual Bessemer members.  *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344, (1977) (noting that "neither [plaintiff's] interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context."); *Debbs v. Chrysler Corp.*, 810 A.2d 137, 158 (Pa. Super. 2002) ("[C]ommon law fraud and fraud under UTPCPL require an individualized showing of reliance on a fraudulent statement.").

held that a district court need not worry about amendment when the plaintiff does not properly request it." (citations omitted)).  The Court further notes that Bessemer has already been afforded two opportunities to file amended complaints in this action, and has still fallen short of stating a claim for unfair and deceptive trade acts and practices.  *See Hickman v. Fullfilment*, No. CV 15-1119, 2016 WL 1319721, at *3 (W.D. Pa. Apr. 5, 2016), *aff'd sub nom. Hickman v. Amazon Fullfilment*, 662 F. App'x 176 (3d Cir. 2016) ("However, leave to amend may be denied if the amendment would be futile which can be demonstrated by the failure of a plaintiff to cure deficiencies in a complaint despite being given multiple opportunities to amend." (citing S.*K. v. N. Allegheny Sch. Dist.*, No. CV 14-218, 2015 WL 7308671, at *5 (W.D. Pa. Nov. 19, 2015))).  In light of the above, the Court will dismiss Bessemer's claims for unfair and deceptive trade acts and practices with prejudice.

### vi.    Breach of the Master Agreement Claim (Count I)

Fiserv seeks dismissal of Bessemer's claim for breach of the Master Agreement on the basis that Bessemer has not set forth the specific provisions of the Master Agreement that Fiserv Solutions allegedly breached.  Br. in Supp of Mot. to Dismiss 22, ECF No. 53.  Bessemer is not required to set forth the specific provisions of the Master Agreement it alleges Fiserv breached to state a claim for breach of contract under the Federal Rules of Civil Procedure.  *See Travelers Cas. & Sur. Co. of Am. v. A.G. Cullen Const., Inc.*, No. CIV. A. 07-0765, 2008 WL 4816477, at *10 (W.D. Pa. Nov. 4, 2008) (citing *Slim CD, Inc. v. Heartland Payment Sys., Inc.*, No. CIV. A. 06-2256, 2007 WL 2459349, at *8 (D.N.J. Aug. 24, 2007) for the proposition that "the Federal Rules of Civil Procedure do not require a plaintiff to allege specific provisions violated in the contract.").  Accordingly, this Court will deny Fiserv's Motion to Dismiss as to Bessemer's claim for breach of the Master Agreement.

### vii. Declaratory Relief Claim (Count XIII)

In seeking dismissal of Bessemer's claim for declaratory relief, Fiserv argues that the ownership rights to the information and documents at issue in Bessemer's Complaint are clearly defined by the Master Agreement.  Br. in Supp of Mot. to Dismiss 22, ECF No. 53.  Fiserv asserts that there is thus no legitimate controversy regarding whether Fiserv Solutions or Bessemer retains ownership of the information.  *Id.*  In its Complaint, Bessemer asserts that Fiserv retains control over specific documents and personal and financial information that belong to Bessemer under the terms of the Master Agreement.  Compl. ¶¶ 197-99; 330-36, ECF No. 48.  This Court cannot determine, based only on a review of the Complaint and Exhibits thereto, whether the specified documents and information at issue constitute "Client Information" or "Client Files" as defined in the Master Agreement such that they should have been returned to Bessemer.  *See* Master Agreement § 3(b); ASP Services Exhibit to the Master Agreement § 8(e).  Accordingly, the Court will deny Fiserv's Motion to Dismiss as to Bessemer's claim for declaratory relief without prejudice to raise the issue again at a later date.

### B.  Motion to Strike

Fiserv has also filed a Motion to Strike (ECF No. 51) seeking to strike Bessemer's jury demand, prayer for punitive damages, and allegations related to its prayer for punitive damages. Fiserv relies on a jury trial waiver and a limitation of damages provision in the Master Agreement in arguing that this Court should strike these aspects of Bessemer's Complaint.

### 1.  Jury Trial Request

Fiserv argues that the terms of the Master Agreement provide an explicit basis for this Court to strike Bessemer's jury trial demand.  Section 11(d) of the Master Agreement is titled "Governing Law; Jury Trial Waiver," and provides: "Both parties agree to waive any right to have

a jury participate in the resolution of any dispute or claim between the parties and any of their respective Affiliates arising under this Agreement."

A jury waiver must be made knowingly and voluntarily to be valid.  *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 222 (3d Cir. 2007).  "The burden of proving that a jury waiver was done both knowingly and voluntarily falls on the party seeking enforcement of the waiver clause."  *Henricks Commerce Park, LLC v. Main Steel Polishing Co*., No. CIV A 09-23, 2009 WL 2524348, at *3 (W.D. Pa. Aug. 18, 2009).  "A waiver is knowing and voluntary when the facts show that (1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business entities; (3) the parties had an opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous."  *Henricks Commerce Park*, 2009 WL 2524348, at *3 (citing *First Union National Bank v. United States of America*, 164 F.Supp.2d 660, 663 (E.D.Pa.2001)).

Bessemer argues that there was a gross disparity in bargaining power between the parties, that Bessemer is comparatively unsophisticated, that Bessemer had no opportunity to negotiate the terms of the Master Agreement, and that the waiver is inconspicuous.  Br. in Opp'n to Mot. to Strike 8-11, ECF No. 55.  Bessemer's assertion that it did not have an opportunity to negotiate with respect to the Master Agreement and its assertion regarding the disparity in negotiating power, in particular, present factual issues that this Court can more effectively address following discovery in this matter.  For this reason alone, this Court will deny Fiserv's Motion to Strike Bessemer's jury trial demand without prejudice to raise the issues set forth therein following discovery in this matter.

### 2.  Punitive Damages Request

Fiserv similarly asserts that Bessemer's punitive damages request and allegations in support of punitive damages are barred by terms of the Master Agreement.  Section 7 of the Master Agreement is titled "<u>Limitation of Liability</u>," and provides: "IN NO EVENT SHALL FISERV [SOLUTIONS] BE LIABLE FOR LOSS OF GOODWILL, OR FOR SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, OR TORT DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, REGARDLESS OF WHETHER SUCH CLAIM ARISES IN TORT, CONTRACT, OR OTHERWISE."

Bessemer argues that the limitation of liability clause is unenforceable with respect to its waiver of punitive damages because New York public policy does not permit waivers of liability for willful or grossly negligent acts.  Br. in Opp'n to Mot. to Strike 3, ECF No. 55.  In a case involving a contract provision which provided that "[u]nder no circumstances shall any party be liable to the other for consequential, incidental or punitive damages[,]" the United States District Court for the Southern District of New York explained: "clauses limiting the amount of damages are treated the same as exculpatory clauses in general: that is, both are enforceable against ordinary negligence claims, but are unenforceable against claims of gross negligence or intentional misconduct."  *E*Trade Fin. Corp. v. Deutsche Bank AG*, No. 05 CIV.0902, 2008 WL 2428225, at *27 (S.D.N.Y. June 13, 2008) (quoting *Cirillo v. Slomin's Inc.*, 196 Misc.2d 922, 768 N.Y.S.2d 759, 772-73 (N.Y.Sup.2003)).  The *E*Trade* court went on to hold:

> Thus, E*Trade may still recover consequential, incidental *and* punitive damages to the extent that it demonstrates Deutsche Bank's liability for willful or grossly negligent misconduct.  E*Trade may not, however, recover such damages pursuant to its contract claims or pursuant to its negligence claims without a showing of gross negligence.

*E*Trade*, 2008 WL 2428225, at *27 (emphasis added).

As discussed above, Bessemer's claim for fraudulent inducement of the Master Agreement and fraud with respect to the 2018 correspondence which Bessemer refers to as the Replevin Action settlement agreement survive Fiserv's Motion to Dismiss. These intentional torts are not subject to the Limitation of Liability provision of the Master Agreement. *See E\*Trade*, 2008 WL 2428225, at \*27. Accordingly, there is no basis to strike Bessemer's request for punitive damages or allegations in support of punitive damages at this time. Fiserv's Motion to Strike Bessemer's request for punitive damages and allegations in support of punitive damages will be denied.

## IV.    Conclusion

For the reasons discussed above, Fiserv's Motion to Dismiss will be granted in part and denied in part, and Fiserv's Motion to Strike will be denied. An appropriate Order of Court follows.

BY THE COURT:

s/*Robert J. Colville*_____
Robert J. Colville
United States District Judge

DATED: July 14, 2020

cc/ecf: All counsel of record