UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

**BESSEMER SYSTEM FEDERAL CREDIT UNION**, *on behalf of itself and its members*,

                    Plaintiff,

          -against-

**FISERV SOLUTIONS, LLC**, *formerly known as* FISERV SOLUTIONS, INC., and **FISERV, INC.**,

                    Defendants.

No. 19 Civ. 624 (RJC)

**BESSEMER SYSTEM FEDERAL CREDIT UNION'S MEMORANDUM OF LAW IN SUPPORT OF ITS RULE 12(b)(6) MOTION TO DISMISS THE COUNTERCLAIMS**

Charles J. Nerko (NY 4764338)
Alexander Mirkin (NY 4944682)
OFFIT KURMAN, P.A.
590 Madison Avenue, 6th Floor
New York, NY 10022
(212) 545-1900
charles.nerko@offitkurman.com
amirkin@offitkurman.com

Richard J. Parks (PA 40477)
PIETRAGALLO GORDON
ALFANO BOSICK & RASPANTI, LLP
7 West State Street, Suite 100
Sharon, PA 16146
(724) 981-1397
rjp@pietragallo.com

*Attorneys for Plaintiff*
*Bessemer System Federal Credit Union*

TABLE OF CONTENTS

Preliminary Statement.................................................................................................... 1

Statement of the Case.................................................................................................... 2

Argument ....................................................................................................................... 6

   I.  Fiserv has not plausibly alleged its breach of contract counterclaim. .................. 6

      A.  Fiserv has not plausibly alleged its own performance because Fiserv admits
          that it materially breached the Master Agreement. ......................................... 6

      B.  Fiserv has failed to plausibly allege Bessemer's breach the Master Agreement. .......... 10

      C.  Because federal law required the security review, any contractual provision
          purporting to bar it would be unenforceable as violating public policy. ...................... 12

      D.  Fiserv has no cognizable damages. .................................................................. 15

   II.  Fiserv's breach of the covenant of good faith and fair dealing counterclaim
      should be dismissed. ....................................................................................... 16

      A.  The implied covenant of good faith and fair dealing is not a distinct cause of
          action.............................................................................................................. 16

      B.  The good faith and fair dealing counterclaim is duplicative because it seeks
          identical damages as the contact-breach counterclaim. .................................. 17

      C.  Fiserv's conclusory allegations fail to overcome the presumption that Bessemer
          acted in good faith........................................................................................... 18

   III. Fiserv's claim for attorneys' fees should be dismissed. ..................................... 20

Conclusion ................................................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**

*159 MP Corp. v. Redbridge Bedford, LLC*,
  128 N.E.3d 128 (2019) ........................................................................................................... 13

*AM Cosmetics Inc. v. Solomon*,
  67 F. Supp. 2d 312 (S.D.N.Y. 1999) ..................................................................................... 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................. 6

*Baraliu v. Vinya Capital, L.P.*,
  2009 WL 959578 (S.D.N.Y. Mar. 30, 2009) ........................................................................... 9

*Bibbo v. 31-30, LLC*,
  963 N.Y.S.2d 303 (App. Div. 2013) ....................................................................................... 19

*Canstar v. J.A. Jones Constr. Co.*,
  622 N.Y.S.2d 730 (App. Div. 1995) ....................................................................................... 17

*Chappo & Co. v. Ion Geophysical Corp.*,
  921 N.Y.S.2d 227 (App. Div. 2011) ......................................................................................... 7

*Comerica Leasing Corp. v. Bombardier Inc.*,
  2019 WL 11027701 (S.D.N.Y. Sep. 30, 2019) ........................................................................ 8

*CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*,
  2006 WL 1379596 (S.D.N.Y. May 18, 2006)........................................................................... 9

*E. Roofing Sys. v. Simon Prop. Grp.*,
  2016 WL 1367176 (M.D. Pa. Apr. 5, 2016) .......................................................................... 20

*Fasolino Foods Co. v. Banca Nazionale Del Lavoro*,
  961 F.2d 1052 (2d Cir. 1992)................................................................................................. 16

*Fuller Landau Advisory Servs. v. Gerber Fin. Inc.*,
  333 F. Supp. 3d 307 (S.D.N.Y. 2018)............................................................................... 17, 19

*Gramore Stores, Inc. v. Bankers Tr. Co.*,
  402 N.Y.S.2d 326 (Sup. Ct. 1978) ......................................................................................... 13

*Greenspan v. Amsterdam*,
  536 N.Y.S.2d 90 (App. Div. 1988) ......................................................................................... 16

*Harris v Provident Life & Acc. Ins. Co.*,
  310 F.3d 73 (2d Cir. 2002) ........................................................................... 16

*HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*,
  994 F. Supp. 2d 520 (S.D.N.Y. 2014) ........................................................... 19

*John F. Dillon & Co. LLC v. Foremost Mar. Corp.*,
  2004 WL 1396180 (S.D.N.Y. June 18, 2004) ................................................ 19

*M/A-COM Sec. Corp. v. Galesi*,
  904 F.2d 134 (2d Cir. 1990) ......................................................................... 20

*Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*,
  52 F. Supp. 3d 601 (S.D.N.Y. 2014) ............................................................. 15

*Matsumura v. Benihana Nat'l Corp.*,
  465 F. App'x 23 (2d Cir. 2012) ..................................................................... 16

*McBride v. Warden of Allegheny Cty. Jail*,
  577 F. App'x 98 (3d Cir. 2014) ....................................................................... 2

*McHolme/Waynesburg, LLC v. Wal-Mart Real Estate Bus. Tr.*,
  2009 WL 1292808 (W.D. Pa. May 7, 2009) .................................................. 17

*Moran v. Erk*,
  901 N.E.2d 187 (N.Y. 2008) ......................................................................... 19

*Mount Vernon Tr. Co. v. Bergoff*,
  272 N.Y. 192, 5 N.E.2d 196 (1936) .............................................................. 13

*N.Y. Univ. v. Cont'l Ins. Co.*,
  662 N.E.2d 763 (N.Y. 1995) ......................................................................... 17

*NCUA v. First Nat'l Bank & Tr. Co.*,
  522 U.S. 479 (1998) ...................................................................................... 12

*Network Enters. v. APBA Offshore Prods.*,
  2004 WL 1837349 (S.D.N.Y. Aug. 16, 2004) ............................................... 16

*O.F.I. Imports Inc. v. Gen. Elec. Capital Corp.*,
  2017 WL 3084901 (S.D.N.Y. July 20, 2017) .................................................. 6

*Peoples Bank of the S. v. Fiserv Sols., Inc.*,
  2017 WL 1653505 (M.D. Tenn. May 1, 2017) ............................................... 20

*Riboldi v. Warren Cty.*,
781 F. App'x 44 (3d Cir. 2019) ................................................................................ 6

*Rowe v. Great Atl. & Pac. Tea Co.*,
385 N.E.2d 566 (N.Y. 1978) .................................................................................. 18

*RXR WWP Owner LLC v. WWP Sponsor, LLC*,
17 N.Y.S.3d 698 (App. Div. 2015) ................................................................... 18, 20

*Smile Train, Inc. v. Ferris Consulting Corp.*,
986 N.Y.S.2d 473 (App. Div. 2014) ..................................................................... 16

*Tractebel Energy Mktg. v. AEP Power Mktg.*,
487 F.3d 89 (2d Cir. 2007) .................................................................................... 18

*United States ex rel. Smith v. N.Y. Presbyterian Hosp.*,
2007 WL 2142312 (S.D.N.Y. July 18, 2007) ........................................................ 18

*Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*,
37 N.E.3d 78 (N.Y. 2015) ...................................................................................... 10

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
807 N.E.2d 876 (N.Y. 2004) .................................................................................. 20

**Rules**

Fed. R. Civ. P. 9(b) .................................................................................................... 9

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 6

Fed. R. Civ. P. 54(d)(2) ............................................................................................ 20

**Regulations**

12 C.F.R. Part 748 App'x A § III.D.3 ............................................................. 8, 12, 13

Plaintiff/counterclaim-defendant Bessemer System Federal Credit Union ("**Bessemer**"), a federally chartered not-for-profit credit union (Compl. ¶ 10; Ans.¶ 10), discovered that defendant/counterclaimant Fiserv Solutions, Inc. ("**Fiserv**"), the vendor to whom it had entrusted hosting its online banking functionality, lacked adequate security controls to keep Bessemer's members' information secure. As a federally chartered and regulated credit union, federal law obligated Bessemer to ensure that member information was stored securely. When Bessemer discovered the severe security vulnerabilities in Fiserv's systems, it undertook the difficulty and expense of a private security review of its accounts hosted on the Fiserv system. Importantly, the security review did not access or attempt to access any information that Bessemer was not authorized to access. The results were shocking: Fiserv's security measures were disastrously bad—the digital equivalent of a bank with no locks on its doors. Indeed, this Court held that Bessemer plausibly stated an entitlement to punitive damages based on Fiserv's misconduct (ECF No. 69).

Bessemer promptly notified Fiserv of what it found. In appreciation for pointing out the holes in the security infrastructure housing Bessemer's members' information, Fiserv resorts to a blame-the-victim gambit. Audaciously, Fiserv seeks to recover the costs of identifying and repairing its own security failings—failings that existed before Bessemer's security review and were not exacerbated in any way by the security review.

That meritless claim is barred not merely by the flagrant lack of cognizable damages, but also because (i) Fiserv has admitted to multiple material breaches of the Master Agreement; (ii) Bessemer's access of its own member information was not "unauthorized" and so was not a breach; and (iii) it would be contrary to public policy to deem Bessemer's reasonable efforts to

comply with statutory and regulatory requirements to ensure the security of its members' information a breach of contract.

Since Bessemer did not breach any express terms of the Master Agreement, Fiserv tries to rescue its counterclaim by claiming Bessemer breached the implied covenant of good faith and fair dealing. In doing so, Fiserv argues that it was somehow "bad faith" for Bessemer to investigate its reasonable suspicions of Fiserv's products. But nothing about Bessemer discovering Fiserv's security failures deprived Fiserv of the benefit of the parties' agreement— Bessemer agreed to use Fiserv's services, not to permit Fiserv to expose its' members information without repercussions. Nor is there merit in Fiserv's claim for attorney fees, based as it is on a prevailing party provision in the parties' agreement, which Fiserv has plainly breached. Therefore, Fiserv's counterclaims should be dismissed in full.

## STATEMENT OF THE CASE[1]

This case arises out of the Master Agreement entered into between Bessemer and Fiserv (the "**Master Agreement**," ECF No. 48-2), under which Fiserv was to host Bessemer's online banking website and provide account processing services for Bessemer. (Countercl. ¶¶ 2, 3).

The Master Agreement obligated Fiserv to (i) keep Bessemer's proprietary, personally-identifiable, or other confidential information secure (Master Agreement, ¶¶ 3(a)(i), 3(b)); (ii) maintain an information security program, to disclose audit reports and test results for that program upon Bessemer's request, and notify Bessemer of security breaches (*id.*, ¶ 4(a)); and (iii) respond to other audit demands from Bessemer (*id.*, ¶¶ 4(b), 10(a); ASP Services Exhibit to

---

[1] The facts are drawn from the Defendants' First Amended Answer and Affirmative Defenses to Second Amended Complaint and Counterclaims (ECF No. 88, in which the "**Answer**" and "**Counterclaim**" have separately numbered paragraphs), those allegations of the Second Amended Complaint (the "**Complaint**," ECF No. 48) which were admitted in the Answer, and the Exhibits to the Complaint whose authenticity was admitted in the Answer. *See McBride v. Warden of Allegheny Cty. Jail*, 577 F. App'x 98, 99 (3d Cir. 2014) ("Although the court is generally limited in its review to the facts contained in the complaint, it may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case.").

Master Agreement ("**ASP Exhibit**") ¶¶ 4(d), 4(h)). In return, Bessemer agreed to pay for Fiserv's services, including fees associated with termination of the Master Agreement or its schedules (Master Agreement., ¶¶ 2, ASP Exhibit ¶ 8(b), 10), and to keep Fiserv's confidential information in confidence (Master Agreement, ¶¶ 3(a)(ii), 3(b)), except Bessemer retained the right to make general references to Fiserv's products that Bessemer was purchasing (*id*., ¶ 11(k)). Bessemer moreover agreed "not to attempt to circumvent the devices employed by [Fiserv] to prevent unauthorized access" to Fiserv's computer systems (ASP Exhibit ¶ 3).

The Master Agreement included dispute resolution provisions, including, as a condition precedent to litigation, a requirement that the parties participate in a good-faith conciliation process to resolve disputes within 30 days through duly designated representatives (*id*., ¶ 9); and attorney's fee-shifting to the party that "prevails on the central issue raised in the action or claim, regardless of the amount of damages awarded" (*id*. ¶ 11(h)).

Fiserv has been plagued with data security issues during the term of the Master Agreement. In 2016, Fiserv, without Bessemer's authorization, disclosed Bessemer's members' transaction data to a different Fiserv customer (Compl. ¶ 48, Answer ¶ 48). In March 2017, Fiserv mailed account verification statements to some of Bessemer's members with an incorrect return address, creating the risk of untraceable statements left in the postal system with no way to deliver or return them for members who had moved (Compl. ¶ 49, Answer ¶49).

These and other issues led Bessemer to serve Fiserv with a notice of breach and nonrenewal on January 8, 2018. (Compl. ¶ 139, Answer ¶ 139, Countercl. ¶ 9, ECF No. 48-11). That notice required the commencement of the good-faith conciliation process that is the condition precedent for litigation and invoked Bessemer's audit rights under the Master Agreement (*id*.; Answer. ¶ 140). This was the first of many formal letters to Fiserv about its

- 3 -

many material breaches (Countercl. ¶ 11), which culminated in an April 11, 2018 notice of termination after Fiserv failed to participate in the conciliation process (Answer, ¶¶ 149-150, 152; Countercl. ¶ 14; ECF Nos. 48-12, 48-13, 48-14).

Fiserv admits that many of Bessemer's concerns raised in the notices of breach had merit (Answer ¶¶ 91, 93, 128(a), 128(b), 128(e) 134, 135, 137), and admits that the Fiserv representative was unprepared to participate in the conciliation process months after the 30-day conciliation process commenced (Compl. ¶ 150, Answer ¶ 150). Moreover, Fiserv failed to provide required audit records concerning its information security. *See infra*, Argument, § I.A.2.

Then, in August 2018, *Krebs on Security* reported Fiserv had a security vulnerability that permits intruders to see customers' account and transactional records (Compl. ¶ 51, Answer ¶ 51). Given Fiserv's evasiveness by failing to provide a single audit record about its data security, and press reports indicating that Fiserv suffered another data breach, Bessemer conducted a security review of its own online banking website. The review, which was limited to attempting to log into certain Bessemer accounts, revealed how woefully inadequate Fiserv's security practices were: an intruder could gain access to an account merely by trying all possible numbers 0000-9999 for the final four digits of the account owner's social security number, with no rate limiting to stop automated login attempts (Compl. ¶¶ 60, 62, 65, 67; Answer ¶¶ 60, 62, 65, 67; ECF No. 48-7). Fiserv attempted to address the gaping vulnerability by requiring users to provide their house number, with many of the same problems (*id*).

The day of the security review, Fiserv left a voicemail for Bessemer's CEO, Joy Peterson, asking her to call back (Countercl. ¶ 42). Ms. Peterson wrote back that same afternoon, asking for communications to be via email, but Fiserv kept calling (*id*.). Two days later, Bessemer sent Fiserv a letter detailing the issues it found (*id*.). In response, Fiserv asserted that

Bessemer somehow "circumvented" Fiserv's security devices by authorizing login attempts to Bessemer's own member accounts. (Compl. ¶ 68, Answer ¶ 68, ECF No. 48-8). Fiserv claims that this "circumvention," and the failure to notify Fiserv of unauthorized access to the system, were material breaches of the Master Agreement, causing Fiserv to incur "investigative and legal fees" which it seeks to recover from Bessemer (Countercl. ¶ 58), despite the fact that the security review did not lead to any unauthorized access to anyone's accounts or personal information (ECF No. 48-8).

Fiserv also asserts a claim for some unspecified unpaid invoices (Countercl. ¶ 58). Bessemer is alleged to have stopped paying its invoices in June 2018 (*id.*, ¶ 21), to have demanded a refund of past invoices and disputed all future invoices from Fiserv in July 2018 (*id.*, ¶ 22), but also to have "submit[ted] payment for its outstanding invoices" in November 2018 (id., ¶ 22 n.2). Fiserv admits, moreover, that Bessemer repeatedly tendered payment on these invoices, which Fiserv refused to accept (Compl. ¶¶ 164-167, Answer ¶¶ 164-167). No other facts are alleged to make clear to what unpaid invoices this claim could be referring.

Though Bessemer terminated the Master Agreement because Fiserv was in material breach, Fiserv refused to provide Bessemer its members' crucial records—tax forms, historical account statements, and the like—from the Fiserv eFischency system unless Bessemer would pay extortionate deconversion fees. (Compl. ¶ 189, Answer ¶ 189). Bessemer remonstrated with Fiserv, but ultimately paid the fees (under protest). Even so, Fiserv refused to produce the records. Fiserv produced Bessemer's records on a hard drive that was locked (Compl. ¶ 192, Answer ¶ 192), then falsely claimed in filings with this Court to have produced them, only to later admit that over 900 records were missing (Compl. ¶¶ 194, 196, Answer ¶¶ 194, 196; ECF

No. 24). Fiserv continues to refuse to give Bessemer images of Bessemer's archived documents (Compl. ¶ 197-99, Answer ¶ 197-99).

ARGUMENT

"To survive a Rule 12(b)(6) motion, a pleading must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Riboldi v. Warren Cty.*, 781 F. App'x 44, 46 (3d Cir. 2019) (*quoting, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).[2] This "does require that the pleading show more than a sheer possibility that a defendant has acted unlawfully. A pleading that merely tenders naked assertions devoid of further factual enhancement is insufficient." *Id.*

## I. Fiserv has not plausibly alleged its breach of contract counterclaim.

"In order to adequately plead breach of contract under New York law a plaintiff must allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *O.F.I. Imports Inc. v. Gen. Elec. Capital Corp.*, 2017 WL 3084901, at *4 (S.D.N.Y. July 20, 2017). Fiserv's counterclaims do not plausibly allege that it adequately performed its obligations under the Master Agreement, that Bessemer's actions constituted a breach of the Master Agreement, nor that Fiserv suffered any damages.

### A. Fiserv has not plausibly alleged its own performance because Fiserv admits that it materially breached the Master Agreement.

The "cause of action for breach of contract must be dismissed [if Fiserv] fails to allege its own performance under the contract." *Chappo & Co. v. Ion Geophysical Corp.*, 921 N.Y.S.2d

---

[2] Unless otherwise indicated, this memorandum omits citations and internal quotation marks from quoted passages, and any emphases have been added.

227, 228 (App. Div. 2011). Fiserv failed to perform its obligations under the Master Agreement in at least three ways.

     ***First***, Fiserv violated the confidentiality of Bessemer's information in ¶ 3(b) and the security standards established in ¶ 4 of the Master Agreement. ***Critically, Fiserv admits that it disclosed Bessemer's information to an unauthorized third party*** (Compl. ¶ 48, Answer ¶ 48). In addition, Fiserv failed to safeguard Bessemer's information by placing the incorrect return addresses on mailings (Compl. ¶ 49, Answer ¶ 49), and failed to place proper security controls on Bessemer's online banking website, as all hackers needed to take over an account was knowing the last four digits of a member's social security number—or guessing by cycling through 0000 to 9999, since Fiserv admits it did not impose rate limiting. (Compl. ¶¶ 60, 62, 65, 67; Answer ¶¶ 60, 62, 65, 67; ECF No. 48-7). These breaches were material. A breach pertaining to information protection was one of the few categories of default by Fiserv that would support Bessemer's termination of Fiserv for cause. *See* Master Agreement, ¶ 8(b).

     ***Second***, Fiserv breached its obligation to provide audit records pertaining to information security. Bessemer's audit of Fiserv requested:

> In accordance with Section 10(b) of the Master Agreement . . . , all documentation relating to the amounts invoices by Fiserv in the prior twelve-month period . . . ;

> In accordance with Section 4(a) of the Master Agreement . . . , copies of all audit reports, and summaries of test results or equivalent measures taken by Fiserv, in effect during the parties' relationship, to assess whether Fiserv's information security program meets the objectives set forth in the Master Agreement;

> In accordance with Section 4(b) of the Master Agreement . . . , summaries of the written information security plans in effect during the parties' relationship . . . ;

> In accordance with Section 4(d) of the ASP Services Exhibit to the Master Agreement . . . , a copy of its most recent security certification . . . for the applicable Fiserv service centers providing services, and copies of the security certifications in effect during the parties' relationship;

> In accordance with Section 4(h) of the ASP Services Exhibit to the Master
> Agreement . . . , a copy of [Fiserv's] independent audit reports of the Fiserv
> service center(s) providing services and copies of the action plan, if any,
> implemented by Fiserv to address and resolve deficiencies.

ECF No. 48-11. *See also* Answer, ¶ 139. Each of these audit demands flowed directly from the

cited terms of the Master Agreement. Fiserv's answer concedes that Fiserv failed to provide

audit records pertaining to security. Instead, Fiserv admits "in response to Bessemer's previous

'audit' demand," Fiserv limited its response by only producing "a reconciliation of the invoices

that Fiserv Solutions issued in 2018," consisting of a single spreadsheet. Countercl. ¶ 28; *see*

*also* ECF No. 48-18 ("[T]he spreadsheet we sent you was intended to convey the information

that it contains in response to your 'audit demands'; we have no obligation to provide you with

anything more."). Fiserv does not and cannot allege that it provided to Bessemer independent

audits and other documents pertaining to security as required. This failure to perform began

when Bessemer sent its audit request on January 8, 2018, and continues to this day. This is a

material obligation of Fiserv, as federal law requires a credit union such as Bessemer to "review

audits, summaries of test results, or other equivalent evaluations of its service providers." 12

C.F.R. Part 748, App'x A, § III.D.3.

    ***Third***, Fiserv has failed to allege, even in conclusory fashion, that it participated in good

faith in an informal, expedited conciliation process, a condition precedent to suit under the

Master Agreement. Under New York law, "[w]here a plaintiff has not alleged satisfaction of a

valid condition precedent, plaintiff fails to state a claim for breach of contract, and a motion to

dismiss must be granted." *Comerica Leasing Corp. v. Bombardier Inc.*, 2019 WL 11027701, at

*6 (S.D.N.Y. Sep. 30, 2019). The Master Agreement provides that:

> ***Before initiating legal action against the other party relating to a dispute***
> ***herein***, the parties agree to work in good faith to resolve disputes and claims
> arising out of this agreement. To this end, either party may request that each party
> designate an officer or other management employee with authority to bind such

> party to meet to resolve the dispute or claim. If the dispute is not resolved within
> 30 days of the commencement of informal efforts under this paragraph, either
> party may pursue formal legal action.

Master Agreement, ¶ 9. A "When commercial parties expressly agree that a specified occurrence shall be a condition precedent to the creation or enforceability of a right or obligation, and there is no ambiguity arising out of other language in their contract, the only question for the court is whether the condition precedent has been complied with." *Baraliu v. Vinya Capital, L.P.*, 2009 WL 959578, at *5 (S.D.N.Y. Mar. 30, 2009).

Bessemer attempted to resolve its own claim through good-faith conciliation, but was stymied by Fiserv's stonewalling and delay (Compl. ¶ 150, Answer ¶ 150), and indeed, aside from acknowledging this delay, Fiserv is entirely silent as to the conciliation process as to its own claims. Because there is no way to honestly do so, the counterclaims do not even attempt to accept Rule 9(b)'s invitation to plead in general terms that Fiserv met the conditions precedent to bringing its claims. Instead, Fiserv only pleads that "conditions precedent to performance of ***Bessemer's contractual obligations*** . . . have been satisfied or waived" (Countercl. ¶ 51). But the conditions applicable to Fiserv—not Bessemer—are at issue. Because Fiserv "has failed to allege, even generally, that the conditions precedent were performed or had occurred," Fiserv "has failed to state a claim for breach of contract." *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, 2006 WL 1379596, at *4 (S.D.N.Y. May 18, 2006).

Fiserv's bald assertion that "Fiserv Solutions performed and satisfied all of its contractual obligations to Bessemer under the Master Agreement" (Countercl. ¶ 51) does not salvage its claims because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, any one of the multiple breaches independently justifies dismissing Fiserv's counterclaims.

**B.  Fiserv has failed to plausibly allege Bessemer's breach the Master Agreement.**

Fiserv asserts that Bessemer's security review breached paragraphs 3 and 5 of the ASP Exhibit and paragraph 3 of the Master Agreement, and that Bessemer's refusal to pay Fiserv an early termination fee breached ¶ 8(b) of the ASP Exhibit (Countercl. ¶¶ 53-57). None of these claims stand up to scrutiny.

Under ASP Exhibit ¶ 3, "[e]ach party agrees not to attempt to circumvent the devices employed by the other party to prevent unauthorized access" to the other's computer systems. But, Fiserv admits that Bessemer's security review was limited to its own accounts (Countercl. ¶ 38), and that no one obtained unauthorized access to any accounts or personal information (*id*., ¶ 41). In fact, the security review occurred on test accounts created by Bessemer (*id*., ¶ 47).

Fiserv has not plausibly alleged that Bessemer's security review amounted to any unauthorized access or prohibited use of Bessemer's online banking system. Construing comparable language and circumstances, New York's highest court held that contract language addressing "computer fraud" such as "fraudulent entry of . . . [or] changes of" ESI applied only to "hacking" the system, not to fraudulent data submitted by an authorized user of the computer system. *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 37 N.E.3d 78, 81 (N.Y. 2015). Thus, to constitute fraudulent entry into a computer system, there had to be a violation of the "integrity of the computer system through deceitful and dishonest access." As a result, New York's Court of Appeals held that "an authorized user's submission of fraudulent information into the . . . computer system" did not constitute "hacking." *Id*. at 79.

So too here. Yet Fiserv misses this critical distinction. Fiserv never alleges that the security researcher wrested unauthorized access to Bessemer's online banking system, let alone to any other Fiserv system. To the contrary, Fiserv concedes that the website analyzed by the security review "***enabled Bessemer to provide banking services*** to its members" and allowed

"***Bessemer's members . . . to enroll in online banking*** . . . using unique member log-in information, including ***usernames and passwords, which the [Bessemer] member controlled***" (Countercl. ¶ 5). Bessemer—not Fiserv—decides who is authorized to have a username and password to access Bessemer's online banking website. When distilled to its essence, Fiserv's counterclaims merely allege that the security researcher, as part of the security review authorized by Bessemer, used an alias and entered incorrect passwords to evaluate whether the security controls were properly functioning. But that is not unauthorized nor unlawful. As New York's highest court recognized, even outright fraudulent data submitted by an authorized user of a computer system does not constitute "hacking." Here too, Fiserv's allegations that the security reviewer used test accounts to review the security controls on Bessemer's own online banking website does not plausibly violate the Master Agreement.

By the same token, Bessemer's ostensible failure to notify Fiserv of the security review—the predicate for Fiserv's claim under ASP Exhibit ¶ 5(g)—cannot constitute breach because that provision only requires Bessemer to inform Fiserv of "any incident of unauthorized access," which did not occur here. Likewise, it is not clear how permitting someone to repeatedly try to log into a Bessemer online banking account is inconsistent with "Fiserv's procedures and operating instructions," as is prohibited by ASP Exhibit ¶ 5(a); indeed, Fiserv does not allege any procedures and operating instructions were violated, saying only, conclusorily, that these unidentified procedures and instructions "do not, and would not, permit" a security review. And, if there is no breach of any of the other provisions of the ASP Exhibit, it is not clear what could trigger paragraph 5(h)'s requirement that Bessemer indemnify Fiserv for claims arising out of the use by Bessemer of the Fiserv System in a manner other than that provided in the Agreement.

Even more puzzling is Fiserv's claim under the Master Agreement's confidentiality provision (¶ 3), since, conclusory accusations aside, Bessemer is not alleged to have disclosed or used any specific confidential Fiserv Information; indeed, the allegations describing the security review do not identify any particular Fiserv Information that was—or even could have been— used doing the security review.

Finally, Fiserv contends that Bessemer breached the requirement to pay early termination fees—indeed, these fees, and not Bessemer's members' data security or the deep dysfunction of Fiserv's product seem to be Fiserv's focus. But Bessemer terminated the Master Agreement for cause, based on Fiserv's many material breaches, including as to Bessemer's members' information (ECF No. 48-13). Given Fiserv's admission of breaches that justify Bessemer's for-cause termination of the Master Agreement, Bessemer's refusal to pay early termination fees is entirely proper. *See* Master Agreement ¶ 8(b)(i); ASP Exhibit ¶ 8(b).

**C. Because federal law required the security review, any contractual provision purporting to bar it would be unenforceable as violating public policy.**

"In 1934, during the Great Depression, Congress enacted the [Federal Credit Union Act], which authorizes the chartering of credit unions at the national level and provides that federal credit unions may . . . offer banking services." *NCUA v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 483 (1998). The National Credit Union Administration (NCUA), a federal government agency, administers the Federal Credit Union Act, and regulates Bessemer.

Bessemer's security review was driven by the strong national policy in favor of maintaining the safety and soundness of federal credit unions, as reflected in 12 C.F.R. Part 748 App'x A § III.D.3, which requires credit unions to "monitor [their] service providers" to ensure credit union member information is being appropriately safeguarded and requires Bessemer to

"review audits, summaries of test results, or other equivalent evaluations of its service providers." *Id.*

"The stability of banks is a matter of such public concern that the State or Federal government regulates the affairs of each bank and periodically examines its apparent condition." *Mount Vernon Tr. Co. v. Bergoff*, 272 N.Y. 192, 196, 5 N.E.2d 196, 197 (1936). Thus, in *Mount Vernon Trust*, New York's highest court invalidated an agreement on public policy grounds that had the effect of undermining the stability of a regulated financial institution. *See id.* That court recently cited *Mount Vernon Trust* with approval, explaining that the agreement there was held to violate public policy because it "undermine[d] the stability of banks, which is a matter of public concern reflected in the regulatory oversight systems for banking."*159 MP Corp. v. Redbridge Bedford, LLC*, 128 N.E.3d 128, 135 (2019). Public policy also protects consumers of financial institutions because "banking is an essential service upon which the public is required to rely." *Gramore Stores, Inc. v. Bankers Tr. Co.*, 402 N.Y.S.2d 326, 328 (Sup. Ct. 1978) (holding bank's agreement limiting duty to customers violated public policy).

The NCUA has reiterated the strong public policy in ensuring credit union stability through credit union oversight of its vendors:

| National Credit Union Administration Letters and Other Guidance | | |
|---|---|---|
| Cite: | Relevant provision: | Available at: |
| NCUA Letter to Credit Unions 08-CU-09, Appx. at A60–A62 | ***The credit union must monitor the performance of the third party relationship to determine compliance with expectations and contractual agreements.*** If deficiencies in performance are noted, a process to notify the third party of inadequate performance and to request corrective action should be implemented. . . . ***Examiners should ensure credit unions are measuring the performance of third party arrangements and periodically verifying the accuracy of any information provided to them by a third party or its*** | https://www.ncua.gov /regulation-supervision/letters-credit-unions-other-guidance/evaluating-third-party-relationships-questionnaire; https://www.ncua.gov /files/letters-credit-unions/LCU2008-09ENC.pdf |

| | | |
|---|---|---|
| | ***affiliate***.... Responsible staff should measure the performance of third party programs in relation to credit union policy guidance, contractual commitments, and service levels. ***Credit unions should implement quality control procedures to review the performance of third parties periodically.*** | |
| NCUA Letter to Credit Unions 97-CU-5, Appx. at 4 | Outsourcing arrangements…must be properly initiated, documented, and managed…. ***The performance of the vendor should be monitored and compared to the provisions of the contract.*** | https://ithandbook.ffiec.gov/media/21983/ncu-97-cu_5_interagency_statement_retail_online_bank.pdf |
| NCUA Supervisory Letter 07-01 at 8 | ***Credit unions engaging in third party relationships must have an infrastructure (i.e. staffing, equipment, technology, etc.) sufficient to monitor the performance of third party arrangements.*** In many cases, credit unions outsource processes or functions due to a lack of internal infrastructure or experience. However, outsourcing processes or functions does not eliminate credit union responsibility for the safety and soundness of those processes and functions. | https://www.ncua.gov/files/letters-credit-unions/LCU2007-13ENC.pdf |
| NCUA Letter to Credit Unions 05-CU-18 at 2–3 | ***If critical systems or processes are outsourced to a vendor or third party, you should ensure appropriate*** computer network logging and ***monitoring procedures are in place at the vendor.*** | https://ithandbook.ffiec.gov/media/28217/ncu-05-cu-18-encl-1.pdf |
| NCUA Letter to Credit Unions 02-FCU-04 at 2 | ***Management should assess the security and performance reliability of web sites whose performance is beyond their control***…[and] verify that the third-party web site complies with all applicable laws (HDMA, Privacy, etc.). | https://ithandbook.ffiec.gov/media/resources/3314/ncu-02-fcu_04_weblinking_relationships.pdf |
| NCUA Letter to Credit Unions 01-CU-20 at 2 | Once a third-party arrangement is entered into, it is important for a credit union to establish controls to ensure the relationship is meeting its expectations and the third party is meeting its responsibilities. ***As part of these controls, a credit union should adopt monitoring and reporting practices. Failing to do so constitutes an unsafe and unsound practice.*** | https://ithandbook.ffiec.gov/media/resources/3554/ncu-01-cu_20_duedil_over_3rd_party_serv_providers.pdf |

| NCUA Letter to Credit Unions 01-CU-11 at 5 | Outsourcing one or more services does not alleviate your responsibility for ensuring that your systems and member data are secure. ***You need to ensure that your vendors implement security programs which meet your standards.*** | https://www.ncua.gov /files/letters-credit-unions/LCU2001-11.pdf |
| NCUA Letter to Credit Unions 00-CU-11 at 1 | Institutions should implement an oversight program to monitor each service provider's controls, conditions, and performance. | https://www.ncua.gov /regulation-supervision/letters-credit-unions-other-guidance/risk-management-outsourced-technology-services |

Consistent with federal law, Bessemer has responsibility to actively and independently monitor the security practices of a vendor such as Fiserv; anything less would be an unsafe and unsound practice threatening the stability of a credit union. While Bessemer hoped that Fiserv would have fulfilled its contractual obligation to provide these independent audits, after Fiserv refused to do so, Bessemer was left with no choice but to obtain them itself. If complying with these regulations can be construed as breaching the Master Agreement, that agreement must yield to public policy.

### D.  Fiserv has no cognizable damages.

Fiserv does not allege that Bessemer's security review broke any system or otherwise caused any direct damages. Rather, Fiserv's alleged damages arise from Fiserv's cost to correct its own security deficiency.  Meanwhile, Fiserv was contractually obligated to provide tests and audits of its security program, and to safeguard Bessemer's records. *See supra*., Argument, § I.A. Fiserv's damages are not cognizable because they seek recovery for what Fiserv ought to have done had it complied with the contract. *See Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 614 (S.D.N.Y. 2014) (dismissing claim for lack of damages where claimant "would have been contractually obligated" to undertake the task and "has failed to come forward

with evidence sufficient to demonstrate damages flowing from the breach alleged"); *Greenspan v. Amsterdam*, 536 N.Y.S.2d 90, 91 (App. Div. 1988) (dismissing counterclaim because defendant's own breach precluded it from recovering damages).

## II.   Fiserv's breach of the covenant of good faith and fair dealing counterclaim should be dismissed.

Fiserv's second counterclaim for a breach of the implied covenant of good faith and fair dealing should be dismissed. The claim cannot stand because (a) there is no such cause of action under either New York or Pennsylvania law[3]; (b) there are no separate damages alleged relating to claimed breach of covenant of good faith and fair dealing separate from the breach of contract claim; and (c) Fiserv fails to overcome the presumption that Bessemer acted in good faith and does Fiserv not allege any plausible facts of bad faith on the part of Bessemer.

### A.   The implied covenant of good faith and fair dealing is not a distinct cause of action.

"New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see also Matsumura v. Benihana Nat'l Corp.*, 465 F. App'x 23, 29 (2d Cir. 2012) ("Plaintiffs based their breach of good faith claim on the same operative facts as their breach of contract claim; accordingly, the District Court did not err in dismissing the former claim as duplicative of

---

[3] This Court has already determined that the contract claims in this action are governed by New York law (ECF No. 69 at 10). New York law should also control with respect to the good faith and fair dealing counterclaim. Under New York law, "the duty to act in good faith under a contract is not a duty separable from the contract." *See Network Enters. v. APBA Offshore Prods.*, 2004 WL 1837349, at *4 (S.D.N.Y. Aug. 16, 2004). Thus, while "parties to an express contract are bound by an implied duty of good faith . . . breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co. v. Banca Nazionale Del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992). "[B]reach of the implied covenant of good faith and fair dealing is not a tort; rather, it is a contract claim." *Smile Train, Inc. v. Ferris Consulting Corp.*, 986 N.Y.S.2d 473, 475 (App. Div. 2014).

the latter.").[4] The entire good faith and fair dealing counterclaim merely incorporates by reference the same allegations as the breach of contract counterclaim and alleges no new facts. (Countercl. ¶ 59). Therefore, Fiserv's second counterclaim should be dismissed.

**B.  The good faith and fair dealing counterclaim is duplicative because it seeks identical damages as the contact-breach counterclaim.**

Fiserv's good faith and fair dealing counterclaim seeks identical damages to the breach of contact claim. *Compare* Countercl. ¶ 58, *with* ¶ 62 (seeking identical relief on both counterclaims). Therefore, even if the Court were to find that a separate cause of action for good faith and fair dealing was permissible, the second counterclaim should be dismissed because the damages sought are duplicative. *See N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995) ("The cause of action [for breach of the covenant] is duplicative of the first cause of action for breach of contract and should have been dismissed.").

Under black-letter New York law, a claim for "breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of the contract." *Fuller Landau Advisory Servs. v. Gerber Fin. Inc.*, 333 F. Supp. 3d 307, 315 (S.D.N.Y. 2018); *see Canstar v. J.A. Jones Constr. Co.*, 622 N.Y.S.2d 730, 731 (App. Div. 1995) (affirming dismissal of a counterclaim that "is redundant since a breach of an implied covenant of good faith and fair dealing is intrinsically tied to the damages allegedly resulting from a breach of the contract"). Without separate or actual damages for the alleged breach of the covenant of good faith and fair dealing, that claim cannot survive. *See RXR WWP Owner LLC v. WWP Sponsor, LLC*, 17 N.Y.S.3d 698, 702 (App. Div.

---

[4] Pennsylvania law also does not have a separate cause of action for breach of implied covenant of good faith and fair dealing. *See e.g. McHolme/Waynesburg, LLC v. Wal-Mart Real Estate Bus. Tr.*, 2009 WL 1292808, at *1 (W.D. Pa. May 7, 2009) (collecting cases).

2015) ("The court correctly dismissed the breach of the implied covenant of good faith and fair

dealing cause of action, because of the lack of actual damages.").

### C.  Fiserv's conclusory allegations fail to overcome the presumption that Bessemer acted in good faith.

The conclusory theories alleged by Fiserv do not overcome the presumption that

Bessemer acted in good faith. "[S]ince there is a presumption that all parties act in good faith, the

burden of proving a breach of the covenant of good faith and fair dealing is on the person

asserting the absence of good faith." *Tractebel Energy Mktg. v. AEP Power Mktg.,* 487 F.3d 89,

98 (2d Cir. 2007); *see also Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 570 (N.Y. 1978)

(The "party who asserts the existence of an implied-in-fact covenant bears a heavy burden."). To

overcome the presumption that Bessemer acted in good faith, Fiserv "must allege the specific

instances or acts that amounted to the breach of those covenants under the contract in question"

*United States ex rel. Smith v. N.Y. Presbyterian Hosp.*, 2007 WL 2142312, at *16 (S.D.N.Y. July

18, 2007). Fiserv has failed to do so.

Bessemer is a not-for-profit, consumer-oriented, credit union. In administering it contract

with Fiserv, Bessemer acted prudently to address serious, repetitive harm that Fiserv was

inflicting on thousands of Bessemer's members, and acted consistent with its duties under federal

law and pursuant to guidance promulgated by the federal government. Fiserv merely

incorporates by reference the facts supporting its breach of contract claim, without explaining

which actions constitute a breach of an implied covenant or how. This fails to plausibly state a

claim that Bessemer violated the implied covenant of good faith and fair dealing. *See United

States ex rel. Smith v. N.Y. Presbyterian Hosp.*, 2007 WL 2142312, at *16 (S.D.N.Y. July 18,

2007).

*First,* Bessemer exercised its contractual rights under the Master Agreement to both assert breaches of the contract under its dispute-resolution protocol and demand information from Fiserv under the audit provisions. "As a matter of law, enforcing a contract provision agreed to by both parties can not constitute a breach of good faith." *AM Cosmetics Inc. v. Solomon*, 67 F. Supp. 2d 312, 324 (S.D.N.Y. 1999). This holds true even notwithstanding Fiserv's theory that Bessemer allegedly exercised its rights in bad faith. *See Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008) (refusing to "read implied limitations into" party's exercise of contractual rights); *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*, 994 F. Supp. 2d 520, 537 (S.D.N.Y. 2014) (finding "the covenant of good faith does not, however, justify an inquiry into [party's] subjective motives for terminating the contract.").

*Second,* Fiserv's claim for unpaid invoices must be consigned to a breach of contract theory because it does not implicate any implied covenant. *See Fuller Landau Advisory Servs. v. Gerber Fin. Inc.*, 333 F. Supp.3d 307, 315 (S.D.N.Y. 2018) (dismissing implied covenant claim premised on "failing and refusing to pay amounts" due under contract).

*Third,* engaging in a security review of Fiserv does not amount to a breach of the implied covenant. The Master Agreement does not contain a provision prohibiting Bessemer from conducting a security review of Fiserv, and it is black-letter law that "the implied covenant of good faith and fair dealing does not add any new obligations to the underlying contract." *John F. Dillon & Co. LLC v. Foremost Mar. Corp.*, 2004 WL 1396180, at *7 (S.D.N.Y. June 18, 2004). This principal especially applies given that the Master Agreement was drafted by Fiserv, a sophisticated Fortune 500 company represented by able counsel. Thus, the Court should not impose a new implied term into the Master Agreement that Fiserv failed to express. *See Bibbo v. 31-30, LLC*, 963 N.Y.S.2d 303, 306 (App. Div. 2013); *see also Vermont Teddy Bear Co. v. 538*

*Madison Realty Co.,* 807 N.E.2d 876, 879 (N.Y. 2004) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.").

*Further*, "the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). Fiserv does not allege that the security review, or any other actions taken by Bessemer, were inconsistent with Bessemer's legitimate interests as a regulated credit union.

*Finally*, the alleged bad faith did not result in any damages, without which a claim for breach of the implied covenant of good faith and fair dealing cannot survive. *See RXR WWP Owner LLC*, 17 N.Y.S.3d at 702. The only alleged damages were because Fiserv's contract performance was deficient, and its security controls were faulty and required remediation.

## III.     Fiserv's claim for attorneys' fees should be dismissed.

Fiserv's claim for attorneys' fees is not ripe because Fiserv is not the prevailing party. Contrary to Fiserv's theory, although the Court has dismissed some of Bessemer's claims, that does not make Fiserv the prevailing party. Section 11(h) of the Master Agreement awards attorneys' fees only to the party prevailing on the "central issue raised in the action," which is not a rote tally of causes of action. *See Peoples Bank of the S. v. Fiserv Sols., Inc.*, 2017 WL 1653505, at *7 (M.D. Tenn. May 1, 2017) (rejecting Fiserv's argument that bank that prevailed on only 1 of 5 claims was entitled to no more than one-fifth its attorneys' fees).

Indeed, "the appropriate vehicle for seeking an award of attorney fees for work done during this case is a Rule 54(d)(2) motion, after a dispositive decision has been entered." *E. Roofing Sys. v. Simon Prop. Grp.*, 2016 WL 1367176, at *6 (M.D. Pa. Apr. 5, 2016). As a result, the Court should dismiss Fiserv's third counterclaim for attorneys' fees.

## CONCLUSION

In light of the foregoing, Fiserv's counterclaims should be dismissed in their entirety and with prejudice given its prior opportunity to amend.

Dated: November 10, 2020

OFFIT KURMAN, P.A.

By: /s/ Charles J. Nerko
    Charles J. Nerko (NY 4764338)
    Alexander Mirkin (NY 4944682)
590 Madison Avenue, 6th Floor
New York, NY 10022
(212) 545-1900
charles.nerko@offitkurman.com
amirkin@offitkurman.com

Richard J. Parks (PA 40477)
PIETRAGALLO GORDON
ALFANO BOSICK & RASPANTI, LLP
7 West State Street, Suite 100
Sharon, PA 16146
(724) 981-1397
rjp@pietragallo.com

*Attorneys for Plaintiff*
*Bessemer System Federal Credit Union*