# EXHIBIT 29



ATTORNEYS AT LAW

777 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202-5306
414.271.2400 TEL
414.297.4900 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
414.297.5518
awronski@foley.com EMAIL

CLIENT/MATTER NUMBER
012474-0427

August 10, 2020

<u>Via E-Mail</u>

Charles J. Nerko
Offit Kurman
10 East 40th Street, Suite 3500
New York, NY  10016

      Re: Bessemer System Federal Credit Union

Dear Charles:

  I write in response to the alleged conflicts of interest you raised during our telephone conversation on July 17, 2020 and in later correspondence that same day, and your suggestion that Foley & Lardner LLP and I must withdraw from representation of Fiserv, Inc. and Fiserv Solutions, LLC in this action.  My firm and I take our ethical obligations very seriously and have examined these issues carefully.  As discussed further below, no meritorious or good faith basis exists for Bessemer to seek disqualification.  The fraudulent inducement claim that gives rise to the alleged conflicts of interest is meritless and, indeed, frivolous.  In short, the claim will not survive summary judgment, rendering moot any purported conflict under Rule 3.7, and, in any event, the law is clear that any attempted disqualification pursuant to that rule would be premature unless and until the claim proceeds to trial.

  With respect to the alleged "personal conflict" under Rule 1.7, Bessemer's allegations do not involve the egregious circumstances necessary to find a non-waivable conflict.  To the contrary, the frivolous nature of the underlying claim makes plain that it was pleaded primarily to manufacture a "conflict" and seek disqualification of Fiserv's chosen counsel in order to prejudice its defense in this action.  As you know, I have been representing Fiserv in connection with this dispute for more than two years and, as your letter states, I have likewise represented Fiserv in "several cases over the past four years" in which you have represented credit unions asserting similar claims.  Given all of the facts and circumstances, the firm and I have reasonably determined that I can continue to provide competent and diligent representation to my clients in this matter.  Indeed, disqualification would work a hardship and impose significant prejudice on Fiserv in the defense of Bessemer's claims, which appears to be the point of pleading the fraudulent inducement claim and asserting these purported conflicts of interest.  As explained below, courts have been extremely reticent to indulge such tactics by permitting opposing parties to seek disqualification in situations where an attorney's client has waived any existing or potential conflict of interest.  Fiserv has reviewed your letter and the Court's opinion and agreed to waive any existing or potential conflict.  Rule 1.7, therefore, provides no meritorious or good faith basis for disqualification.

| | | | | |
|---|---|---|---|---|
| AUSTIN | DETROIT | MEXICO CITY | SACRAMENTO | TAMPA |
| BOSTON | HOUSTON | MIAMI | SAN DIEGO | WASHINGTON, D.C. |
| CHICAGO | JACKSONVILLE | MILWAUKEE | SAN FRANCISCO | BRUSSELS |
| DALLAS | LOS ANGELES | NEW YORK | SILICON VALLEY | TOKYO |
| DENVER | MADISON | ORLANDO | TALLAHASSEE | |



Charles J. Nerko
August 10, 2020
Page 2

## **BESSEMER'S "FRAUDULENT INDUCEMENT" CLAIM**

Bessemer claims to have been "defrauded" by a sentence in a letter of understanding dated October 19, 2018 that was prepared on Foley & Lardner letterhead but signed by both Bessemer's counsel, Richard Parks, and me: "As we discussed, given the lead time required, deconversion is not likely to happen until near the June 30, 2019 expiration of the Master Agreement in any event, making the early termination fee issue one that the parties should be able to resolve." Specifically, in its Second Amended Complaint, Bessemer alleges:

> 162. It was critical that Bessemer regain its records as promptly as possible, given the security and other problems at Fiserv. However, the only reason Bessemer agreed to wait until nearly June 2019 to effect the deconversion was based upon Fiserv's representation in the Replevin Action Settlement Agreement that such an expansive time frame was necessary "given the lead time required." It was Bessemer's understanding, based on Fiserv's representations, that it was impossible to obtain its records sooner than what Fiserv represented. Bessemer had no choice but to wait, because without those records, Bessemer would effectively have been unable to function.

(SAC ¶ 162.) Bessemer further alleges that "[w]hen executing the Replevin Action Settlement Agreement, it was understood that Fiserv required such a lead time for technical reasons – not for improperly ceasing work for several months in an attempt to renegotiate the deal the parties agree to when settling the replevin action." (*Id.* ¶ 177.)

Compelled to accept Bessemer's allegations as true for purposes of resolving the motion to dismiss, the Court found only that "these assertions sufficiently set forth a claim for fraud that lies outside of the Master Agreement *at this time*." (Dkt. 69 (emphasis added).) While a comprehensive refutation of this claim must await subsequent motion practice, even a cursory review of the facts—facts known to Bessemer when it filed the Second Amended Complaint but omitted from that pleading and therefore never put before the Court—make clear that the claim is frivolous. Indeed, the obvious lack of merit—including the lack of any conceivable damages—makes apparent that the claim was pleaded for the tactical purpose of attempting to disqualify Fiserv's counsel. When the appropriate time comes, and the Court sees the facts that Bessemer and its counsel have known all along, this claim will be dismissed.

As the Court's decision makes clear, a claim for fraud requires a material representation that is false and made with knowledge of its falsity, intent to mislead another, justifiable reliance, and damages proximately caused by such reliance. The facts show that Bessemer cannot satisfy any of these elements.



Charles J. Nerko
August 10, 2020
Page 3

First, the sentence about which Bessemer complains was not a representation at all, much less a false one. As you know, Bessemer initiated a replevin action (Case No. 2018-3022) and filed an expedited motion for a writ of seizure that was set to be heard on October 22, 2018 (a Monday). On October 18, 2018, Mr. Parks sent a letter to Richard Epstein (then Fiserv's local counsel) proposing a resolution of that motion in which "the parties stipulate to cooperate in implementing a de-conversion and transition of the Bessemer accounts to a new service vendor to be engaged in order to facilitate the parties parting ways amicably." (Ex. A.) Mr. Parks' letter made clear that such an agreement would not resolve a key outstanding issue between the parties—the payment of early termination fees under the Master Agreement if Bessemer deconverted before that agreement expired on June 30, 2019. To that end, Mr. Parks wrote: "This proposal does not include the payment of any liquidated damages or early termination charges by Bessemer but rather those issues would be preserved as between the parties to be resolved by the action at the Writ of Summons currently pending separate and apart from the Replevin action." (*Id.*)

Mr. Parks and I (and others) spoke by telephone on October 18 after receiving his letter. I conveyed to Mr. Parks that Fiserv required that the replevin action be dismissed if the parties were to move forward as proposed in his letter. We also discussed whether a global resolution of all issues (not just the replevin action) might be possible after the parties resolved the immediate replevin issue. A global resolution would require (among other things) an agreement by the parties on the issue of early termination fees. That evening, Mr. Parks confirmed by email:

> I was able to speak with my client about a dismissal of the replevin without prejudice provided we have written assurance on behalf of Fiserv that will demonstrate and provide assurance of an good faith agreement to the basic terms I set out in my settlement proposal letter delivered today. I have authority to dismiss the replevin without prejudice based upon a receipt of acceptable written assurance that the parties will proceed in good faith to migrate the Bessemer account records to a new vendor per the terms we have discussed today and in return Bessemer will release the fees currently being held.

(Ex. B.) Later that evening, I provided Mr. Parks with the form of the October 19, 2018 letter as the "written assurances" that he requested. (Ex. C.) I sent Mr. Parks an updated version (to correct the date) on the morning of October 19, and he returned a signed copy to me by email at 9:11 a.m. that morning. (*Id.*)

Nothing in Mr. Parks' initial letter on October 18 or during our communications that day or on October 19, asked when Fiserv could complete a deconversion for Bessemer. The statement in the October 19 letter that Bessemer claims to be a "misrepresentation" did not relate to Fiserv's technical ability to complete a deconversion by any particular date. Rather, that statement conveyed that, because months had passed since Bessemer first purported to "terminate" the Master

3

Case 2:19-cv-00624-RJC   Document 116-29   Filed 04/29/21   Page 5 of 12



Charles J. Nerko
August 10, 2020
Page 4

Agreement and filed suit against Fiserv, and additional time would be required to complete the deconversion, the amount of "early termination fees" Bessemer might potentially owe had been substantially reduced, and I believed the parties could resolve that issue as part of a global settlement.[1] Reading the sentence in context makes this perfectly clear:

> 2. Dismissal of the replevin action would not affect Bessemer's other pending action, Case No. 2018-01130. That said, Bessemer and Fiserv will work in good faith to negotiate a global resolution of the issues raised in that action, including the issue of whether Fiserv is entitled to early termination fees. As we discussed, given the lead time required, deconversion is not likely to happen until near the June 30, 2019 expiration of the Master Agreement in any event, making the early termination fee issue one that the parties should be able to resolve.

(October 19, 2018 Letter, Ex. D.) The reference to "June 30, 2019" clearly related to the "expiration of the Master Agreement," not a deadline for deconversion. Nowhere does the letter state (or even imply) that it would be "***impossible***" for Bessemer to deconvert before June 30, 2019. (SAC ¶ 162 (emphasis added).) To the contrary, the letter clearly contemplates that deconversion would be completed ***before*** the Master Agreement expired on June 30, 2019. Under Bessemer's strained reading of the letter, Fiserv would not have been entitled to early termination fees at all, and there would have been no need to discuss—much less waive—these fees. In short, Bessemer's reading (like its claim) makes no sense.

The facts also leave no doubt that neither Mr. Parks nor Bessemer "understood" the statement as a representation that Fiserv could not complete a deconversion before June 30, 2019. Indeed, at 8:48 a.m. on October 19 (before he signed the October 19 letter), Mr. Parks sent me an email stating: "I am just confirming that we will get some packet or email directions from Fiserv so we can start the transition process asap?" (Ex. E.) I responded: "With respect to the transition, I will confer with Fiserv today and make sure that is in motion. My suggestion would be that we let the business people handle that directly, as it is quite an involved process. That said, I will of course take whatever reasonable steps you would like to make sure you are in the loop and advised of the status of the project." (*Id.*) Later that day, when confirming that he had filed the dismissal of the replevin action, Mr. Parks emailed to me: "Now let's get the parties separated for the other as soon as possible." (*Id.*) And on October 23 (the following Tuesday), I emailed Mr. Parks to confirm that Fiserv could reach out directly to Bessemer to start the deconversion planning: "Just checking in on whether Fiserv (Shaun Gehman) has the green light to reach out to Joy and get rolling on the

---

[1] As you know, Fiserv in fact proposed a global resolution that involved mutual releases and the waiver of early termination fees on December 3, 2018. Bessemer rejected that offer.

4


Charles J. Nerko
August 10, 2020
Page 5

deconversion plan? Please let me know." (Ex. F.) Mr. Parks responded the next day: "New Vendor is Compusource and their conversion person is Tim Puitt. He can be contacted directly by Fiserv by calling 716-636-3700." (*Id.*) These communications and steps to start deconversion planning immediately after the October 19 letter was signed are irreconcilable with Bessemer's allegations that Fiserv represented, and Bessemer understood, that Fiserv could not technically complete a deconversion until June 30, 2019 and that Bessemer was "waiting." These allegations are false and will be proven so by Mr. Parks' own communications.

Indeed, both you and Bessemer understood the likely lead time for deconversion well before October 19. On April 18, 2018, after Bessemer purported to "terminate" the Master Agreement, Fiserv wrote to you and requested that you provide the name of Bessemer's new vendor and Bessemer's anticipated date of deconversion. (Ex. G.) You did not provide the name of a vendor but, on April 23, 2018, you emailed Fiserv in response and asked: "What formats can Fiserv provide the data in? What timing is possible?" (*Id.*) Fiserv responded to you on April 27, 2018, as follows:

> We can provide the data TXT files either ASCII or EBCDIC character format depending on the new vendor and platform your client selects. The number of files to be provided is determined as part of the deconversion process. We also provide documentation explaining the content and layout of the character files.
>
> The timing of the deconversion is largely dependent upon when your client has contracted with a new provider and when that new provider is available to convert the credit union to the its products(s). ***We would need at least 3-4 months advance notice for preparation and execution of the conversion.*** But again at this point the timing is in your client's court.

(*Id.* (emphasis added).) You did not respond to this email. Fiserv asked Bessemer (including in written communications directly to you) to provide the details of Bessemer's deconversion plan, including the name of the vendor and desired timing, again on July 25, 2018, August 23, 2018, and September 14, 2018. (Ex. H; Ex. I; Ex. J.) Bessemer never provided the requested information in response to these inquiries. The fundamental premise of Bessemer's claim—that Fiserv was somehow trying to delay Bessemer's decoversion—is patently and demonstrably false. It was Bessemer's non-responsiveness (motivated by its strategy to avoid early termination fees) that consistently delayed deconversion. And Bessemer knew, because Fiserv told it so in April 2018, that deconversion would require a 3-4 month lead time.

Further, as you also know, Fiserv experienced some difficulty in connecting with Bessemer's chosen vendor, CompuSource, in late October. In responding to Mr. Parks' inquiries

5



Charles J. Nerko
August 10, 2020
Page 6

about whether Fiserv had made contact, I told Mr. Parks (on October 30) that Fiserv had attempted to contact CompuSource and that "things are in process," (Ex. K.) confirmed again (on October 31) that Fiserv's project manager had called CompuSource and that Fiserv was "ready to go," (Ex. L.) provided (on November 1) the name, email and telephone number of Fiserv's project manager, and assured Mr. Parks that Fiserv had "been trying to reach out to your vendor and want[s] the deconversion done as soon as is reasonably possible." (*Id.*)  Ultimately, Mr. Parks and CompuSource confirmed that an employee illness at CompuSource (not any inaction by Fiserv) was the cause of the communication delay.  (Ex. M.)  When Fiserv was finally able to make contact (on November 1) CompuSource relayed that **Bessemer's** desired conversion date was May 31, 2019.  (Ex. N.)

These facts—all of which were in the possession of you, Mr. Parks or Bessemer before the Second Amended Complaint was filed[2]—demonstrate that Bessemer's allegation of a "false representation" is meritless and that its allegation that it understood that Fiserv was unable to deconvert before June 30, 2019 is false.  This evidence makes clear that Bessemer will be unable to establish either a false representation or actual (much less reasonable) reliance on any representation.  We expect that discovery of Bessemer and CompuSource will yield additional evidence fatal to Bessemer's allegations, including evidence that the May 31 deconversion date that **CompuSource proposed** was the product of its and Bessemer's schedules and technical requirements, not any statements or actions of Fiserv.

Likewise, Bessemer has suffered no conceivable injury or other damages.  First, the evidence will demonstrate that Bessemer converted successfully on the date selected by it and its vendor.  Second, Bessemer would have been contractually obligated to pay early termination fees if it had deconverted before June 30, 2019.  Any supposed "savings" from an earlier switch to CompuSource would have been offset by the early termination fees due to Fiserv; Bessemer would have had to pay both vendors.  Finally, Bessemer dismissed the replevin action without prejudice, relinquishing nothing of value, and the conversion claim it repleaded in this action was dismissed with prejudice, showing that it had no value in the first place.

In short, Bessemer will be unable to prove a single element of its "fraudulent inducement" claim with respect to the October 19, 2018 letter.  Evidence that has long been in Bessemer's possession and subject a reasonable investigation by its counsel, makes this clear.  That

---

[2] Given this evidence, it is difficult to understand how you and Mr. Parks would not face the same alleged conflicts raised in your letter.  We trust that both you and Mr. Parks have preserved all documents, things, and electronically stored information that may be potentially relevant to Bessemer's "fraudulent inducement" claim with respect to the October 19 letter, including, without limitation, all communications between you and Mr. Parks (or others in his firm), communications between you or Mr. Parks and CompuSource, and communications between you or Mr. Parks and Bessemer on this subject.  Given that you were at Vedder Price during the time of these events, please confirm whether you have taken appropriate steps to preserve potentially relevant material in its files or whether Fiserv should send a document preservation notice to Vedder Price.



Charles J. Nerko
August 10, 2020
Page 7

claim, if not sooner withdrawn, will not survive summary judgment. Its frivolous nature makes clear that Bessemer pleaded it primarily for the tactical and improper purpose of attempting to disqualify Fiserv's counsel.

## RULE 3.7 AND THE WITNESS ADVOCATE RULE

Purporting to invoke Rule 3.7, your letter asserts that "you and others at Foley & Lardner likely possess first-hand, personal knowledge of events at issue in this action, will be deposed and will be necessary trial witnesses" and that, as a result, "your continued representation of Fiserv is improper under the advocate-witness rule." At the outset, it is unclear what "others" you reference and whether "your" refers only to me or to others at the firm. It is clear, however, that any conflict under Rule 3.7, would not be imputed to others at Foley & Lardner. Pa. RPC 3.7(b).

More importantly, however, any disqualification motion under Rule 3.7 would simply be premature. As your letter makes clear, the rule unambiguously applies only at the time of trial. *See* Pa. RPC 3.7(a)(3) ("A lawyer shall not act as advocate *at a trial* in which the lawyer is likely to be a necessary witness. . . ." (emphasis added)). Rule 3.7 "regulates only trial conduct" so courts have "uniformly found pre-trial practice to be beyond [Rule 3.7's] scope." *Tibbott v. N. Cambria Sch. Dist.*, No. CV 16-5, 2017 WL 2570904, at *5 (W.D. Pa. June 13, 2017) (internal quotation marks omitted) ; *Lebovic v. Nigro*, No. CIV. A. 96-319, 1997 WL 83735 at * 1 (E.D. Pa. Feb. 26, 1997) (Rule 3.7 "only prevents an attorney from acting as an 'advocate at trial' in such a case. Nothing in Rule 3.7 prevents [an attorney] from representing [a client] in all pre-trial matters, including discovery." (internal citations omitted)); *Golomb & Honik P.C. v. Ajaj*, 2001 WL 1179423, at *2-3 (Ct. Common Pleas Apr. 5, 2001) (calling a pre-trial Rule 3.7 disqualification motion "overbroad and premature"); *In re Jeffery*, No. AP 17-028, 2020 WL 2769048, at *2 (Bankr. E.D. Pa. May 26, 2020) ("Rule 3.7 is not yet applicable to these proceedings, which remain at the pre-trial stage."); *Foster v. JLG Indus.*, 372 F. Supp. 2d 792, 798–99 (M.D. Pa. 2005) (same); *Robinson v. Hicks*, No. CIV.A. 1:07-CV-1751, 2009 WL 1140093, at *3 (M.D. Pa. Apr. 28, 2009) (explaining that "[p]retrial matters … do not implicate the risk of juror confusion associated with" Rule 3.7); *Pa. Bar Ass'n Comm. on Legal Ethics & Prof'l Responsibility*, Informal Op. 96–15, 1996 WL 928125 (1996) ("[T]here is no … bar to an attorney witness acting as an advocate in pre-trial proceedings."). Your letter does not even acknowledge, much less address, this fundamental aspect of the rule, even though I specifically raised it during our earlier telephone conversation.

At a minimum, therefore, Bessemer's "fraudulent inducement" claim must survive summary judgment before Rule 3.7 becomes relevant. *Javorski v. Nationwide Mut. Ins. Co.*, No. CIVA 3:06CV1071, 2006 WL 3242112, at *9 (M.D. Pa. Nov. 6, 2006) ("[D]isqualification occurs at the time of trial."); *Evans v. Chichester Sch. Dist.*, 533 F. Supp. 2d 523, 539 (E.D. Pa. 2008) (The Rule 3.7 determination is "to be made closer to the trial date"); *Lebovic*, 1997 WL 83735, at *2 ("[T]he court cannot determine … prior to the close of discovery, whether [the attorney] is likely to be a necessary witness at trial."). We are confident that Bessemer's fraud claim is meritless and, if



Charles J. Nerko
August 10, 2020
Page 8

not earlier withdrawn, will be dismissed after the completion of discovery and summary judgment. Rule 3.7, therefore, will never be implicated. *Javorski*, 2006 WL 3242112, at *9.

Even were that not the case, however, the rule would nonetheless permit my continued representation of Fiserv in all pretrial matters. Moreover, given the length and scope of my representation of Fiserv in this and similar matters, Rule 3.7's substantial hardship exception would likely apply. Pa. RPC 3.7(a)(3) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless … disqualification of the lawyer would **work substantial hardship on the client**." (emphasis added)). As your letter concedes, my representation of Fiserv has "spanned several cases over the past four years" and I have been Fiserv's lead counsel on this matter for more than two years. Any attempt to deprive Fiserv of my knowledge of the case and the issues presented would work a significant hardship on, and substantially prejudice, my clients. *Accord Weeks v. Samsung Heavy Indus. Co.*, 909 F. Supp. 582, 585 (N.D. Ill. 1996) (The client "will not receive its full value for the money spent in attorneys' fees for Mr. Paik's legal services and will be obligated to pay the substitute attorney for his or her repetitive work. Thus, an order disqualifying Mr. Paik from this lawsuit at this stage of the litigation would unfairly prejudice the defendants."). Moreover, in the unlikely event that Bessemer's "fraudulent inducement" claim proceeds to trial, the court has ample discretion to address that hardship including, we believe, allowing unconflicted counsel to try the fraudulent inducement claim while permitting me to continue to serve as lead counsel for all other claims. In any event, Rule 3.7 provides no basis for disqualification of me at any time before trial and no basis for disqualification of Foley & Lardner at any time.

## RULE 1.7 AND THE ALLEGED PERSONAL CONFLICT OF INTEREST

Your letter also references Rule 1.7 (presumably because Rule 3.7 provides no basis for disqualification) and makes the conclusory assertion that "[t]he significance of the Foley Letter to Bessemer's fraud and punitive damages allegations implicate other issues that are likely to give rise to nonwaivable conflicts of interest under RPC 1.7." A party cannot manufacture a "nonwaivable" conflict to precipitate the disqualification of its adversary's counsel through creative pleading. As a primary matter, we do not believe that a credible conflict of interest exists between Foley and Fiserv because our interests are aligned and, as described above, the claim upon which this manufactured conflict is based is frivolous.

In addition, we have shared your letter with Fiserv, which is well aware of Bessemer's allegations and the Court's opinion. Fiserv continues to desire that the firm and I represent it in this matter and has, on a fully informed basis, agreed to waive any existing or potential conflict that may exist. *See* Pa. RPC 1.7, cmt. 18 ("Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client."); *id.*, cmt. 14 ("Ordinarily, clients may consent to representation notwithstanding a conflict."); *Hesling v. Avon*

8



Charles J. Nerko
August 10, 2020
Page 9

*Grove Sch. Dist.*, No. CIV.A. 02-8565, 2007 WL 1030096, at *3 (E.D. Pa. Mar. 30, 2007) (The "Rule of Professional Conduct 1.7 allows waiver of a potential conflict of interest where 'each affected client gives informed consent.'").

If your position is that Bessemer, who is not a client of Foley & Lardner, can deprive Fiserv of its chosen counsel by asserting that the alleged conflict is "nonwaivable," you are incorrect.  Rule 1.7 is intended to protect the client, Fiserv, not Bessemer.  Fiserv is a commercially and legally sophisticated entity fully capable of evaluating and protecting its own interests.  In such cases, courts have been appropriately reluctant "to deprive [litigants] of their freedom to choose the advocate who will represent their claims, nor lightly dismiss the trust and confidence [the litigants] have placed in their chosen counsel." *Jackson v. Rohm & Haas Co.*, No. CIV.A. 05-4988, 2008 WL 3930510, at *1 (E.D. Pa. Aug. 26, 2008) (quoting *Max-Um Fin. Holding Corp. v. Moya Overview, Inc.*, No. CIV.A. 88-6345, 1989 WL 8064, at *1 (E.D. Pa. Feb. 1, 1989)); *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 441 (1985) (Brennan, J., concurring) ("A fundamental premise of the adversary system is that individuals have the right to retain the attorney of their choice to represent their interests in judicial proceedings. To be sure, that right is qualified . . . .When a trial court mistakenly disqualifies a party's counsel ... the court in essence permits the party's opponent to dictate his choice of counsel. . . . [T]his result is in serious tension with the premises of our adversary system.").

For that reason, motions to disqualify opposing counsel are particularly "disfavored" because of the risk "that one could subvert the ethical rules in an attempt to use them as a procedural weapon." *Martin v. Turner*, No. CIV.A. 10-1874, 2011 WL 717682, at *2 (E.D. Pa. Feb. 18, 2011) (denying motion to disqualify opposing counsel under Rules 1.7 and 3.7); *accord Richardson-Merrell*, 472 U.S. at 441 (Brennan, J., concurring) ("[T]he tactical use of attorney-misconduct disqualification motions is a deeply disturbing phenomenon in modern civil litigation."); *Caracciolo v. Ballard*, 687 F. Supp. 159, 160–61 (E.D. Pa. 1988) (The Code of Professional Responsibility "was not intended as an addition to the depressingly formidable array of dilatory strategies already part of the litigator's arsenal."); Pa. RPC, Preamble and Scope ¶ 19 ("[T]he purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons.").

As a result, courts have limited the circumstances in which non-clients may seek disqualification of opposing counsel to, for example, egregious circumstances that threaten the fair administration of justice.  *See, e.g.*, *United States v. Kolodesh*, No. CRIM.A. 11-464, 2012 WL 1156334, at *4 (E.D. Pa. Apr. 5, 2012); *Tibbott*, 2017 WL 2570904, at *2-4 (Court was "inclined to conclude that" non-client lacked standing because no "glaring conflict[] … call[ed] into question the fair … administration of justice" in employment retaliation dispute.).  This is not such a case, as the

9



Charles J. Nerko
August 10, 2020
Page 10

authorities on which your letter relies make plain.³  Rather, to the extent there is a conflict here, it is waivable.  Unwaivable conflicts must be "so severe as to impede the fair operation of the courts." *Martin*, 2011 WL 717682, at *4 n.1 (quoting *Hesling v. Avon Grove Sch. Dist.*, No. CIV.A. 02-8565, 2007 WL 1030096, at *3 (E.D. Pa. Mar. 30, 2007)).  Unwaivable conflicts are rare and arise mostly in the criminal context, such as where "the defendant's constitutional right under the Sixth Amendment to effective assistance of counsel" is implicated. *Id*.  No such threat exists in this civil case.

Under Rule 1.7(b), "even if there is a 'significant risk' that 'a personal interest of the lawyer' will 'materially limit[]' the lawyer's representation of a client, continued representation is permissible if" Rule 1.7's waiver requirements are met.  *Id.* at *3, 5 (denying motion to disqualify based on attorney's alleged conflict in avoiding malpractice liability).  Particularly given the frivolous nature of Bessemer's "fraudulent inducement" claim, I reasonably believe (and Fiserv agrees) that I can continue to "provide competent and diligent representation" to Fiserv notwithstanding that claim; such representation is not prohibited by law; I am not representing directly adverse clients in the same litigation; and Fiserv has provided informed consent.  That is all that Rule 1.7(b) requires.

Simply put, Bessemer has no legitimate interest in disqualification; its motives are plainly tactical in nature.  In the unlikely event that Bessemer's "fraudulent inducement" claim survives summary judgment, Rule 3.7 will give the Court ample means to address any remaining issues, while permitting Fiserv to retain its chosen counsel.  While Bessemer would apparently prefer to force Fiserv to endure the expense and disruption of changing counsel after more than two years of litigation, nothing in the rules permits that result.

---

³ In *Gov't of V.I. v. Zepp*, 748 F.2d 125, 138-39 (3d Cir. 1984), the court disqualified an attorney who was allegedly present while his criminal-defendant client destroyed drug evidence.  In *Kolodesh*, 2012 WL 1156334, the court disqualified a criminal defense attorney "inextricably intertwined with the creation of false" reports in client's criminal Medicare fraud.  *Id.* at *20-21, *28.  And in *Pittsburgh Universal, LLC v. Mykleby*, No. CV 16-1548, 2016 WL 7339935, at *1 (W.D. Pa. Dec. 16, 2016), a decision that was described as "a narrow ruling based only on the facts before us," a firm was disqualified for "represent[ing] both the employer and employee at the same time in an earlier," related dispute.  Nothing of the sort is presented here.



---



**FOLEY & LARDNER LLP**

Charles J. Nerko
August 10, 2020
Page 11

       For all of these reasons, neither Foley & Lardner nor I intend to withdraw from this representation.  Fiserv will oppose any motion to disqualify.  Given the foregoing authorities and the frivolous nature of Bessemer's fraudulent inducement claim, any such motion would likewise be frivolous and Fiserv will seek all appropriate remedies, including an award of fees.  Fiserv reserves all rights and remedies.

       Very truly yours,

       */s/ Andrew J. Wronski*

       Andrew J. Wronski