# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

**BESSEMER SYSTEM FEDERAL CREDIT UNION, on behalf of itself and its members**,

                          Plaintiff,

     vs.

**FISERV SOLUTIONS, LLC, f/k/a FISERV SOLUTIONS, INC., and FISERV, INC.,**

                     Defendants.

_____

Case No. 2:19-cv-00624-MJH

**JURY TRIAL DEMANDED**

## BESSEMER'S ANSWER TO FISERV SOLUTIONS' COUNTERCLAIMS

Charles J. Nerko (NY 4764338)
Benjamin M. Wilkinson (NY 4927661;
   *pro hac vice* to be filed)
BARCLAY DAMON LLP
80 State Street
Albany, NY 10020
cnerko@barclaydamon.com
bwilkinson@barclaydamon.com
(518) 429-4200

Richard J. Parks (PA 40477)
PIETRAGALLO GORDON
ALFANO BOSICK & RASPANTI, LLP
7 West State Street, Suite 100
Sharon, PA 16146
(724) 981-1397
rjp@pietragallo.com

*Attorneys for Plaintiff*
*Bessemer System Federal Credit Union*

## ANSWER

Plaintiff Bessemer System Federal Credit Union ("Bessemer"), a federally chartered not-for-profit credit union, hereby answers the counterclaims of Fiserv Solutions, LLC, formerly known as Fiserv Solutions, Inc. ("Fiserv Solutions"; together with Fiserv, Inc., "Fiserv") and submits a jury trial demand.

Fiserv admitted that it made Bessemer's member information available to unauthorized third parties. Bessemer, and the thousands of consumers who bank at it, are the victims here. Not Fiserv. That Fiserv had to spend money fixing its own security problems is not Bessemer's fault.

In an effort to distract from its own misconduct—which the Court previously held plausibly gives rise to punitive damages—Fiserv resorts to a retaliatory "sue the victim" gambit. Fiserv's counterclaims contrive a tale of Bessemer (a tiny, not-for-profit, consumer-owned community credit union) engaging in an "attack," "letter-writing campaign," and "bad faith tactics" against Fiserv (a Fortune 500 company) after Fiserv's security problems surfaced. The actual facts here describe nothing more than a consumer-focused non-profit responding appropriately when confronted with a serious security problem jeopardizing scores of consumers. In sum, Bessemer acted responsibly and in accordance with its duties to protect the thousands of consumers who entrust Bessemer to safeguard their confidential information.

Bessemer denies all allegations in the counterclaims not specifically admitted, including the allegations contained in the counterclaim's headings and footnotes. Any allegation admitted is admitted solely as to the specific facts alleged and not as to any conclusions or characterizations which may be contained in or implied by an allegation. These averments are incorporated as appropriate into each numbered paragraph of this answer.

1.      This action is the story of hyper-aggressive negotiation tactics run amok. After a nearly 40-year relationship with Fiserv Solutions, Bessemer (under a new CEO) decided that it

no longer wanted to keep its contractual promises or pay for services that Fiserv Solutions provided under the parties' agreement. With the assistance of its counsel, Bessemer commenced a pattern of escalating "negotiation" tactics that included asserting baseless claims, refusing to pay Fiserv Solutions' invoices, and threatening Fiserv Solutions with adverse publicity over the parties' dispute. All the while, Fiserv Solutions attempted to work cooperatively and in good faith with its contractual partner to resolve Bessemer's issues, but also insisted that Bessemer perform its contractual obligations, including payment. Apparently unwilling to do that, Bessemer escalated matters and attempted to manufacture a claimed "security breach" that Bessemer could use (through more threats of adverse publicity) to coerce Fiserv Solutions to accede to its demands. Bessemer commissioned and attempted a brute force cyber-attack on the servers and systems that Fiserv uses to service more than 750 credit unions, which collectively have more than 2.4 million members across the country.

ANSWER: Bessemer denies the allegations in paragraph 1, except that Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegation that it had a "nearly 40-year relationship with Fiserv Solutions," and Bessemer admits that Bessemer "refuse[d] to pay Fiserv Solutions' invoices" that were subject to a legitimate dispute, and admits that Fiserv Solutions insisted that Bessemer pay Fiserv Solutions.

2.     On or about July 1, 2014, Bessemer and Fiserv Solutions entered into the Master Agreement.

ANSWER: Bessemer admits the allegations in paragraph 2.

3.     Pursuant to the Master Agreement, Fiserv Solutions agreed to provide Bessemer with specific electronic account processing, online banking, and bill payment services – known broadly as "ASP Services" and "Virtual Branch Services" – and related equipment, software, and

1

professional services to facilitate the provision of ASP Services and Virtual Branch Services, in exchange for the payment of certain fees as set forth in the Master Agreement.

ANSWER: Bessemer admits the allegations in paragraph 3.

4.   In Paragraph 2 of the Master Agreement, Bessemer agreed to pay certain fees, out-of-pocket expenses and charges and applicable taxes in exchange for the services and other deliverables that Fiserv Solutions provided. Under the Master Agreement, invoices to Bessemer were due and payable upon receipt and accrued late charges if not paid in full within thirty (30) days. Further, the Master Agreement authorized Fiserv Solutions to terminate the agreement upon 30 days' written notice if Bessemer failed to pay its invoices within 30 days of issuance.

ANSWER: Bessemer denies the allegations in paragraph 4 that there was "applicable taxes" and states that as a not-for-profit federal credit union it was exempt from taxes under the Federal Credit Union Act (12 USC §1768); denies that Fiserv Solutions' termination right could be exercised if Bessemer's invoices were not paid  "within 30 days of issuance" and incorporates the text of the Master Agreement for an accurate statement of Fiserv Solutions' termination right; and admits the remaining allegations in paragraph 4.

5.   Fiserv Solutions' ASP Services enabled Bessemer to provide banking services to its members. Fiserv Solutions' servers and systems process member transactions made at the teller line, at an ATM or online through Fiserv Solutions' Virtual Branch services. Through the "Virtual Branch" services that Fiserv Solutions provided under the Master Agreement, Bessemer's members were able to enroll in online banking which provides access to the member's accounts and financial information through the internet accessed with a computer or a mobile device. Bessemer's members enrolled in online banking using unique member login information, including usernames and passwords, which the member controlled.

**ANSWER**: Bessemer lacks knowledge or information sufficient to form a belief about truth the allegation that Bessemer's members were "using unique member log-in information, including usernames and passwords, which the member controlled" and admits the remaining allegations in paragraph 5.

6.      To provide ASP Services, Fiserv Solutions necessarily stored and processed certain confidential financial information of Bessemer's members on Fiserv Solutions' servers. Bessemer did not and does not own these servers and systems or any of the financial and other information that Fiserv processes for other clients through its processing centers.

**ANSWER**: Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegations that Fiserv Solutions' storing and processing of Bessemer's member information occurred on "Fiserv Solutions' servers" and the alleged ownership of "the financial and other information that Fiserv processes for other clients through its processing centers."  Bessemer admits the remaining portions of paragraph 6.

7.      Fiserv Solutions' servers and systems include robust security and authentication processes to detect and prevent fraudulent or unauthorized attempts to enroll accounts, access account or other personal information, or conduct transactions through online banking or other electronic means.

**ANSWER**: Bessemer denies the allegations in paragraph 7 that Fiserv Solutions' security and authentication processes were "robust" or could "prevent fraudulent or unauthorized attempts to enroll accounts, access account or other personal information, or conduct transactions through online banking or other electronic means."  Bessemer lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 7.

8.      The Master Agreement imposes certain confidentiality and security obligations on

Bessemer. Bessemer agreed to maintain the confidentiality of all "Fiserv Information"[1] and further agreed to limit its use of Fiserv Information to "lawful purposes contemplated by this Agreement." Further, Bessemer agreed (in Paragraph 3 of the ASP Services Exhibit to the Master Agreement (the "ASP Services Exhibit")) not to attempt to circumvent or gain unauthorized access to Fiserv's servers and systems: "Fiserv systems used in the delivery of Services (the 'Fiserv System') and Client's networks and computer systems ('Client Systems') contain information and computer software that are proprietary and confidential information of the respective parties, their suppliers and licensors. Each party agrees not to attempt to circumvent the devices employed by the other party to prevent unauthorized access thereto, including without limitation modifications, decompiling, disassembling, and reverse engineering thereof."

      **ANSWER**: Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 8, except that Bessemer admits the contents of the Master Agreement quoted by Fiserv Solutions.  Bessemer states that the Master Agreement is subject to defenses and that various exceptions applied to confidentiality, including that Bessemer was not obligated to maintain the confidentiality of information that Bessemer "already possesses without an obligation of confidentiality," "develops independently without reference to Information of [Fiserv Solutions]," or "becomes publicly available without [Bessemer's] breach" (Master Agreement § 3(iii)).

---

[1] "Fiserv Information" is defined in Paragraph 3(a)(ii) of the Master Agreement as follows: "[T]he following types of information of Fiserv and its Affiliates obtained or accessed by Client form or on behalf of Fiserv or its Affiliates in connection with this Agreement or any discussions between the parties regarding new services or products to be added to this Agreement: (A) trade secrets and proprietary information (including that of any Fiserv client, supplier, or licensor); (B) client lists, information security plans, business continuity plans, all information and documentation regarding the Deliverables, all software Products (including software modifications and documentation, databases, training aids, and all data, code, techniques, algorithms, methods, logic, architecture, and designs embodied or incorporated therein), and the terms and conditions of this Agreement; (C) any personally identifiable information, defined as information that can [be] identified to a particular person without unreasonable effort, such as the names and social security numbers of Fiserv employees; and (D) any other information and data received from or on behalf of Fiserv or its Affiliates that Client could reasonably be expected to know is confidential."

4

9.    On January 8, 2018, Bessemer (through its counsel) sent Fiserv Solutions a "Notice of Breach," describing alleged "breaches" (many that supposedly occurred years earlier) and falsely claiming that Bessemer had suffered "data breaches" by Fiserv Solutions. In that same letter, Bessemer provided notice that it would not renew any agreement with Fiserv Solutions, including the Master Agreement.

ANSWER: Bessemer denies the allegations in paragraph 8 that the Notice of Breach "falsely claim[ed] that Bessemer had suffered data breaches by Fiserv Solutions." Bessemer refers Fiserv to its Answer to Bessemer's complaint, in which Fiserv has admitted that it failed to safeguard Bessemer's member information and made it available to unauthorized persons. *See* Answer, ECF No. 76, ¶¶ 48–49, 62, 73. Bessemer admits the remaining allegations of paragraph 9.

10.    Bessemer's decision not to renew meant that Bessemer would be required to incur deconversion and other professional service fees pursuant to the Master Agreement. Likewise, under the Master Agreement, termination before June 30, 2019, required Bessemer to pay early termination fees.

ANSWER: Bessemer denies the allegations in paragraph 10.

11.    In an attempt to avoid paying the early termination or deconversion fees it promised to pay in the Master Agreement, Bessemer began a letter-writing campaign in which it repeatedly accused Fiserv Solutions of material breaches of the Master Agreement (without factual support) and acting in "bad faith," ignoring the parties' long, productive relationship. All of this was pretextual and itself a bad faith exercise orchestrated to avoid Bessemer's clear contractual obligations under the Master Agreement.

ANSWER: Bessemer denies the allegations in paragraph 11, except that Bessemer

admits that it wrote letters regarding Fiserv Solutions' material breaches of the Master Agreement and that Bessemer's relationship with Fiserv turned out to be "long."

12.     Fiserv Solutions' legal and business teams worked in good faith with Bessemer to negotiate an amicable conclusion of the parties' relationship – including, but not limited to, offering to transition Bessemer's information to a new service provider. Fiserv Solutions' efforts to reach a mutually acceptable resolution and to initiate the deconversion and transition process were consistently rebuffed by Bessemer without any real explanation.

**ANSWER**: Bessemer denies the allegations in paragraph 12, except that Bessemer admits that Fiserv attempted to "negotiate" toward the "conclusion of the parties' relationship" and offered "to transition Bessemer's information to a new service provider."

13.     What Bessemer really wanted was a free deconversion and early termination without paying the agreed-upon fees. When its unsupported claims of breach did not achieve this result, Bessemer tried to increase the pressure on Fiserv Solutions.

**ANSWER**: Bessemer denies the allegations in paragraph 13, except that Bessemer admits that it wanted to terminate Fiserv Solutions.

14.     On April 11, 2018, Bessemer purported to "terminate" the Master Agreement, more than a year before it expired. In order to avoid early termination fees, Bessemer asserted that it was terminating for Fiserv Solutions' material breach. On April 11, 2018, Fiserv Solutions was not in, and had not been in, breach of the Master Agreement, much less material breach. Any early termination by Bessemer required the payment of early termination fees.

**ANSWER**: Bessemer denies the allegations in paragraph 14, except that Bessemer admits that it sent an April 11, 2018 letter terminating Fiserv Solutions for material breach.

15.     Despite its purported "termination," Bessemer did not inform Fiserv Solutions

6

when it would transition to a new service provider or provide a timeframe for deconversion and transition. Instead, Bessemer continued to operate its credit union on Fiserv Solutions' platform in the ordinary course of business and continued to accept all processing and related services from Fiserv Solutions under the Master Agreement. The only change in the relationship occasioned by Bessemer's "termination" was that it refused to pay for the services that Fiserv Solutions continued to provide and that Bessemer continued to accept (as described further below).

    **ANSWER**: Bessemer denies the allegations in paragraph 15.  Bessemer refers to its April 11, 2018 notice of termination which sought to have Fiserv Solutions return Bessemer's information to Bessemer itself for in-house processing by Bessemer in advance of being provided to a new service provider.  Bessemer states that by virtue of Fiserv Solutions' refusal to return Bessemer's information and misrepresenting the time it required to provide deconversion services, Bessemer had no reasonable choice but to continue to receive its information from Fiserv and let Fiserv Soluations dictate the timeframe for deconversion.  During this time, Fiserv was holding Bessemer's data hostage and the "services" Fiserv Solutions alleges to have been provided were contrary to Bessemer's express instructions and were unacceptable to Bessemer.

    16. On April 18, 2018, Fiserv's Assistant General Counsel responded to Bessemer's "termination" letter as follows:

> I am in receipt of your letter and email dated April 11, 2018, including your client's notice of termination. Fiserv will of course honor its contractual obligations and expressly reserves all rights under the Master Agreement including with respect to early termination. Further Fiserv denies the allegations of wrongdoing and any claim for damages asserted in your letter and email.
>
> Please advise as to the following: (1) the name of the vendor(s) and product(s) to which your client intends to convert; and (2) the anticipated date of deconversion.

**ANSWER**: Bessemer admits the allegations in paragraph 16.

17.     On April 23, 2018, Bessemer's counsel sent a brief email to Fiserv's Assistant General Counsel about deconversion, asking: "What formats can Fiserv provide the data in? What timing is possible?"

**ANSWER**: Bessemer admits the allegations in paragraph 17.

18.     On April 27, 2018, Fiserv's Assistant General Counsel responded:

> We can provide the data TXT files either ASCII or EBCDIC character format depending on the new vendor and platform your client selects. The number of files to be provided is determined as part of the deconversion process. We also provide documentation explaining the content and layout of the character files.
>
> The timing of the deconversion is largely dependent upon when your client has contracted with a new provider and when that new provider is available to convert the credit union to . . . its product(s). We would need at least 3-4 months advance notice for preparation and execution of the conversion. But again at this point the timing is in your client's court.

**ANSWER**: Bessemer admits the allegations in paragraph 18.

19.     Bessemer did provide not any information with respect to its deconversion plans in response to this communication. Specifically, Bessemer did not identify a new service provider, the technical requirements of that service provider or the timeline for Bessemer's deconversion. Instead, Bessemer continued to operate on Fiserv Solutions' processing platform and accept services from Fiserv Solutions every day.

**ANSWER**: Bessemer denies the allegations in paragraph 19, except that Bessemer admits that it did not identify a new service provider or its technical requirements immediately in response to this communication, and that Bessemer continued to operate on Fiserv Solutions' processing platform.  Bessemer refers to its April 11, 2018 notice of termination which sought to

8

have Fiserv Solutions return Bessemer's information to Bessemer itself for in-house processing by Bessemer in advance of being provided to a new service provider. Bessemer states that by virtue of Fiserv Solutions' refusal to return Bessemer's information and misrepresenting the time it required to provide deconversion services, Bessemer had no reasonable choice but to continue to receive its information from Fiserv and let Fiserv Soluations dictate the timeframe for deconversion. During this time, Fiserv was holding Bessemer's data hostage and the "services" Fiserv Solutions alleges to have been provided were contrary to Bessemer's express instructions and were unacceptable to Bessemer.

20. Unhappy that its tactics did not succeed in procuring free deconversion and transition services or avoiding early termination fees, Bessemer attempted to escalate its pressure tactics.

**ANSWER**: Bessemer denies the allegations in paragraph 20.

21. In June 2018, Bessemer stopped paying its invoices, even though it continued to accept and utilize all of the processing services identified in the Master Agreement to operate its business every day.

**ANSWER**: Bessemer denies the allegations in paragraph 21, except that Bessemer admits that it stop paying certain disputed invoices and utilized Fiserv Solutions' processing services. Bessemer refers to its April 11, 2018 notice of termination demanding that Fiserv Solutions return Bessemer's files and information to Bessemer for in-house processing by Bessemer in advance of Bessemer's transition to its successor vendor. Bessemer states that by virtue of Fiserv Solutions' refusal to return Bessemer's information and misrepresenting the time it required to provide deconversion services, Bessemer had no reasonable choice but to continue to use Fiserv Solutions' processing platform because Fiserv was holding Bessemer's data hostage.

9

22.     Then, in a letter dated July 18, 2018, Bessemer demanded a "refund" of all invoices it had previously paid, without identifying any issues or discrepancies with particular invoices. Moreover, Bessemer went so far as to prospectively dispute all future invoices that Fiserv Solutions might issue: "[T]he Credit Union disputes any invoices that have been unpaid or that will be subsequently issued by Fiserv." Despite continuing to accept Fiserv Solutions' services, Bessemer "disputed" any amounts that Fiserv might invoice for them in the future.[2]

ANSWER: Bessemer denies the allegations in paragraph 22 that it did not identify any issues or discrepancies with particular Fiserv invoices and that Bessemer allegedly was continuing to accept Fiserv Solutions' services.  Bessemer states that its March 7, 2018 letter (ECF No. 48-12) provides the reasons for its refund demand and Bessemer refers to Section 10(b) of the Master Agreement for a statement of Fiserv Solutions' burden to substantiate its invoices with appropriate audit documentation.

23.     Fiserv Solutions' Assistant General Counsel responded to the assertions in Bessemer's letter by email dated July 25, 2018. Among other things, Fiserv Solutions again asked Bessemer to provide information about its plans and timeline for deconversion:

> We also await your client's intentions with respect to its Notice of Termination of the Agreement. Despite our repeated requests, we have not received the anticipated deconversion date or the name of the new provider. When we can we expect that information? Deconversion is a significant undertaking for the credit union, Fiserv and the new provider such that planning should begin as soon as possible to best meet all parties' expectations and timelines.
> In the meantime, and consistent with our contractual obligations, we continue to provide services for the credit union and expect the credit union to likewise meet its contractual obligations, including paying for the services its

---

[2] Bessemer did not submit payment for its outstanding invoices until November 2018.

continues to use.

**ANSWER**: Bessemer admits the allegations in paragraph 23.

24.     Once again, however, Bessemer failed to and refused to provide any information with respect to its deconversion plans in response to this communication. Specifically, Bessemer did not identify a new service provider, the technical requirements of that service provider or the timeline for Bessemer's deconversion. Instead, Bessemer continued to operate on Fiserv Solutions' processing platform and accept services from Fiserv Solutions every day.

**ANSWER**: Bessemer denies the allegations in paragraph 24, except that Bessemer admits that Bessemer did not identify a new service provider or its technical requirements in immediate response to this communication and admits that it continued to operate on Fiserv Solutions' processing platform.  Bessemer refers to its April 11, 2018 notice of termination which sought to have Fiserv Solutions return Bessemer's information to Bessemer itself for in-house processing by Bessemer in advance of being provided to a new service provider.  Bessemer states that by virtue of Fiserv Solutions' refusal to return Bessemer's information and misrepresenting the time it required to provide deconversion services, Bessemer had no reasonable choice but to continue to receive its information from Fiserv and let Fiserv Soluations dictate the timeframe for deconversion.  During this time, Fiserv was holding Bessemer's data hostage and the "services" Fiserv Solutions alleges to have been provided were contrary to Bessemer's express instructions and were unacceptable to Bessemer.

25.     On August 22, 2018, [Ms.] Joy Peterson, Bessemer's Chief Executive Officer, communicated with Mr. Vincent Brennan, who was then Fiserv Solutions' President of Credit Union Solutions, about a service issue stating: "This is simply ridiculous. I can't even put into words how much I hate Fiserv at this point."

11

**ANSWER**:     Bessemer admits the allegations in paragraph 25.

26.     Mr. Brennan responded the next day by email, acknowledging that Bessemer was unhappy with Fiserv Solutions and again offering to assist Bessemer in transitioning to another service provider if Bessemer would simply provide the necessary information:

> Clearly this relationship is not agreeable to you as you continue to state in your emails. I believe you notified us of your intent not to renew our agreement and move to another provider. We stand ready to assist you with that move but we have received no further information from you or your counsel. Please let us know the date you intend to deconvert and the name of the new provider so we can assist you in making that move.

**ANSWER**:     Bessemer denies the allegations in paragraph 26, except that Bessemer admits that "Mr. Brennan responded the next day by email, acknowledging that Bessemer was unhappy with Fiserv Solutions" and the contents of the email contained in the indented block quotation.

27.     Yet again, Bessemer did provide not any information with respect to its deconversion plans in response to this communication. Specifically, Bessemer did not identify a new service provider, the technical requirements of that service provider or the timeline for Bessemer's deconversion. Instead, Bessemer continued to operate on Fiserv Solutions' processing platform and accept services from Fiserv Solutions every day.

**ANSWER**:     Bessemer denies the allegations in paragraph 27, except that Bessemer admits that Bessemer did not identify a new service provider or its technical requirements in immediate response to this communication and admits that it continued to operate on Fiserv Solutions' processing platform.   Bessemer refers to its April 11, 2018 notice of termination which sought to have Fiserv Solutions return Bessemer's information to Bessemer itself for in-house processing by Bessemer in advance of being provided to a new service provider.

Bessemer states that by virtue of Fiserv Solutions' refusal to return Bessemer's information and misrepresenting the time it required to provide deconversion services, Bessemer had no reasonable choice but to continue to receive its information from Fiserv and let Fiserv Soluations dictate the timeframe for deconversion.  During this time, Fiserv was holding Bessemer's data hostage and the "services" Fiserv Solutions alleges to have been provided were contrary to Bessemer's express instructions and were unacceptable to Bessemer.

28.     On September 11, 2018, Fiserv Solutions (through counsel) provided Bessemer with a reconciliation of the invoices that Fiserv Solutions issued in 2018 in response to Bessemer's previous "audit" demand. That reconciliation revealed that Fiserv Solutions had ***under billed*** Bessemer by $441.92. The reconciliation also mapped the various provisions of the Master Agreement to Fiserv Solutions' invoices so that Bessemer could see (although after 40 years, it certainly already knew) how Fiserv Solutions calculated the amounts due under the Master Agreement.

**ANSWER**:     Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28, except that Bessemer admits that on or about September 11, 2018, Fiserv Solutions provided a purported "reconciliation" of invoices to Bessemer and denies that the purported "reconciliation" constituted a proper audit response substantiating Fiserv Solutions' invoices in accordance with the requirements of the Master Agreement's audit provision.

29.     Fiserv Solutions' letter further noted that Bessemer had failed to pay the invoices issued on May 31, June 28 and July 30 in the aggregate amount of $38,934.52, and that the invoice issued on August 30 in the amount of $12,746.67 would begin to accrue late fees on September 30. Fiserv Solutions demanded payment in the aggregate amount of $51,681.19 on or before

September 30, 2018. The letter made clear that: "If Bessemer fails to remit payment in full by that date, Fiserv intends to pursue an appropriate counterclaim in the action that Bessemer has filed and to seek all available remedies including the imposition of late fees and attorneys' fees."

        **ANSWER**:    Bessemer admits the allegations in paragraph 29.

30.    On September 14, 2018, Bessemer (through its counsel) responded, dismissing Fiserv Solutions' invoice reconciliation without (yet again) identifying any specific issues or purported discrepancies with respect to any particular invoice. Unable to refute Fiserv Solutions' invoice reconciliation or demonstrate any justification for continuing to accept processing services from Fiserv Solutions without paying for them, Bessemer resorted to threats: "Your client would be well advised to consider all the adverse consequences of prosecuting a meritless counterclaim against a customer that has been victimized by a multitude of problems, including ***several data breaches caused by Fiserv.***" (emphasis in original.) Bessemer provided no details or facts supporting its assertion of "several data breaches," but the implication of its statement was clear: Fiserv Solutions would suffer adverse consequences from negative publicity when Bessemer went public with its "data breach" claims, and Bessemer planned to do just that if Fiserv Solutions continued to insist that Bessemer pay its invoices or filed a counterclaim to enforce its rights under the Master Agreement.

        **ANSWER**:    Bessemer denies the allegations in paragraph 30, except that Bessemer admits that its counsel sent the referenced letter.

31.    Fiserv Solutions (through counsel) responded by letter that same day, making clear that it would not bend to such extortionate tactics:

> If your client moves forward with the lawsuit and refuses to pay Fiserv's invoices, there will be counterclaims. Your repeated threats of negative publicity and "adverse consequences" reveal an unwillingness or inability to

> engage on the merits and will meet
> with no more success here than they have with your other
> credit union clients. If Bessemer would like to
> "productively engage" – by paying its invoices and
> discussing the timing and logistics of its deconversion and
> transition – Fiserv remains, as it has been throughout, fully
> prepared to discuss those issues.

    **ANSWER**:    Bessemer admits the allegations in paragraph 31.

32.    Each of Bessemer's unsupported assertions of "material breach," purported terminations of the Master Agreement, refusal to pay Fiserv Solutions' invoices when due, demands for refunds of invoices previously paid, and refusal to pay for or cooperate with deconversion and transition was pretextual, coercive and undertaken by Bessemer in bad faith. Each of these actions by Bessemer has injured and damaged Fiserv Solutions by, among other things, imposing unnecessary cost and inconvenience on Fiserv Solutions' personnel and requiring Fiserv Solutions to incur attorneys' fees and other expenses.

    **ANSWER**:    Bessemer denies the allegations in paragraph 32.

33.    Bessemer did not provide any information with respect to its deconversion plans in response to these communication. Specifically, Bessemer did not identify a new service provider, the technical requirements of that service provider or the timeline for Bessemer's deconversion. Instead, Bessemer continued to operate on Fiserv Solutions' processing platform and accept services from Fiserv Solutions every day.

    **ANSWER**:    Bessemer denies the allegations in paragraph 33, except that Bessemer admits that it did not identify a new service provider or its technical requirements immediately in response to certain communications of Fiserv Solutions, and that Bessemer continued to operate on Fiserv Solutions' processing platform.   Bessemer refers to its April 11, 2018 notice of termination which sought to have Fiserv Solutions return Bessemer's information

to Bessemer itself for in-house processing by Bessemer in advance of being provided to a new service provider.  Bessemer states that by virtue of Fiserv Solutions' refusal to return Bessemer's information and misrepresenting the time it required to provide deconversion services, Bessemer had no reasonable choice but to continue to receive its information from Fiserv and let Fiserv Soluations dictate the timeframe for deconversion.   During this time, Fiserv was holding Bessemer's data hostage and the "services" Fiserv Solutions alleges to have been provided were contrary to Bessemer's express instructions and were unacceptable to Bessemer.

34.     In September 2018, after refusing to provide information with respect to deconversion, refusing to pay outstanding invoices (or any future invoices), Bessemer once again sought to escalate pressure and obtain leverage.

**ANSWER**:   Bessemer denies the allegations in paragraph 34, except Bessemer admits that it did not identify a new service provider or its technical requirements immediately in response to certain communications of Fiserv Solutions and that Bessemer refused to pay certain invoices subject to a legitimate dispute.

35.     In an attempt to manufacture some type of "breach" for the purposes of embarrassing and extorting Fiserv Solutions to accede to its demands, Bessemer commissioned and orchestrated an unsuccessful "brute force" cyberattack on Fiserv Solutions' servers and systems.

**ANSWER**:   Bessemer denies the allegations in paragraph 34.

36.     Specifically, on September 24, 2018, Bessemer and/or its agents attempted a "brute force" cyberattack on the servers and systems that performed Virtual Branch Services for Bessemer and over 750 other credit unions.

**ANSWER**:   Bessemer denies the allegations in paragraph 36, except that

16

Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegation that the servers and systems that performed Virtual Branch Services for Bessemer also were used by 750 other credit unions and admits that on or about September 24, 2018, a security review occurred on test accounts authorized by Bessemer.

37.     A brute force attack is a trial-and-error method used to obtain information such as a user password or personal identification number (PIN). In a brute force attack, automated software is used to generate a large number of consecutive guesses as to the value of the desired data.

**ANSWER**: Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 37.

38.     Fiserv Solutions identified irregular activity indicative of a cyberattack, based on a review of transaction processing data from September 25. Fiserv Solutions' data security team observed that backup files for Virtual Branch systems and servers were significantly larger than normal. Fiserv Solutions immediately began to review and investigate the matter, which revealed that failed Virtual Branch authorization requests accounted for the unusually large size of these backup files. Each Virtual Branch authorization request with data in the backup files corresponds to a failed attempted login to a member's online banking profile. Failed attempted logins are most commonly associated with incorrect username and password combinations. Fiserv Solutions' investigation also revealed that nearly all of this activity was occurring in member accounts for a single credit union – Bessemer.

**ANSWER**:     Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38.

39.     Between 2:19 p.m. and midnight on September 24, the attack caused at least

181,322 failed Virtual Branch authorization attempts. Between 1:30 a.m. and midnight on September 25, the attack caused at least 1,964,366 failed Virtual Branch authorization attempts. Between 3:17 p.m. and midnight on September 26, the attack caused at least an additional 932,258 failed Virtual Branch authorization attempts. Altogether, the attacker made over 3 million failed Virtual Branch authorization attempts.

**ANSWER**:    Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39.

40.    Virtual Branch authorization attempts were occurring at rates from 35 to 50 *per second*, rates that are at least *ten times higher* than Fiserv Solutions typically processes. The size, scope, and speed of the attack strongly suggested to Fiserv Solutions' data security team that a wide-ranging attempt to penetrate accounts for the nearly 750 Virtual Branch clients serviced by the servers and systems had begun.

**ANSWER**:    Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40.

41.    Upon this discovery, Fiserv Solutions immediately committed significant resources in security and personnel to defending its servers and systems against the attack. Fiserv Solutions implemented security measures that successfully prevented unauthorized access and put a stop to the attacks. Fiserv Solutions' efforts to repel the attack prevented the unauthorized access to the legitimate accounts or personal information of any member of Fiserv Solutions' clients, including Bessemer.

**ANSWER**:    Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41, except Bessemer states that test accounts were created for purposes of the security review, and admits that the security review did not result in

18

any "unauthorized access to the legitimate accounts or personal information of any member of Fiserv Solutions' clients, including Bessemer."

42.     Upon discovering the attack, Fiserv Solutions attempted to notify Bessemer via telephone calls to its Chief Executive Officer, Joy Peterson. Fiserv Solutions placed a telephone call to Ms. Peterson at approximately 2:00 p.m. (Eastern) on September 26. Strangely, Ms. Peterson refused to take the call. The Fiserv Solutions representative left a voicemail for Ms. Peterson and followed that up with an email stating that he needed to speak with her "as soon as possible regarding an issue we have detected on your Home Banking site." More than an hour later, Ms. Peterson responded by email directing Fiserv Solutions to communicate with her only by email. Fiserv Solutions placed additional calls to Bessemer regarding the attack on September 26, leaving voicemails when there was no answer. Neither Ms. Peterson nor anyone else at Bessemer returned these calls.

**ANSWER**:     Bessemer denies the allegation in paragraph 42 that the security review constituted an "attack," lacks knowledge or information sufficient to form a belief about the truth of the allegation that Fiserv Solutions' referenced communications occurred "upon discovering" the security review, and admits the remaining portions of paragraph 42.  Bessemer states that the calls were responded to in writing by Bessemer. *See* September 28, 2019 letter, ECF No. 48-7.

43.     On September 27, Fiserv Solutions sent an email to Ms. Peterson that attached a security notice. The security notice stated:

> Notice of Potential Fraudulent Activity Identified
>
> We have identified an unusually and extremely high number of attempts to enroll in Bessemer FCU's online banking that have occurred since Monday, September 24, 2018. This activity is indicative of a brute force attack. We

> have taken several steps that have successfully blocked the attack and we are actively monitoring your online banking to detect any further attacks.
>
> The unknown perpetrator utilized a program to enter high volumes of numbers in the account enrollment application. We identified four new online banking enrollments during this period and have blocked online banking access for those accounts until you are able to validate the enrollments with your members who own the associated accounts. Additionally, we have suspended new online banking enrollments for your financial institution while we work with you on next steps.
>
> Please contact us as soon as possible so we can provide you the information on the four enrollments that have occurred since September 24th.

The email stated: "It's imperative that we talk with you as soon as possible today so we can discuss our action plan."

      **ANSWER**:    Bessemer admits the allegations in paragraph 43.

44.    Once again, neither Ms. Peterson nor anyone else from Bessemer responded to Fiserv Solutions' email or the security notice.

      **ANSWER**:    Bessemer denies the allegations in paragraph 44 and refers to its September 28, 2019 letter, ECF No. 48-7.

45.    Bessemer did not request or obtain Fiserv Solutions' consent to conduct any "security review," much less the attack. Bessemer did not provide Fiserv Solutions with any advance notice of any "security review," much less the attack.

      **ANSWER**:    Bessemer denies the allegation in paragraph 45, states that the security review occurred with Fiserv Solutions' express or implied consent, and admits that Bessemer did not specifically notify Fiserv in advance of the particular security review.

46.    Upon information and belief, the attack orchestrated by Bessemer was an attempt

to manufacture an additional "data breach" for Bessemer to assert in this action, to obtain improper and unsanctioned "discovery," and to induce Fiserv Solutions to forego its claims for unpaid invoices and early termination fees and to provide Bessemer with deconversion and transition services without charge through threats of public disclosure and coercion.

>    **ANSWER**:    Bessemer denies the allegations in paragraph 46.

47.    On information and belief, Bessemer created fictitious accounts using social security numbers and other personally identifiable information belonging to third parties, and at least one deceased person, who have or had personal or familial relationships with Bessemer's CEO.

>    **ANSWER**:    Bessemer denies the allegation in paragraph 47 except that Bessemer admits that it created test accounts for purposes of the security review, that the test accounts used pseudonyms and were associated with nonexistent street addresses, and that the test accounts employed Social Security Numbers associated with deceased individuals who have had personal or familial relationships with Bessemer's managerial employees.

48.    Fiserv Solutions incurred significant costs and expended significant resources to repel and later investigate the cause and source of the brute force attack, test the affected systems and assess the business and legal impact of the brute force attack, including the cost of security consultants and attorneys' fees.

>    **ANSWER**:    Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 48.

### BREACH OF MASTER AGREEMENT

49.    Bessemer incorporates its responses to the allegations of paragraphs 1 through 48 as though fully set forth herein.

50.    Bessemer and Fiserv Solutions are parties to the Master Agreement.

21

**ANSWER**:     Bessemer admits the allegations in paragraph 50.

51.     Fiserv Solutions performed and satisfied all of its contractual obligations to Bessemer under the Master Agreement. Any and all conditions precedents to performance of Bessemer's contractual obligations to Fiserv Solutions have been satisfied or waived.

**ANSWER**:     Bessemer denies the allegations in paragraph 51.    Without limitation, Bessemer specifically denies that Fiserv Solutions failed to satisfy the conditions precedent necessary to assert this claim because Fiserv fraudulently induced Bessemer into contracting with Fiserv Solutions, engaged in fraud in the performance of its contractual obligations, and failed to fully and properly perform its contractual obligations and satisfy the conditions required of it.

52.     Bessemer materially breached multiple provisions of the Master Agreement by commissioning and orchestrating the attack on Fiserv Solutions' servers and systems. Nothing in the Master Agreement provides Bessemer with the legal right to conduct the attack (or so-called "security review").

**ANSWER**:     Bessemer denies the allegations in paragraph 52.

53.     Specifically, Bessemer breached Paragraph 3 of the ASP Services Exhibit by, among other things, attempting to circumvent the devices employed by Fiserv Solutions to prevent unauthorized access to Fiserv Solutions' systems and servers. By orchestrating the cyberattack on Fiserv Solutions' systems and servers, Bessemer engaged in repeated and multiple attempts to circumvent Fiserv Solutions' systems and procedures that are designed to prevent unauthorized access. This was done without the knowledge or consent of Fiserv Solutions and in direct contravention to, and in breach of, Bessemer's obligations under the Master Agreement.

**ANSWER**:     Bessemer denies the allegations in paragraph 53.

54.     In addition, Bessemer materially breached Paragraph 5 of the ASP Services Exhibit as follows:

a.   Bessemer materially breached Paragraph 5(a) by failing to comply with Fiserv Solutions' procedures and operating instructions for use of Services and the Fiserv Solutions Systems. The attack was not authorized by Fiserv Solutions or consistent with Fiserv Solutions' procedures or operating instructions for use of Services and the Fiserv Solutions System. Such procedures and instructions do not, and would not, permit a client to conduct a surprise, unauthorized attack on Fiserv Solutions' servers and systems.

b.   Bessemer materially breached Paragraph 5(g) by failing to notify Fiserv Solutions of the attack (of which it was obviously aware) and evading Fiserv Solutions' attempts to communicate with Bessemer about that matter. As a result of Bessemer's material breach, Fiserv Solutions lacked material information necessary to assess the true nature and scope of the threat, causing Fiserv Solutions to incur additional damages.

c.   Further, Bessemer has a contractual duty pursuant to Paragraph 5(h) to indemnify and hold Fiserv Solutions harmless from any and all claims arising out of Bessemer's use of the Fiserv Solutions system in a manner other than that provided in the Agreement. The attack commissioned and orchestrated by Bessemer constituted the use of the Fiserv Solutions System in a manner other than that provided in the Master Agreement.

**ANSWER**:     Bessemer denies the allegations in paragraph 54.

55.     Bessemer breached Paragraph 3 of the Master Agreement, which defines Fiserv

23

Information to include proprietary information, all information regarding the Deliverables, all software products (which includes things such as databases, methods, architecture), any personally identifiable information and "any other information or data received from or on behalf of Fiserv or its Affiliates that Client could reasonably be expected to know is confidential," by (a) disclosing confidential Fiserv Information to third-parties, including the third-parties who orchestrated and conducted the attack, without consent; and (b) using confidential Fiserv Information other than for lawful purposes contemplated by the Master Agreement. Specifically, Bessemer used confidential Fiserv Information for purposes of orchestrating an unlawful attack on Fiserv Solutions' servers and systems and to threaten the disclosure of confidential Fiserv Information to induce Fiserv Solutions to provide Bessemer with money or other things of value, including the release or forgiveness of Fiserv Solutions' rights to payment under the Master Agreement and/or the provision of deconversion and transition services by Fiserv Solutions without charge.

**ANSWER**:    Bessemer denies the allegations in paragraph 55.

56.    Bessemer has further materially breached the Master Agreement by refusing and failing to pay for certain services provided by Fiserv Solutions and accepted by Bessemer, including services demanded by Bessemer and provided in connection with Bessemer's deconversion.

**ANSWER**:    Bessemer denies the allegations in paragraph 56.

57.    Bessemer has further materially breached the Master Agreement by refusing and failing to pay early termination fees as required by Paragraph 8(b) of the ASP Services Exhibit.

**ANSWER**:    Bessemer denies the allegations in paragraph 57.

58.    As a direct and proximate cause of Bessemer's breaches of the Master Agreement,

Fiserv Solutions has been damaged in the amounts owed for the services provided by Fiserv Solutions, early termination fees, and investigative and legal fees incurred as a direct and proximate result of the brute force attack, in addition to late fees, prejudgment interest, attorneys' fees and other amounts provided in the Master Agreement, all in an amount to be proven at trial.

      **ANSWER**:    Bessemer denies the allegations in paragraph 58.

<u>**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**</u>

59.    Bessemer incorporates its responses to the allegations of paragraphs 1 through 58 as though fully set forth herein.

60.    By virtue of the Master Agreement and the resulting contractual relationship between Fiserv Solutions and Bessemer, Bessemer owed Fiserv Solutions a duty of good faith and fair dealing in the performance of its obligations under the Master Agreement.

      **ANSWER**:    Bessemer lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 60.

61.    Bessemer breached its duty of good faith and fair dealing in the performance of its obligations to Fiserv Solutions under the Master Agreement by, among other things, (a) asserting unsupported breaches of the Master Agreement; (b) refusing to pay Fiserv Solutions' invoices when due; (c) making contractual demands in bad faith; and, (d) conducting a brute force attack. Bessemer has undertaken these actions to avoid its contractual obligations and obtain benefits from Fiserv Solutions to which it was not entitled under the Master Agreement.

      **ANSWER**:    Bessemer denies the allegations in paragraph 61.

62.    As a direct and proximate cause of Bessemer's breach of its duty of good faith and fair dealing, Fiserv Solutions has been damaged in the amounts owed for the services provided by Fiserv Solutions, early termination fees, and investigative and legal fees incurred as a direct and proximate result of the brute force attack, in addition to late fees, prejudgment interest, and

attorneys' fees, all in an amount to be proven at trial.

**ANSWER**:    Bessemer denies the allegations in paragraph 62.

## CONTRACTUAL RECOVERY OF ATTORNEYS' FEES AND COSTS

63.    Bessemer incorporates its responses to the allegations of paragraphs 1 through 62 as though fully set forth herein.

64.    In accordance with the Court's September 15, 2021 Order (ECF No. 121), Fiserv Solutions' counterclaim for contractual recovery of attorneys' fees and costs was dismissed. Consequently, no response is required to paragraphs 63 to 68.  Bessemer denies that Fiserv Solutions is or will be the prevailing party in this action or is entitled to an award of its attorneys' fees, costs, and expenses.

## AFFIRMATIVE AND OTHER DEFENSES

### First Defense
### Fiserv Solutions' Breach

Fiserv's purported contracts, policies, terms, and notices, or portions thereof, are unenforceable by Fiserv Solutions because Fiserv Solutions materially breached its obligations to Bessemer, including obligations arising under the implied covenant of good faith and fair dealing. Fiserv Solutions' material breaches has excused Bessemer's performance.

### Second Defense
### Fraud

Fiserv's purported contracts, policies, terms, and notices, or portions thereof, are unenforceable by Fiserv Solutions because Fiserv defrauded Bessemer by fraudulently inducing Bessemer into contracting with Fiserv Solutions and engaged in fraudulent misconduct in the performance of its contractual obligations.  Bessemer incorporates by reference the allegations in its complaint, including that:

- **Fraud in the Inducement:**  Fiserv falsely represented to Bessemer that Fiserv Solutions' Virtual Branch system, which hosted Bessemer's online banking website, provided adequate safeguards and satisfied Federal Financial Institutions Examination Council (FFIEC) requirements.  In reality, Virtual Branch suffered security problems and was not complaint with those requirements.

- **Fraud in the Performance:**  Fiserv falsely represented that it provided Bessemer's archived documents as part of the de-conversion from Fiserv Solutions.  Fiserv made these false reorientations not just to Bessemer, but also to the Court.  When Bessemer filed a motion for a temporary restraining order and preliminary injunction to effectuate the de-conversion, Fiserv claimed in filings with the Court that it "indisputably sent the records" and "[a]ny claim that [d]efendants are 'denying access' to this data is simply false" (ECF No. 24).  Fiserv concealed from Bessemer and the Court that it was in fact withholding from Bessemer over 900 of its documents, which were subsequently returned to Bessemer.

### Third Defense
### Public Policy

Fiserv's purported contracts, policies, terms, and notices, or portions thereof, are unenforceable because they are contrary to public policy, including the Federal Credit Union Act and rules, regulations, and guidance issued by the National Credit Union Administration and Federal Financial Institutions Examination Council.  Public policy exists to protect the safety and soundness of not-for-profit credit unions such as Bessemer, as well as the individual consumers who trust Bessemer to safeguard their most sensitive financial and personal information.

### Fourth Defense
**Unenforceability**

Fiserv's purported contracts, policies, terms, and notices, or portions thereof, are unenforceable because they are unreasonable, not necessary to protect any legitimate interest of Fiserv, unconscionable, punitive, procured by Fiserv's superior bargaining power and without a reasonable meaningful choice on the part of Bessemer, vague, indefinite, misleading, and uncertain; and because of lack of consideration, failure of consideration, and frustration of purpose.

### Fifth Defense
**Waiver, Estoppel, Consent, Reliance, Laches, Acquiescence**

Bessemer at all times relied on the authorization, approval, encouragement, and acquiescence of Fiserv.  Fiserv knew or should have known of Bessemer's actions, but Fiserv unreasonably delayed efforts to enforce its rights, if any, causing significant prejudice to Bessemer and others and substantial changes to their positions. Fiserv Solutions' claims are barred, in whole or in part, by the doctrines of waiver, estoppel (whether equitable, promissory, or otherwise), consent, reliance, laches, and acquiescence.

### Sixth Defense
**Fiserv's Acts or Omissions**

Fiserv's claims are barred, in whole or in part, due to Fiserv's acts or omissions or those of its employees and agents, including Fiserv's own deficiencies in performing services, its own misconduct, and its own failures to act reasonably and follow applicable standards and requirements.

### Seventh Defense
**Failure to State a Cause of Action**

The counterclaims fail to state a claim upon which relief can be granted.

**Eighth Defense**
**Standing**

Fiserv Solutions' claims are barred, in whole or in part, for lack of standing to the extent that they are based on alleged access to information or systems which Fiserv Solutions does not own or control, including information and system storage locations that are owned and controlled by Bessemer or third parties.

**Ninth Defense**
**Abandonment**

Some or all of the property interests on which Fiserv Solutions relies have been forfeited or abandoned, including through Fiserv's failure to reasonably protect the confidential or proprietary information on its systems and to implement reasonable access controls.

**Tenth Defense**
**Public Domain and Non-Protectable Information**

Some or all of Fiserv Solutions' alleged confidential and proprietary information or portions thereof are in the public domain or constitute facts, information, works, general industry information, third-party information, or non-confidential information that are not protectable under the law.

**Eleventh Defense**
**No Duty Owed by Bessemer**

Fiserv Solutions' claims are barred, in whole or in part, because Bessemer did not and does not owe the alleged duty to Fiserv and Bessemer acted in accordance with applicable duties.

**Twelfth Defense**
**Actions Taken without Authority**

To the extent a Bessemer employee or agent committed any unlawful acts alleged in the counterclaims, those acts were committed outside the scope of the employment or agency relationship, without Bessemer's authorization, against Bessemer's directions, without authority

29

from Bessemer, or during a time when there was no extant employment or agency relationship with Bessemer.

**Thirteenth Defense**
***De Minimis* Harm**

To the extent Bessemer harmed Fiserv Solutions, any such harm was *de minimis* and therefore not actionable.

**Fourteenth Defense**
**Unclean Hands**

Fiserv's claims and the requested relief are barred, in whole or in part, by the doctrine of unclean hands because Fiserv engaged in immoral, unconscionable, or inequitable conduct related to the subject matter of this action that injured Bessemer.

**Fifteenth Defense**
**Indemnification Unavailable**

Fiserv Solutions' claims and the requested relief are barred, because Fiserv Solutions is not entitled to indemnification for acts and omissions caused by its own negligent, grossly negligent, or intentional acts.

**Sixteenth Defense**
**Statute of Limitations**

Fiserv Solutions' claims are barred, in whole or in part, by the applicable statute of limitations.

**Seventeenth Defense**
**Waiver and Abandonment**

Fiserv's purported contracts, policies, terms, and notices, or portions thereof, were knowingly, voluntarily, and intentionally waived and abandoned by Fiserv through its affirmative conduct and failure to act, so as to clearly manifest and evidence Fiserv's intent not to claim the purported advantages of such contracts, policies, terms, and notices, or portions thereof.

30

### Eighteenth Defense
### Wordings Construed against Fiserv Solutions

Fiserv Solutions was the drafter of any purported contracts, policies, terms, and notices, or portions thereof. Accordingly, their wordings must be construed against Fiserv Solutions.

### Nineteenth Defense
### No Damage or Harm

Fiserv Solutions' claims and the requested relief are barred, in whole or in part, because Fiserv Solutions has not been damaged or harmed, and Bessemer has not been benefited, by reason of any act or omission alleged against Bessemer.

### Twentieth Defense
### No Causation

Fiserv Solutions' claims and the requested relief are barred, in whole or in part, because Fiserv's damages or harm, if any, were not caused by Bessemer. Any such damages or harm resulted from causes other than any act or omission by Bessemer, including by individuals and entities other than Bessemer and for which Bessemer is not legally responsible.

### Twenty-first Defense
### Failure to Mitigate Damages

Fiserv Solutions' claims and the requested relief are barred, in whole or in part, because Fiserv Solutions failed to mitigate, minimize, or avoid its damages, if any.

### Twenty-second Defense
### Speculative and Unrecoverable Injury and Damages

Fiserv Solutions' claims and the requested relief are barred, in whole or in part, because the alleged injury or damage suffered by Fiserv is nonexistent, is speculative, lacks specificity, is not of the nature or to the extent alleged, is not recoverable for the claims asserted, or was not the foreseeable result of Bessemer's alleged conduct.

**Twenty-third Defense**
**Innocent Intent and Lack of Willfulness**

The relief Fiserv Solutions seeks, including damages, if any, is limited by Bessemer's innocent intent and lack of willfulness. Bessemer has not willfully violated Fiserv's rights or actively induced others to do so. Bessemer acted in good faith, reasonably, without any actual or constructive knowledge of any alleged violation of Fiserv Solutions' rights, and without any willfulness or culpable intent.

**Twenty-fourth Defense**
**Assumption of Risk**

Fiserv Solutions freely, voluntarily, and knowingly assumed the risk of all alleged acts, injuries, and damages asserted against Bessemer.

**Twenty-fifth Defense**
**Double Recovery and Unjust Enrichment**

The relief Fiserv Solutions seeks, including damages, if any, is limited to the extent it would constitute an unlawful double recovery or unjust enrichment.

**Twenty-sixth Defense**
**Setoff and Recoupment**

The relief Fiserv Solutions seeks, including damages, if any, is limited to the extent Bessemer is entitled to set off or recoup damages or other relief, including by the damages and other relief Fiserv owes Bessemer on account of the claims Bessemer is prosecuting against Fiserv.

**Twenty-seventh Defense**
***In Pari Delicto***

Fiserv's claims are barred, in whole or in part, by the doctrine of *in pari delicto* because Fiserv has engaged in culpable wrongdoing barring it from bringing claims against Bessemer.

**Twenty-eighth Defense**
**Prejudgment Interest Unavailable**

Fiserv Solutions' claim for prejudgment interest is barred, in whole or in part, because the amount of Fiserv Solutions' damages, if any, is not and has not been readily ascertainable and because relevant considerations do not support awarding prejudgment interest to Fiserv.

**Jury Trial Demand**

Bessemer requests a trial by jury of all issues so triable.

**Reservation of Rights**

In asserting its defenses, Bessemer does not assume the burden of proof with respect to any issue as to which applicable law places the burden of proof upon Fiserv.  Further, Bessemer intends to rely upon such other defenses as may become available by law or in the course of discovery or further factual development of this case. Bessemer reserves the right to amend its answer and to assert such defenses.

Dated: October 18, 2021

Respectfully submitted,

BARCLAY DAMON LLP

By: /s/ Charles J. Nerko
    Charles J. Nerko (NY 4764338)
    Benjamin M. Wilkinson (NY 4927661;
    *pro hac vice* to be filed)
BARCLAY DAMON LLP
80 State Street
Albany, NY 10020
cnerko@barclaydamon.com
bwilkinson@barclaydamon.com
(518) 429-4200

33

Richard J. Parks (PA 40477)
PIETRAGALLO GORDON
ALFANO BOSICK & RASPANTI, LLP
7 West State Street, Suite 100
Sharon, PA 16146
(724) 981-1397
rjp@pietragallo.com

*Attorneys for Plaintiff*
*Bessemer System Federal Credit Union*