# EXHIBIT "A"



2601 Network Boulevard, Suite 600
Frisco, TX 75034
888-287-3371
www.fiserv.com

September 10, 2013

Linda K. Gregory
CEO
Bessemer System Federal Credit Union
106 Woodfield Drive
Greenville, PA 16125

Dear Ms. Gregory,

Enclosed for your files please find the fully executed Master Agreement dated August 13, 2013.

If you have any questions or concerns, please don't hesitate to contact me.

Sincerely,

Albert J. Ku

Enclosure

cc: Richard Reynolds

# fiserv.

## MASTER AGREEMENT

MASTER AGREEMENT ("**Agreement**") dated as of July 1, 2014 ("**Effective Date**") between Fiserv Solutions, Inc., a Wisconsin corporation with offices located at 2601 Network Boulevard, Suite 600, Frisco, TX 75034 ("**Fiserv**"), and Bessemer System Federal Credit Union, a federally chartered credit union with offices located at 106 Woodfield Drive, Greenville, PA 16125 ("**Client**").

Fiserv and Client hereby agree as follows:

1.   Deliverables.

    (a)   General.  Fiserv, itself and through its Affiliates (as defined herein), agrees to provide to Client, and Client agrees to obtain from Fiserv, the services ("**Services**") and products ("**Products**") (collectively, "**Deliverables**") described in the attached Exhibits, subject to the terms set forth in this Agreement and in the applicable Exhibit.  "**Affiliate**" means an entity that controls, is controlled by, or is under common control with a party, where "control" means the direct or indirect ownership of more than 50% of the voting securities of such entity or party.  Each Exhibit will be deemed to incorporate all of the terms of this Agreement.  Use of the term "Exhibit" throughout this Agreement shall include any Schedules attached to such Exhibit.  Exhibits and Schedules attached as of the Effective Date are listed below.

ASP Services Exhibit
    Account Processing Services Schedule to the ASP Services Exhibit
    eFichency Services Schedule to the ASP Services Exhibit
    ID Verification Services Schedule to the ASP Services Exhibit
    Virtual Branch Services Schedule to the ASP Services Exhibit
Equipment Exhibit
Professional and Development Services Exhibit
Software Products
    Sellstation Software Schedule to the Software Products Exhibit

    (b)   Additional Entities and Deliverables.  The parties or their Affiliates may add Deliverables to this Agreement by adding an appropriate new Exhibit or Schedule to this Agreement incorporating the added Deliverables and/or Affiliates, as applicable.  When Deliverables are received by a Client Affiliate or provided by a Fiserv Affiliate under an Exhibit, then for the purposes of that Exhibit, references to "Client" or "Fiserv" in this Agreement will be deemed to include the applicable Client Affiliate or Fiserv Affiliate.  An Affiliate's execution of an amendment to receive or provide Deliverables hereunder shall constitute such Affiliate's agreement to be bound by the terms of this Agreement.

2.   Fees for Deliverables.

    (a)   General.  Client agrees to pay Fiserv: (i) fees for Deliverables as specified in the Exhibits, (ii) out-of-pocket and other additional charges pursuant to Section 2(b), and (iii) Taxes as defined in Section 2(c). Fees may be increased as set forth in the Exhibits.

    (b)   Additional Charges.  Client shall pay travel and living expenses and other out-of-pocket expenses reasonably incurred by Fiserv in connection with the Deliverables.  As applicable, such out-of-pocket expenses shall be incurred in accordance with Fiserv's then-current corporate travel and expense policy.  If an out-of-pocket expense is listed in an Exhibit, such expense may be changed to reflect changes issued by the applicable vendor.

    (c)   Taxes.  Client is responsible for the payment of all sales, use, excise, value added, withholdings and other taxes and duties however designated that are levied by any taxing authority relating to the Deliverables ("**Taxes**").  All Fees and other charges under any Exhibit are exclusive of Taxes.  Client shall

reimburse Fiserv for those Taxes that Fiserv is required to remit on behalf of Client. In no event shall Taxes include taxes based on Fiserv's income.

(d) Payment Terms. Invoices are due and payable upon Client's receipt of such invoice. Client shall pay Fiserv through the Automated Clearing House unless otherwise set forth in the Exhibits. If any invoiced amounts remain unpaid 30 days after Client's receipt of invoice, Client shall pay a monthly late charge based on the unpaid amounts equal to the lesser of 1.5% or the highest amount allowed by law until such invoice amount is paid in full. Client shall neither make nor assert any right of deduction or set-off from amounts invoiced.

3.   Confidentiality and Ownership. The provisions of this Section 3 survive any termination or expiration of this Agreement.

(a) Definitions.

(i)   "**Client Information**" means the following types of information of Client and its Affiliates obtained or accessed by Fiserv from or on behalf of Client or its Affiliates in connection with this Agreement or any discussions between the parties regarding new services or products to be added to this Agreement: (A) trade secrets and proprietary information; (B) customer lists, business plans, information security plans, business continuity plans, and proprietary software programs; (C) any personally identifiable information, defined as information that can be identified to a particular person without unreasonable effort, such as the names and social security numbers of Client's individual customers ("**Client PII**"); and (D) any other information received from or on behalf of Client or its Affiliates that Fiserv could reasonably be expected to know is confidential.

(ii)   "**Fiserv Information**" means the following types of information of Fiserv and its Affiliates obtained or accessed by Client from or on behalf of Fiserv or its Affiliates in connection with this Agreement or any discussions between the parties regarding new services or products to be added to this Agreement: (A) trade secrets and proprietary information (including that of any Fiserv client, supplier, or licensor); (B) client lists, information security plans, business continuity plans, all information and documentation regarding the Deliverables, all software Products (including software modifications and documentation, databases, training aids, and all data, code, techniques, algorithms, methods, logic, architecture, and designs embodied or incorporated therein), and the terms and conditions of this Agreement; (C) any personally identifiable information, defined as information that can identified to a particular person without unreasonable effort, such as the names and social security numbers of Fiserv employees; and (D) any other information and data received from or on behalf of Fiserv or its Affiliates that Client could reasonably be expected to know is confidential.

(iii)   "**Information**" means Client Information and/or Fiserv Information, as applicable.   No obligation of confidentiality applies to any Information that: (A) the receiving entity ("**Recipient**") already possesses without obligation of confidentiality, develops independently without reference to Information of the disclosing entity ("**Discloser**"), or rightfully receives without obligation of confidentiality from a third party; or (B) is or becomes publicly available without Recipient's breach of this Agreement.

(b) Obligations. Recipient agrees to hold as confidential all Information it receives from the Discloser. All Information shall remain the property of Discloser or its suppliers and licensors. Recipient will use the same care and discretion to avoid disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law. Recipient may only use Information for the lawful purposes contemplated by this Agreement, including in the case of Fiserv use of Client Information for fulfilling its obligations under this Agreement, performing, improving and enhancing the Deliverables, and developing data analytics models to produce analytics-based offerings. Client agrees that prior to providing Fiserv access to any Client PII, Client shall ensure that any necessary consent has been obtained that is required by law or regulation for Fiserv to access the information and to use it pursuant to the terms set forth in this Agreement. Fiserv specifically agrees not to use or disclose any "non-public personal information" about Client's customers in any manner prohibited by Title V of the Gramm-Leach-Bliley Act or the regulations issued thereunder ("**GLB**"), as

applicable to Fiserv. Recipient may disclose Information to: (i) its employees and employees of permitted subcontractors and Affiliates who have a need to know; (ii) its attorneys and accountants as necessary in the ordinary course of its business; and (iii) any other person with Discloser's prior written consent. Before disclosure to any of the above persons, Recipient will have a written agreement with (or in the case of clause (ii) a professional obligation of confidentiality from) such person sufficient to require that person to treat Information in accordance with the requirements of this Agreement, and Recipient will remain responsible for any breach of this Section 3 by any of the above persons. Fiserv as Recipient may also disclose Client Information to third party vendors designated by Client. Recipient may disclose Information to the extent required by law or legal process; provided that: (A) Recipient gives Discloser prompt notice, if legally permissible, so that Discloser may seek a protective order; (B) Recipient reasonably cooperates with Discloser (at Discloser's expense) in seeking such protective order; and (C) all Information shall remain subject to the terms of this Agreement in the event of such disclosure. At Recipient's option, Information will be returned to Discloser or destroyed (except as may be contained in back-up files created in the ordinary course of business that are recycled in the ordinary course of business over an approximate 30- to 90-day period or such longer period as required by applicable law) at the termination or expiration of this Agreement or the applicable Exhibit and, upon Discloser's request, Recipient will certify to Discloser in writing that it has complied with the requirements of this sentence. Recipient acknowledges that any breach of this Section 3 may cause irreparable harm to Discloser for which monetary damages alone may be insufficient, and Recipient therefore acknowledges that Discloser shall have the right to seek injunctive or other equitable relief against such breach or threatened breach, in addition to all other remedies available to it at law or otherwise.

(c) Ownership. With the exception of Client Information, all information, reports, studies, object and source code (including without limitation the Products and all modifications, enhancements, additions, upgrades, or other works based thereon or related thereto), flow charts, diagrams, specifications, and other tangible or intangible material of any nature whatsoever produced by Fiserv or jointly with Client or by any of Fiserv's or Client's employees or agents, through or as a result of or related to any of the Deliverables provided hereunder or development of any data analytics models hereunder, and all patents, copyrights, and other proprietary rights related to each of the foregoing, shall be the sole and exclusive property of Fiserv or its Affiliates. Client hereby irrevocably assigns and transfers to Fiserv all rights, title, and interest in any such works referenced in the foregoing sentence, including without limitation copyrights, patent rights, trade secrets, industrial property rights, and moral rights, and shall execute all documents reasonably requested by Fiserv to perfect such rights. Client shall be entitled to use all such work product in accordance with the applicable terms and conditions of this Agreement.

(d) Restrictions. Without limiting any other obligation set forth in this Section 3, Client shall not use, transfer, distribute, interface, integrate, or dispose of any information or content contained in Deliverables in any manner that competes with the business of Fiserv. Except as expressly authorized in an Exhibit, Client shall not: (i) use the Deliverables to provide services to third parties; or (ii) reproduce, republish or offer any part of the Deliverables (or compilations based on any part of the Deliverables) for sale or distribution in any form over or through any medium.

4.   Information Security.

(a) General. Fiserv has implemented and shall maintain an information security program that is designed to meet the following objectives: (i) protect the security and confidentiality of customer information (as defined in GLB); (ii) protect against any anticipated threats or hazards to the security or integrity of such information; (iii) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer; and (iv) ensure the proper disposal of "consumer information" (information obtained from "consumer reports" as defined in the Fair Credit Reporting Act). Fiserv agrees to use security safeguards for all personal information pertaining to Massachusetts residents in accordance with Massachusetts Regulation 201 CMR 17.00. Upon Client's written request, Fiserv shall allow Client to review any associated audit reports, summaries of test results or equivalent measures taken by Fiserv to assess whether its information security program meets the foregoing objectives, to the extent and on the same terms such information is made generally available to Fiserv's other clients. Fiserv shall also take appropriate actions to address incidents of unauthorized access to Client's "sensitive customer information" (as defined in GLB), including notification to Client as soon as possible of any such incident. As required by an applicable industry security organization (e.g. PCI-SSC) or the applicable regulatory agency

having jurisdiction over Client, Fiserv may disclose information regarding any such incident to such organization and such agency.

(b) Fiserv Plan. Within 30 days of Client's written request, Fiserv shall provide to Client a summary of Fiserv's written information security plan for the applicable Services received by Client, and thereafter upon Client's request will provide updates on the status of such information security plan.

(c) Data Encryption. As applicable to the Deliverables received by Client, Client agrees to comply with Fiserv's then-current data encryption policies and controls regarding transmission to and from Fiserv of tapes, images, and records maintained and produced by Fiserv for Client in connection with the Deliverables ("Client Files"), or other data transmitted to and from Fiserv in connection with the Deliverables (collectively with Client Files, "Data"). If Client requests or requires Fiserv to send, transmit, or otherwise deliver Data to Client or any third party in a non-compliant format or manner, or Client (or third party on Client's behalf) sends, transmits or otherwise delivers Data to Fiserv in a non-compliant format or manner, then, notwithstanding any other provision of this Agreement: (i) Client understands and accepts all risk of transmitting Data in an unencrypted or otherwise noncompliant format; and (ii) Client releases, discharges, and shall indemnify and hold harmless Fiserv and its employees, officers, directors, agents, and Affiliates from any and all liability, damage, or other loss under this Agreement or otherwise suffered by or through Client or suffered by any of the indemnified entities arising out of the transmission, destruction, or loss of such Data, including without limitation any information security or privacy breach related to such Data.

(d) Examination of Client Files. Client Files may be subject to examination by such federal, state, or other governmental regulatory agencies as may have jurisdiction over Client's business to the same extent as such records would be subject if maintained by Client on its own premises. Client agrees that Fiserv may give all reports, summaries, or information contained in or derived from the data or information in Fiserv's possession relating to Client when formally requested to do so by a regulatory or government agency. Fiserv reserves the right to charge Client at Fiserv's then-current rates for any assistance provided in response to regulatory requests, government agency requests, and legal process requests such as subpoena or search warrant, in each case to the extent related to Client, Client Files and/or Client Information, whether issued during or after the term of this Agreement.

5.  Hiring and Employment.

(a) Background Checks. Neither party shall knowingly permit any of its employees to have access to the premises, records or data of the other party when such employee: (i) uses drugs illegally; or (ii) has been convicted of a crime in connection with a dishonest act or a breach of trust, as set forth in Section 19 of the Federal Deposit Insurance Act, 12 U.S.C. 1829(a) (a "Conviction"). Consistent with Fiserv's employment practices, newly hired Fiserv employees are required to pass both a pre-employment criminal background check and are required to pass a pre-employment drug screening, as permitted by law, and Fiserv periodically confirms that employees have not acquired any Convictions subsequent to hiring. Upon Client's reasonable request and at Client's expense, Fiserv may perform more frequent confirmation checks or utilize additional reasonable background checking criteria for those of Fiserv's employees who will have access to Client facilities or Client's networks and computer systems located at Client facilities. The results of all such background checks shall be retained solely by Fiserv or the third party performing such screening on behalf of Fiserv.

(b) Equal Employment. Each party agrees that it shall not discriminate against any employee or applicant for employment because of race, creed, color, age, sex, national origin, marital status, liability for service in the armed forces, disability due to veteran status, status as veteran of the Vietnam era or handicap, and each party shall comply with all applicable requirements of the Equal Opportunity Clause set forth in Executive Order 11246, as amended, and its implementing instructions, as well as the Rehabilitation Act of 1973 and the Vietnam Era Veterans' Readjustment Assistance Act of 1974.

6.  Warranties

(a) By Fiserv. Fiserv warrants that: (i) no contractual obligations exist that would prevent Fiserv from entering into this Agreement; (ii) it has the requisite authority to execute, deliver, and perform its obligations

under this Agreement; and (iii) it will comply with all regulatory requirements applicable to Fiserv's operations used in the performance of its obligations under this Agreement.

(b) By Client. Client represents and warrants that: (i) no contractual obligations exist that would prevent Client from entering into this Agreement; (ii) it has the requisite authority to execute, deliver, and perform its obligations under this Agreement; and (iii) it will comply with all regulatory requirements applicable to its receipt and use of Deliverables under this Agreement.

(c) THE WARRANTIES STATED ABOVE AND IN THE EXHIBITS, IF ANY, ARE LIMITED WARRANTIES AND ARE THE ONLY WARRANTIES MADE BY THE PARTIES. FISERV DOES NOT REPRESENT THAT THE DELIVERABLES MEET CLIENT'S REQUIREMENTS OR THAT THE OPERATION OF THE DELIVERABLES WILL BE UNINTERRUPTED OR ERROR-FREE. CLIENT ACKNOWLEDGES THAT IT HAS INDEPENDENTLY EVALUATED THE DELIVERABLES AND THEIR APPLICATION TO CLIENT'S NEEDS. FISERV DISCLAIMS, AND CLIENT HEREBY EXPRESSLY WAIVES, ALL OTHER REPRESENTATIONS, CONDITIONS, OR WARRANTIES, EXPRESS AND IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, AND ANY ARISING FROM A COURSE OF DEALING OR USAGE OR TRADE. CLIENT MAY NOT MAKE ANY WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, ON BEHALF OF FISERV, ITS AFFILIATES OR THEIR RESPECTIVE THIRD PARTY PROVIDERS OR LICENSORS TO ANY AUTHORIZED USER OR ANY OTHER PARTY IN CONNECTION WITH THE DELIVERABLES WITHOUT FISERV'S EXPRESS PRIOR WRITTEN CONSENT.

7. Limitation of Liability. IN NO EVENT SHALL FISERV BE LIABLE FOR LOSS OF GOODWILL, OR FOR SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, OR TORT DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, REGARDLESS OF WHETHER SUCH CLAIM ARISES IN TORT, CONTRACT, OR OTHERWISE. EXCEPT FOR CLAIMS RELATED TO PROPRIETARY RIGHTS OR PAYMENT OBLIGATIONS, NEITHER PARTY MAY ASSERT ANY CLAIM AGAINST THE OTHER RELATED TO THIS AGREEMENT MORE THAN 2 YEARS AFTER SUCH CLAIM ACCRUED. FISERV'S AGGREGATE LIABILITY TO CLIENT AND ANY THIRD PARTY FOR ANY AND ALL CLAIMS OR OBLIGATIONS RELATING TO THIS AGREEMENT SHALL BE LIMITED TO THE TOTAL FEES PAID BY CLIENT TO FISERV UNDER THE SCHEDULE RESULTING IN SUCH LIABILITY IN THE 2 MONTH PERIOD PRECEDING THE DATE THE CLAIM ACCRUED.

8. Term and Termination.

(a) Term. This Agreement shall be effective on the Effective Date and shall remain in effect until the term of all outstanding Exhibits has expired or such Exhibits have terminated, unless otherwise terminated as provided herein. The term for Deliverables may be set forth in the applicable Exhibit. An Exhibit that does not state a term will be effective from its last date of execution until terminated in accordance with this Agreement or the Exhibit.

(b) Termination. In addition to termination rights set forth in any Exhibit:

(i) Either party may, upon written notice to the other, terminate: (A) any Schedule if the other party materially breaches its obligations under that Schedule or under this Agreement with respect to that Schedule; or (B) this Agreement if the other party materially breaches its obligations with respect to the non-breaching party's Information or other intellectual property; and the breaching party fails to cure such material breach within 90 days following its receipt of written notice stating, with particularity and in reasonable detail, the nature of the claimed breach.

(ii) If any invoice remains unpaid by Client 30 days after due, Fiserv may, upon 30 days' written notice to Client, terminate: (A) the Schedule and/or Client's access to and use of Deliverables to which the payment failure relates; or (B) this Agreement if the unpaid amounts constitute a material portion of annual charges due under this Agreement.

(c) Remedies. Remedies contained in this Section 8 are cumulative and are in addition to the other rights and remedies available to Fiserv under this Agreement, by law or otherwise.

9.   Dispute Resolution. Before initiating legal action against the other party relating to a dispute herein, the parties agree to work in good faith to resolve disputes and claims arising out of this Agreement. To this end, either party may request that each party designate an officer or other management employee with authority to bind such party to meet to resolve the dispute or claim. If the dispute is not resolved within 30 days of the commencement of informal efforts under this paragraph, either party may pursue formal legal action. This paragraph will not apply if expiration of the applicable time for bringing an action is imminent and will not prohibit a party from pursuing injunctive or other equitable relief to which it may be entitled.

10.   Audit.

(a)   Fiserv Operations and Security. Client acknowledges and agrees that Fiserv is subject to certain examinations by the Federal Financial Institutions Examination Council ("FFIEC") regulators and agencies. Client acknowledges and agrees that reports of such examinations of Fiserv business units are available to Client directly from the relevant FFIEC agencies. Fiserv employs an internal auditor responsible for reviewing the integrity of its processing environments and internal controls.

(b)   Billing Records. Upon Client's reasonable request in writing no more frequently than once every 12 months, Fiserv shall provide Client with documentation supporting the amounts invoiced by Fiserv hereunder for the 12-month period preceding such Client request. If such documentation reveals the amounts paid to Fiserv exceed the amounts to which Fiserv is entitled and such amounts are independently verified, Fiserv shall promptly remit or otherwise credit to Client the amount of such overpayment. Conversely, if such documentation reveals the amounts paid to Fiserv are less than the amounts owed, Client shall promptly remit the amount of such underpayment to Fiserv. Invoices dated prior to the 12-month review period hereunder shall be deemed correct. Fiserv reserves the right to charge Client for any assistance required in connection with an audit at Fiserv's then-current rates.

11.   General.

(a)   Binding Agreement; Assignment. This Agreement is binding upon the parties, their participating Affiliates, and their respective successors and permitted assigns. Neither this Agreement nor any part thereof or interest therein may be sold, assigned, transferred, pledged, or otherwise disposed of by Client, whether pursuant to change of control, by operation of law or otherwise, without Fiserv's prior written consent. Client agrees that Fiserv may assign all or part of this Agreement and may subcontract any obligations to be performed hereunder; provided that any such subcontractors shall be required to comply with all applicable terms and conditions of this Agreement, and Fiserv shall remain primarily liable for the performance of any such subcontractors.

(b)   Entire Agreement Amendments. This Agreement, including its Exhibits and Schedules, which are expressly incorporated herein by reference, constitutes the complete and exclusive statement of the agreement between the parties as to the subject matter hereof and supersedes all previous agreements with respect thereto and the terms of all existing or future purchase orders and acknowledgments. Each party hereby acknowledges that it has not been induced to enter into this Agreement by virtue of, and is not relying on, any representation made by the other party not embodied herein, any term sheets or other correspondence preceding the execution of this Agreement, or any prior course of dealing between the parties, including without limitation any statements concerning product or service usage or the financial condition of the parties. The protections of this Agreement shall apply to actions of the parties performed in preparation for and anticipation of the execution of this Agreement. Modifications of this Agreement must be in writing and signed by duly authorized representatives of the parties. If the terms of any Exhibit or Schedule conflict with the terms of this Agreement, this Agreement shall control unless the applicable Exhibit or Schedule expressly states that its terms control. If the terms of any Schedule conflict with the terms of the Exhibit to which such Schedule is attached, the terms of the Schedule shall control.

(c)   Severability. If any provision of this Agreement is held to be unenforceable or invalid, the other provisions shall continue in full force and effect.

(d)   Governing Law: Jury Trial Waiver. This Agreement will be governed by the substantive laws of the State of New York, without reference to provisions relating to conflict of laws. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement. Both parties

agree to waive any right to have a jury participate in the resolution of any dispute or claim between the parties or any of their respective Affiliates arising under this Agreement.

(e) Force Majeure. With the exception of Client's payment obligations, neither party shall be responsible for delays or failures in performance resulting from acts of God, acts of civil or military authority, fire, flood, strikes, war, epidemics, pandemics, shortage of power, telecommunications or Internet service interruptions or other acts or causes reasonably beyond the control of that party. The party experiencing the force majeure event agrees to give the other party notice promptly following the occurrence of a force majeure event, and to use diligent efforts to re-commence performance as promptly as commercially practicable.

(f) Notices. Any written notice required or permitted to be given hereunder shall be given by: (i) Registered or Certified Mail, Return Receipt Requested, postage prepaid; (ii) confirmed facsimile; or (iii) nationally recognized overnight courier service to the other party at the addresses listed on page 1 or to such other address or person as a party may designate in writing. All such notices shall be effective upon receipt.

(g) No Waiver. The failure of either party to insist on strict performance of any of the provisions hereunder shall not be construed as the waiver of any subsequent default of a similar nature.

(h) Prevailing Party. The prevailing party in any arbitration, suit, or action brought by one party against the other party to enforce the terms of this Agreement or any rights or obligations hereunder, shall be entitled to receive, in addition to such other relief as the arbitrators or court may award, its reasonable costs and expenses, including without limitation all attorneys' fees, expert witness fees, litigation-related expenses and arbitrator and court or other costs incurred in such proceeding or otherwise in connection with bringing such arbitration, suit, or action. For purposes of this Agreement, a party is "prevailing" if that party prevails on the central issue raised in the action or claim, regardless of the amount of damages awarded or otherwise owed, if any. A party may prevail by judgment or decision in that party's favor, consent decree, settlement agreement or voluntary dismissal with or without prejudice.

(i) Survival. All rights and obligations of the parties under this Agreement that, by their nature, do not terminate with the expiration or termination of this Agreement shall survive the expiration or termination of this Agreement.

(j) Recruitment of Employees. Client shall not, without Fiserv's prior written consent, directly or indirectly, solicit for employment or hire any Restricted Employee (as defined herein) while such person is employed by Fiserv and for the 12-month period starting on the earlier of: (i) termination of such Restricted Employee's employment with Fiserv; or (ii) termination or expiration of this Agreement. "**Restricted Employee**" means any former or current employee of Fiserv or its Affiliates that Client became aware of or came into contact with during Fiserv's performance of its obligations under this Agreement.

(k) Publicity. Client and Fiserv shall have the right to make general references about each other and the type of Deliverables being provided hereunder to third parties, such as auditors, regulators, financial analysts, and prospective customers and clients, provided that in so doing Client or Fiserv does not breach Section 3 of this Agreement. Fiserv may issue a press release regarding this Agreement, including its renewal and the addition of Deliverables, subject to Client's review and approval, which shall not be unreasonably withheld or unduly delayed. Except as authorized herein, Client will not use the name, trademark, service mark, logo or other identifying marks of Fiserv or any of its Affiliates in any sales, marketing, or publicity activities, materials, or website display without the prior written consent of Fiserv. Any such authorized or approved use shall at all times comply with Fiserv's Trademark Usage Guidelines (or such other requirements and/or guidelines) set forth on Fiserv's corporate website and other requirements issued or otherwise made available by Fiserv.

(l) Independent Contractors. Client and Fiserv expressly agree they are acting as independent contractors and under no circumstances shall any of the employees of one party be deemed the employees of the other for any purpose. Except as expressly authorized herein or in the Exhibits, this Agreement shall not be construed as authority for either party to act for the other party in any agency or other capacity, or to make commitments of any kind for the account of or on behalf of the other.

(m) <u>No Third Party Beneficiaries</u>. Except as expressly set forth in any Exhibit hereto, no third party shall be deemed to be an intended or unintended third party beneficiary of this Agreement.

(n) <u>Counterparts; Signatures</u>. This Agreement and any Exhibits hereto may be executed in counterparts, each of which shall be deemed an original and which shall together constitute one instrument. Signatures transmitted by facsimile or electronically via PDF or similar file delivery method shall have the same effect as an original signature, provided that in no event shall the Agreement or any amendment or other document hereunder be executed by placing or inserting a digital signature file into such document.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

For Client:

For Fiserv:

**Bessemer System Federal Credit Union**

By: _Linda K Gregory_

Name: _LINDA K. GREGORY_

Title: _CEO_

Date: _7-29-13_

**Fiserv Solutions, Inc.**

By: _Shell_

Name: _David J Campbell_

Title: _Authorized Signatory_

Date: _8/13/13_

## ASP Services Exhibit to Master Agreement

1.   <u>ASP / Processing Services</u>. The parties shall add individual Schedules to this ASP Services Exhibit for Fiserv's provision of ASP, processing, or other service bureau Services to Client. The terms of this ASP Services Exhibit shall apply to the Services set forth in Schedules attached to this Exhibit.

2.   <u>Additional Services</u>.

   (a)   <u>Implementation Services</u>. Services: (i) to convert Client's existing applicable data and/or information to the Services, and/or (ii) to implement the Services (collectively, "**Implementation Services**") will be provided by Fiserv to the extent applicable to the Services, for the fees, if any, set forth in the Schedules to this Exhibit. Client agrees to provide all necessary cooperation, information and assistance in connection with Implementation Services to facilitate conversion and/or implementation.

   (b)   <u>Train ng Services</u>. To the extent applicable to the Services, Fiserv shall provide training, training aids, user manuals, and other documentation for Client's use as Fiserv finds necessary to enable Client personnel to become familiar with Services, for the fees, if any, set forth in the Schedules to this Exhibit. If requested by Client, classroom training in the use and operation of Services will be provided at a training facility designated by Fiserv.

   (c)   <u>Optional Services</u>. If optional services are listed on a Schedule to this Exhibit, such optional services shall become part of the Agreement upon Client's use of such optional services.

3.   <u>Fiserv System and Client Systems</u>. Fiserv systems used in the delivery of Services (the "**Fiserv System**") and Client's networks and computer systems ("**Client Systems**") contain information and computer software that are proprietary and confidential information of the respective parties, their suppliers, and licensors. Each party agrees not to attempt to circumvent the devices employed by the other party to prevent unauthorized access thereto, including without limitation modifications, decompiling, disassembling, and reverse engineering thereof.

4.   <u>Fiserv Obligations</u>.

   (a)   <u>Client Policies</u>. While assigned to provide Services at a Client location or otherwise visiting Client's facilities, Fiserv employees will: (i) comply with Client's reasonable safety and security procedures and other reasonable Client rules applicable to Client personnel at those facilities to the extent such procedures and rules are provided to Fiserv in writing and in advance, (ii) comply with all reasonable requests of Client personnel, as applicable, pertaining to personal and professional conduct, and (iii) otherwise conduct themselves in a professional and businesslike manner.

   (b)   <u>Changes</u>. Fiserv may make changes in its methods of delivering the Services, including but not limited to operating procedures, type of equipment or software resident at, and the location of Fiserv's service center(s). Fiserv will notify Client prior to implementing any material change that affects Client's normal operating procedures, reporting, or internal service costs. ·

   (c)   <u>Client Systems Access</u>. If Fiserv accesses Client Systems, Fiserv will: (i) use this access only to provide Services to Client; and (ii) ensure that the Fiserv System includes up-to-date anti-viral software designed to prevent viruses from reaching Client Systems through the Fiserv System.

   (d)   <u>Security Testing</u>. Fiserv may use a third party to provide monitoring, penetration and intrusion testing with respect to certain Services. Upon Client's written request, Fiserv agrees to provide Client with a copy of its most recent security certification, if any, for the applicable Fiserv service center providing such Services.

   (e)   <u>Services Warranties</u>. Fiserv represents and warrants that: (i) Services will conform to the specifications set forth in the Schedules to this Exhibit; (ii) Fiserv will perform Services  accurately provided that Client supplies accurate data and information, and follows the procedures described in all Fiserv documentation and notices; (iii) Fiserv personnel will exercise due care in provision of Services; and (iv) functionality provided by the Fiserv System will enable Client to comply in all material respects with Federal regulations generally applicable to Fiserv's clients in the industry in which the functionality is intended to be used.

(f) Error Correction. In the event of an error or other default caused by Fiserv personnel, systems, or equipment, Fiserv shall correct such error or default at no additional charge to Client, provided that Client supplies Fiserv with a written request for correction of the error within 7 days after Client's receipt of the work containing the error. Work reprocessed due to errors in data supplied by or through Client or by Client's failure to follow procedures set forth by Fiserv shall be billed to Client at Fiserv's then current time and material rates.

(g) Infringement Claims. Fiserv shall, at its expense, defend Client against any third party claim or action alleging that the Fiserv System infringes a United States patent, copyright, or other proprietary right of such third party ("**Infringement Claim**"), and shall pay all amounts payable by Client under any judgment, verdict, or court order entered by a court of competent jurisdiction or settlement agreed upon by Fiserv in any Infringement Claim, provided that Client: (i) notifies Fiserv promptly of such Infringement Claim, (ii) grants Fiserv the sole right to control the defense and disposition of such Infringement Claim, and (iii) provides Fiserv with reasonable cooperation and assistance in the defense and disposition of such Infringement Claim. The obligations set forth in this paragraph are Fiserv's entire liability and Client's sole and exclusive remedy for any Infringement Claim.

(h) Audit. In addition to the audit provisions set forth in Section 10 of the Agreement, Fiserv provides for periodic independent audits of its operations, which shall include an annual SSAE 16 Type II audit to the extent required by law or regulation. Fiserv shall provide Client with a copy of such independent audit report of the Fiserv service center providing Services within a reasonable time after its completion, and may charge Client a fee based on the pro rata cost of such audit apportioned among Fiserv's clients. If material deficiencies affecting the Services are noted in such audit report, Fiserv will develop and implement an action plan to address and resolve any such deficiencies within a commercially reasonable time at Fiserv's expense.

5.   Client Obligations.

(a) Procedures; Processing Priority. Client agrees to comply with Fiserv's procedures and operating instructions for use of Services and the Fiserv System. Client acknowledges that Fiserv does not subscribe to any processing priority; all users receive equal processing consideration.

(b) Communication Lines, Terminals, Equipment, Software. All communication lines, terminals, equipment, computer software, and interface devices required to access the Fiserv System and to transmit and receive data and information between Client's location(s), Fiserv's service center(s), and/or other necessary location(s) (collectively, "**Client Equipment**") are subject to approval by Fiserv and shall be compatible with the Fiserv System. Client is responsible for the expense of either procuring Client Equipment from Fiserv or providing Client Equipment itself, provided that all communication lines shall be procured from Fiserv. If Client has elected to provide Client Equipment itself, Fiserv shall provide Client with a list of compatible equipment and software. Client agrees to pay Fiserv's standard fee for recertification of the Fiserv System resulting from Client's use of non-compatible Client Equipment. If Fiserv provides such items, Client agrees to pay charges relating to the installation and use of Client Equipment as set forth in the Schedules to this Exhibit.

(c) Input. Client shall be solely responsible for the input, transmission, or delivery to and from Fiserv (whether delivered to or from Client site(s) or any applicable clearinghouse, regulatory agency, or Federal Reserve Bank) of all information and data required by Fiserv to perform Services unless Client has retained Fiserv to handle such responsibilities, as specifically set forth in Schedules to this Exhibit. The information and data shall be provided in a format and manner approved by Fiserv. Client is responsible for providing all instructions requested by Fiserv as necessary to perform the Services. Client shall determine and be responsible for the authenticity, accuracy, and completeness of all information, data, and instructions submitted to Fiserv. Fiserv is not obligated to check for errors or omissions in any such information, data, or instructions and/or to correct, cancel or amend any action in connection with any Services once Fiserv has received instructions to complete such action.

(d) Client Personnel. Client shall designate appropriate Client personnel for training in the use of the Services, shall supply Fiserv with reasonable access to Client's site during normal business hours for Implementation Services, and shall cooperate with Fiserv personnel in their performance of Services.

(e) Client Review; Responsibility for Accounts. Client shall review all reports furnished by Fiserv for accuracy, and shall work with Fiserv to reconcile any out of balance conditions or discrepancies. As

applicable, Client shall be responsible for balancing its accounts each business day and notifying Fiserv promptly of any errors or discrepancies. If Client so notifies Fiserv, Fiserv shall, at its expense, promptly recompute accounts affected by discrepancies solely caused by the Fiserv System or provide for another mutually agreeable resolution. Fiserv will use commercially reasonable efforts to correct errors attributable to Client or Client's other third party servicers. Reconstruction of error conditions attributable to Client or to third parties acting on Client's behalf will be done at Fiserv's then-current professional services rates.

(f)   Client Systems. Client shall ensure that Client Systems: (i) are capable of passing and/or accepting data from and/or to the Fiserv System, and (ii) include up-to-date anti-viral software designed to prevent viruses from reaching the Fiserv System through Client Systems.

(g)   Client Notification. Client agrees that it shall notify Fiserv as soon as possible upon becoming aware of any incident of unauthorized access to any Information or the Fiserv System.

(h)   Indemnity. Client shall indemnify and hold harmless Fiserv, its officers, directors, employees, and affiliates against: (i) any and all claims or actions arising out of (A) the use by Client of the Fiserv System in a manner other than that provided in the Agreement, and (B) access by Client's customers, through a voice response system or through such customers' personal computers or mobile devices, to Client Files or any Fiserv files (including the files of other Fiserv clients) or the Fiserv System or other Fiserv systems; and (ii) any and all claims by third parties through Client arising out of the performance and non-performance of Services by Fiserv, provided that such indemnity shall not preclude Client's recovery of damages from Fiserv pursuant to the terms and subject to the limitations of the Agreement.

(I)   Regulatory Requirements. As applicable to Client's receipt of Services and as required by regulatory authorities having jurisdiction over Client, Client agrees to: (i) submit a copy of the Agreement to the appropriate regulatory agencies prior to the date Services commence, (ii) provide adequate notice to the appropriate regulatory agencies of the termination of the Agreement or any material changes in Services, (iii) retain records of its accounts, and (iv) obtain and maintain at its own expense any required Fidelity Bond and  casualty and business interruption insurance coverage for loss of records from fire, disaster, or other causes.

6.   Business Continuity / Disaster Recovery.

(a)   General. Fiserv maintains a business continuity plan ("**Business Continuity Plan**") for each Service that describes measures it will implement to recover from a Disaster. A "**Disaster**" shall mean any unplanned impairment or interruption of those systems, resources or processes that enable standard performance of the applicable Service's functionality. Each Business Continuity Plan shall include a plan for the recovery of critical technology systems (a "**Disaster Recovery Plan**"), as well as procedures for restoring business operations at the primary location or at a designated recovery site, if necessary. Fiserv shall work with Client to establish a plan for alternative communications in the event of a Disaster.

(b)   Disaster Occurrence. Fiserv shall notify Client as soon as possible after the occurrence of a Disaster and shall comply with the Business Continuity Plan. Fiserv shall move the processing of Client's standard services to the recovery site as expeditiously as possible if operations cannot be satisfactorily restored (in Fiserv's sole discretion) at the primary location. If a recovery site is used, Fiserv shall coordinate the cut-over to back-up telecommunication facilities with the appropriate carriers. Client shall maintain adequate records of all transactions under the reasonable control of Client during the period of service interruption and shall have personnel available to assist Fiserv in implementing the switchover to the recovery site. During a Disaster, optional or on-request services shall be provided by Fiserv only to the extent adequate capacity exists at the recovery site and only after stabilizing the provision of base services.

(c)   Disaster Recovery Test. Fiserv shall test the Disaster Recovery Plan periodically. Client agrees to participate in and assist Fiserv with such test, if requested by Fiserv. Upon Client's request, test results  will be made available to Client's management, regulators, auditors, and insurance underwriters.

(d)   No Warranty. Client understands and agrees that the Business Continuity Plan is designed to minimize, but not eliminate, risks associated with a Disaster affecting Fiserv's service center(s). No performance standards shall be applicable for the duration of a Disaster. Client maintains responsibility

for adopting a disaster recovery plan relating to disasters affecting Client's facilities and for securing business interruption insurance or other insurance necessary for Client's protection. Fiserv agrees to release information necessary to allow Client's development of a disaster recovery plan that operates in concert with the Business Continuity Plan.

7.   Lost Records.  Notwithstanding Section 7 of the Master Agreement, if Client's records or other data submitted for processing are lost or damaged as a result of any failure by Fiserv, its employees, or agents to exercise reasonable care to prevent such loss or damage, Fiserv's liability on account of such loss or damages shall not exceed the reasonable cost of reproducing such records or data from Fiserv's back-up data or from exact duplicates thereof in Client's possession.

8.   Term and Termination; Deconversion.

(a)  Term.  Unless otherwise set forth in an applicable Schedule to this Exhibit, (i) with respect to the Schedules attached to this Exhibit as of the Effective Date, the initial term of Services provided hereunder shall end June 30, 2019, and (ii) with respect to Schedules added to this Exhibit after the Effective Date, the initial term of Services provided thereunder shall end 5 years following the date Services are first used by Client in live production.  Unless written notice of non-renewal is provided by either party at least 1 year prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of 5 years.

(b)  Convenience; Early Termination.  If Client terminates the Agreement or reduces (other than as a result of account attrition or volume fluctuation in the ordinary course of business) or terminates Services for any reason other than pursuant to Section 8(b)(i) of the Agreement, Client shall pay a termination fee based on the remaining unused term of the Services.  Such fee shall be determined by multiplying the average of the monthly invoices for each Service received by Client during the 6-month period preceding the effective date of termination (or if no monthly invoice has been received, the estimated monthly billing for each Service to be received hereunder) by 80% times the remaining months of the term, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination.

(c)  Defaults.  If Client: (i) fails to cure its material breach or fails to pay amounts due, each as set forth in Section 8(b) of the Agreement; (ii) deconverts any data or information from the Fiserv System either without Fiserv's prior written consent or in violation of the Agreement; or (iii) commits an act of bankruptcy or becomes the subject of any proceeding under the Bankruptcy Code or becomes insolvent or if any substantial part of Client's property becomes subject to any levy, seizure, assignment, application, or sale for or by any creditor or governmental agency; then, in any such event, Fiserv may, upon written notice, terminate the Agreement in whole or in part and be entitled to recover from Client as liquidated damages for such early termination an amount equal to the present value of all payments remaining to be made for the remaining unused term of the Agreement or the applicable Exhibit, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination. For purposes of the preceding sentence, present value shall be computed using the "prime" rate (as published in *The Wall Street Journal*) in effect at the date of termination and "all payments remaining to be made" shall be calculated by multiplying the average monthly invoices for the 6 months immediately preceding the date of termination by the remaining months of the term.

(d)  Liquidated Damages.  Client understands and agrees that Fiserv losses incurred as a result of early termination of the Agreement, this Exhibit, or any Schedule would be difficult or impossible to calculate as of the effective date of termination since they will vary based on, among other things, the number of clients using the Fiserv System on the date the Agreement (or applicable part thereof) terminates.  Accordingly, the amounts set forth in Sections 8(b) and 8(c) above and Section 10(e) below represent Client's agreement to pay and Fiserv's agreement to accept as liquidated damages (and not as a penalty) such amount for any such termination.

(e)  Return of Client Files.  Upon expiration or termination of the Agreement or any Schedule to this Exhibit, Fiserv shall furnish to Client such copies of Client Files as Client may request in a Fiserv standard format, and shall provide such information and assistance as is reasonable and customary to enable Client to deconvert from the Fiserv System; provided, however, that Client authorizes Fiserv to retain Client Files until: (i) Fiserv is paid in full for all amounts due for all Services provided through the date such Client Files are returned to Client; (ii) Fiserv is paid its then standard rates for the services necessary to return such Client Files; (iii) if the Agreement or applicable Schedule is being terminated,

Fiserv is paid any applicable termination fee pursuant to Section 8(b) or (c) above; and (iv) Client has returned or destroyed all Fiserv Information in accordance with Section 3(b) of the Agreement. Fiserv shall be permitted to destroy Client Files any time after 30 days from the final use of Client Files for processing, unless: (A) Fiserv is directed by Client in writing to retain such files for a longer period, provided that Client may not require Fiserv to retain Client Files for longer than 90 days unless Fiserv agrees to such longer retention period, or (B) otherwise specified in a Schedule.

(f)  Miscellaneous.  Client is responsible for the deinstallation and return shipping of any Fiserv-owned equipment located on Client's premises.

9.  Exclusivity.  Client agrees that Fiserv shall be the sole and exclusive provider of the services that are the subject matter of the Schedules to this Exhibit. Client agrees not to enter into an agreement with any other entity to provide these services (or similar services), and not to perform these services (or similar services) for itself, during the term of this Exhibit without Fiserv's prior written consent. If Client acquires another entity, the exclusivity provided to Fiserv hereunder shall take effect with respect to such acquired entity as soon as practicable after expiration or earlier termination of such acquired entity's previously existing arrangement for these services. If Client is acquired by another entity, the exclusivity provided to Fiserv hereunder shall apply with respect to the level or volume of services provided immediately prior to the signing of the definitive acquisition agreement relating to such acquisition and shall continue with respect to the level or volume of such services until any termination or expiration of this Exhibit.

10.  Additional Fee Provisions.

(a)  Annual Adjustment.  Fiserv's fees for Services may be increased annually effective each January 1 upon 30 days' notice to Client. Each increase shall be limited to the increase in the U.S. Department of Labor, Consumer Price Index for All Urban Consumers ("CPI") for the most recently available 12-month period preceding such 30-day notice period, or 5%, whichever is greater.

(b)  Holdover.  Upon any termination or expiration of the Agreement or an Exhibit, Services provided after the applicable termination date, expiration date, or final processing date specified by Client will be provided subject to Fiserv's capacity and will be invoiced at then current fees under the applicable Schedule plus a holdover premium of 25%, unless such holdover is due to Fiserv's action or inaction.

(c)  Deconversion Charges.  Client agrees to pay Fiserv's then current deconversion charges in connection with Client's deconversion from the Fiserv System.

(d)  Regulatory and Compliance Charge.  Fiserv reserves the right to charge Client for Client's share of direct Fiserv costs of maintaining regulatory compliance as required by Section 4(e)(iv) of this Exhibit and/or meeting relevant third party standards (such as PCI-SSC's Payment Card Industry Data Security Standard).

(e)  Assumptions.  Fees set forth in the Schedules to this Exhibit are based on completion of the initial term of all Services. If Services are reduced or terminated pursuant to Section 8(b) or (c) above, or if Client renegotiates pricing before expiration of the initial term, Client shall reimburse Fiserv for all credits, rebates, discounts, and incentives granted on all Services. Any such credits, rebates, discounts, and incentives will no longer be granted through the remainder of the term for any continuing Services.

11.  Residuals.  Nothing contained in the Agreement shall restrict Fiserv from the use in its business of any ideas, concepts, know-how, or techniques contained in Client Information accessed by Fiserv in connection with the Services that are related to Fiserv's business activities and retained in the unaided memory of Fiserv's employees.

**Account Processing Services Schedule**
**To ASP Services Exhibit**

1. **Description of Services.** Fiserv agrees to provide to Client the following Services ("Account Processing Services"):

   (a) Base Services.

   (i) Share Features:

   | | |
   |---|---|
   | Types: | Regular; Club; Investment; Savings; Family |
   | Fees: | Excess Withdrawal Fee; Manual Fee Posting Transactions |
   | Holds: | Check Hold; Fixed Dollar Pledge; Administrative Hold; Legal Hold; Dormancy Hold; Delinquent Hold; Automatic Pledge Calculation |
   | Transfers: | Share to Share; Share to Loan; Open-End Loan to Share Draft Account; Share to Fee Payment |

   (ii) Certificate Features:

   | | |
   |---|---|
   | Types: | Renewable; Non-Renewable; Money Markets |
   | Purchase Methods: | Cash/Check; Transfer from Shares or other Investments (if allowed); Add Ons |
   | Surrender/Maturity/Renewal: | Cash/Check; Transfer to Shares; Partial Withdrawal; Penalty Assessment On-Line |
   | Dividend Payments: | Automatic Calculation to Investments Accounts (Compounding) On-Line; Automatic Calculation to Check On-Line; Automatic Calculation to Any Share Account On-Line; Off-Line Posting to Investment Accounts; Off-Line Posting/Withdrawal; Off-Line Posting/Transfer to Specified Share Account |

   (iii) Loan Features:

   | | |
   |---|---|
   | Pledging: | Whole Dollar Pledge; Percentage of Loan Balance; Loan Payment Amount |
   | Payment Methods: | Payroll; Automatic Transfer; Over-the-Counter; Cash/Check; Share-to-Loan Transfer |
   | Payment Types: | Level-Includes Interest, Late Charges and Principal-Computer Calculated; Fixed Principal Payment; Interest Only-Calculated by Teller or Computer |
   | Interest Rates: | Variable-May Change at Any Frequency Off-Line in Mass or Individually; Assigned by Individual Loan-Cross-Referenced to Plan Type; 365 Day Basis |
   | Loan Advances: | Term Extension; Recalculation of Payment |

   (iv) Dividend Features:

   | | |
   |---|---|
   | Calculation Methods: | Date-of-Deposit/Date-of-Withdrawal or Average Daily Balance (DOD/DOW/ADB); Minimum Balance Split Rate (DOD/DOW or ADB); Plateau Split Rate (DOD/DOW or ADB) |

Compounding:     Monthly; Quarterly; Semi-Annually; Annually

(v)  Payroll Features:

Types:         Exception; PC to PC; Standard Account Format

Features:      Multiple Deduction Maintenance; Distribution to Share, Loan, Certificates, or Family Member; Payroll Statement Description for Third Parties

(vi)  Other Features:
- Automatic Voucher/Check Writing
- Available Funds Inquiry
- Client Defined Security
- Message Sending Capability
- On-Line/Off-Line Capability
- Teller Sales Support
- Test Client for On-Line Training

(vii) Standard Reports & Documents:
   (1)  Daily:
- Daily Activity Journal
- Teller Totals
- Ledger Totals
- Daily Summary
- Client Recap
- Client File Totals
- Master File Maintenance
- Payroll File Maintenance
- Check Register
- Name and Address (N/A) File Maintenance
- On-Line Printing of Checks/Receipts
- Certificate Policy Table Maintenance

   (2)  Weekly:
- Short Trial Balance
- Updated N/A Index Cards

   (3)  Monthly:
- Long Trial Balance
- Delinquency Report
- New Loans Report
- New Loans Analysis
- By Purpose
- By Collateral
- Paid-Off Loans Report
- New Members Report
- Closed Accounts Report
- Dormant Accounts Report
- Share Analysis by Dollar Value
- Loan Analysis
- By Dollar Value
- By Purpose
- By Collateral
- By Interest Rate
- Share Certificate Register
- Insurance Report

    (4) Quarterly:
- Quarterly Statements
- Dividend Distribution and Interest
- Rebate Report

    (5) Annually:
- Auditor Confirmations
- 1099 Files to IRS
  - i.     1099 Detail Report
- Long Trial Balance Report and Delinquency Report (Supervisory/Audit Purposes)

    (6) As Posted:
- Payroll Deduction Journal
- Payroll Exception Report
- Payroll Daily Summary
- Payroll Recap

    (7) Conversion:
- Account Proof List
- N/A Error Report
- Missing Record Report
- Bridge History List
- Payroll Proof List
- N/A Index Cards

(b) Optional Services.
   (i) Alpha Account Processing:
- IRA Accounting
- Automatic Certificate Renewal and Notices
- Maturity Notices

   (ii) Automatic Teller Machine Processing:
- ATM Cardholder
- ATM Processing (Batch/Online)
- ATM/Audio Service Charges
- ATM Transactions

   (iii) Dividend Processing:
- Automatic Dividend Withdrawal/Transfer
- Monthly Dividend Posting

   (iv) General Ledger Services:
- Batch General Ledger
- Integrated General Ledger
- Budget or Comparative Data
- Daily General Ledger Reports
- General Ledger Financial Reports
- On-Line General Ledger History

   (v) Hardware Recovery:
Fiserv offers support for the temporary rental and installation at one location of equipment and software Fiserv deems necessary to access the Account Processing Services within 24 hours in the event of a disaster. Telephone support, configuration professional services and new documentation are also provided. The Hardware Recovery support service also includes 5-day usage of rental equipment. Additional rental days will be provided at Fiserv's then standard rates.

   (vi) Insurance Processing:
- Insurance Withdrawals
- CDI Insurance Processing
- Move Master File Fields from Prime Accounts to Sub-Accounts

(vii) Loan Origination Processing
- Loan Advantage
- Loancierge
- Credit Bureau Report Retrieval
- Instant Pre-Approval
- Risk Based Pricing
- Secure Public Viewer

(viii) Mass Withdrawal Processing:
- Christmas / Club Withdrawals
- Fixed Payment Mass Withdrawal
- Interest Rebate Checks

(ix) Miscellaneous Processing:
- ACH Processing
- ACH Returns
- Aires Software Support
- Audio Response Subsystem
- Automated Loan Collections Subsystem
- Bank Reconciliation Tape
- Check Hold System
- Credit Bureau Reporting
- Credit Card Interface
- CRI Automated Lending System Interface
- Data Match (quarterly)
- Debit Card Processing
- Dormancy Fees
- EFT NSF & Overdraft Transfer Fees & Notices Subsystem
- EXEC (Executive Decision Support) Subsystem
- FinCen Support
- Firewall Support
- Health Savings Accounts
- Internet Back-up Solution
- Loan Extract Files
- Merger Processing
- Miscellaneous Uncollected Debt Subsystem
- Month end Account Fee Processing
- OFAC Support
- POS Processing
- Shared Audio Response Subsystem

(x) Name and Address File Processing:
- Name and Address Labels
- Name and Address Lists
- Zip Code Analysis Report

(xi) On-Line History:
- 3 Months (Nondraft account) and 1 Month (Share draft account)
- 3 Months (Nondraft account) and 2 Months (Share draft account)
- 3 Months (Nondraft account) and 3 Months (Share draft account)
- 6 Months (Nondraft account) and 1 Month (Share draft account)
- 6 Months (Nondraft account) and 2 Months (Share draft account)
- 6 Months (Nondraft account) and 3 Months (Share draft account)
- 12 Months (Nondraft account) and 12 Months (Share draft account)

(xii) Payroll Processing:
- ACH Format
- Direct Payroll Files

- Standard
- Social Security Format
- Non-Standard (Approved)
- Computer to Computer (RJE)

(xiii) Share Draft Processing:
- Share Draft System
- Share Draft Service Charges
- NSF and Paid Overdraft Notices
- Automatic Share Draft Returns
- FEDLINE Truncation Service
- Shared Service Center Processing

(xiv) Statement Processing:
- Statement Sorting (monthly/quarterly)
- Monthly/Quarterly Statements
- Optical Character Reader (OCR Coding)
- Share Draft Trace Number on Statement
- Share Draft Sequencing on Statement
- Statement Mailing Service (monthly/quarterly)
- Client Logo on Statement

(xv) Optional Reports and Notices:
  (1) Daily:
  - Teller Productivity Report
  (2) Weekly:
  - Delinquency System
  - Paid Loan Notices
  (3) Monthly:
  - Accrued Dividend Report
  - Closed Account Notices
  - Teller Productivity Report
  - Check Register
  - Certificate Renewal Notices
  - CD Reports
  (4) Annual:
  - Auditor Confirmation Notices
  - All IRS Reporting Files
  (5) Special Reports:
  - Additional Copy of Long Trial Balance
  - Cost Analysis (Monthly)
  - General Ledger Annual Listing
  - General Ledger Financial Reports
  - General Ledger Quarterly Activities Report
  - IRA Transaction Register (Quarterly)
  - IRA Annual Transaction Register
  - Name and Address Lists
  - Reference/Location Code
  - Share/Loan Analysis
  - Uncollected Interest Journal
  - Utility Long Trial Balance
  - Zip Code Analysis Report

(c) Interfaces.
Fiserv agrees to make available to Client access to certain Interfaces or extract files identified in Section 2(c) below, and any additional Interfaces or extract files agreed by the parties from time

to time, in accordance with the terms set forth in this subsection and subject to subsection (f) of the Additional Terms section below ("Third Party Interfaces"). Fiserv agrees to work with Client to determine whether Fiserv, Client or the applicable third party can develop and support such Third Party Interfaces, whether such Third Party Interfaces are based on extracts Client, Fiserv or the third party will provide, or whether such Third Party Interfaces are web service interfaces to be provided by Fiserv, Client or an applicable third party. Access to any Third Party Interface and any development by Fiserv or the third party with respect thereto is subject to Fiserv's approval to the vendor and channel to which the Third Party Interface relates (which may be withheld in Fiserv's sole discretion), Fiserv entering into a reasonable agreement with such third party and such agreement remaining in full force and effect; provided, that Fiserv will work in good faith to enter into a reasonable agreement as promptly as possible if approval is granted. Any such development by Fiserv is also subject to Fiserv's resource availability. Upon completion of such agreement and development of such Third Party Interface, Fiserv will certify the Third Party Interface with the third party. To the extent Fiserv has entered into an agreement with such third party and the development and certification have been completed prior to the date the Account Processing Services are first used in live production, Fiserv shall make such Third Party Interface available to Client. Any access to Third Party Interfaces which are based on extracts Client or such third party will provide, any development to be provided by Client or a third party, or web service interfaces provided by a third party are subject to Client and the applicable third party fulfilling their obligations with respect thereto and Fiserv shall not be liable for any delay or failure to receive access or use such Third Party Interface. Client agrees that Fiserv may provide any Client Information to any third party with whom Fiserv has a Third Party Interfaces used or accessed for Client. Notwithstanding anything in the Agreement to the contrary, Third Party Interfaces and access thereto are provided "as is" and Fiserv shall not be liable for any damages, whether direct, indirect, incidental, or consequential arising from use of or access to any Third Party Interfaces.

2. **Fees.** Client agrees to pay Fiserv the fees set forth below for Account Processing Services. Such fees will be invoiced to Client on a monthly basis unless otherwise indicated.

(a) Base Services.

| Monthly On-Line Use Fee | Number of Members | Monthly Fee |
|---|---|---|
| | 0 – 1,000 | $0.36792 per member |
| | Over 1,000 | $0.39858 per member |

For the purpose of calculating the Monthly On-line Use Fee, a "Member Account" is defined as a total of up to 4 share sub-accounts, 10 loan sub-accounts and 17 certificate sub-accounts, to be used as specified by Fiserv. Notwithstanding the foregoing of this Section, the parties hereto agree that there will be a monthly minimum processing charge of $360.00 applicable during the term of this Schedule.

(b) Telecommunication Services.
The workstation telecommunications fees shall be billed to Client at a rate of $150.00 per Client location per month and $0.20 per member per month. Any additional telecommunication services requested by Client and provided by Fiserv will be at Fiserv's standard rates in effect at the time the services are requested. The monthly telecommunication fees include Client's current locations and will be subject to increase or decrease by Fiserv in direct proportion to any increase or decrease in Fiserv's associated costs from the telecommunications vendor.

(c) Optional Services.
Client agrees to pay Fiserv the Fees set forth below for the Account Processing Services. The boxes marked below with an "X" indicate the Optional Services selected by the Client as of the Effective Date ("Selected Services"). Such Selected Services will be charged and paid by Client monthly at the rates set forth below, which shall be subject to modification as set forth in the Agreement and this Schedule. If Client adds Selected Services after the Effective Date, Client

shall pay Fiserv's then standard rates, unless otherwise agreed by the parties for such additional Services. For purposes of this Account Processing Services Schedule, "Included" means the fee for a specific service has been factored into the monthly on-line use fee outlined above. If, subsequent to the Effective Date, Client desires to add an Optional Service to the Selected Services, Client will notify Fiserv which notice may be provided via email or orally and Client will purchase the new Service at Fiserv's then current standard charges, unless specified otherwise in this Account Processing Services Schedule. Notwithstanding Section 12(b) of the Agreement, upon receipt of a purchase or sales order or an amendment to the Agreement for such Service executed by Client, Fiserv and Client agree that such Service will then be deemed a Selected Service and be subject to the terms of this Schedule and the Agreement.

☒ Alpha Account Processing:
    ☒ IRA Accounting                                $0.25 per account
                                                  ($44.50 monthly minimum)

    ☐ Automatic Certificate Renewal and Notices
    ☒ Maturity Notices                              $7.50 per month
☒ Automatic Teller Machine Processing:
    ☒ ATM Cardholder                              $0.10 per cardholder
    ☒ ATM Processing (Batch/Online)                $0.08 per transaction
                                                      ($150.00 monthly minimum)

    ☐ ATM/Audio Service Charges
    ☐ ATM Transactions
☒ Dividend Processing:
    ☒ Automatic Dividend Withdrawal/Transfer       $22.50 per month
    ☒ Monthly Dividend Posting                $44.50 per month
☒ General Ledger Services:
    ☐ Batch General Ledger
    ☒ Integrated General Ledger                   Included
    ☐ Budget or Comparative Data
    ☐ Daily General Ledger Reports
    ☐ General Ledger Financial Reports
    ☒ On-Line General Ledger History            $21.50 per month
☐ Hardware Recovery
☐ Insurance Processing:
    ☐ Insurance Withdrawals
    ☐ CDI Insurance Processing
    ☐ Move Master File Fields from Prime Accounts to Sub-Accounts
☒ Loan Origination Processing
    ☒ Loan Advantage                         $0.11 per member
        Monthly minimum                 $250.00 per month
        Monthly maximum               $1,100.00 per month
    ☒ Credit Bureau Report Retrieval           $0.55 per report
    ☐ Instant Pre-Approval
    ☐ Risk Based Pricing
    ☐ Secure Public Viewer
☐ Mass Withdrawal Processing:
    ☐ Christmas / Club Withdrawals
    ☐ Fixed Payment Mass Withdrawal
    ☐ Interest Rebate Checks
☒ Miscellaneous Processing:
    ☒ ACH Processing                        $0.20 per account
                                                       ($20.00 monthly minimum)

    ☒ ACH Returns                          $0.77 per item
    ☒ Aires Software Support                 $15.00 per month
    ☐ Audio Response Subsystem

☐ Automated Loan Collections Subsystem
☐ Bank Reconcillation Tape
☐ Check Hold System
☒ Courtesy Pay                         $0.25 per item
                                           ($100.00 monthly minimum)
☒ Credit Bureau Reporting          Included
☐ Credit Card Interface
☐ CRI Automated Lending System Interface
☐ Data Match (quarterly)
☐ Debit Card Processing
☐ Dormancy Fees
☒ EFT NSF & Overdraft Transfer Fees & Notices Subsystem    Included
☐ EXEC (Executive Decision Support) Subsystem
☐ FinCen Support
☐ Firewall Support
☐ Health Savings Accounts
☒ Internet Back-up Solution         $95.00 per month
☐ Loan Extract Files
☐ Merger Processing
☒ Miscellaneous Uncollected Debt Subsystem    $32.50 per month
☐ Month end Account Fee Processing
☐ OFAC Support
☒ POS Processing
          First 2,500 POS Transactions       $0.11 per transaction
          2,501 and more POS Transactions    $0.10 per transaction
                                         ($11.00 monthly minimum)
☐ Red Flag Support
☐ Shared Audio Response Subsystem
☐ Name and Address File Processing:
    ☐ Name and Address Labels
    ☐ Name and Address Lists
    ☐ Zip Code Analysis Report
☒ On-Line History:
    ☐ 3 Months (Nondraft account) and 1 Month (Share draft account)
    ☐ 3 Months (Nondraft account) and 2 Months (Share draft account)
    ☐ 3 Months (Nondraft account) and 3 Months (Share draft account)
    ☐ 6 Months (Nondraft account) and 1 Month (Share draft account)
    ☐ 6 Months (Nondraft account) and 2 Months (Share draft account)
    ☐ 6 Months (Nondraft account) and 3 Months (Share draft account)
    ☒ 12 Months (Nondraft account) and 12 Months (Share draft account) Included
☐ Payroll Processing:
    ☐ ACH Format
    ☐ Direct Payroll Files
    ☐ Standard
    ☐ Social Security Format
    ☐ Non-Standard (Approved)
    ☐ Computer to Computer (RJE)
☒ Share Draft Processing:
    ☒ Share Draft System           $0.40 per draft account
                              ($100.00 monthly minimum)
    ☐ Share Draft Service Charges
    ☒ NSF and Paid Overdraft Notices      $0.12 per draft account
                              ($75.00 monthly minimum)
    ☒ Automatic Share Draft Returns      $0.77 per draft return
    ☐ FEDLINE Truncation Service
    ☐ Shared Service Center Processing

☒ Statement Processing:
    ☒ Statement Sorting (monthly/quarterly)              $0.0065 per page
                                                  ($22.50 monthly minimum)
    ☒ Monthly/Quarterly Statements                    $0.0171 per page
                                                    ($1.50 monthly minimum)

    ☐ Optical Character Reader (OCR Coding)
    ☐ Share Draft Trace Number on Statement
    ☐ Share Draft Sequencing on Statement            Included
    ☒ Statement Mailing Service (monthly/quarterly)
        Inserting                              $0.085 per statement
        ($100.00 minimum per statement cycle)
        Envelopes                         $0.04 per envelope
        Postage                            Standard rates
    ☐ Client Logo on Statement
Optional Reports and Notices:
    Daily:
        ☐ Teller Productivity Report
    Weekly:
        ☒ Delinquency System
            ☒ Delinquency Notices              $7.00 per week
           ☒ Delinquency Reports             $7.00 per week
           ☒ Delinquency Notice Mailings     $5.00 per week
        ☐ Paid Loan Notices
    Monthly:
        ☒ Accrued Dividend Report           Included
        ☐ Closed Account Notices
        ☐ Teller Productivity Report
        ☐ Check Register
        ☐ Certificate Renewal Notices
        ☒ CD Reports                     $150.00 per month
    Annual:
        ☐ Auditor Confirmation Notices
        ☐ 1099 Detail Report
    Special Reports:
        ☐ Additional Copy of Long Trial Balance
        ☐ Cost Analysis (Monthly)
        ☐ General Ledger Annual Listing
        ☐ General Ledger Financial Reports
        ☐ General Ledger Quarterly Activities Report
        ☐ IRA Transaction Register (Quarterly)
        ☐ IRA Annual Transaction Register
        ☐ Name and Address Lists
        ☐ Reference/Location Code
        ☐ Share/Loan Analysis
        ☐ Uncollected Interest Journal
        ☐ Utility Long Trial Balance
        ☐ Zip Code Analysis Report
        ☐ Microfiche

## 3.   Performance.

    (a) Hours of Operation.  The Fiserv data center will be in operation for on-line Account Processing Services during the following hours: Monday through Friday, 7:30 a.m. to 7:30 p.m. Eastern Time; Saturday 7:30 a.m. to 1:30 p.m. Eastern Time.  The Account Processing Services are not available on the following holidays: New Year's Day, Thanksgiving Day, Memorial Day, Christmas Eve (after 1PM Eastern Time), Independence Day, Christmas Day, and Labor Day.

**4. Additional Terms.** The following additional terms apply to Account Processing Services:

(a) <u>Annual Histories</u>. As applicable, Fiserv maintains annual histories for its clients, which can be used to reconstruct Client Files in an emergency. However, in order to permit prompt and accurate reconstruction of accounts, Client agrees to retain at all times and make available to Fiserv upon request the most recent data printout(s) received from Fiserv, together with copies or other accurate and retrievable records of all transactions to be reflected on the next consecutive printout(s).

(b) <u>Backup Center</u>. Fiserv maintains an operations backup center, for which Client agrees to pay the charges indicated in Section 2 above.

(c) <u>Forms and Supplies</u>. Client assumes and will pay the charges for all customized forms, supplies, and delivery charges. Custom forms ordered through Fiserv will be subject to a 15% administrative fee for warehousing and inventory control.

(d) <u>Communication Lines</u>. Client shall procure from Fiserv all data communication lines necessary to access the Account Processing Services.

(e) <u>Third Parties</u>. In the event any of Fiserv's obligations under this Schedule are directly or indirectly dependent on entering into an agreement with a third party, or otherwise directly or indirectly dependent on the actions or omissions of a third party, Fiserv shall use commercially reasonable efforts to enter into such agreement on reasonable terms and conditions, or use commercially reasonable efforts to obtain such action, and provided that Fiserv has complied with the terms hereof and if Fiserv is unable to enter into an agreement with such third party or obtain such action, Fiserv's obligations hereunder shall immediately terminate and Fiserv shall not be liable for its inability to perform such obligations and shall be relieved of any such obligations hereunder.

### eFichency Services Schedule to the ASP Services Exhibit

**1.  Description of Services.**  Fiserv agrees to provide to Client the following Services ("eFichency Services").

- (a) This electronic file management system ("eFichency System") (i) allows Fiserv to store and index Client's electronic files which are generated by the Fiserv System (as listed in Section b below) and (ii) allows Client to store, index and purge the eFichency Documents (as defined in Section b below). Client may view and perform searches on such information through Client's utilization of the Internet.

- (b) The electronic files which may be accessed by Client using the eFichency System include:

    - (i)  all standard or optional reports provided under the Account Processing Services Schedule ("Host System Reports"),

    - (ii)  if applicable, all standard output reports provided as part of the EFT Services Schedule ("EFT Reports"), and all standard output reports provided as part of CredIT Card Processing Schedule ("CredIT Reports"), and

    - (iii)  all imaged documents either (A) scanned and loaded by Client, (B) imported into the eFichency System by Client or (C) imported electronically by Fiserv on Client's behalf through a separate Service ("eFichency Documents").  The reports set forth in (i) and (ii) above are hereinafter referred to as the "eFichency Reports."

**2.  Fees.**  Client agrees to pay Fiserv the Fees set forth below for the eFichency Services.  The boxes marked below with an "X" indicate the Optional Services selected by the Client as of the Effective Date ("Selected Services").  Such Selected Services will be charged and paid by Client monthly at the rates set forth below, which shall be subject to modification as set forth in the Agreement and this Schedule.  If Client adds Selected Services after the Effective Date, Client shall pay Fiserv's then standard rates, unless otherwise agreed by the parties for such additional Services.  If, subsequent to the Effective Date, Client desires to add an Optional Service to the Selected Services, Client will notify Fiserv which notice may be provided via email or orally and Client will purchase the new Service at Fiserv's then current standard charges, unless specified otherwise in this eFichency Services Schedule.  Notwithstanding Section 12(b) of the Agreement, upon receipt of a purchase or sales order or an amendment to the Agreement for such Service executed by Client, Fiserv and Client agree that such Service will then be deemed a Selected Service and be subject to the terms of this Schedule and the Agreement.

☒ Host System Reports Set-Up Fee:                                Previously paid

Provides Client i) access to the eFichency System, ii) the appropriate number of User ID's and passwords, iii) creation of User Security Profiles for each User ID, iv) standard and customary indexes, and v) Remote Training.

☒ Host System Reports Monthly Fee:

| | |
|---|---|
| ☐ 0 - 2,500 members | $150.00 |
| ☒ 2,501 - 5,000 members | $250.00 |
| ☐ 5,001 – 10,000 members | $500.00 |
| ☐ 10,001 - 25,000 members | $750.00 |
| ☐ Over 25,000 members | $975.00 |

☐ EFT Reports Set-Up Fee:                                $500.00 one-time

Provides Client (i) access to Client's EFT Reports via the eFichency System, and (ii) Fiserv's configuration and User Security Profiles for each User ID who will have access to the EFT Reports.

☐ EFT Reports Monthly Fee:

| | |
|---|---|
| ☐ 0 - 2,500 members | $50.00 |
| ☐ 2,501 - 5,000 members | $50.00 |
| ☐ 5,001 - 10,000 members | $75.00 |
| ☐ 10,001 - 25,000 members | $100.00 |
| ☐ Over 25,000 members | $100.00 |

☐ <u>CredIT™ Reports Set-Up Fee:</u>      $500.00 one-time

Provides Client (i) access to Client's CredIT Reports via the eFichency System, and (ii) Fiserv's configuration and User Security Profiles for each User ID who will have access to the CredIT Reports.

☐ <u>CredIT Reports Monthly Fee:</u>      $50.00

☐ <u>CredIT Reports Daily Transmission:</u>      $150.00 per month

☐ <u>eFichency Documents Set-up Fee:</u>      $3,500.00 one-time

Payment of the eFichency Documents fee provides Client access to all imaged documents either (i) scanned and loaded by Client or (ii) imported into the eFichency System by the Client or (iii) imported electronically by Fiserv on Client's behalf through a separate Service.

☐ <u>eFichency Documents Monthly Fee:</u>

| | |
|---|---|
| ☐ 0 - 2,500 members (15 gigabytes) | $250.00 |
| ☐ 2,501 - 5,000 members (15 gigabytes) | $250.00 |
| ☐ 5,001 - 10,000 members (25 gigabytes) | $500.00 |
| ☐ 10,001 - 25,000 members (75 gigabytes) | $750.00 |
| ☐ Over 25,000 members (Quote) | Quote |

☐ <u>eFichency Desktop Capture Set-up Fee:</u>      $250.00 one-time

☐ <u>Additional Storage (per 10 gigabytes):</u>      $100.00

If Client exceeds the number of gigabytes as listed in the chart above, Fiserv will increase the number of gigabytes by increments of 10. Client will be charged an additional $100.00 per month per 10 gigabyte increment.

3. **Hours of Operation.**

(a) Subject to scheduled maintenance, scheduled downtime and causes beyond the control of Fiserv, Fiserv will use reasonable efforts to cause the eFichency Services to be available to Client, 24 hours a day, 365 days per year.

(b) Fiserv will process eFichency Report information on a daily basis and Fiserv will use commercially reasonable efforts to make the eFichency Reports available to Client within 24 hours of the Fiserv System processing such information. In addition, Fiserv will use commercially reasonable efforts to make month-end and quarterly eFichency Report data available to Client within 48 hours of the Fiserv System processing such data.

4. **Additional Terms.**

(a) <u>Fiserv Responsibilities</u>. (i) Fiserv will provide to Client the appropriate number of user identifications ("User ID's") and passwords as requested by Client as of eFichency System Installation. The Client staff member whom Client designates as its system administrator will be one of those individuals issued a User ID and password by Fiserv (the "System Administrator").

(ii) Fiserv will work with the System Administrator to complete installation of the eFichency Services according to an implementation schedule agreeable to both parties. The eFichency Services will be deemed installed when Client has received User ID's (as defined in Section b(iii) from Fiserv and the eFichency Services are available for use by Client ("eFichency System Installation").

(iii) As soon as practicable, Fiserv will schedule Client to receive eFichency Services' "train-the-trainer" training for the System Administrator remotely via the telephone ("Remote Training").

(iv) During eFichency System Installation and pursuant to Client's direction, Fiserv will set-up eFichency System access restriction profiles for each User ID that will designate which of the eFichency Reports or eFichency Documents each User ID has been authorized by Client to access ("User Security Profiles").

(v) As soon as practicable upon receipt of a written request from the System Administrator, Fiserv may implement "add", "change", and/or "delete" actions concerning Client User ID's, including changes to passwords and User Security Profiles.

(viii) Fiserv will archive the eFichency Reports beginning on eFichency System Installation and continuing for 7 years thereafter or upon expiration or termination of the Account Processing Services Schedule, whichever comes first.

(b) Client Responsibilities. (i) In order to access the electronic files, Client will be responsible, at Client's expense, to acquire its own personal computers each of which will be equipped with industry standard browser software and the capability to access the Internet. Client acknowledges that access to eFichency Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources. Fiserv shall have no liability for failed access over public lines or compromised data delivered over such lines. Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client or Client's on-site systems and remote employee or affiliate access.

(ii) Client acknowledges and agrees that the eFichency System is the exclusive property of Fiserv and is subject to all of the protections set forth in Section 3 of the Agreement. Client will acquire neither title nor ownership rights to the eFichency System. Fiserv will disclose to Client only such information concerning the eFichency System which is necessary in order for Client to access the eFichency Services.

(iii) The System Administrator will (A) attend the Remote Training conducted by Fiserv, (B) control distribution of User ID's and passwords, and (C) possess the authority to request that Fiserv implement "add", "change", or "delete" actions for each User ID, which will include changes to User Security Profiles and passwords.

(iv) Client will be responsible for all communications costs associated with Client accessing the eFichency Services.

(v) Client will be responsible for the supervision, management and control of its use of the eFichency Services, including without limitation, implementing sufficient procedures to satisfy its requirements for the security and accuracy of data. Fiserv is entitled to rely upon and act in accordance with any instructions, guidelines or information provided by Client which is given by persons having actual or apparent authority to provide such instructions, guidelines or information.

(vi) If required, Client will provide at its own expense or procure from Fiserv a scanner ("Scanning Hardware") for the purpose of scanning the eFichency Documents into the eFichency System. In addition, Client will be responsible for the maintenance of the Scanning Hardware. If Client has elected to provide such Scanning Hardware itself, Fiserv shall provide Client with a list of compatible Scanning Hardware. Client agrees to pay Fiserv's then standard fee for certification of non-compatible Scanning Hardware.

(c) <u>Continued Access of Electronic Files</u>. Upon the expiration or termination of the Account Processing Services Schedule for any reason, Client may choose one of the following options with respect to the eFichency Services:

(i) <u>Option One</u>: Client may terminate this Schedule and for the requisite charge, Fiserv will, upon written request from Client, provide Client, in Fiserv's then current electronic media format, with copies of those electronic files received by Client from Fiserv during the term of this Schedule. Such electronic media will contain a "read only" version of the electronic files. The fee for this service will be based upon Fiserv's then current charges and will include the purchase of a limited use license for the eFichency System. Such license will include other terms and conditions which will be agreed upon by the parties at that time; or

(ii) <u>Option Two</u>: eFichency Services will be modified to provide Client with the ability to continue to view existing electronic files on the eFichency System. Client may (A) continue to update the electronic files by transmitting them via Client's current data processor or (B) the dates of such eFichency Reports will be as of the date of eFichency System Installation until the date of expiration or termination of the Account Processing Services Schedule. The fee for these services will be based upon Fiserv's then current rates.

(iii) <u>Option Three</u>: Client may elect to purge all electronic files received by Client from Fiserv during the term of this Schedule. Should Client fail to provide Fiserv with written notice at least 90 days after termination or expiration of the Account Processing Services Schedule of its intent to choose Option One or Option Two, Fiserv will automatically purge all electronic files received by Client from Fiserv during the term of this Schedule.

(d) <u>Customization</u>. Should Client request customization or modifications to the eFichency System in addition to the standard eFichency Services, such customization or modification will be considered an optional service and billable at Fiserv's then standard rates.

### ID Verification Services Schedule
### to the ASP Services Exhibit

1. **Description Services.**  Fiserv agrees to provide to Client the following Services ("ID Verification Services").

- ID Verification (IDV)
- Web Delivery of New Account Data
- Processing of the New Account Data
- Maintenance of the Data Repository
- OFAC Screening, bi-weekly
- FinCEN Screening
- Reports
- Administrative Functionality
- Training

(a) Fiserv Responsibilities:

    (i)   Client acknowledges and understands that use of ID Verification Services may be subject to unavailability due to congestion or overload on public circuits supplied by third parties or due to downtime by such third parties.

    (ii)  Fiserv agrees to provide second level support to Client if the event Client is unable to resolve issues related to the normal operation of ID Verification Services adequately during normal business hours.  Fiserv's sole obligation is to provide timely response to Client for requests for support.

    (iii)  Fiserv itself or through its vendor or subcontractor (in the sole discretion of Fiserv), will provide reasonable free training via the Internet during the term of this Schedule, provided that such training is provided by Fiserv's vendor or subcontractor during such term.

(b) Client Responsibilities:

    (i)   Client will be responsible for sending new customer data for OFAC and FinCEN validation in order to research and resolve any possible matches.  A message is returned that provides a "pass" or "fail" answer on the information submitted.  If a "fail" message is returned, the message includes a notation of the information that did not match or the name submitted appeared on one more of the government lists.  Client also has the option to log on to ID Verification Services via the Internet to research and resolve any possible matches for OFAC.

    (ii)  Client will review and approve all applications for use of ID Verification Services, using any validation procedures Client determines.

    (iii)  Client is, and shall remain, solely and exclusively responsible for any and all financial risks associated with its employees and/or customers (as applicable) accessing ID Verification Services.

    (iv)  Client will use, and will instruct its employees to use ID Verification Services in accordance with such reasonable rules as may be established by Fiserv from time to time as set forth in any materials furnished by Fiserv to Client.

    (v)  Client is expressly prohibited from extending any warranty or warranties on Fiserv's behalf to any person.

(vi) Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client's on-site systems and remote employee or affiliate access.

(vii) Merger Responsibilities: In the event of any merger or acquisition involving Client, Client agrees to promptly notify Fiserv. Fiserv will inform Client whether Client is responsible for transitioning the data of such merged or acquired institution, whether Fiserv will coordinate with its third party subcontractor on Client's behalf to transition such data into Fiserv's third party subcontractor's database, or if such data cannot be merged and transitioned into Fiserv's third party subcontractor's database and Client will be required to maintain two databases. In the event Client is required to notify Fiserv's third party subcontractor or any other third party, Client agrees to do so promptly and to relieve Fiserv from any and all liability or obligations arising directly or indirectly out of any delay or failure by Client or any failure of such data to transition into Fiserv's third party subcontractor's database. In the event Fiserv will coordinate data transition on Client's behalf, Fiserv shall provide Client with notice (which may be via email) of all amounts due Fiserv and Client agrees to pay such amounts, provide Fiserv with all requested assistance and information that may be needed in connection with such data transition, and to promptly enter into any agreements or amendments required by Fiserv or its third party subcontractor.

2.  **Fees.** Client shall pay Fiserv the fees set forth below for ID Verification Services. Fiserv shall invoice Client monthly in advance for fixed fees and recurring monthly fees, and on a current basis for all transaction and customer fees and third party services. Except as otherwise set forth in this Schedule, fees may be increased annually on the anniversary date of this Schedule upon 30 days' notice to Client.

One-Time Set-up Fee (includes Training):                    Previously paid

Monthly Recurring Fees:

Client's ID Verification Services Monthly Fee is calculated utilizing the chart set forth below:

| Current Tier | Number of Members | Monthly Fee* | Free IDV Transactions per Month | IDV Transaction Fee Charged after Free IDV's |
|---|---|---|---|---|
| ☒ | 0 – 10,000 | $100.00 | 10 | $2.50 each |
| ☐ | 10,001–30,000 | $150.00 | 20 | $2.50 each |
| ☐ | Over 30,000 | $200.00 | 30 | $2.50 each |

*Includes the following:
- Unlimited OFAC Screenings
- Unlimited 314(a) Screenings
- Maintenance of the Data Repository
- Administrative Functionality
- Annual Maintenance

3.  **Hours of Operation.** Fiserv shall provide use of ID Verification Services that Fiserv controls in a 7 x 24 environment, subject to reasonable downtime for maintenance. Fiserv will attempt to limit its downtime to those hours of operation least impacted by customer usage, when such options are available.

4.  **Additional Terms.**

(a) <u>Equipment and Supplies</u>. Client shall obtain and maintain at its own expense such equipment as may be necessary or appropriate to facilitate the proper use and receipt of ID Verification

Services. Client shall be responsible for paying for all supplies to be used in connection with ID Verification Services.

(b) <u>Effect of Termination.</u>  In the event Fiserv's agreement with its third party service provider shall expire or terminate for any reason, Fiserv may terminate this Schedule immediately upon notice to Client.  Upon any termination or expiration of this Schedule, Client shall continue to be responsible for fees related to ID Verification Services unless Fiserv receives written notice to delete Client files from the Fiserv System.  Client shall continue to be responsible for all data communications and modem fees until (i) all circuits are disconnected and the telecommunications company ceases invoicing Fiserv; and (ii) Fiserv receives back all equipment supplied to Client by Fiserv.

(c) <u>Trademark and Content License.</u>  Client hereby grants to Fiserv a non-exclusive, non-assignable right to use Client's trademarks, trade names, service marks, service names (collectively, "Trademarks"), and Content (as defined below) in connection with Fiserv's provision of ID Verification Services.  Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier, and affiliates against any claims or actions arising out of Fiserv's use of Trademarks and/or Content.

(d) <u>Client Warranties.</u>  Client represents and warrants that (a) any work, content, or identification verification ("Content") provided to Fiserv is either original or that Client has the legal right to provide such Content; and (b) Content does not impair or violate any intellectual property or other rights of Fiserv or any third party.  Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier, and affiliates against any claims or actions arising out of any breaches of the foregoing; or any improper use of information gathered through any co-branded site as part of ID Verification Services.  Client acknowledges that Fiserv shall not monitor, review, or approve any Content.

(e) <u>Technical Support.</u>  Client agrees to provide all end user technical support.  Fiserv will provide "second level" Technical Support to Client's user support representatives.  "Technical Support" means Fiserv will take an initial technical support inquiry from Client and initiate the troubleshooting process.  Fiserv shall use commercially reasonable efforts to determine the source of technical support issues, and to remedy the issue.  Technical Support is available as described in this Schedule.

(f) During the term of this Schedule, Fiserv may provide written notice to Client that it is offering a product and/or service of substantially similar functionality and use as the services provided herein.  Following such notice, either party may elect to transition Client to such product or service, subject to (i) providing the other party with written notice at least 60 days prior to such transition and (ii) Fiserv and Client entering into a separate Schedule to the Agreement for such product and/or service.

(g) <u>Third Party Required Terms and Conditions.</u>  Notwithstanding anything set forth in the Agreement, the following additional terms and conditions shall apply to use of ID Verification Services provided pursuant to this Schedule.  These Third Party Required Terms and Conditions are required by Fiserv's third party subcontractor and shall not be modified by the Client.  In the event of a conflict between the Third party Required Terms and Conditions of this Schedule and the Agreement, these Third Party Terms and Conditions shall control, unless otherwise specified below; provided however, to the extent comparable provisions in the Agreement are more restrictive than those set forth below, the provisions in the Agreement shall control.

(i) <u>License of Information.</u>

A. <u>General.</u>  Fiserv grants a non-exclusive license to Client to use the information provided through ID Verification Services only as described in this Schedule.  Client may reproduce or store the information obtained through ID Verification Services solely for each of their respective

uses in accordance with this Schedule, and will hold all information licensed under this Schedule in strict confidence and will not reproduce, reveal or make it accessible in whole or in part, in any manner whatsoever, to any others unless required by law, or unless Client first obtains Fiserv's written consent; provided, however, that Client may discuss information in a report with the subject of that report when Client has taken adverse action against the subject based on the report. Client will not provide a copy of the report to the consumer, except as may be required or permitted by law or approved in writing by Fiserv, except in any state where this contractual prohibition would be invalid. Client will not interpret the failure of Fiserv to return information regarding the consumer's identity as a statement regarding that consumer's identity, because that failure may result from one or more factors unrelated to identity validation. Client warrants that it is the end user of the information.

B. Restrictions. Client will not use any alert messages generated by ID Verification Services as a part of the eligibility determination for granting credit, insurance or employment. Client acknowledges that any such alert message is merely an indication that the application information should be further verified prior to a business decision. Client may only use the data from ID Verification Services for the specific transaction for which the alert message is provided. ID Verification Services is proprietary and Client may not use ID Verification Services as a component of any database or file built or maintained by Client. Client understands that the information supplied by ID Verification Services may or may not apply to the consumer who has made the application to Client.

C. International Supplier. Client may from time to time request ID Verification Services for consumers having identity information accumulated outside of the United States. If that information is available under the terms of this Schedule, Fiserv may facilitate Client's access of that information through a Fiserv affiliated company, affiliate or independent supplier (collectively, "International Supplier"). Client's receipt and use of that information will be subject to all the terms of this Schedule and this Schedule will be deemed to be a separate agreement between Client and the applicable International Supplier directly, with Fiserv having entered into that agreement with Client on behalf of the International Supplier. Client further recognizes that Fiserv will merely facilitate access to the information. In addition, Client acknowledges that the receipt and use of that information may be governed by various laws and regulations of the country, state or province in which the subject resides or from which the information originates, and Client will comply with those applicable laws and regulations regarding Client's receipt and use of that information.

D. Third Party Beneficiary. Notwithstanding anything set forth in the Agreement to the contrary, Client agrees that Fiserv's third party subcontractor is designated as a third party beneficiary of this Schedule as it relates to the use of the subcontractor's software and/or access to the subcontractor's system as contemplated by the terms of this Schedule.

(ii) Compliance with Laws. Client will comply with the provisions of the Fair Credit Reporting Act (the "FCRA"), the Federal Equal Credit Opportunity Act, as amended (the "ECOA"), all state law counterparts of them, and all applicable regulations promulgated under any of them, including, without limitation, any provisions requiring adverse action notification to the consumer. In addition the Client will comply with the following:

A. Client Use Limitations. Client acknowledges that Fiserv and/or any third party involved in the provision of ID Verification Services or information contained therein ("Third Parties") retain all right, title and interest under applicable contractual, copyright and related laws in the databases and materials contained therein used to provide ID Verification Services, and Client shall not use such materials in any manner that is inconsistent with such right, title and interest and notify Fiserv of any threatened or actual infringement thereof. Client shall notify Fiserv immediately of any changes to the information contained in Client's application for ID Verification Services. Client shall at no time represent that it is the

authorized agent or representative of Fiserv or any Third Party providing information or any part of ID Verification Services.

B.  Client Use Limitations – Fair Credit Reporting Act.  Client agrees not to use ID Verification Services or any data, which is the subject of this Schedule, for consumer credit purposes, consumer insurance underwriting, employment purposes, tenant screening purposes, or for any other purpose(s) covered by the FCRA or other similar and applicable law.

C.  Client Use Limitations – Driver's Privacy Protection Act.  Client agrees to use ID Verification Services and any data received therefrom, in strict conformance with the Federal Drivers Privacy Protection Act (18 U.S.C. Section 2721 et seq.) or other similar and applicable law.

D.  Client Use Limitations – Gramm-Leach-Bliley Act.  Client agrees to use ID Verification Services and any data received therefrom, which is the subject of this Agreement, in strict conformance with the Gramm-Leach Bliley Act (U.S.C. Title 15, Chapter 94, Section 6801 et seq.) and similar state statutes, if applicable.

E.  Misuse of Services or Information.  Client agrees to take appropriate measures so as to protect against the misuse of ID Verification Services.  Client agrees that Fiserv may, if it is concerned about Client's use, temporarily suspend Client's access for up to 10 business days pending an investigation of such use.  Client agrees to cooperate fully with any and all investigations.  If misuse is confirmed through investigation, Fiserv may immediately terminate this Agreement.

F.  Changes in Use or Access.  Fiserv may, at any time, impose restrictions and/or prohibitions on the Client's use of ID Verification Services or certain data.  Client understands that such restrictions or changes in access may be the result of a modification in Fiserv or one of its Third Parties' policies, a modification of Third Party agreements, a modification in industry standards, or a change in law or regulation.  Upon written notification by Fiserv of such restrictions, Client agrees to comply with such restrictions.

(iii)  Data Security.  This Section (iii) applies if Client will access ID Verification Services via personal computer or direct access terminals (in either case, a "DAT"). Client will: (a) restrict access to each DAT to those employees who have completed training offered by Fiserv, (b) inform users of ID Verification Services of Client's FCRA and other obligations with respect to the access and use of consumer reports, (c) ensure that neither trained operators nor other employees will obtain any reports for personal reasons or provide them to any third party, and (d) take all necessary measures to prevent unauthorized use of the DAT by any persons other than the trained operators for permissible purposes. Those measures will include limiting knowledge of the Client number(s), access codes, and telephone access number(s) Fiserv provides, and any DAT user passwords Client may use, to train DAT operators and other employees with a need to know, changing the user passwords on the DAT at least every 180 days, or sooner if an employee trained to operate the DAT is no longer responsible for accessing reports, or if Client suspects an unauthorized person has learned the password, and using all security features in the software and hardware Client uses to access ID Verification Services or the Fiserv System. Client will immediately notify Fiserv if Client suspects or knows of unauthorized access to the Fiserv System. Client will not ship hardware or software between Client's locations or to third parties without deleting all Client number(s), access codes, telephone access number(s) and user passwords. Client will inform trained DAT users and other employees with a need to know that unauthorized access to consumer reports may subject them to civil and criminal liability under the FCRA punishable by fines and imprisonment. Fiserv may suspend or terminate DAT service to Client at any time Fiserv reasonably believes that Client has violated this Section.

(iv) <u>Indemnification</u>. Client hereby agrees to protect, indemnify, defend and hold harmless Fiserv and all Third Parties from and against any and all costs, claims, demands, damages, losses and liabilities (including actual attorneys' fees) arising from or in any way related to use of information by Client (or any third party receiving such information from or through Client) furnished by or through ID Verification Services by Fiserv to the extent such costs, claims, demands, damages, losses or liabilities (including actual attorneys' fees) do not result from the grossly negligent acts or omissions of Fiserv or Third Parties. Provisions hereof related to release of claims, indemnification, use of information and ID Verification Services, payment for ID Verification Service and disclaimer of warranties shall survive any termination of this Agreement.

(v) <u>Warranty, Indemnification and Limitation of Liability</u>. NEITHER FISERV, ITS AFFILIATES, DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, CONTRACTORS, LICENSORS, VENDORS OR THIRD PARTIES, NOR ANY PERSONS OR ENTITIES AFFILIATED WITH THE FOREGOING (COLLECTIVELY, "FISERV AFFILIATES") SHALL BE LIABLE TO CLIENT OR TO ANY PERSON CLAIMING THROUGH CLIENT OR TO WHOM CLIENT MAY HAVE PROVIDED SERVICE-RELATED INFORMATION FOR ANY LOSS, DAMAGE OR INJURY ARISING OUT OF OR CAUSED, IN WHOLE OR IN PART, BY THEIR NEGLIGENT ACTS OR OMISSIONS IN PROCURING, COMPILING, COLLECTING, INTERPRETING, REPORTING, COMMUNICATING, OR DELIVERING THE SERVICE OR IN OTHERWISE PERFORMING THIS AGREEMENT. CLIENT ACKNOWLEDGES THAT EVERY BUSINESS DECISION INVOLVES THE ASSUMPTION OF RISK, AND THAT THE FISERV AFFILIATES DO NOT UNDERWRITE THAT RISK IN ANY MANNER WHATSOEVER. IF, NOTWITHSTANDING THE FOREGOING, LIABILITY CAN BE IMPOSED ON A FISERV AFFILIATE, THEN CLIENT AGREES THAT THE AGGREGATE LIABILITY FOR ANY AND ALL LOSSES, DAMAGES OR INJURIES ARISING OUT OF SAME, REGARDLESS OF THE CAUSE (INCLUDING NEGLIGENCE), AND REGARDLESS OF THE NATURE OF THE LEGAL OR EQUITABLE RIGHT CLAIMED, SHALL NOT EXCEED, IN THE AGGREGATE, THE FEES PAID FOR THE SERVICE TO WHICH THE CLAIM RELATES BY CLIENT DURING THE 6 MONTHS IMMEDIATELY PRECEEDING THE FIRST SUCH CLAIM. CLIENT FURTHER COVENANTS AND PROMISES THAT IT WILL NOT SUE A FISERV AFFILIATE FOR AN AMOUNT GREATER THAN SUCH SUM EVEN IF THE FISERV AFFILIATE WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGE, CLIENT SHALL NOT SEEK NOR BE ENTITLED TO RECOVER PUNITIVE, CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY OR SPECIAL DAMAGES, INCLUDING LOST PROFITS IN ANY SUIT AGAINST A FISERV AFFILIATE. THE FOREGOING WAIVERS, DISCLAIMERS AND LIMITATIONS OF LIABLITY ARE PROVIDED BY CLIENT IN CONSIDERATION OF THE RECEIPT OF THE ID VERIFICATION SERVICES AT THE RATES CHARGED UNDER THIS AGREEMENT, WHICH ARE FAR LOWER THAN WOULD BE AVAILABLE TO CLIENT ABSENT THOSE WAIVERS, DISCLAIMERS AND LIMITATIONS OF LIABILITY. THE FISERV AFFILIATES DO NOT MAKE, AND FULLY DISCLAIM, ANY WARRANTY, EXPRESS OR IMPLIED. THE FISERV AFFILIATES DO NOT GUARANTEE OR WARRANT THE CORRECTNESS, COMPLETENESS, CURRENTNESS, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE SERVICE OR THE COMPONENTS THEREOF. IN NO EVENT SHALL AN FISERV AFFILIATE BE LIABLE FOR ANY DIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, HOWEVER ARISING, INCURRED BY CLIENT.

(vi) <u>Confidentiality</u>. Client agrees to hold in confidence all information received through ID Verification Services, except as specifically permitted in this Schedule. Each recipient of confidential information will hold those materials and that information in strict confidence, and will restrict its use of those materials and that information to the purposes anticipated in this Schedule. If the law or legal process requires recipient to disclose confidential and proprietary data, recipient will notify the disclosing party of the request. Thereafter, the disclosing party may seek a protective order or waive the confidentiality requirements of this

Schedule or the Agreement, provided that recipient may only disclose the minimum amount of information necessary to comply with the requirement. Recipient will not be obligated to hold confidential any information from the disclosing party which (a) is or becomes publicly known, (b) is received from any person or entity who, to the best of recipient's knowledge, has no duty of confidentiality to the disclosing party, (c) was already known to recipient prior to the disclosure, and that knowledge was evidenced in writing prior to the date of the other party's disclosure, or (d) is developed by the recipient without using any of the disclosing party's information. Each party will indemnify, defend and hold harmless the other from and against any direct and actual loss, cost, liability and expense (including reasonable attorneys' fees) resulting from the indemnifying party's breach of this Section (vi).

(vii) <u>Assignment</u>. Client may not assign its rights or obligations under this Schedule without the written consent of Fiserv; provided, however, unless prohibited by the terms of the Agreement, Client may assign or transfer this Schedule, by operation of law or otherwise, to any person that becomes the successor entity of Client, in connection with a change of control (which shall include a direct or indirect transfer of all or substantially all of Client's stock or assets to a third party, a merger, reorganization or other such transaction, or any such transaction by a parent corporation of Client) and Fiserv consents to such assignment or transfer in advance. Subject to the foregoing, this Schedule shall be binding upon all successors and assigns. The legal successor(s) resulting from such aforementioned assignment or transfer shall succeed to and be bound by this Schedule. Fiserv may subcontract any of the work, services, or other performance required of Fiserv under this Schedule without the consent of Client.

(viii) <u>Termination</u>. If the continued provision of all or any portion of ID Verification Services becomes impossible, impractical, or undesirable due to a change in applicable federal, state or local laws or regulations, as determined by Fiserv in its reasonable judgment, Fiserv may either (a) cease to provide the affected ID Verification Services service within, or pertaining to persons residing within, the affected jurisdiction, or (b) establish new prices which will apply to the affected ID Verification Services service when provided or delivered within, or pertaining to persons residing within, the affected jurisdiction, which prices will be reasonably calculated to cover the costs incurred by Fiserv in complying with the applicable laws or regulations and will become effective on the date specified in such notice unless Client objects in writing, in which case Fiserv may exercise its rights under clause (a) above. Fiserv will attempt to provide written notice of its actions as far in advance of the effective date as is reasonably possible under the circumstances.

### Virtual Branch® Services Schedule
### to the ASP Services Exhibit

1.  **Description of Services.** Fiserv will provide to Client the following services:  (a) online banking, (b) bill payment, (c) new member applications, (d) loan applications, (e) website design and hosting, and (f) online statements and notices by Internet or Internet-enabled devices (the foregoing are collectively, "Virtual Branch Services").  Where Virtual Branch Services require connectivity to an account processing system, the services are offered only for an institution utilizing a Fiserv supported account processing system.  Functionality and processes will vary between account processing systems.

(i)  Fiserv Responsibilities:

   A.  Fiserv will provide Virtual Branch Services directly to Client's customers ("Members") on Client's behalf.  In the course of providing Virtual Branch Services to a particular Member, Client authorizes Fiserv to choose the most effective method to process a Member payment instruction, including, without limitation, electronic, paper or other draft means.

   B.  Fiserv will be responsible for storage, telecommunications, appropriate operating system maintenance, and security monitoring of Virtual Branch Services at Fiserv's site.

   C.  Fiserv will present all new web site builds to Client for review prior to going live to its Members.

   D.  Fiserv shall retain ownership of all designs and software code prepared by Fiserv for the web site.

(ii)  Client Responsibilities:

   A.  Client will provide and make available to Fiserv appropriate management and technical personnel of Client who will work with Fiserv and will perform, on a timely basis, the activities referenced in this Schedule, the responsibility for which is required therein to be assumed by Client.  In addition, Client will cooperate with Fiserv through making available such personnel, management decisions, information, authorizations, approvals and acceptances in order that Fiserv's performance of the Virtual Branch Services may be properly, timely and efficiently accomplished.

   B.  Client will complete and perform any and all validation procedures it determines, in its sole discretion, are necessary to authenticate the identity and ensure the financial integrity of a particular Member or potential Member.

   C.  Client will provide necessary hardware, software and connectivity to access the Virtual Branch systems.

   D.  Client acknowledges that Fiserv will not monitor, review or approve any Client Content (as defined below), including without limitation grammar, spelling, copyrighted information and claims regarding services and products. Client shall review the web site and promptly inform Fiserv if there are any errors or inaccuracies in the web site.

   E.  With respect to all Virtual Branch Services, Client is and shall remain solely and exclusively responsible for any and all financial risks, including, without limitation, insufficient funds, associated with each Member accessing the Virtual Branch Services. Fiserv shall not be liable in any manner for such risk.

   F.  Client acknowledges that if it does not select Primary Customer Service offered by Virtual Branch, Client will provide level 1 technical support to its Members.

G. Client agrees that it will use, and will instruct its Members to use, the Virtual Branch Services in accordance with such rules as may be established by Fiserv from time to time. Client will be responsible for the supervision, management and control of its use of Virtual Branch Services, including without limitation, implementing sufficient procedures to satisfy its requirements for the security and accuracy of data. Fiserv is entitled to rely upon and act in accordance with any instructions, guidelines or information provided by Client which is given by persons having actual or apparent authority to provide such instructions, guidelines or information.

H. Client shall execute separate agreements with third party vendors as directed by Fiserv when needed for Virtual Branch Services including, but not limited to, check image presentment, estatements, credit bureau information and identity verification services. Any charges from these third parties are the responsibility of Client. Client is responsible for contacting the third party vendors in the event of technical issues. If Fiserv resources are required for consultation or to resolve issues caused by the third party vendor, and those issues are determined to not be caused by Fiserv, Fiserv will bill Client at Fiserv's then current hourly rate.

J. Client acknowledges that it and its Members are responsible for obtaining access to the site through an Internet service provider, using current third party supported Internet browser software, including any associated plug-in applications and support software and having email access for system notifications.

K. Client acknowledges that it has certain notice requirements to its Members in connection with its receipt of Virtual Branch Services. Client acknowledges and agrees that it is responsible for ensuring its Members are provided with any applicable privacy disclosures prior to such Members' enrollment and use of the Virtual Branch Services. Client further acknowledges and agrees that it shall comply with all applicable laws, rules and regulations in connection with its receipt of Virtual Branch Services.

L. With respect to bill payment services, tax payments and court ordered payments ("Exception Payments") may be scheduled through bill payment services; however, such payments are scheduled at Client's risk and in no event shall Fiserv be liable for any claims or damages resulting from the scheduling of Exception Payments. Client acknowledges that Fiserv has no obligation to research or resolve any claim resulting from an Exception Payment. All research and resolution for any misapplied, mis-posted or misdirected payments shall be the sole responsibility of Client.

M. With respect to bill payment services, Client shall designate a bank settlement account such as a Federal Reserve account or a separate clearinghouse account ("Settlement Account") which will be used by Fiserv to settle, in the aggregate, all financial transactions requested via the Virtual Branch Services by each Member. In certain instances, financial transactions requested via the Virtual Branch Services will be settled utilizing a Member's account as opposed to the Settlement Account. Client shall be solely responsible for the auditing and balancing of Member accounts.

N. With respect to online statements, Client agrees that it will, or will cause a third party, if applicable, to provide statement data to Fiserv, or Fiserv's designated third party subcontractor, in the format specified by Fiserv, or by such Fiserv third party subcontractor, on a monthly and/or quarterly basis, or such other basis as determined by Fiserv or such Fiserv third party subcontractor, in order for Fiserv to provide Client with the online statement services pursuant to this Agreement. Notwithstanding anything to the contrary in the Agreement, in the event Fiserv, or Fiserv's third party subcontractor, does not receive the statement data as set forth herein, Fiserv will not be responsible for any failure to provide to

the Client or Member the online statement services and Fiserv may terminate this Schedule for cause pursuant to the terms of the Agreement.

   O. With regard to online statements and notices, Client will be solely responsible for the accuracy and integrity of the information reflected on each of its Members' statements and notices.

   **2.**  **Fees.** Client agrees to pay Fiserv the fees set forth below for Virtual Branch Services. Such fees will be invoiced to Client on a monthly basis unless otherwise indicated. Client agrees to pay Fiserv the Fees set forth below for the Virtual Branch Services. The boxes marked below with an "X" indicate the Optional Services selected by the Client as of the Effective Date ("Selected Services"). Such Selected Services will be charged and paid by Client monthly at the rates set forth below, which shall be subject to modification as set forth in the Agreement and this Schedule. If Client adds Selected Services after the Effective Date, Client shall pay Fiserv's then standard rates, unless otherwise agreed by the parties for such additional Services. If, subsequent to the Effective Date, Client desires to add an Optional Service to the Selected Services, Client will notify Fiserv which notice may be provided via email or orally and Client will purchase the new Service at Fiserv's then current standard charges, unless specified otherwise in this Virtual Branch Services Schedule. Notwithstanding Section 12(b) of the Agreement, upon receipt of a purchase or sales order or an amendment to the Agreement for such Service executed by Client, Fiserv and Client agree that such Service will then be deemed a Selected Service and be subject to the terms of this Schedule and the Agreement.

|  | Onetime | Monthly |
|---|---|---|
| ☒ **Virtual Branch Online Banking** | | |
| ☒ Online Banking Site | | |
|   Implementation Fee | Previously paid | |
|   Monthly Fee | | $0.00 per month |
| Usage Options (user based or flat-rate based) | | |
| ☐ Users | | |
| ☒ Flat-rate monthly pricing [1] | | $675.00 per month |
| ☒ **Virtual Branch Bill Pay** | | |
| Implementation Fee | Previously paid | |
| Monthly Fee | | $150.00 per month |
| User Fee | | $5.65 per user per month |
| Transaction Fee | | $0.10 per transaction per month |
| Payment Investigation Fee | | $25.00 each |
| Stop Payment Request Fee | | $25.00 each |
| Payment Funding Fee (based on method funded): [2] | | |
|   ACH: | | |
|   AP or File-Based Processing: | | |
|   Fiserv EFT Network: | | $75.00 per month |
| **Virtual Branch Links** [3] | | |
| For each Link to non-Virtual Branch system | | |
|   with interface currently in Virtual Branch library | $1,500.00 | $150.00 per month |
|   with interface NOT currently in Virtual Branch library | Quote | Quote |
| ☐ Check Image Retrieval | | |
| ☐ Electronic Statement | | |

☐ Credit Card Information System
☐ Check Reorder
☐ Mortgage Information System

☒ **Enhanced Authentication** [4]

| | |
|---|---|
| Implementation Fee | Previously paid |
| User Fee (bill annually) | $0.30 per User per year |

☐ **Account to Account Transfer Program (A2A)**

Implementation                                         $1,000.00
Annual Fee Based on Number of Virtual Branch Users (Unlimited Transactions) [4]

| | |
|---|---|
| User Fee (1 – 1,000 users) | $1,500.00 per year |
| User Fee (1,001 – 3,000) | $2,500.00 per year |
| User Fee (3,001-5,000) | $4,000.00 per year |
| User Fee (5,001-10,000) | $7,500.00 per year |
| User Fee (10,001-20,000) | $10,000.00 per year |
| User Fee (Over 20,000) | Quote |

☐ **Account Create**

| | | |
|---|---|---|
| Base Version Implementation Fee | $3,000.00 | |
| Monthly Fee | | $150.00 per month |
| | | $3.00 per application |

**Account Create add-on packages** [6]

| | | |
|---|---|---|
| ☐ Core Integration Package | $3,000.00 | $150.00 per month |
| | | $2.50 per application |
| ☐ ID Verification / Credit Bureau Data Package | $3,000.00 | $150.00 per month |
| | | $2.50 per application |
| ☐ New Account Funding Package | $3,000.00 | $150.00 per month |
| | | $1.00 per application |
| ☐ Online Forms / PDF Package | $2,000.00 | $150.00 per month |
| ☐ Multiple Channels Package | $3,000.00 | $150.00 per month |
| ☐ Personalized Training Package | $2,000.00 | |

**Other**

| | | |
|---|---|---|
| ☐ Online Check Deposit [7] | $1,000.00 | $150.00 per month |
| ☐ Account Alerts | $1,000.00 | $150.00 per month |
| ☐ Spanish Language Support for Online Banking | $1,000.00 | $150.00 per month |
| ☐ Web Trends Reporting | | $1,000.00, $150.00 per month |
| ☐ Intuit's WebConnect [8] | | $1,000.00, $0.00 per month |
| ☐ Intuit's DirectConnect [8] | $2,500.00 | $250.00 per month |
| | | $0.15 per logon |
| ☐ Virtual Branch SAS70/SSAE16 | | $350.00 per year |
| ☐ Demographic update to/from APS [7] | $1500.00 | $150.00 per month |
| ☐ ACH Origination Form | | $250.00 per year |
| ☐ ACH Origination Form with delivery to APS [7] | | $500.00 per month |
| ☐ Online Banking Standard Conversion | | |
| ☐ Bill Pay Standard Conversion | | |
| ☐ 60-Day Complimentary Support | | |

☐ **Virtual Branch Primary Member Support** *(includes Phone, Live Chat and Secure Messaging)*

| | | | |
|---|---|---|---|
| Implementation Fee | | $1,000.00 | |
| Monthly minimum | | | $250.00 per month |
| Primary Customer Support Usage Fees | | | |
|    Phone | | | $2.50 per call plus $2.50 per minute |
|    Live Chat | | | $10.00 per session |
|    Secure messaging | | | $10.00 per email |

☐ **Virtual Branch Complimentary Phone Support** [10]

| | | |
|---|---|---|
| Primary support via phone for 60-days post implementation | | $0.00 per month |

☐ **Virtual Branch Chat**

| | | | |
|---|---|---|---|
| ☐ $0 – 25M in assets | 20 seats | $1,000.00 | $125.00 per month |
| ☐ $26M – 50M in assets | 30 seats | $1,000.00 | $165.00 per month |
| ☐ $51M – 100M in assets | 40 seats | $1,000.00 | $235.00 per month |
| ☐ $101M – 200M in assets | 60 seats | $1,000.00 | $310.00 per month |
| ☐ $201M – 500M in assets | 80 seats | $1,000.00 | $460.00 per month |
| ☐ $501M – 750M in assets | 125 seats | $2,500.00 | $600.00 per month |
| ☐ $751M – 1B in assets | 200 seats | $2,500.00 | $750.00 per month |
| ☐ $1B – 2B in assets | 300 seats | $2,500.00 | $1,000.00 per month |
| ☐ Over $2B in assets | | Quote | Quote |
| ☐ Additional seats | | | Quote |

☐ **Virtual Branch WebSite Design and Hosting**

Development and Hosting

| | | |
|---|---|---|
| ☐ 5 page site | $1,325.00 | $80.00 per month |
|    ☐ Additional pages | $225.00 | $10.00 per 5 pages per month |
| ☐ 10 page site | $1,950.00 | $80.00 per month |
|    ☐ Additional pages | $170.00 | $10.00 per 5 pages per month |
| ☐ 20 page site | $3,100.00 | $100.00 per month |
|    ☐ Additional pages | $130.00 | $10.00 per 5 pages per month |
| ☐ Over 26 pages | Quote | Quote |

Additional items if applicable

| | | |
|---|---|---|
| ☐ Hosting Transfer | Quote | |
| ☐ SSL Certificate [12] | Quote | |
| ☐ Additional Domain Name | | $25.00 per year |
| ☐ Additional Email Account | | $6.00 per month |
| ☐ Host a former domain name | | $100.00 per year |
| ☐ Support beyond included 30 minutes/month | | $125.00 per hour |

☒ **Virtual Branch Online Statement Services** [7]

☒ **Statement Express** [13]

| | | |
|---|---|---|
| Interface Fee (if needed) | Quote | |
| One-time Set-up Fee | Previously paid | |
| Monthly Minimum | | $100.00 per month |
| Per Statement Fee (with 6 months retention) | | $0.30 per loaded Statement |
| Per Statement Fee (per 6 months additional retention) | | |
| Custom Statement Backer Creation (FOS only) | | |

☐ **Virtual Branch Statements Archive** [13]

| | | |
|---|---|---|
| Interface Fee (if needed) | Quote | |
| One-time Set-up Fee | $1,500.00 | |
| Monthly Minimum | | $150.00 per month |
| Per Statement Fee (with 6 months retention) | | $0.30 per loaded Statement |
| Per Statement Fee (per 6 months additional retention) | | $0.02 per loaded Statement |

☐ **Virtual Branch Online Electronic Notices** [6] [14]

| | | |
|---|---|---|
| Interface Fee (if needed) | Quote | |
| One-time Set-up Fee | $1,500.00 | |
| Monthly Fee | | $150.00 per month |
| Electronic Notices | | $0.02 per alert sent |

☐ **Virtual Branch Loan Delivery Services** [15]

| | | |
|---|---|---|
| ☐ Implementation for up to five loan types | $3,650.00 | |
| Monthly Fee | | $125.00 per month |
| ☐ Configuration of up to 5 additional loan types | | $375.00 each |
| ☐ Implementation for decisioning | | Quote |
| Loan applications: | | $3.00 per application submitted |
| | | $2.50 per application delivered |
| | | $2.50 per decision request |
| | | $1.00 per credit bureau request |

**Connectivity (In-house credit unions)** [16]

| | | |
|---|---|---|
| ☐ Dedicated Frame Relay Circuit | $5,000.00 | |
| Monthly Fee | | Quote |
| ☐ Point-to-Point Virtual Private Network (VPN) | $1,500.00 | |
| Monthly Fee | | Quote |

**Virtual Branch Professional Services**          $250.00 per hour

**Notes**

(1)   Based on current number of Client's members, additional services include Fiserv bill pay, mobile and/or online statements

(2)   Not all funding methods are available for each AP system.  While Virtual Branch does not have additional charges for funding through EFT, EFT or the AP system may charge extra for this funding method.

(3)   Links availability may vary by core account processing system. Virtual Branch will only interface to third-party systems in a single-sign-on model where the third-party has a published, web-facing API.  Virtual Branch reserves the right to not integrate with specific third-party or Client-hosted products. Virtual Branch does not link to products to supply account data (other than for authentication purposes), or to retrieve account data for use within Virtual Branch.  Examples of links:  Check images, check reorder, electronic statements, credit cards, source capture, loan origination systems, cross-sell engines, etc.

(4)   Annual Fee is due in advance and is based on the number of Virtual Branch Users on the anniversary date.

(5)   Add-on package prices for implementation, monthly maintenance and per application are cumulative

(6)   This option may require integration between the account processing system and Virtual Branch.

(7)   This option requires development work by the account processing system to enable the capability.

(8)   Activation of Intuit WebConnect and / or DirectConnect requires additional considerations:
  a.   Client responsible for agreement and associated fees from Intuit.
  b.   Intuit requires certification for each unique online banking and core account processing system integration for both WebConnect and DirectConnect.  If Virtual Branch and core account processing system integration has not been certified, certification fees may apply:

(9)   Charge for integration is per form.  Includes but is not limited to Stop Pay, WireXchange and ACH Origination

(10)  Conditions apply to 60-day customer support that may be offered to new Virtual Branch clients and including but not limited to adherence to the Virtual Branch Conversion Communication Plan.  Support hours for complimentary support are only available on business days only, does not include after hours or weekends.

(11)   One rate applies to all registered users based on the access method option made available by the Client for users.

(12)   SSL Certificate charges are subject to change at any time

(13)   Statement Express is offered to Charlotte, CUBE, CubicsPlus and Portico APS clients.   Virtual Branch Statements Archive is offered to CUSA, OnCU and Reliance clients. Per statement charges are assessed the month the statement is loaded, a statement loaded with 12 month retention would incur a charge of $0.30 + ($0.02 x 6) for a total charge of $0.42 per statement.

(14)   Virtual Branch Electronic Notices are currently available for Portico APS clients.

(15)   Loan Delivery Services functionality and pricing models vary from system to system.  Additional fees from other services as part of the loan delivery process may apply (examples:  the AP system, loan origination system, scoring system, credit bureau, etc.).  Per application pricing is cumulative.

(16)   Connectivity pricing is approximate.  Contact Virtual Branch to obtain a quote for a specific location.  Client side equipment may be required and is the responsibility of the Client.

3. **Hours of Operation.**  Fiserv will use reasonable efforts to make the Virtual Branch Services available to Client 24 hours a day, 7 days a week, subject to scheduled maintenance, scheduled downtime and causes beyond the reasonable control of Fiserv.

4. **Additional Terms.**

(a) Customer Support.
(i) Primary.  Fiserv will provide all end user customer support in connection with Virtual Branch Services.  Fiserv will take an initial technical support inquiry from Client and Client's Members and initiate the troubleshooting process.

(ii) Secondary. Fiserv will take an initial technical support inquiry from Client and initiate the troubleshooting process.  Client will provide all end user customer support and Fiserv will provide "second level" Customer Support to Client's user support representatives.

(iii) Fiserv will use commercially reasonable efforts to determine the source of Customer Support issues, and to remedy the issues. Customer Support is currently available Monday through Friday from 6:00 am to 10:00 pm CT and 7:00 am to 4:00 pm CT on Saturdays.  No Customer Support will be available on Thanksgiving Day, Christmas Day and New Years Day.  Customer Support is available on all other Federal holidays, with Saturday hours on Memorial Day, Independence Day and Labor Day.  Customer Service hours are subject to change.

(b) Equipment and Supplies.  Client shall obtain and maintain at its own expense such equipment as may be necessary or appropriate to facilitate the proper use and receipt of Virtual Branch Services.  Client shall be responsible for paying for all supplies to be used in connection with Virtual Branch Services.

(c) Effect of Termination.  Upon any termination or expiration of this Schedule, Client shall continue to be responsible for fees related to the Virtual Branch Services unless Fiserv receives written notice to delete Client Files from the Fiserv System.  Client shall continue to be responsible for all data communications and modem fees until (i) all circuits are disconnected and the telecommunications company ceases invoicing Fiserv; and (ii) Fiserv receives back all equipment supplied to Client by Fiserv.

(d) Client Trademark and Content License.  Client hereby grants to Fiserv a non-exclusive, non-assignable right to use Client's trademarks, tradenames, service marks, and service names (collectively, "Client Trademarks"), and Client's work, content or information ("Client Content") in connection with Fiserv's provision of Virtual Branch Services.  Client will indemnify, defend, and hold harmless Fiserv, its officers, directors, employees, designated suppliers, and affiliates against any claims or actions arising out of Fiserv's use of Trademarks and/or Client Content. Fiserv acknowledges that all of the goodwill associated with the use of the Client Trademarks shall be owned by Client.

(e) <u>Fiserv Trademark and Content License.</u> (i) Fiserv hereby grants to Client a non-exclusive, non-assignable right to use the trademark related to Virtual Branch Services owned by Fiserv, (the "Fiserv Trademark"), and Fiserv work, content, or information ("Fiserv Content") in connection with Client's receipt of Virtual Branch Services. Fiserv will, at its expense, defend Client against any third party claim or action alleging that the Fiserv Trademark and/or Fiserv Content infringes a United States patent, trademark, or other proprietary right of such third party and shall pay all amounts payable by Client under any judgment, verdict, or court order entered by a court of competent jurisdiction or settlement agreed upon by Fiserv in any such claim; provided that Client (A) promptly notifies Fiserv of such claim, (B) grants Fiserv the sole right to control the defense and disposition of such claim, and (C) provides Fiserv with reasonable cooperation and assistance in the defense and disposition of such claim. The obligations set forth in this subsection are Fiserv's entire liability and Client's sole and exclusive remedy for any infringement claim with regard to the Fiserv Trademark or Fiserv Content. Client acknowledges that all of the goodwill associated with the use of the Fiserv Trademark shall be owned by Fiserv.

(ii) Client shall use the Fiserv Trademark only in the manner and with appropriate legends prescribed at any time by Fiserv. Client shall not use any other trademark, tradename, service mark, service name or logo in combination with the Fiserv Trademark without the prior written approval of Fiserv, except if required by law. Client shall not use any other trademark, trade name, service mark, service name or logo similar to or resembling the Fiserv Trademark that is likely to cause confusion, deception or mistake.

(f) <u>Client Warranties.</u> Client represents and warrants that (i) any Client Content provided to Fiserv is either original, or that Client has the legal right to provide such Client Content; and (ii) Client Content doesn't impair or violate any intellectual property or other rights of Fiserv or any third party. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated supplier and affiliates against any claims or actions arising out of any breaches of the foregoing; or any improper use of information gathered through any co-branded site as part of Virtual Branch Services. Client acknowledges that Fiserv shall not monitor, review or approve any Client Content. Client acknowledges that access to Virtual Branch Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources.

(f) <u>Marketing.</u> Client agrees to market, promote and sell the Virtual Branch Services to Client's Members ("Members") and potential members. In addition, and as may be reasonably requested, Client will assist Fiserv and its authorized representatives in marketing, promoting and selling the Virtual Branch Services to its Members and potential members.

(g) <u>Service Modifications.</u> In connection with Fiserv's provision of Virtual Branch Services, either party may terminate Virtual Branch Services, or any part thereof, immediately upon notice to the other party of any legislative, regulatory, or judicial (i) impairment of the provision thereof; and/or (ii) restrictions or conditions that would materially affect the integrity thereof.

(i) <u>Communication Lines.</u> Client acknowledges that access to Virtual Branch Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources. Fiserv shall have no liability for failed access over public lines or compromised data delivered over such lines and assumes no liability or control over the Internet access of Client's on-site systems and remote employee or affiliate access. Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet.

## Equipment Exhibit to the Master Agreement

**1.   Equipment.**  Components of hardware being purchased by Client through Fiserv are described in each Schedule attached hereto and executed by the parties ("Equipment").  Client understands that Fiserv is acting as an independent sales organization representing each manufacturer or supplier (each, a "Supplier") identified in each Schedule.

**2.   Payment.**  Client shall pay Fiserv 50% of the total price for Equipment specified in each Schedule upon execution of such Schedule, and 50% upon delivery of Equipment to the site or sites designated on each Schedule (collectively, "Installation Site").  Client shall be responsible for all freight charges associated with shipment of Equipment from Supplier or Fiserv, as the case may be, to the Installation Site.  In the event of any price increase by a Supplier, Fiserv shall accordingly increase the prices for Equipment.

**3.   Fiserv Obligations.**  The ability of Fiserv to obtain Equipment may be subject to availability and delays due to causes beyond Fiserv's control.  Fiserv shall promptly place any orders submitted under this Exhibit with each Supplier and shall, at Client's direction, request expedited delivery whenever available.

**4.   Insurance.**  Client shall be responsible for appropriate property insurance for all Equipment, whether Client-owned or Fiserv-owned, within Client's premises.

**5.   Delivery and Installation.**  (a) Delivery.  On Client's behalf, Fiserv shall arrange for delivery of Equipment to the Installation Site on or about the date requested by Client ("Delivery Date").  In the absence of shipping instructions, Fiserv shall select a common carrier on Client's behalf.

(b) Installation.  Fiserv shall arrange for the installation of the items of Equipment for the installation fees listed on each Schedule.  Client shall not perform any installation activities without Fiserv's written consent.  Fiserv or its designee shall have full and free access to Equipment and the Installation Site until installation is completed.  If a suitable installation environment is not provided by Client, then Fiserv shall be required to perform only as many normal installation procedures as it deems to be practicable within the available facilities.  Installation of Equipment will take place during normal Fiserv business hours, Monday through Friday, exclusive of Fiserv holidays, unless otherwise agreed by Fiserv.

(c) Installation Environment.  Client shall provide a suitable installation environment for Equipment as specified by Fiserv or its agents and any and all other specifications provided to Client by Supplier or Fiserv.  Unless Fiserv agrees to so provide, Client shall also be responsible for (i) furnishing all labor required for unpacking and placing Equipment in the desired location for installation; and (ii) physical planning including, but not limited to, floor planning, cable requirements, and safety requirements in accordance with the installation manual and any and all applicable building, electrical, or other codes, regulations, and requirements.  All such physical planning shall be completed on or before the Delivery Date

**6.   Shipment and Risk of Loss.**  All prices shown on each Schedule are F.O.B. Supplier's plant.  All transportation, rigging, drayage, insurance, and other costs of delivery of Equipment to the Installation Site shall be paid by Client.  Risk of loss shall pass to Client upon shipment.

**7.   Title to Equipment.**  Title to all Equipment shall remain with Supplier or Fiserv, as the case may be, until all payments are made by Client and, until such time, Client agrees that it shall not sell, transfer, pledge, or otherwise dispose of such items without Fiserv's prior written consent.

**8.   Security Interest.**  Client grants Fiserv a security interest in each component Equipment and the proceeds thereof until the purchase price due Fiserv is paid in full.  Client shall execute any instruments or documents Fiserv deems appropriate to protect the security interest and, in any event, this Exhibit shall constitute a financing agreement within the meaning of Article 9 of the Uniform Commercial Code and a copy of this Exhibit may be filed at any time after signature by Fiserv as a financing statement for that purpose.  In the event of default in payment or other breach by Client, Fiserv shall have all rights and remedies of a

secured creditor upon default as provided by applicable law. Fiserv shall, at its sole expense, file releases for any financing statements recorded pursuant to this Exhibit promptly upon receipt of final payment.

**9.** **Acceptance.** Equipment shall be deemed to have been accepted when it has passed either Fiserv's or Supplier's standard post-installation test procedures at the Installation Site.

**10.** **Warranties.** Fiserv warrants that Client will acquire good and clear title to all hardware items comprising Equipment free and clear of all liens and encumbrances. Fiserv assigns to Client all warranties Supplier has granted to Fiserv with respect to Equipment as set forth in each Schedule. Client agrees to all of the terms and conditions applicable to those warranties and acknowledges that:\

(i) neither Supplier nor Fiserv warrants that use of Equipment will be uninterrupted or error free; and

(ii) Supplier's warranties, and the assignment of such warranties by Fiserv to Client, shall not impose any liability on Fiserv due to the services or assistance provided to Client by Fiserv with respect thereto.

**11.** **Liability.** Notwithstanding the limitation of liability provisions set forth in the Agreement, Fiserv's aggregate liability for a default relating to Equipment shall be limited to the amount paid by Client to Fiserv for the applicable Equipment.

**Professional and Development Services Exhibit**
**to the Master Agreement**

1.  **Professional and Development Services.**  Fiserv will provide Client with modifications, enhancements, and other customized programming services related to Services and Fiserv's proprietary Products ("Development Services"), and professional services related to Deliverables ("Professional Services", and together with Development Services, "P&D Services") for particular projects (each, a "Project") as described in individual Schedules executed by the parties and attached hereto.  P&D Services shall be performed in accordance with the procedures set forth below.

a. Business Requirements List.   Client shall provide Fiserv with all necessary information concerning its requirements for P&D Services in a business requirements list ("Business Requirements List").  Fiserv shall review and suggest revisions to such Business Requirements List on a timely basis. The parties shall mutually agree in writing on the final Business Requirements List for any Project.

b. Functional Specifications.  Development Services shall be based upon specifications created by Fiserv and approved by Client ("Functional Specifications") as provided below:

(i)     Fiserv shall develop Functional Specifications based on the Business Requirements List for Client's written approval.  Fiserv shall not be obligated to perform any further development work until Functional Specifications are approved in writing by Client, which approval shall not be unreasonably withheld or unduly delayed.

(ii)    Modifications, changes, enhancements, conversions, upgrades, or additions to the agreed upon work beyond those stated in Functional Specifications shall be added only upon mutual written agreement.  In the event the parties agree to add any such items, the Functional Specifications and applicable Project Plan (as defined below) shall automatically be modified to the extent necessary to allow for the implementation or provision of the items.

c. Project Plan.  Fiserv shall develop a project plan for each Project based on the Business Requirements List (for Professional Services Projects) or Functional Specifications (for Development Services Projects) (each, a "Project Plan").  Each Project Plan shall contain a listing of the nature and timing of tasks for the project to be performed by each party, including the development of an acceptance test if applicable as set forth below.   Any dates for performance are dependent upon the timely performance by each party of the tasks assigned under the Project Plan for such P&D Services.  Fiserv shall use commercially reasonable efforts to meet the dates set forth in the Project Plan.  Modifications and changes to the Project Plan shall be only by mutual written agreement of the parties.

d. Acceptance Test.  Fiserv shall prepare an acceptance test for the testing of deliverables provided under each Schedule for Development Services ("Acceptance Test").   Client shall timely review the proposed Acceptance Test.  The Acceptance Test shall be adopted upon Client's written approval, which shall not be unreasonably withheld or delayed.

e. Acceptance Testing.   Each Development Services Project shall be deemed successfully completed upon the earlier of completion of the Acceptance Test or by live operation and use of the deliverables provided under the applicable Schedule in Client's business for a period of 10 days, unless Client notifies Fiserv promptly in writing (and with reasonable particularity) upon conclusion of the Acceptance Test or earlier upon discovery of any failure of the Project deliverable to operate in accordance with the Functional Specifications (each, a "Specification Non-conformity") disclosed by such testing or use. Fiserv shall correct any such Specification Non-conformities within a reasonable time of receipt of Client's notice.

## 2.   P&D Fees.

a. Client shall pay Fiserv fees and other charges for each Project as set forth in each Schedule ("P&D Fees"). Any estimates of P&D Fees and completion dates are referenced solely for the purpose of allowing Client to plan its budgets and schedules based upon information available at the time the Schedule is executed. Daily or hourly rates quoted in a Schedule, if any, will be valid for 3 months from the effective date of such Schedule. Thereafter, they will be subject to change by Fiserv on 30 days' prior written notice to Client. A higher rate may be applied for an individual whose support to Client has advanced to a new job grade or after 30 days' notice if such individual's general development warrants a job upgrade by Fiserv.

b. Fees for any installation, conversion, or training services to be provided by Fiserv for a Project shall be specified in each Schedule.

c. Unless otherwise set forth in a Schedule, P&D Fees shall be paid 50% upon execution of such Schedule and 50% upon Project completion.

d. If applicable, Fiserv reserves the right to (i) increase the applicable maintenance fees for the Deliverable to which a Development Services Project relates, and (ii) charge Client at Fiserv's then current professional services rates for any necessary retrofitting services when releases of the Fiserv System(s) to which a Development Services Project relates are made generally available.

**3.   Project Termination.** At Client's sole option, Client may terminate any Project upon 30 days' prior written notice to Fiserv, provided that Client agrees to pay Fiserv for any outstanding P&D Fees for P&D Services rendered and any out-of-pocket expenses incurred prior to the effective date of termination. In no event shall Fiserv be liable for refund of any P&D Fees already paid by Client.

**4.   Rescheduling.** If Client is unable to provide access to required facilities or personnel or is unable to meet its tasks assigned on a Project Plan in a timely manner, Fiserv will endeavor to reschedule tasks to minimize non-productive time. All such non-productive time is chargeable to Client, provided that if such non-productive time is expected to be significant, Fiserv will endeavor to reassign its personnel to other suitable work. If Fiserv is successful in such reassignment efforts, Client will not be charged for the time personnel were reassigned.

## Software Products Exhibit to the Master Agreement

1.  **Software Products.**  The parties shall add individual Schedules to this Exhibit for Fiserv's license of software Products and provision of related software maintenance services to Client.  The terms of this Exhibit shall apply to any such Products and related services covered by Schedules to this Exhibit.

2.  **Defined Terms.**

(a) "Computer System" means the Client-supplied computer equipment and specified operating environment required for operation of the Software when installed, as identified in each Schedule and/or in the Documentation.

(b) "Documentation" means the technical end-user documentation for the Software, as delivered by Fiserv to Client with the Software, as may be updated by Fiserv from time to time as part of Maintenance Services.

(c) "Enhancements" means modifications made to Software that add program features or functions not originally within the Software and that are provided upon payment of additional license fees.

(d) "Location" means only the Client premises identified as such on each Schedule.

(e) "Maintenance Fee" means the annual (unless otherwise specified) fee set forth in each Schedule for Maintenance Services.

(f) "Maintenance Services" means maintenance services described in Section 5 below.  Maintenance Services are available only with respect to the current release of Software.

(g) "Non-conformity" means a failure of Software to perform in substantial accordance with the functions described in the Documentation, for which Client has provided sufficient information for Fiserv to replicate on a computer configuration that is comparable to the Computer System and under Fiserv's control.

(h) "Professional Service Rates" means Fiserv's then current hourly or daily rates for Fiserv's provision of implementation, conversion, and/or training services to Client in connection with the Software.

(i) "Software" means the standard, unmodified computer programs in object code (unless otherwise specified on the applicable Schedule), as specified in each Schedule.

(j) "Software System" means the Software and Third Party Software.

(k) "Third Party" means any party other than Fiserv and its agents and subcontractors, and Client.

(l) "Third Party Software" means the object code version of software that is owned or licensed by Third Parties and provided to Client by Fiserv.  Third Party Software shall be identified as such on the applicable Schedule hereto.  Third Party Software does not include Third Party code (if any) that Fiserv embeds in the Software.

(m) "Total License Fee" means the total sum specified in each Schedule to be paid by Client for the license to Use the Software granted to Client hereunder.  Any fees for Enhancements, modifications, or other additions to the Software are not included in the Total License Fee.

(n) "Updates" means, when and if made available through Maintenance Services to Fiserv's other clients at no additional charge, changes made to correct Non-conformities, to maintain compatibility with new system software releases, or to improve existing features and functions within the Software, but does not include Enhancements or other new modules or products for which Fiserv charges a license fee.  Updates provided hereunder are subject to all license rights and related restrictions set forth in this Exhibit with respect to the Software, but provision of Updates does not commence new warranty periods for the Software.

(o) "Use" means copying or loading any portion of Software from storage units or media into any equipment for the processing of data by Software, or the operation of any procedure or machine instruction utilizing any portion of either the computer program or instructional material supplied with Software at the

Location. Use is limited to type of operations described in the Documentation solely to process Client's own work, and is subject to any other restrictions or limitations set forth in each Schedule. Use specifically excludes any service bureau, time-share, training, or facilities management services to Third Parties without Fiserv's prior written consent and Client's payment of additional fees in accordance with mutually agreed terms. Use further excludes any right to enhance, modify, improve or create derivative works of the Software unless any such right is expressly granted in the applicable Schedule.

(p) "Warranty Period" means the period of time ending 90 days after the effective date of the applicable Schedule.

3. **License.**

(a) Fiserv agrees to furnish Software to Client and hereby grants to Client a non-exclusive, nontransferable, non-sublicensable, perpetual (subject to all termination provisions set forth in this Exhibit and in the Agreement) license to Use the Software at the Location on the designated Computer System, subject to any additional limitations as to number of accounts, number of users, asset size, and other matters as specified in each Schedule. Any rights not expressly granted in this Exhibit are expressly reserved.

(b) Upon 60 days advance notice to Fiserv, Client may change the Location if Client transfers its operations to a new location within the same country. Client shall contemporaneously uninstall/delete the Software from the prior Computer System following such transfer to the alternative Client location. Assistance by Fiserv related to the transfer shall be chargeable at the Professional Service Rates plus any out-of-pocket expenses.

(c) Client shall not copy any portions of the Software System, except that Client may copy reasonable quantities of any Documentation, and may utilize non-production copies of the Software at the Location for archive, back-up, or emergency restart purposes or to replace copy made on defective media. The original, and all copies of Software and Documentation, and all parts thereof, Fiserv's property and shall include Fiserv's copyright and other proprietary notices.

(d) Client shall maintain any such copies and the original at the Location and one Client archive site in the same country ("Archive Site"). Client may transport or transmit a copy of Software from the Location or the Archive Site to another location in the same country as the Location for back-up use when required by Computer System malfunction in an emergency or disaster situation, provided that (a) Client must promptly inform Fiserv of the emergency or disaster (but in no event later than five (5) days following the commencement of such use), (b) Client must stop using such copy promptly after the Computer System and facility affected by the emergency or disaster is restored, and (c) the copy or original is destroyed or returned to the Location or Archive Site when the malfunction is corrected.

(e) Client shall not decompile, disassemble, or otherwise reverse engineer the Software System.

(f) Client shall obtain and maintain at its own expense such data processing and communications equipment and supplies as may be necessary or appropriate to facilitate the proper use of the Software System. Client is responsible for undertaking the proper supervision, control and management of its use of the Software, including: (i) assuring a proper Computer System configuration, and (ii) following industry standard procedures for the security of data, accuracy of input and output, and back-up plans, including restart and recovery in the event of hardware or software error or malfunction.

(g) Third Party Software is provided to Client under the following supplemental terms:

   (i) Use of Third Party Software shall be restricted to use as part of the Software System.
   (ii) Third Party Software is provided "as is", and neither Fiserv nor Third Party Software owners shall be liable for any damages, whether direct, indirect, incidental, or consequential arising from the use of Third Party Software.
   (iii) Publication of benchmark tests of Third Party Software is permitted only in a writing signed by an authorized officer of Fiserv and the Third Party Software owner.
   (iv) Third Party Software owners are hereby designated as third party beneficiaries of this Exhibit as it relates to their software.

(v) Fiserv will not provide maintenance or support for Third Party Software, but agrees to pass through to Client any Third Party Software warranties provided by the applicable Third Party Software owner, to the extent Fiserv is able to do so without negatively impacting or diminishing its contractual rights with such Third Party Software owner.

## 4.  Professional Services Terms.

(a) Implementation, conversion, and/or training services to be provided by Fiserv in connection with the Software, including the fees for such services, are set forth in each Schedule.

(b) Any other professional services, development services, or operational support services requested by Client in connection with the Software shall be provided by Fiserv in accordance with additional terms set forth in a separate exhibit to be added to the Agreement.

## 5.  Maintenance Services Terms.

(a) During each annual period for which Client has paid the Maintenance Fee, Fiserv will provide the following Maintenance Services to Client:

(i) Telephone support during normal business hours for reasonable operator support to Client's employees duly trained in the Use of the Software.  If telephone support requests are excessive or made outside of Fiserv's normal business hours, Client will be charged the Professional Service Rates.

(ii) Software program fixes or workarounds with respect to Non-conformities will be provided within a reasonable period of time following receipt of notice from Client.  Client agrees to provide Fiserv with reasonable assistance and information in connection therewith.

(iii) Updates will be provided to Client and shall be installed by Client within the time frame specified by Fiserv.  Training for Updates may be offered to Client at the Professional Service Rates.

(b) The initial term for Maintenance Services shall begin upon the effective date of the applicable Schedule and shall continue for a period of time set forth in the Schedule.  Thereafter, Maintenance Services shall automatically renew for successive 1-year terms at Fiserv's then current fees for all modules then licensed, unless either party provides written notice of non-renewal to the other party at least 90 days prior to expiration of the then current term.

(c) Fiserv may utilize remote diagnostic software and dial-up telephone lines in providing Maintenance Services.

(d) Should Fiserv's review of the Non-conformity indicate, in Fiserv's reasonable opinion, that the reported problem is not a Software defect but is due to other problems, including without limitation input not in accordance with the Documentation, Client's abuse or misuse of the Software System, a modification or addition to the Software System not performed by Fiserv, Client's failure to properly maintain the Computer System, or Client's failure to install the required current system software release, Update, fix or workaround as instructed by Fiserv, then:

(i) Client agrees to reimburse Fiserv for the related costs of work performed by Fiserv in investigating the problem at the Professional Service Rates, and

(ii) At Client's request, Fiserv shall advise Client whether Fiserv can correct or assist in resolving such problem, and the terms under which Fiserv shall undertake the same.  Upon acceptance by Client, Fiserv shall correct or assist in resolving the problem in accordance with such terms.

(e) Maintenance Fees shall be payable annually in advance.  Maintenance Fees shall be subject to annual increases commencing in the second year of the maintenance term upon 30 days written notice to Client, provided that any such annual increase shall not exceed 10%.  Maintenance Fees may also be subject to increase following: (i) changes in accounts processed, user seats, or other license limitations set forth in the applicable Schedule, or (ii) delivery of new Software releases, Enhancements, or custom Software modifications or additions provided by Fiserv as a result of Client-requested development services.

(f) Network-related problems and errors in non-production environments are not covered under Maintenance Services. If Fiserv provides such services, or any other maintenance services beyond those specified in this Section, Client shall pay for such services at the Professional Service Rates.

## 6. Equipment Terms.

(a) If Client agrees to purchase from Fiserv any components of the Computer System, such purchase shall be in accordance with terms specified in a separate exhibit to be added to the Agreement. If Fiserv is to provide installation services for the Computer System, such services and related fees shall be set forth on the applicable Schedule.

(b) Fiserv shall not be responsible for the provision of any maintenance or repairs to the Computer System or of any parts or replacements for the Computer System.

(c) Notwithstanding the limitation of liability provisions set forth in the Agreement, Fiserv's aggregate liability for a default relating to any Third Party equipment or Third Party Software shall be limited to the amount paid by Client to Fiserv for the applicable equipment or software.

## 7. Performance.

(a) Client shall give Fiserv access to the Location, Software System, and Computer System as necessary to enable Fiserv to provide services hereunder and shall make available information, facilities, and personnel reasonably required by Fiserv for the performance of its obligations hereunder.

(b) Client agrees to train current and future support staff employees on Software technical and user operations, and shall require employees to complete ongoing training to maintain minimal proficiency.

(c) Work in determining the nature of any problem or in making Software corrections, amendments, or additions may be carried out at Fiserv premises or the Location, at Fiserv's option.

(d) Upon Fiserv's request, Client shall provide Fiserv with written certification of the following relating to Client's Software Use: (i) total number of Software copies and Documentation related thereto; (ii) total number and location of workstations and servers on which the Software is installed, operated, or accessed; and (iii) total number of accounts, users, or other measurement of Software use for the licensing restrictions set forth in the applicable Schedule. Fiserv reserves the right to audit such certification pursuant to paragraph (e) below.

(e) Client shall permit Fiserv's authorized representatives at all reasonable times during Client's normal hours of operation to audit Client's Use of the Software (such audit may occur at Client's premises) to determine that the provisions of this Exhibit and the Agreement are being faithfully performed. Any such audit shall be conducted in such a manner as to minimize the disruption to Client's business and/or the Use of the Software. If such audit reveals any misuse by Client, Client shall immediately terminate such use unless Fiserv otherwise agrees in writing to allow correction of the misuse by payment of appropriate additional fees. If such noncompliance by Client is material, Client shall also pay Fiserv its costs of conducting the audit.

## 8. Warranties.

(a) Fiserv warrants that, during the Warranty Period, the Software will perform without the occurrence of a Non-conformity when operated on the Computer System and in compliance with the Documentation, this Exhibit, and the Agreement. Fiserv will provide replacements or corrections to Software that does not so perform where such failure is material, provided Fiserv is notified in writing of such failure during the Warranty Period. This warranty shall not apply if the Non-conformity results from modification to the Software by Client or any Third Party, use of the Software in combination with non-Fiserv provided software, or by incorrect Use. Client acknowledges that the Software System is designed to operate on the Computer System and that the warranties given by Fiserv are conditional upon the procurement and maintenance by Client of the Computer System in accordance with the then current specified configuration.

(c) If the Software has been delivered by Fiserv on physical media, Fiserv warrants the media to be free from material physical defects for a period of ninety (90) days after delivery by Fiserv. Fiserv will replace the

copy provided on defective media or deliver the Software via an alternate method selected by Fiserv, provided Fiserv is notified in writing of such defective media with such 90-day period.

(d) Fiserv warrants that the Maintenance Services and professional services provided under this Exhibit shall be performed in a professional and workmanlike manner. Client shall notify Fiserv in writing of any alleged warranty defect within thirty (30) days of the date the defective services were performed, and Fiserv shall correct the services at no additional charge to Client.

(e) FISERV DOES NOT WARRANT THAT ALL NON-CONFORMITIES CAN BE CORRECTED. IN NO EVENT SHALL FISERV BE LIABLE FOR LOSS OF OR DAMAGE TO CLIENT'S DATA RESULTING FROM CLIENT'S USE OF THE SOFTWARE. Client acknowledges that it is responsible for the results obtained from use of the Software, including without limitation the completeness, accuracy and content of such results. Client acknowledges further that it is responsible for independent verification and testing of any such results prior to using them in its business. The corrective actions provided by Fiserv as set forth in this Section 8 shall be Fiserv's entire liability and Client's sole and exclusive remedy for Fiserv's breach of any of the foregoing warranties.

9. **Infringement Claims.**

(a) Fiserv shall, at its expense, defend Client against any Third Party claim or action that alleges Use of the Software infringes a patent, copyright, or other proprietary right of such Third Party enforceable in the Location, and shall pay all amounts payable by Client under any judgment, verdict, or court order entered by a court of competent jurisdiction or any settlement agreed upon by Fiserv in such Third Party claim or action, provided that Client: (i) notifies Fiserv promptly in writing of any such claim, (ii) grants Fiserv sole right to control the defense and disposition of such claim, and (iii) provides Fiserv with reasonable cooperation and assistance in the defense and disposition of any such claim.

(b) If, as a result of such claim, Fiserv or Client is permanently enjoined from using Software by a final, non-appealable decree, or if Fiserv deems entry of such a decree to be reasonably likely, Fiserv, at its sole option and expense, may (i) procure for Client the right to continue to use Software or (ii) provide a replacement or modification for Software so as to settle such claim. If neither option (i) or (ii) is reasonably practical in Fiserv's sole opinion, Fiserv shall discontinue and terminate the applicable Schedule upon written notice to Client and shall pay to Client a pro rata refund of the Total License Fees paid by Client for the infringing Software, depreciated on a five-year straight line basis commencing on the effective date of the applicable Schedule for such Software. In making this determination, Fiserv will give due consideration to all factors, including financial expense.

(c) This Section 9 states Fiserv's entire liability and Client's sole and exclusive remedy for any claims of Software infringement or misappropriation, and Client hereby expressly waives any other liabilities on the part of Fiserv arising therefrom.

(d) Fiserv shall have no obligation under this Section 9 for any claim based upon:

(i) use of any part of Software in combination with materials or software not provided by Fiserv;
(ii) modifications made by Client or any Third Party;
(iii) use of other than the current release of the Software if infringement would have been avoided by use of such current release;
(iv) use of the Software other than in accordance with the Documentation, the Agreement, or this Exhibit, including without limitation Software use in violation of Section 3 above; or
(v) Fiserv's adherence to Client's specifications or instructions.

10. **Title.** Nothing in this Exhibit shall convey to Client any title to or any rights in Software, including but not limited to all proprietary rights or ownership of any modifications, enhancements, additions, updates, or other works based thereon or related thereto. Client's sole right in relation to Software or any such other works is to Use the same in accordance with the terms and conditions hereof.

## 11. Termination.

(a) The termination of the Agreement or this Exhibit or any individual Schedule hereto shall automatically, and without further action by Fiserv, terminate and extinguish the license(s) granted under the applicable Schedule and Fiserv's obligation to provide Maintenance Services with respect to such Software. Unless Client destroys all copies of the Software and provides written certification to Fiserv of said destruction within ten (10) days of receipt of written notice from Fiserv following termination of the applicable Schedule, Fiserv shall have the right to take immediate possession of the Software and all copies thereof wherever located without further notice or demand. In addition, upon termination for any reason other than Fiserv's uncured material default pursuant to Section 8(b)(i) of the Agreement: (i) all remaining Maintenance Fees through the end of the then current term of Maintenance Services shall be accelerated, and Client shall pay all such accelerated fees to Fiserv pursuant to the payment terms set forth in the Agreement; and (ii) all credits, rebates, discounts, and incentives granted on all Software and Maintenance Services shall be reimbursed to Fiserv, and any such credits, rebates, discounts, and incentives will no longer be granted through the remainder of the term for any continuing Maintenance Services.

(b) If Client violates Sections 3 or 12 of this Exhibit, or the confidentiality provisions of the Agreement in relation to Software, and fails to remedy any such breach within 5 days of notice thereof from Fiserv, Fiserv may terminate this Exhibit or the applicable Schedule without further notice.

(c) Client agrees to pay Fiserv's then current deconversion charges in connection with Client's deconversion from the Software System.

## 12. Non-Assignment.

(a) Client may not transfer or assign this Exhibit (or any individual Schedule) except upon Fiserv's prior written consent and payment of additional license fees for such transfer, if applicable, at Fiserv's then current rates. The sale of 50% or more of Client's common stock, the sale of all or substantially all of Client's assets, or any merger in which Client is not the surviving organization, shall be deemed a "transfer" subject to the provisions of this paragraph.

(b) If the organization to which a transfer subject to paragraph (a) above is proposed derives more than 5% of its gross revenues from providing service bureau, time share, computer software consulting services, computer software licensing, or computer hardware sales, Fiserv shall be under no obligation to consent to such transfer.

## 13. Export.

(a) Subject to restrictions regarding Location, territory, or other applicable geographic limitation set forth in a Schedule, Client shall not export, or re-export, directly or indirectly, any Software or any technical data derived therefrom to any country for which the United States Government or any agency thereof may require an export license or other government approval without first acquiring that license or approval.

(b) Client agrees that with respect to compliance with the U.S. export regulations: (i) Client will comply with such export regulations regarding the Software and technical data; (ii) Client will permit audits or reviews by Fiserv covering the Software and data export activity; (iii) Client understands that Fiserv reserves the right to refuse performance of its obligations hereunder in cases of noncompliance by Client of such export regulations; and (iv) Client will not engage in any transaction or activity with any party, firm, or company that is prohibited by applicable law.

**Sellstation Software Schedule**
**to the Software Products Exhibit**

**License Section:**

1.  <u>Software and License Fees</u>.  The following Software modules are hereby licensed to Client in exchange for Client's payment of the corresponding license fees, subject to the additional limitations set forth below.

|  | Sellstation |
| --- | --- |
| Total License Fee | Previously paid |
| User Seat (Workstation) Limitations | 12 workstations included; Licenses for additional workstations may be purchased at Fiserv's then standard rates |

2.  <u>License Fee Payment Schedule</u>.  All license fees set forth above shall be paid by Client in accordance with the following schedule:

   100% due upon delivery of Licenses

3.  <u>Location</u>.  The Location for this Schedule is as follows:

   106 Woodfield Drive, Greenville, PA 16125

4.  <u>Computer System</u>.  The Computer System for this Schedule is as follows:

   Client is responsible for providing a Computer System that meets the minimum configuration requirements recommended by Fiserv or as separately published and updated from time to time.

**Maintenance Services Section:**

1.  <u>Term</u>.  The initial term of Maintenance Services shall begin July 1, 2014 and shall continue for an initial term ending June 30, 2019.  Thereafter, Maintenance Services shall automatically renew for successive 5 year terms at Fiserv's then current fees for all modules then licensed, unless either party provides written notice of non-renewal to the other party at least 1 year prior to expiration of the then current term.

2.  <u>Maintenance Fees</u>.  The Maintenance Fee for the Software licensed under this Schedule is as follows:

   Sellstation   (12 x $50.00)          $600.00 per year

3.  <u>Additional Maintenance Terms</u>.  The following additional terms apply to Fiserv's provision of Maintenance Services for the Software licensed under this Schedule:

a.  Fiserv will bill Maintenance Fees for Sellstation as the lesser of either $50.00 per workstation or a maximum of a $1,000.00 per site.